IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

J.H. on behalf of her minor child J.P.,

        Plaintiffs,

vs.                                   No. CIV 12-0128 JB/LAM

BERNALILLO COUNTY and
J.M. SHARKEY, Bernalillo County Deputy,

        Defendants.

## UNSEALED MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on the County Defendants' Motion for Partial Summary Judgment No. II: Dismissal of Counts II, V and VI of Plaintiffs' Second Amended Complaint, filed July 30, 2013 (Doc. 93)("MSJ"). The Court held a hearing on September 6, 2013. The primary issues are: (i) whether the Court should grant summary judgment on the claim of Plaintiffs J.H. on behalf of her minor child J.P. that the Defendant J.M. Sharkey used excessive force when he handcuffed J.P. following an altercation at Roosevelt Elementary School

---

[1]On March 31, 2014, the Court issued an Order (Doc. 139) in which it granted the County Defendants' Motion for Partial Summary Judgment No. II: Dismissal of Counts II, V and VI of Plaintiffs' Second Amended Complaint, filed July 30, 2013 (Doc. 93), stating: "The Court will, at a later date, issue a memorandum opinion more fully detailing its rationale for this decision." Order at 1 n.1. This Memorandum Opinion is the promised opinion.

In its Sealed Memorandum Opinion, filed June 16, 2014 (Doc. 150)("Sealed MO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MO before the Court published a public version of the Sealed MO. See Sealed MO at 1 n.1. The Court gave the parties fourteen calendar days to provide notice of any proposed redactions. See Sealed MO at 1 n.1. In their Notice Regarding Redaction, filed June 24, 2014 (Doc. 151), Defendants Bernalillo County and J.M. Sharkey requested no redactions. The Plaintiffs J.H. on behalf of her minor child J.P. have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MO in an unsealed form. The only changes are: (i) the Court has corrected certain spacing in the footnotes and headings; (ii) the Court has, in the caption, corrected the initials of the Magistrate Judge now assigned to the case; and (iii) this footnote.

in Bernalillo County, New Mexico, thereby violating the Fourth Amendment to the Constitution of the United States of America; and (ii) whether the Court should grant summary judgment on the Plaintiffs' claims against Sharkey and Defendant Bernalillo County (collectively "the County Defendants") under the Americans with Disabilities Act, 42 U.S.C. §§ 12201-12213 ("ADA"). The Court will grant the MSJ.  The Court concludes that Sharkey did not violate J.P.'s rights under the Fourth Amendment, because he had probable cause to arrest J.P., and because, given her recent attack on a student and on a school employee, he was entitled to handcuff her.  The Court also concludes that, when Sharkey arrested J.P., he did not deprive her of any right that the ADA secures; further, there is no evidence that Bernalillo County acted with deliberate indifference, as the Plaintiffs must show to recover compensatory damages.  Accordingly, the Court will grant summary judgment as to the Plaintiffs' claims under the ADA.

## FACTUAL BACKGROUND

The Court will discuss the factual background in multiple parts.  First, the Court needs to point out several formatting notes.  The parties incorporated by reference most of the basic facts underlying the MSJ from Defendant J.M. Sharkey's Motion for Partial Summary Judgment No. I: Dismissal of Plaintiffs' Fourth Amendment Illegal Seizure Claim (Count I) Based on Qualified Immunity, filed July 30, 2013 (Doc. 92)("MSJ No. 1"), from the Plaintiff's Response to Defendant Sharkey's Motion for Partial Summary Judgment No. I: Plaintiff's Fourth Amendment Illegal Seizure Claim (Count I) Based on Qualified Immunity, filed August 16, 2013 (Doc. 103)("Response to MSJ No. 1"), and from the Reply to Plaintiffs' Response to J.M. Sharkey's Motion for Partial Summary Judgment No. I: Dismissal of Plaintiffs' Fourth Amendment Illegal Seizure Claim (Count I) Based on Qualified Immunity, filed September 3,

2013 (Doc. 115)("Reply to Response to MSJ No. 1").  The parties added only a few additional facts in the MSJ, in the Plaintiff's Response to Defendants' Motion for Partial Summary Judgment No. I: Dismissal of Counts II, V, and VI of Plaintiffs' Second Amended Complaint, filed August 16, 2013 (Doc. 102)("Response"), and in the County Defendants' Reply to Plaintiffs' Response to County Defendants' Motion for Partial Summary Judgment No. II: Dismissal of Counts II, V and VI of Plaintiffs' Second Amended Complaint, filed September 3, 2013 (Doc. 117)("Reply").  Where the parties took their facts from the more extensive discussion in MSJ No. 1, the Court will cite the MSJ No. 1, the Response to MSJ No. 1, and the Reply to Response to MSJ No. 1.  Where the parties added additional facts in the MSJ, the Court will cite the MSJ, Response, and Reply.

Confusion over the parties' names plagues the briefing.  Sometimes the parties -- including the Plaintiffs -- refer to J.H. on behalf of her minor child J.P. as a singular Plaintiff, see, e.g., Response to MSJ No. 1 at 1 ("Plaintiff, J.H. on behalf of J.P., a minor, hereby responds to" MSJ No. 1), and sometimes the parties refer to J.H. and J.P. as plural Plaintiffs, see, e.g., Response to MSJ at 2 ("Plaintiffs hereby respond to Defendants' 'undisputed' numerical material facts.").  Given that even the Plaintiffs' briefing does not clearly prefer one name over the other, the Court will refer to J.H. on behalf of her minor child J.P. in the plural as Plaintiffs, because the caption refers to them in the plural.  Where the Court quotes briefing, however, it will not change the parties' naming conventions, because changing the parties' naming conventions would confuse the reader more than it would illuminate.

The Court has also adopted a naming convention with respect to the County Defendants.  The Court refers to Sharkey and Bernalillo County collectively as "the County Defendants,"

because they refer to themselves that way in their briefing, and to distinguish them from other Defendants formerly in the lawsuit.  In the MSJ, the parties incorporated by reference their briefing from the MSJ No. 1, the Response to MSJ No. 1, and the Reply to Response to MSJ No. 1, regarding approximately 150 proposed undisputed facts.  The MSJ No. 1 was, however, filed only on Sharkey's behalf, and the MSJ was filed on Sharkey and Bernalillo County's collective behalf.  Where the Court draws facts from the MSJ No. 1 and discusses the parties' positions regarding those facts, it will refer only to Sharkey, because, again, the alternative would require rewriting substantial portions of the parties' briefing, which would confuse the reader.  The Court will, in its analysis, treat the facts and arguments as applying to the County Defendants.

The facts proceed in eight parts.  First, the Court provides background on J.P.  Second, the Court discusses Sharkey's background, his training, and his role at Roosevelt Middle School.  Third, the Court discusses the procedure for handling a de-escalation event.  Fourth, the Court discusses the September 26, 2011, events.  Fifth, the Court discusses J.P.'s booking at the Bernalillo County Detention Center.  Sixth, the Court discusses the arrest's effects on J.P.  Seventh, the Court discusses the charges against J.P., her competency evaluation, and the circumstances surrounding the dropping of her charges.  Eighth and finally, the Court discusses matters that the parties addressed only in the MSJ and not in the MSJ No. 1; those matters relate primarily to Sharkey's training and to the exhaustion of remedies.

### 1.      Background on J.P.

"J.P. has qualified as emotionally disturbed since at least 2008."  Response to MSJ No. 1 ¶ A, at 9 (setting forth this fact).  See Unidentified Report at 5-6 (taken July 19, 2013), filed

August 16, 2013 (Doc. 103-1)("Unidentified Report").[2]

According to John King, Ph. D., who diagnosed J.P. after the incident underlying this case, her present condition is such that

> [s]he doesn't think about the consequences.  And she just kind of reacts, instead of thinks about it.  So if some other child upsets her, instead of being able to step back and think about and analyze the situation, she just reacts right away.  And her reaction is with anger and aggression.

Deposition of John H. King, Ph. D. at 36:25-37:6 (taken July Depo. at 36:25-37:6), filed August 16, 2013 (Doc. 103-1)("King Depo.").  See Neuropsychological Evaluation Report at 1 (dated April 5, 2012), filed September 3, 2013 (Doc. 115-1).[3]

---

[2]Sharkey replies: "Deputy Sharkey does not dispute that J.P. met the eligibility of emotionally disturbed class placement.  That said, it is also undisputed that Deputy Sharkey was unaware of the reason for J.P.'s eligibility to receive special education services."  Reply to Response to MSJ No. 1 ¶ A, at 8 (citation omitted).  D.N.M.LR-Civ. 56.1(b) states:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  The local rules regarding summary judgment thus require the responding party to "specifically controvert[]" the movant's fact or else the fact is deemed admitted.  D.N.M.LR-Civ. 56.1(b).  Because Sharkey has not specifically controverted the fact, the Court will deem it undisputed.  The Court notes, however, that it has elsewhere disposed of the parties' dispute whether Sharkey knew of J.P.'s condition.

The Court treats this fact as substantially incorporating the following fact that the Plaintiffs added in their Response to MSJ No. 1 ¶ 1, at 3: "J.P. has exhibited the symptoms which led to her arrest since at least 2008."  See Reply to Response to MSJ No. 1 ¶ 1, at 1 (not disputing this fact).

[3]The Plaintiffs ask the Court to find undisputed that

> J.P.'s diagnosed emotional disturbance causes her to have issues specifically with controlling her impulses. "She doesn't think about the

J.P. received special education services because "she has the eligibility of Emotional Disturbance.  She has difficulty regulating her emotions.  Her mood can vary from one minute to the next.  At her best, she can be a very cooperative, helpful girl who is a natural leader.  However, she also has had episodes of violent verbal and physical acting out towards other students and adults.   More commonly, J[.P.] can also shut down and refuse to interact with anyone for hours at a time."

MSJ No. 1 ¶ 1, at 4 (setting forth this fact).  See Response to MSJ No. 1 ¶ 1, at 2 (not disputing

---

consequences.  And she just kind of reacts, instead of thinks about it. So if some other child upsets her, instead of being able to step back and think about and analyze the situation, she just reacts right away.  And her reaction is with anger and aggression."

Response to MSJ No. 1 ¶ D, at 9 (quoting King Depo. at 36:25-37:6).  Sharkey responds:

Disputed.   Plaintiffs do not support their statement regarding "J.P.'s diagnosed emotional disturbance." John King's diagnosis of J.P. occurred after the September 26, 2011 incident.  See Neuropsychological Evaluation Report, p. 1 (dated April 5, 2012), attached hereto as Exhibit A.  Therefore, Deputy Sharkey did not have the benefit of Dr. King's evaluation of J.P. which renders the evaluation immaterial.  See Buck v. City of Albuquerque, 549 F.3d 1269, 1281(10th Cir. 2008)(stating that the probable cause inquiry depends upon "facts known to the arresting officer at the time of the arrest"); see also Saucier[ v. Katz, 433 U.S. 194, 207 (2008), receded from by Pearson v. Callahan, 555 U.S. 223 (2009)]("Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.").

Reply to Response to MSJ No. 1 ¶ D, at 9 (emphasis in original).  The Court has modified the proposed fact to reflect that Dr. King diagnosed J.P. only after the events in this lawsuit. Although the Court agrees that the relevant facts for Fourth Amendment purposes are those that Sharkey knew at the time he arrested her, the Court includes the fact as useful background information about J.P.

The Plaintiffs ask the Court to find undisputed that "[n]either J.P. nor J.H. are malingering or misrepresenting J.P.'s symptoms."  Response to MSJ No. 1 ¶ E, at 9 (citing King Depo. at 50:19-51:5; 61:14-62:12).  Sharkey argues: "Disputed. In ruling on Deputy Sharkey's summary judgment motions, testimony on the issue of whether Plaintiffs are malingering or misrepresenting J.P.'s symptoms may not be considered by this Court."  Reply to Response to MSJ No. 1 ¶ E, at 9 (citing, e.g., Seamons v. Snow, 206 F.3d 1021 (10th Cir. 2000)).  The Plaintiffs' characterizations of their credibility are not properly considered facts for summary judgment purposes.  The Court will not, therefore, find this fact undisputed.

this fact); Individualized Education Program at 3, dated October 19, 2010, filed July 30, 2013

(Doc. 91-1)("IEP").

> J.P. "requires specific, direct 1:1 or small group instruction in the area of
> academics and social emotional issues to compensate for social emotional
> deficits.  This instruction cannot be appropriately or adequately addressed in the
> regular education setting because J[.P.] is unable to maintain her emotions in the
> larger group setting and impedes the learning of herself and other[s]."

MSJ No. 1 ¶ 2, at 5 (setting forth this fact).  See Response to MSJ No. 1 ¶ 2, at 3 (not disputing

this fact); IEP at 10.  "J.P.'s IEP team also prepared a [Behavioral Intervention Plan ("BIP")] for

J.P. because she exhibited frequent verbal and physical aggression towards fellow students and

staff, and interventions were needed to redirect her behavior."  MSJ No. 1 ¶ 3, at 5 (setting forth

this fact).  See Response to MSJ No. 1 ¶ 3-7, at 3 (not disputing this fact)[4]; Behavior Intervention

---

[4]The Plaintiffs do not dispute this fact, "which appears to be Defendant's [sic] general
description of J.P.'s Behavioral Intervention Plan (BIP).  Plaintiff, however, directs the Court to
pages 2-3 of [the BIP] where that document states that 'Administration will determine **IF** the
need for APS police or other law enforcement is necessary.'"  Response to MSJ No. 1 ¶ 3-7, at 3
(emphasis in original).  Sharkey "does not dispute that this language is contained in the BIP.  It is
undisputed, however, that Deputy Sharkey received a call from the administrative office asking
him [to] respond to [Allison] Gonzales' classroom."  Reply to Response to MSJ No. 1 ¶¶ 3-7, at
2.  In the end, the Plaintiffs' additional note about the BIP does not specifically controvert the
fact.  Accordingly, the Court deems this fact undisputed.
   The Plaintiffs ask the Court to find undisputed that "[t]he BIP program is a special
education program designed to address emotional, academic, and behavioral needs of students
that require more support and structure to allow children to succeed in school."  Response to
MSJ No. 1 ¶ B, at 9 (quoting Unidentified Report at 2).  Sharkey responds:

> Disputed.  The [regulations under the Individuals with Disabilities
> Education Act, 20 U.S.C. §§ 1400-82 ("IDEA"),] indicate that "in the case of a
> child whose behavior impedes his or her learning or that of others" the IEP
> team should consider "positive behavioral interventions, strategies, and supports to
> address that behavior."  20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R.
> § 300.346(a)(2)(i).  Plaintiffs' description of a BIP is broader than that contained
> in the IDEA.

Reply to Response to MSJ No. 1 ¶ B, at 8.  Sharkey is correct that a BIP's legal function is

Plan (dated March 3, 2011), filed July 30, 2013 (Doc. 92-3)("BIP").   "J.P.'s behavior had resulted in physical harm to both peers and staff."   MSJ No. 1 ¶ 4, at 5 (setting forth this fact). See Response to MSJ No. 1 ¶ 3-7, at 3 (not disputing this fact);[5] BIP at 1.

> The BIP indicated that the following is the targeted behavior for J.P.: "J[.P.] will frequently lash out at peers and adults in the classroom.  This behavior manifests as cussing, throwing objects and furniture with the intent to cause harm, as well as physical and verbal aggression to cause harm to peers and/or adults."

MSJ No. 1 ¶ 5, at 5 (setting forth this fact).   See Response to MSJ No. 1 ¶¶ 3-7, at 3 (not disputing this fact);[6] BIP at 1. "According to her BIP, J.P.'s behavior is a performance deficit, meaning she 'knows how to perform the desired behavior, but does not consistently do so.'" MSJ No. 1 ¶ 6, at 5 (setting forth this fact).   See Response to MSJ No. 1 ¶¶ 3-7, at 3 (not disputing this fact);[7] BIP at 1.  "The presumed reason for J.P.'s behavior was 'task/consequence avoidance.'"  MSJ No. 1 ¶ 7, at 5 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 3-7, at 3 (not disputing this fact);[8] BIP at 1.

J.P. had "been categorized as emotionally disturbed for IEP purposes" at the time of the incident underlying this case.  MSJ No. 1 ¶ 8 at 6 (setting forth unmodified version of this fact).

---

somewhat narrower than the Plaintiffs suggest.  Accordingly, the Court will not find this fact undisputed.

[5]The Court disposed of the parties' sole additional dispute regarding this fact in note 4, supra.

[6]The Court disposed of the parties' sole additional dispute regarding this fact in note 4, supra.

[7]The Court disposed of the parties' sole additional dispute regarding this fact in note 4, supra.

[8]The Court disposed of the parties' sole additional dispute regarding this fact in note 4, supra.

See Response to MSJ No. 1 ¶ 8, at 3 (not disputing this portion of the fact).[9]

          According to the BIP, "In the event that J[.P.] physically harms a peer or adult (by direct contact or by throwing an object with the intent to harm)[,] [t]he crisis team will be called.  If necessary, appropriate physical management may be employed by trained personnel to ensure the safety of J[.P.] and/or other persons involved in the crisis situation.  J[.P.]'s Mother will be called.  Administration will determine if the need for APS Police or other law enforcement is necessary."

MSJ No. 1 ¶ 9, at 6 (setting forth this fact)(quoting BIP at 3).  See Response to MSJ No. 1 ¶ 9, at 3 (not disputing this fact).  "The crisis intervention team is comprised of members of Roosevelt Middle School staff 'that have been trained in de-escalation' and 'are called in to any situation where a . . . teacher or staff member needs assistance.'"  MSJ No. 1 ¶ 10, at 6 (setting forth this fact)(quoting Deposition of Cee Kaye Nation at 32:6-11 (taken June 14, 2013), filed July 30, 2013 (Doc. 92-2)("Sharkey's Nation Depo.")).  See Response to MSJ No. 1 ¶ 10, at 8 (not

---

[9]The Plaintiffs respond:

> J.P. had been diagnosed as emotionally disturbed at the time of the incident underlying this lawsuit.  Plaintiff disputes the underlying contention that J.P.'s disability was not to be afforded deference based on her diagnosis of emotionally disturbed, as she has exhibited the same symptoms that she was arrested for since 2008.  Furthermore, Plaintiff's status as emotionally disturbed is sufficient to trigger both the Americans with Disabilities Act and the Individuals with Disabilities Education Act, [respectively].  42 U.S.C.A. § 12102(A)(1) (West 2013); 20 U.S.C.A. § 1401(3)(A)(i-ii) (West 2013) . . . .

Response to MSJ No. 1 ¶ 8, at 3.  Sharkey replies, in essence, that the Plaintiffs have conflated J.P.'s eligibility for special education services with a medical diagnosis.  See Reply to Response to MSJ No. 1 ¶ 8, at 2.  They cite cases showing that the two concepts are distinct.  See Reply to Response to MSJ No. 1 ¶ 8, at 2 (citing, e.g., Bowers v. Nat. Collegiate Athletic Ass'n, 563 F. Supp. 2d 508 (D.N.J. 2008)).  In the end, to the extent that the Plaintiffs ask the Court to conclude that, as a matter of law, J.P.'s eligibility for special education services is a disability under the ADA, the proposed addition is a legal conclusion and not a fact.  The Court will, if necessary, return to this question in its analysis.

disputing this fact).[10]

### 2.    Sharkey's Background and Training; His Role at Roosevelt Middle School.

Prior to becoming a School Resource Officer [("SRO")] Defendant Sharkey was a field training officer for cadets and detectives, a fi[el]d investigator, a firearms instructor, a crisis intervention officer, a special weapons and tactics (SWAT) officer on the entry team, a sniper, a crisis negotiator, a property crimes detective, a narcotics detective, a FBI fugitive and gang task force detective, a civil deputy assigned to serve domestic violence orders and civil summonses, and has been assigned to execute mental health pick-up orders.

Response to MSJ No. 1 ¶ V, at 13.   See Reply to Response to MSJ No. 1 ¶ V-W, at 12 (not

disputing this fact); Deposition of John Matthew Sharkey at 12:13-13:5 (taken July 30, 2013),

filed August 16, 2013 (Docs. 103-4, 103-5, 103-6, & 103-7 ("Plaintiffs' Sharkey Depo.").

"Defendant Sharkey has had the opportunity to interact with several citizens who had mental

health challenges throughout the course of his career.   When dealing with citizens dealing with

mental health challenges Defendant Sharkey seeks voluntary compliance through de-escalation

techniques."   Response to MSJ No. 1 ¶ W, at 13 (citation omitted)(setting forth this fact).   See

Reply to Response to MSJ No. 1 ¶ V-W, at 12 (not disputing this fact);[11] Plaintiffs' Sharkey

---

[10]The Plaintiffs state only that they do "not dispute that a crisis intervention team of personnel trained in de-escalation is maintained at Roosevelt Middle School."   Response to MSJ No. 1 ¶ 9, at 3.   To the extent that the Plaintiffs suggest that they do not agree with the remainder of the fact, the Plaintiffs have not specifically controverted the proposed fact.   Accordingly, the Court deems the fact undisputed for purposes of the MSJ.

[11]The Plaintiffs ask the Court to find undisputed that "Defendant Sharkey was aware of J.P.'s mental disability because he had been told by J.P.'s former principal after his first encounter with J.P. prior to the incident at issue in this case."   Response to MSJ No. 1 ¶ X, at 13 (citing Deposition of [J.H.] at 153:25-154:10 (taken July 17, 2013), filed August 16, 2013 (Doc. 103-9)("Plaintiffs' J.H. Depo.")).   Sharkey replies:

Plaintiffs contend that "Deputy Sharkey was aware of J.P.'s mental disability because he had been told by J.P.'s former principal after his first encounter with J.P. prior to the incident at issue in this case." [Response to MSJ

Depo. at 13:13-15; id. at 14:7-12.

"Defendant Sharkey became a School Resource Officer because he wanted a 'constructive, positive' assignment where he could help people rather than targeting certain crimes."  Response to MSJ No. 1 ¶ M, at 11 (setting forth this fact)(quoting Plaintiffs' Sharkey Depo. at 12:1-9).  See Reply to Response to MSJ No. 1 ¶ M, at 10-11 (not disputing this fact);

---

No. 1 ¶ X, at 13]. In support of this allegation, Plaintiffs rely on testimony from J.P.'s mother as to what J.P.'s former principal, Ms. Mildren, allegedly said she told Deputy Sharkey.  See [Deposition of [J.H.] at 153:7-155:4 (taken July 17, 2013), filed August 3, 2013  (Doc. 115-4)("Sharkey's J.H. Depo. Vol. II")]. According to J.H., Ms. Mildren said she had a private discussion with Deputy Sharkey and "brought to his attention that in the behavior intervention program that they have a one-two-three-four list they go through first before they call in the school resource officer."  Id.[ at 153:7-17].  J.H. further testified that Ms. Mildren "did state to me that she made him aware that in the case of children who are in the Special Ed setting and especially ones who have IEP BIP, that they specifically have to follow protocol first and that it states on there that a school resource officer is referred to as last resort."  Id.[ at 153:25-154:10].  J.H. was not present at the meeting Ms. Mildren said she had with Deputy Sharkey.  Id.[ at 154:11-16].  J.H.'s testimony on this issue is inadmissible hearsay which does not create a genuine dispute and cannot support a plaintiff's opposition to summary judgment.  See Fed. R. Civ. P. 56(c)(2); see also Llewellyn[ v. Allstate Home Loans, Inc., 711 F.3d 1173, 1180 (10th Cir. 2013)].  Moreover, there is nothing in J.H.'s deposition testimony which would indicate that Ms. Mildren told Deputy Sharkey that J.P. had a "mental disability."  At most, J.H.'s hearsay testimony indicates that Ms. Mildren spoke to Deputy Sharkey generally about the protocol for responding to an incident involving a student's behavioral outburst. A behavioral outburst is certainly different than a "mental disability."  In short, a student can have a behavioral outburst without having a mental disability.

Reply to Response to MSJ No. 1 ¶ X, at 12-13.  Sharkey is correct: Mildren has made an out-of-court statement, and the Plaintiffs seek to admit it for the truth of what it asserts -- that Mildren told Sharkey about the role of SROs with respect to special-education students, particularly those with BIPs.  Further, even if the testimony were not inadmissible hearsay, it would not give Sharkey any reason to conclude that J.P. was disabled within the ADA's meaning -- much less knowledge that would lead him to conclude that, because of any such disability, she could not form general intent to commit crimes, as the Plaintiffs allege.  Accordingly, the Court has not found this fact undisputed.

Plaintiffs' Sharkey Depo. at 19:10-20:2.  Sharkey's purpose is to keep his students safe and not

to arrest his students; even so, on occasion, he gets involved in criminal investigations -- for

example, when the Children, Youth, and Families Department of the State of New Mexico

("CYFD") contacts him, or when he must deal with those who commit drug offenses or violent

crimes -- and he arrests students, particularly when an offense involves battery on students or

staff, or a drug offense.  See Plaintiffs' Sharkey Depo. at 19:10-20:2; id. at 28:1-5; Deposition of

John Sharkey at 20:12-21:12 (taken July 30, 2013), filed September 3, 2013 (Doc. 115-3).[12]  "In

---

[12]The Plaintiffs ask the Court to find undisputed that

> Defendant Sharkey tries to get to know his students and has the
> opportunity to see what their struggles are.  [Plaintiffs' Sharkey Depo. at] 34:4-
> 15.  Defendant Sharkey became a School Resource Officer because he wanted to
> have a "constructive, positive" assignment where he could help people rather than
> targeting certain crimes. [Plaintiffs' Sharkey Depo. at] 12:1-9; 19:10-20:2.
> Defendant Sharkey's admitted purpose is not to arrest students, but to keep
> students safe. [Plaintiffs' Sharkey Depo. at] 28:1-5.  In pursuance of this goal,
> Defendant Sharkey claims to take into consideration the struggles that the
> children he works with are faced by. [Plaintiffs' Sharkey Depo. at] 34:4-6.

Response to MSJ No. 1 ¶ M, at 11.  Sharkey replies:

> This paragraph contains four statements of fact contrary to the
> requirements of D.N.M.LR-Civ. 56(b) which states that "each additional fact must
> be lettered[.]" Deputy Sharkey objects to the first statement of fact contained in
> this paragraph to the extent it states that he "has the opportunity to see what [the
> students'] struggles are" and that he "claims to take into consideration the
> struggles that the children he works with are faced by." [Doc. No. 103], p. 11,
> ¶ M. In the cited testimony, Deputy Sharkey stated that "*sometimes* I'll see what
> their struggles are." [Doc. No. 103-4], p. 34, ll. 5-6. Deputy Sharkey has also
> specifically testified as follows regarding J.P.: "I didn't see anything that lead
> [sic] me to think that she -- there was a mental health issue." [Doc. 103-7], p. 81,
> ll. 8-13; see [Doc. No. 92-4, ¶15 ("I had no knowledge that J.P. had any sort of
> disability that would cause her to be physically violent to classmates or
> teachers."). Deputy Sharkey testified that he had never seen J.P. behave the way
> she did on September 26, 2011. [Doc. No. 103-5], p. 82, ll. 4-9. He also testified
> he did not know the reason why J.P. was in a special education class. Id., p. 81, l.

pursuance of this goal, Defendant Sharkey claims to take into consideration the struggles that the children he works with are faced by," where he knows of those struggles.  Response to MSJ No. 1 ¶ M, at 11 (setting forth unmodified version of this fact).  See Plaintiffs' Sharkey Depo. at 34:4-6.[13]

"Deputy Sharkey was hired by the Bernalillo County Sheriff's Office on January 30, 1989.  Deputy Sharkey retired in March 2007.  After being retired for approximately two years, Deputy Sharkey was rehired by the Bernalillo County Sheriff's Office in September 2009."  MSJ

_____

14-p. 82, l. 3. Although Deputy Sharkey testified it is not his purpose to arrest students, he has also testified that "there are times where there's criminal investigations, whether it's drugs or a battery or I'm contacted by CYFD . . . ." Id., p. 19, ll. 21-24. Deputy Sharkey testified he does arrest students who commit drug offenses or crimes of violence such as battery.  See Transcript of Deposition of John Sharkey, p. 20, l. 12 – p. 21, 12 (July 30, 2013), attached as Exhibit C.

Reply to Response to MSJ No. 1 ¶ M, at 10-11.
        Although the Plaintiffs' briefing contains four separate fact statements, in violation of the local rules, the Court has considered each fact, because it is in the interest of justice to decide the matter on the merits rather than to punish the Plaintiffs for this violation of the local rules by ignoring the facts.
        As for the first of the several facts in this paragraph, the Court concludes that Sharkey is correct: the Plaintiffs slightly mischaracterized Sharkey's testimony.  The Court's version of the fact more accurately reflects the proposed testimony.  The Court has elsewhere disposed of the parties' dispute whether Sharkey knew that J.P. was disabled.
        The Court does not understand Sharkey to object to the second sentence in this paragraph -- that is, that he "became a School Resource Officer because he wanted a 'constructive, positive' assignment where he could help people rather than targeting certain crimes."  Response to MSJ No. 1 ¶ M, at 11 (setting forth this fact)(quoting Plaintiffs' Sharkey Depo. at 12:1-9).
        As for the third sentence -- regarding Sharkey's disposition toward arresting students -- the Court has modified the proposed fact to reflect that, despite that it is not his purpose  to arrest students -- but to keep his students safe -- he will, on occasion, arrest students.
        For the fourth and final sentence -- regarding whether Sharkey takes his students' struggles into account when interacting with them -- the Court has modified the proposed fact to clarify that, in context, Sharkey referred to those struggles of which he knows and not to all struggles that his students endure.

        [13] The Court disposed of the parties' discussion of this fact in note 12, supra.

- 13 -

No. 1 ¶ 11, at 6 (setting forth these facts).  See Response to MSJ No. 1 ¶¶ 11-12, at 3 (not

disputing these facts); Affidavit of John M. Sharkey ¶¶ 1-3, at 1 (executed July 30, 2013), filed

July 30, 2013 (Doc. 92-4)("Sharkey Aff.").  "For the 2011-2012 school year, Deputy Sharkey

was assigned to be the school resource officer at Roosevelt Middle School."  MSJ No. 1 ¶ 12, at

6 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 11-12, at 3 (not disputing this fact);

Sharkey Aff. ¶ 4, at 3.

"Deputy Sharkey did not have access to J.P.'s special education files."  MSJ No. 1 ¶ 13,

at 6 (setting forth this fact).  See Response to MSJ No. 1 ¶ 13, at 4 (not disputing this fact);

Sharkey's Nation Depo. at 25:13-16; id. at 26:56-28:34.[14]  "Deputy Sharkey was not part of

---

[14] The Plaintiffs assert that they dispute this fact:

> Defendant's fact 13 is disputed. Plaintiff does not dispute that Defendant
> did not have access to J.P.'s special education files; however, this does not mean
> Defendant was totally unaware of Plaintiff's emotional disturbance.  [Plaintiffs'
> Sharkey Depo. at 81:8-82:15]  (stating that he had never seen J.P. act out as she
> had on the date of the subject incident).  Defendant Sharkey is aware of where
> special education students are located on the campus of Roosevelt Middle School
> and knows that there are different teachers associated with different special
> education challenges.  [Plaintiffs' Sharkey Depo. at 62:24-63:10].  Also, federal
> law mandates that "An agency reporting a crime committed by a child with a
> disability shall ensure that copies of the special education and disciplinary records
> of the child are transmitted for consideration by the appropriate authorities to
> whom the agency reports the crime".  20 U.S.C.1415 (K)(B)(6).  Thus, Sharkey
> was required to not only determine whether J.P. had a disability; he was also
> required to transmit the information to the District Attorney's Office.

Response to MSJ No. 1 ¶ 13, at 4.  Sharkey replies:

> Plaintiffs contend this fact is disputed but then proceed to state that they
> do not dispute the specific fact asserted by Deputy Sharkey.  Instead, Plaintiffs
> add that Deputy Sharkey was not completely unaware of J.P.'s emotional
> disturbance.  However, the cited portion of Deputy Sharkey's deposition
> testimony states only that "I've never seen [J.P.] act like that" and that he did not
> see anything that lead [sic] him to believe that "there was a mental health issue."

Roosevelt Middle School's crisis intervention team," although he was generally aware when someone calls out the team, and has witnessed the crisis team in action from within the immediate area.   MSJ No. 1 ¶ 14, at 6 (setting forth unmodified version of this fact).   See Response to MSJ No. 1 ¶ 14, at 3 (not disputing this fact);[15] Sharkey's Nation Depo. 32:3-4;

---

See [Doc. No. 103-7], p. 81, l. 8- p. 82, l. 15.  Plaintiffs also add that Deputy Sharkey "is aware where special education students are located" on campus and "knows there are different teachers associated with different special education challenges."  Plaintiffs' citation to Deputy Sharkey's testimony does not entirely support these allegations.  Instead, Deputy Sharkey testified that he knows which teachers have special education classes generally but does not know and has not been told which teachers have students with behavioral or mental health issues. See [Doc. No. 103-6], p. 62, l. 24 - p. 63, l. 10.  In an effort to support their contention that Deputy Sharkey was aware of J.P.'s emotional disturbance, Plaintiffs misapply a section of the IDEA which provides that "[a]n agency reporting a crime committed by a child with a disability shall ensure that copies of the special education and disciplinary records of the child are transmitted for consideration by the appropriate authorities to whom the agency reports the crime." 20 U.S.C. §1415(k)(9)(B).  This section refers to a public school agency's obligation.  See Valentino C. v. School Dist. of Philadelphia, 2004 WL 225038 at *7 (E.D. Pa. 2004) (citing cases).   Moreover, Plaintiffs offer no evidence that Roosevelt Middle School officials complied with this provision or provided Deputy Sharkey with any specific information regarding J.P. immediately after the incident.

Reply to Response to MSJ No. 1 ¶ 13, at 3.  In the end, the Court agrees with Sharkey that the Plaintiffs do not dispute the fact, but instead seek to qualify it or to add another fact.  Because the Plaintiffs have not specifically controverted the proposed fact, the Court deems the fact undisputed.  As to the legal arguments that the Plaintiffs embed in their Response to MSJ No. 1, the Court will, if necessary, consider them in its analysis.

[15]The Plaintiffs assert:

Defendant's fact 14 is disputed.  Plaintiff does not dispute the contention that Defendant Sharkey is not part of the formal crisis intervention team at Roosevelt Middle School.  [Plaintiffs' Sharkey Depo. at] 63:15-64:5. However, Defendant Sharkey "will generally be aware that they're calling them out" and there have been times where he is in the immediate area and has witnessed the crisis intervention team in action.  [Plaintiffs' Sharkey Depo. at] 64:6-24.

Sharkey Aff. ¶ 21, at 3.  At the time of the event, "Deputy Sharkey's main responsibility as a school resource officer at Roosevelt Middle School was to help keep the campus safe."  MSJ No. 1 ¶ 15, at 7 (setting forth unmodified version of this fact).  See Sharkey's Nation Depo. at 26:25-27:9; Sharkey Aff. ¶ 16, at 3.[16]  "Deputy Sharkey is 'always extremely calm'[ and] 'never raises his voice.'"  MSJ No. 1 ¶ 16, at 7 (setting forth unmodified version of this fact)(quoting

---

Response to MSJ No. 1 ¶ 14, at 4.  Sharkey replies that the fact is "[u]ndisputed.  However, Plaintiffs add that Deputy Sharkey is generally aware when the crisis intervention team is called out and has witnessed them in action.  Deputy Sharkey does not dispute this general allegation."  Reply to Response to MSJ No. 1 ¶ 14, at 4.  Because the Response to MSJ No. 1 does not specifically controvert the proposed fact, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b).  The Court has, however, modified the proposed fact to reflect the undisputed addition.

> [16]The Plaintiffs assert:
>
> Defendant's fact 15 is disputed.  See **Exhibit D:** Bernalillo County Sheriff's Department Rules and Regulations 353 et seq. (Effective May 22, 2012) hereinafter "BCSD Rules") available at http://www.bernalillocountysheriff.com/sop.html (Section III).  Among Defendant Sharkey's duties as a school resource officer are to "[t]ake steps appropriate and consistent with a law enforcement officer's duty when a crime occurs," **Exhibit D:** BCSD Rule 353-2(F), to "[r]efrain from functioning as a school disciplinarian," **Exhibit D:** BCSD Rule 353-2(H), and to "[b]e available for conferences with students, parents and faculty members to assist with problems related to law enforcement and crime prevention." **Exhibit D:** BCSD Rule 353- 2(J).

Response to MSJ No. 1 ¶ 15, at 4-6.  Sharkey argues that the cited evidence does not support the dispute for two reasons: (i) the policy that they cite went into effect some eight months after the events at issue; (ii) "to the extent Plaintiffs imply that Deputy Sharkey did not comply with certain provisions of the SOP, the law is clearly established that the violation of an SOP is irrelevant to a Fourth Amendment inquiry."  Reply to Response to MSJ No. 1 ¶ 15, at 4 (citing, e.g., Tanberg v. Sholtis, 401 F.3d 1151, 1167 (10th Cir. 2005)).  Sharkey is correct that the cited evidence does not dispute that, at the time of the events at issue, his main responsibility was campus safety: in addition to the two problems that Sharkey identified, the cited evidence that Sharkey had multiple responsibilities does not controvert the fact that his main responsibility at the time was campus safety.  Accordingly, the Court deems the fact undisputed.  The Court has, however, slightly modified the fact to clarify that the limited timeframe in which this hierarchy of responsibilities applies also applies to the time of the events underlying this lawsuit.

Sharkey's Nation Depo. at 29:8-16).  See Response to MSJ No. 1 ¶ 16, at 5 (not disputing this portion of the fact).[17]

"Defendant Sharkey 'get[s] to know the students very, very well, because [he] know[s] them from elementary school all the way until they get [out] to middle school.'"  Response to MSJ No. 1 ¶ N, at 11 (setting forth unmodified version of this fact)(quoting Plaintiffs' Sharkey Depo. at 74:12-15).[18]  Sharkey gets to know his students and, sometimes, sees what their struggles are, and takes those struggles of which he knows into account as he interacts with them. See Plaintiffs' Sharkey Depo. at 34:4-6.[19]  Sharkey likes his students and cares about his students

_____

[17]Sharkey asks the Court to conclude that "Deputy Sharkey is 'always extremely calm,' 'never raises his voice,' and treats all students and staff with respect."  MSJ No. 1 ¶ 16, at 7 (quoting Sharkey's Nation Depo. 29:8-16).  The Plaintiffs respond:

> Defendant's fact 16 is disputed. Defendant did not treat J.P. with respect when he ignored her Behavioral Intervention Plan and arrested her in lieu of allowing the crisis intervention team to do their job or at least calling J.H. Document 92-3 (Defendant's Exhibit C).  Defendant did not treat J.H. nor J.P. with respect by refusing to contact J.H. until J.P. was out of his custody at the Juvenile Detention Center.  Id.; [Plaintiffs' Sharkey Depo. at] 75:2-76:21; 77:17-78:10.  Whether Defendant Sharkey is a good human is immaterial to whether he acted with objective reasonableness.

Response to MSJ No. 1 ¶ 16, at 5.  "Deputy Sharkey concedes that evidence of his good character is immaterial to the Fourth Amendment's objective reasonableness inquiry."  Reply to Response to MSJ No. 1 ¶ 16, at 4.  The Court's disposition of the MSJ does not turn on this dispute about Sharkey's character.  The Court has, however, modified the fact to reflect that, in light of the events underlying this case, whether Sharkey "treats all students and staff with respect," MSJ No. 1 ¶ 16, at 7, is disputed.

[18]The Plaintiffs slightly misquoted the testimony; the Court has inserted the missing word "out" into the proposed fact.  Sharkey states that this fact is undisputed, but underscores his position that he lacked knowledge of J.P.'s mental health issues.  See Reply to Response to MSJ No. 1 ¶ N, at 11.  The Court has elsewhere addressed the parties' dispute whether Sharkey knew that J.P. was disabled within the ADA's meaning, and the Court will not repeat itself here.

[19]The Court disposed of the parties' discussion of this fact in note 12, supra.

very much; he does not want to arrest them and does not take that decision lightly.  See Response

to MSJ No. 1 ¶ N, at 11 (setting forth a similar fact); Plaintiffs' Sharkey Depo. at 74:23-25.[20]

      "Defendant Sharkey . . . knows that there are different teachers associated with different

special education challenges," and knows that certain teachers, including Ms. Gonzales, who

have special education students.  Response to MSJ No. 1 ¶ O, at 11-12 (setting forth unmodified

version of this fact).  See Plaintiffs' Sharkey Depo. at 62:24-63:10.[21]  Sharkey is aware that

Albuquerque Public Schools has a crisis intervention team.  See Plaintiffs' Sharkey Depo. at

---

[20]The parties disputed the wording of this proposed fact.  See Response to MSJ No. 1 ¶ N, at 11 ("He does not like to arrest his students because he likes them and cares about them very much." (internal quotation mark omitted)); Reply to Response to MSJ No. 1 at 11 (quibbling with the wording, based on the quote).  The Court's fact reflects Sharkey's testimony.  See Plaintiffs' Sharkey Depo. at 74:23-25 ("I don't want to arrest my students.  I like them.  I care about them very much, and it's not something that I take lightly.").  The Court disposed of the parties' other disputes regarding this fact in note 12, supra.

[21]The Plaintiffs ask the Court to find undisputed that  "Defendant Sharkey is aware of where special education students are located on the campus of Roosevelt Middle School and knows that there are different teachers associated with different special education challenges." Response to MSJ No. 1 ¶ O, at 11-12 (setting forth this fact).  Sharkey replies:

      Objection.  Plaintiffs' statement is not an accurate summary of Deputy Sharkey's testimony.  When asked if he knew where the special education kids are and where they are located, Deputy Sharkey responded, "I know from -- that I have -- for example, Ms. Gonzales, she has challenged students.  They don't tell me, "This is where our students who have behavior issues, mental health issues, special needs issues, that type of thing.  It's just that she has special classes."

Reply to Response to MSJ No. 1 ¶ O, at 11 (quoting Plaintiffs' Sharkey Depo. at 62:24-63:5).
      Sharkey is correct: he did not testify that he knew where all the children in special education classes are located on Roosevelt Middle School's campus.  Sharkey did, however, know that certain teachers, including Ms. Gonzales, had special education students.  The Court has, therefore, modified the proposed fact.  Sharkey testified, however, that he thought "they have different teachers for different challenges."  Plaintiffs' Sharkey Depo. at 62:10.  The Court has, therefore, left that portion of the fact intact.

63:11-14.[22]  "Defendant Sharkey has personally seen the school's Crisis Intervention Team deescalate students involved in screaming, yelling, and throwing desks around."  Response to MSJ No. 1 ¶ P, at 12 (setting forth this fact).  See Reply to Response to MSJ No. 1 ¶ P, at 11 (not disputing this fact); Plaintiffs' Sharkey Depo. at 64:6-24.

Sharkey did not know whether J.P. had a disability within the ADA's meaning before he arrested her; further, he had no reason to find out whether she had a disability, because whether a person that he is investigating has a disability plays no role in his investigation or in his decision to arrest that person.  See Response to MSJ No. 1 ¶ R, at 12 (setting forth a similar fact); Plaintiffs' Sharkey Depo. at 7:5-21.[23]  Sharkey was aware, or should have been aware, that J.P. suffered from some educational and behavioral limitations; he did not, however, know or have reason to know that she was disabled within the ADA's definition of that term, or that any disability which she had would deprive her of the capacity to form general criminal intent.  See

---

[22]The Plaintiffs ask the Court to find undisputed that "Defendant Sharkey is aware that APS has its own Crisis Intervention Team that is responsible for dealing with children who are emotionally disturbed."  Response to MSJ No. 1 ¶ P, at 12.  As Sharkey properly objects, see Reply to Response to MSJ No. 1 ¶ P, at 11, Sharkey testified only that he knew the school had a crisis intervention team and not to its responsibilities.  Accordingly, the Court has modified the proposed fact.

[23]The Plaintiffs ask the Court to find undisputed that "Defendant Sharkey did not know nor claims to have had any reason to ascertain whether J.P. had a disability prior to arresting her as whether a person he is investigating has a disability has no role in how he investigates or makes decisions to arrest."  Response to MSJ No. 1 ¶ R, at 12.  Sharkey replies: "This is not a coherent sentence.  To the extent portions make sense, Deputy Sharkey does not dispute he did not know or have reason to know that J.P. had an alleged disability. The remainder of the sentence is irrelevant in assessing Deputy Sharkey's actions and decisions."  Reply to Response to MSJ No. 1 ¶ R, at 12.  The sentence is confusing, but its meaning is not unintelligible.  The Court has constructed this sentence based on what it thinks the Plaintiffs intended the sentence to communicate and what the cited testimony supports.  As for relevance, the Court will return to that issue, if necessary, in its analysis.

- 19 -

Plaintiffs' Sharkey Depo. at 33:24-34:15 ("I get to know my students, and sometimes I'll see what their struggles are."); Plaintiffs' Sharkey Depo. at 62:24-63:5 ("Ms. Gonzales, she has special students. . . . [S]he has special classes."); Deposition of John Sharkey at 75:9-12 (taken July 30, 2013), filed September 3, 2013 (Doc. 115-2)("Sharkey Depo. Vol. III")("And her mom and her boyfriend arrived on scene, and mom was of the opinion of, 'You can't do this, you can't even be here;' that there's a plan, and they have to handle the plan.").[24]

"Defendant Sharkey [was] trained in the Americans with Disabilities Act when he was trained to become a School Resource Officer in 2010."  Response to MSJ No. 1 ¶ S, at 12 (setting forth this fact).  See Reply to Response to MSJ No. 1 ¶¶ S-T, at 12  (not disputing this fact); Plaintiffs' Sharkey Depo. at 7:22-8:6.  "Defendant Sharkey knows 'that there are certain accommodations that are made for students that have a disability.'"  Response to MSJ No. 1 ¶ T,

---

[24]The parties dispute Sharkey's level of knowledge of J.P.'s condition throughout the briefing.  The Court concludes that this statement of the fact best reconciles what the evidence supports, taking it in the light most favorable to the Plaintiffs: because Sharkey knew J.P. was in a special education classroom, because he knew of a prior incident involving J.P. in elementary school where J.H. had spoken about a "plan" -- which, in context, probably was a reference to her BIP or IEP -- and because he generally gets to know his students well, Sharkey either knew or should have known that J.P. had some educational or behavioral limitations.  Nothing that Sharkey knew, however, would have given him knowledge or reason to know that J.P. had a disability as the ADA defines that term -- that is, "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S. § 12102. Perhaps a teacher familiar with J.P.'s classroom performance could speak to whether her impairments "substantially limit" her ability to learn.  An SRO's interactions with a student are, however, more limited: although an SRO would, incidental to his or her day-to-day interactions with a student, be able to infer that a given child has some limitations, he would have no reason to determine that that condition "substantially limits" an individual student's learning ability.
   Further, as the Court explains elsewhere, that Sharkey knew or had reason to know that J.P. had a BIP or an IEP in elementary school does not mean that he knew that, some three years later, when she had gone to middle school, any BIP or IEP was still in effect.  Finally, the Court underscores, nothing of which Sharkey was aware would have given Sharkey knowledge or reason to know that, because of her disability or limitations, J.P. could not form criminal intent.

at 12 (setting forth this fact)(quoting Plaintiffs' Sharkey Depo. at 8:10-13).   See Reply to
Response to MSJ No. 1 ¶¶ S-T, at 12 (not disputing this fact).[25]   Sharkey has been trained as
follows: "If I remember correctly it was discussed as to we will have students that we interact
with who have disabilities, whether it's a learning disability or behavioral disabilities, challenges
that young people have that go to school and to realize that not every student would be the
same."  Plaintiffs' Sharkey Depo. at 9:2-12.  See Response to MSJ No. 1 ¶ U, at 12 (setting forth
similar facts); Reply to Response to MSJ No. 1 ¶ U, at 12 (not disputing this fact).[26]  "Defendant
Sharkey was a Crisis Intervention Officer and has been trained in de-escalation techniques" in
general, though not in de-escalation techniques as they relate to special needs or students with

---

[25]The Plaintiffs ask the Court to find undisputed that

> Defendant Sharkey knows that School Resource Officers "will have
> students that we interact with who have disabilities, whether it's a learning
> disability or behavioral disabilities, challenges that young people have that go to
> school and to realize that no[t] every student would be the same." He also knows
> that there will be different types of students who have different special needs.
> [Plaintiffs' Sharkey Depo. at] 9:3-12. Defendant Sharkey was a Crisis
> Intervention Officer and has been trained in de-escalation techniques. [Plaintiffs'
> Sharkey Depo. at] 10:20-25.  However, Defendant Sharkey was never trained
> specifically in dealing with special needs children or mental health issues with
> students.  [Plaintiffs' Sharkey Depo. at] 11:18-12.

Response to MSJ No. 1 ¶ U, at 12-13.  Sharkey replies: "Disputed.  Deputy Sharkey testified that
he had received deesclation training as a crisis intervention officer but had not received specific
training in 'deesclation techniques' as they relate to students with special needs."  Reply to
Response to MSJ No. 1 ¶ U, at 12.  The Court has altered the first sentence in the quoted
paragraph from the Plaintiffs' Response to MSJ No. 1 to remove an awkwardness in its phrasing
and has combined it with the second sentence to eliminate redundancy.  The Court has modified
the last two sentences, because Sharkey is correct: Sharkey did not testify that he was never
trained in any form about dealing with special needs children or dealing with students with
mental health issues, but that he was not trained with respect to de-escalation techniques as they
relate to those children.  See Plaintiffs' Sharkey Depo. at 10:20-11:22.

[26]The Court disposed of the parties' objections to this fact in note 25, supra.

mental-health issues.  Response to MSJ No. 1 ¶ U, at 12-13 (setting forth unmodified version of these facts).  See Plaintiffs' Sharkey Depo. at 10:20-11:22.[27]  "Defendant Sharkey has never been trained on the possible psychological effects on children being restrained."  Response to MSJ No. 1 ¶ EE, at 14 (setting forth this fact).  See Reply to Response to MSJ No. 1 ¶ EE, at 14 (not disputing this fact); Plaintiffs' Sharkey Depo. at 71:24-72:4.[28]

During his deposition, "Defendant Sharkey agreed that there's always a question of whether a child has the ability to form criminal intent."  Response to MSJ No. 1 ¶ CC, at 14 (setting forth this fact).  See Plaintiffs' Sharkey Depo. at 59:11-23.[29]  "Defendant Sharkey determined that J.P., an emotionally disturbed 11 year-old, had the requisite criminal intent to commit the crime of [b]attery."  Response to MSJ No. 1 ¶ DD, at 14 (setting forth this fact).  See Plaintiffs' Sharkey Depo. at 56:2-57:20.[30]

Defendant Sharkey has no knowledge of whether a child he arrests will be housed at the Juvenile Detention Center and is not fully aware of the booking

---

[27]The Court disposed of the parties' objections to this fact in note 25, supra.

[28]The Court disposed of the parties' objections to this fact in note 25, supra.

[29]Sharkey replies: "Undisputed. In this case, however, Deputy Sharkey believed that J.P. had the intent to batter Ms. Gonzales."  Reply to Response to MSJ No. 1 ¶¶ CC, at 13-14.  That much of the factual assertion is undisputed, as the next fact in this paragraph underscores.  Because Sharkey did not specifically controvert the proposed fact, the Court deems it undisputed.

[30]Sharkey replies: "Deputy Sharkey does not dispute he determined that J.P. had the requisite criminal intent to commit the crime of battery.  Deputy Sharkey was not aware that J.P. was emotionally disturbed and was not sure of her exact age."  Reply to Response to MSJ No. 1 ¶¶ DD, at 14.  This statement does not specifically controvert the fact; accordingly, the Court deems it undisputed.  The Court does not read this sentence to mean that Sharkey knew she was eleven years old or that she was emotionally disturbed, but to mean that Sharkey found that J.P., who was then eleven and emotionally disturbed, had the requisite criminal intent to commit battery.

process for juveniles or how a risk assessment is employed to determine whether a child is subject to custody.  Defendant Sharkey believes that taking a child to the detention center, even if they will not be housed there, is appropriate because it accomplishes the purpose of stopping law breaking behavior. According to Defendant Sharkey, if a child is "at the detention center, then they're -- it's controlled."

Response to MSJ No. 1 ¶ Y, at 13 (setting forth this fact)(citations omitted).  See Reply to

Response to MSJ No. 1 ¶ Y, at 13 (not disputing this fact); Plaintiffs' Sharkey Depo. at

42:24:44:10.[31]  "Defendant Sharkey proffered that even if law-enforcement purposes are fulfilled

---

[31]Sharkey replies: "Undisputed. However, Plaintiffs' factual allegation as to the purpose accomplished by taking a juvenile to the detention center even if the juvenile will not be housed there is irrelevant.  At the time she was booked, Deputy Sharkey did not know that J.P. would not be accepted for housing."  Reply to Response to MSJ No. 1 ¶ Y, at 13.  The Court will return to this fact's relevance, if necessary, in the analysis.
    The Plaintiffs ask the Court to find undisputed that, "[i]n his deposition[,] Defendant Sharkey  agreed that the Juvenile Detention Center's release of J.P. to J.H. had the same effect as if he had released J.P. to J.H. himself."  Response to MSJ No. 1 ¶ Z, at 14.  Sharkey replies: "Disputed.  Deputy Sharkey did not testify that releasing J.P. directly to J.H. was an option on September 26, 2011 nor did he testify that the juvenile detention center's release of J.P. to J.H. had the same effect as if he had released J.P. to J.H. himself."  Reply to Response to MSJ No. 1 ¶ Z, at 13 (citing Plaintiffs' Sharkey Depo. at 49:10-50:3).
    Sharkey is correct.  The testimony reads:

    Q.    Well, she was released immediately essentially, and the time that she was in the detention facility was the time it took her mom to get down there to pick her up.  So, I mean, I guess to the extent that your goal was to stop the law breaking behavior by putting her in a correctional facility wasn't accomplished, I guess, I mean, because she's released right away to her mom?

    A.    To her mom, but she wasn't at Roosevelt Middle School any more. So I didn't have any concern of her attacking another teacher or another student. So it was stopped.

    Q.    Okay.  Well, how was the option of releasing her to her mom from the school directly rather than taking her to the detention facility?

    A.    I -- that may be an option --

    Q.    Okay.

- 23 -

by direct release to a child's parent, transporting a child to the Detention Center is appropriate because a child's angry parent could pose a threat to the safety of the school or its personnel." Response to MSJ No. 1 ¶ BB, at 14.  See Plaintiffs' Sharkey Depo. at 50:11-52:5.[32]

**3.      Procedure for Handling a De-Escalation Event.**

"A de-escalation event usually involves a student who is being aggressive."  MSJ No. 1 ¶ 17, at 7.  See Response to MSJ No. 1 ¶¶ 17-21, at 5 (not disputing this fact); Sharkey's Nation Depo. at 62:3-10.  "At Roosevelt Middle School, when a special education classroom calls the office via intercom [or on the office telephone] requesting assistance from the crisis intervention team, office staff contacts the principal 'or the admin' on the walkie-talkie."  MSJ No. 1 ¶ 18, at 7 (setting forth this fact)(quoting Sharkey Nation Depo. at 34:21-35:3).  Response to MSJ No. 1

---

A.      -- for some, if a deputy chose to do that or an officer did that.

Plaintiffs' Sharkey Depo. at 49:11-50:3.  Sharkey did not say that the Juvenile Detention Center's release of J.P. to J.H. had the same effect as if he had released J.P. to J.H. directly from the school; to say that something is "an option" is not to say that all options have the same effect. Accordingly, the Court will not find this fact undisputed.

The Plaintiffs ask the Court to find undisputed that "J.P. was immediately released from the juvenile detention center, whom had no legal basis to detain her."  Response to MSJ No. 1 ¶ AA, at 14.  Sharkey disputes this fact, pointing out that the document on which J.H. relies neither indicates that J.P. was immediately released nor that there was no legal basis for the juvenile detention center to detain her.  See Reply to Response to MSJ No. 1 ¶ AA, at 13. Sharkey also cites New Mexico law generally explaining the basis on which juveniles may be detained.  See N.M. Stat. Ann. § 32A-2-11.  Sharkey is correct: the cited document demonstrates neither that she was released immediately nor that the facility made any sort of determination about the legal basis for her release or detention.  Accordingly, the Court will not find this fact undisputed.

[32]Sharkey replies: "Plaintiffs' allegations are irrelevant. It is undisputed that Deputy Sharkey witnessed J.P. kick Ms. Gonzales and, thus, had probable cause to arrest her.  Plaintiffs' discussion of alternatives to booking J.P. is, therefore, irrelevant.  See Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001)."  Reply to Response to MSJ No. 1 ¶ BB, at 13.  The Court will, if necessary, return to relevancy in its analysis.  Because Sharkey did not specifically controvert the proposed fact, the Court deems it undisputed.

¶¶ 17-21, at 5 (not disputing this fact).[33]  "Deputy Sharkey also has a walkie-talkie so when a call goes out for the crisis intervention team, he hears it as well and responds to the area."  MSJ No. 1 ¶ 19, at 17 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 17-21, at 5 (not disputing this fact); Sharkey's Nation Depo. at 35:11-18; Sharkey Aff. ¶ 18, at 3.   "Deputy Sharkey allows the crisis intervention team 'to do what they need to do' and 'he's there if it escalates to a point where [the team] can't contain it.'"   MSJ No. 1 ¶ 20, at 7 (setting forth this fact)(quoting Sharkey's Nation Depo. at 35:11-18).  See Response to MSJ No. 1 ¶¶ 17-21, at 5 (not disputing this fact); Sharkey Aff. ¶¶ 22-25, at 3.  "It is a safe practice to have Deputy Sharkey close at hand because a situation can get out of hand very quickly."  MSJ No. 1 ¶ 21, at 7 (setting forth this fact).  See  Response to MSJ No. 1 ¶¶ 17-21, at 5 (not disputing this fact); Sharkey's Nation Depo. at 61:12-62:2; Sharkey Aff. ¶ 23, at 3.  "Deputy Sharkey is generally expected to take immediate control of the situation if he arrives on scene first and sees somebody being struck, in danger of being battered, or a situation quickly escalating."  MSJ No. 1 ¶ 22, at 8 (setting forth this fact).  See Sharkey's Nation Depo. at 36:15-19; Sharkey Aff. ¶¶ 25-26, at 3.[34]

---

[33]The Court has modified the proposed fact slightly, because the testimony reflects that the office staff would contact the other members of the crisis intervention team "on their office phone or buzzing into [sic] their office."  Sharkey's Nation Depo. at 3:21-35:3.

[34]The Plaintiffs purport to dispute this fact, citing provisions of the BIP:

According to J.P.'s BIP "[i]n the event that [J.P.] physically harms a peer **or adult** (by direct contact or by throwing an object with the intent to harm). (*sic*) The crisis team will be called.  If necessary **appropriate** physical management may be employed by trained personnel to ensure the safety of [J.P.] and/or other persons involved in the crisis situation. [J.P.'s] mother will be called.  Administration will determine if the need for APS Police or other law enforcement is necessary."  Id. Regardless of Defendant's hindsight contentions the plain language of J.P.'s BIP does not authorize her arrest.

### 4.  __The Incident on September 26, 2011__.

"In the fall of 2011, J.P. was placed in Ms. Allison Gonzales's sixth grade special education class at Roosevelt Middle School."  MSJ No. 1 ¶ 23, at 8 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 23-26, at 8 (not disputing this fact); Plaintiffs' Second Amended Complaint for Recovery of Damages due to Deprivation of Civil Rights and Rights Under the

---

Response to MSJ No. 1 ¶ 22, at 5 (emphasis in original).  Sharkey replies that "[t]he BIP is immaterial . . . to the question of whether Deputy Sharkey had probable cause to arrest J.P.  Moreover, the BIP guides the conduct of school employees, not police officers."  Reply to Response to MSJ No. 1 ¶ 22, at 4 (citations omitted).

The Court concludes that the fact is undisputed.  First, the Plaintiffs' contentions about what a BIP required with respect to J.P. does not specifically controvert the fact, which speaks about what Sharkey was "generally expected" to do.  MSJ No. 1 ¶ 22, at 8.  Second, although the Court will, if necessary, return to this issue in the analysis, because the issue of the BIP's role in Sharkey's arrest is important to the parties' portrayal of the facts, the Court clarifies here that Sharkey is essentially correct:  the BIP does not change the Fourth Amendment standards that govern Sharkey's conduct in arresting J.P.  The IDEA, from which the BIP arises, governs the conduct of state educational officials that receive federal financial assistance:

> Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies.

20 U.S.C.A. § 1415(a).  Indeed, the IDEA expressly disclaims the notion that a Court should understand the IDEA to impose a heightened burden on law enforcement officers:

> Nothing in this subchapter shall be construed to prohibit an agency from reporting a crime committed by a child with a disability to appropriate authorities or to prevent State law enforcement and judicial authorities from exercising their responsibilities with regard to the application of Federal and State law to crimes committed by a child with a disability.

20 U.S.C. § 1415(k)(6)(A).  In short, the BIP has little or nothing to say about whether Sharkey violated the Fourth Amendment when he arrested J.P. -- or about what he is generally expected to do when he arrives upon a violent event.  That analysis depends on objective reasonableness in light of the facts known to him at the time and not on provisions in a BIP created under a statute that expressly preserves law enforcement officers' rights to enforce the law.

Americans with Disabilities Act, ¶ 5, at 1, filed June 28, 2013 (Doc. 85)("Complaint"); id. ¶ 25, at 4.  "Ms. Gonzales was employed as a teacher with the Albuquerque Public Schools."  MSJ No. 1 ¶ 24, at 8 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 23-26, at 8 (not disputing this fact); Deposition of Allison Gonzales at 13:6-17 (taken June 13, 2013), filed July 30, 2013 (Doc. 92-5)("Sharkey's Gonzales Depo."); Complaint ¶ 5, at 1; id. ¶ 25, at 4.  "There were [sic] a total of seven (7) students in Ms. Gonzales's class, including J.P."  MSJ No. 1 ¶ 25, at 8 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 23-26, at 8 (not disputing this fact); Sharkey's Gonzales Depo. at 14:20-22.  "Ms. Gonzales also had a teaching assistant, Gwendoline Zamora."  MSJ No. 1 ¶ 26, at 8 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 23-26, at 8 (not disputing this fact); Sharkey's Gonzales Depo. at 17:22-18:3.  "Deputy Sharkey was aware that J.P. was assigned to a class that provided special education services, but he was not aware of the reason for her placement in that class as children receive special education services for a variety of reasons."  MSJ No. 1 ¶ 27, at 8.  See Sharkey Aff. ¶ 8, at 2.[35]

---

[35]The Plaintiffs respond: "Defendant's fact 27 is disputed.  While Defendant may not have been aware of why J.P. was eligible for special education classes, Plaintiff reminds Defendant that he had previously  interacted with J.P. for a behavioral issue and should have been aware that J.P. had emotional/behavioral problems."  Response to MSJ No. 1 ¶ 27, at 6 (citing Plaintiffs' Sharkey Depo. at 75:2-76:21.  Sharkey replies:

> Plaintiffs concede that Deputy Sharkey may not have been aware of why J.P. was eligible for special education classes.  They, nonetheless, conten[d] that he should have been aware that she had emotional/behavioral problems since he was aware of one prior instance of misbehavior.  Plaintiffs do not offer any competent evidence or legal authorities to support this leap of logic.  Prior to the September 26, 2011 incident, Deputy Sharkey was only aware that J.P. had one instance of misconduct during elementary school which had been resolved before his arrival to the area.

Reply to Response to MSJ No. 1 ¶ 27, at 5.
The Court deems the fact undisputed.  That Sharkey was aware of a single incident of

"On September 26, 2011, J.P. was disrupting the classroom after arriving late to school." MSJ No. 1 ¶ 28, at 9 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact);[36] Statement by Allison Gonzales at 2 (dated September 26, 2011), filed July 30, 2013 (Doc. 92-6); Sharkey's Gonzales Depo. at 54:19-56:13.  "When asked to participate in the lesson she responded, 'I'm not doing shit.'"  MSJ No. 1 ¶ 29, at 9 (setting forth this fact)(quoting Statement by Allison Gonzales at 2).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact).[37]  "J.P. then began to disrupt the class by loudly tapping a metal type marble."  MSJ No. 1 ¶ 30, at 9 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact);[38] Sharkey's Gonzales Depo. at 55:19-56:19.  "J.P. ignored repeated requests from Ms. Gonzales and peers to stop bouncing the marble."  MSJ No. 1 ¶ 31, at 9 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact);

---

misbehavior does not controvert the proposed fact: the fact is that Sharkey did not know why J.P. had been placed in that class and not whether he should have known that reason, based on this single other interaction.  Accordingly, the Court deems the fact undisputed for purposes of this opinion.

[36]The Plaintiffs respond:

Plaintiff does not dispute Defendant's facts 28-42. Plaintiff notes, however, that by Defendant's admission, it was the crisis intervention team that was called to assist with J.P., not Defendant.  Plaintiff further notes that while J.P. did throw her marble across the room she did not intend to strike anyone with it, in fact, she did not even see where it went.

Response to MSJ No. 1¶¶ 28-42, at 6 (citing Deposition of Allison Gonzales at 62:23-63:4 (taken June 13, 2013), filed August 16, 2013 (Doc. 103-3).  This statement does not specifically controvert the proposed fact.  The Court, therefore, deems the fact undisputed.

[37]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

[38]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

Sharkey's Gonzales Depo. at 55:19-56:19; id. at 58:19-59:11.[39]  "Ms. Zamora asked J.P. if she wanted some help and she said, 'no.'"  MSJ No. 1 ¶ 32, at 9 (setting forth this fact)(quoting Statement of Allison Gonzales at 2).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact).[40]  "Ms. Gonzales then asked J.P. if she wanted to talk to her mom or maybe her mom could come back to school in an effort to 'change the environment, change the action, that might be a support as well.'"  MSJ No. 1 ¶ 33, at 9 (setting forth this fact)(quoting Sharkey's Gonzales Depo. at 60:13-19).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Statement of Allison Gonzales at 2.[41]  "J.P. responded that her mother was at work and could not come to the school."  MSJ No. 1 ¶ 34, at 9 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact);[42] Statement of Allison Gonzales at 2.  "J.P. then called another [sic] male student a 'butt head' which elicited a response from him, and they exchanged words."  MSJ No. 1 ¶ 35, at 9 (setting forth this fact)(quoting Statement of Allison Gonzales at 2).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 55:19-56:19.[43]  "The other student then returned to his seat to work with Ms. Gonzales."  MSJ No. 1 ¶ 36, at 9 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Statement of Allison Gonzales at 2.[44]

---

[39]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

[40]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

[41]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

[42]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

[43]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

[44]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

"J.P. could not see her peers from her study carrel, so no eye contact took place from the time the other student took his seat."  MSJ No. 1 ¶ 37, at 10 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact);[45] Statement of Allison Gonzales at 2; Sharkey's Gonzales Depo. at 61:23-62:11.   "J.P. then came around her study carrel and forcefully threw the metal marble across the room where it hit the wall hard, bounced back and rolled to the other side of the classroom."  MSJ No. 1 ¶ 38, at 10 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Statement of Allison Gonzales at 2; Sharkey's Gonzales Depo. at 55:19-56:19.[46]  "J.P. then punched the other student in the back of the head with her fist."  MSJ No. 1 ¶ 39, at 10 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Statement of Allison Gonzales at 2; Sharkey's Gonzales Depo. at 55:19-56:9; id. at 63:8-19.[47]

"Ms. Gonzales stood up and placed her body between both students to stop the altercation."  MSJ No. 1 ¶ 40, at 10 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Statement of Allison Gonzales at 2;  Sharkey's Gonzales Depo. at 55:19-57:4;  id.  at 63:20-23.[48]   "As J.P. attempted to strike the male student again, Ms. Gonzales moved J.P. toward the side of the room and immediately instructed the male student to leave the classroom."  MSJ No. 1 ¶ 41, at 10 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Statement of Allison Gonzales at 2; Sharkey's

---

[45]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

[46]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

[47]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

[48]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

Gonzales Depo. at 55:19-57:4.[49]  "Ms. Gonzales directed Ms. Zamora to call the office on the intercom to request assistance from the crisis intervention team."  MSJ No. 1 ¶ 42, at 10 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Statement of Allison Gonzales at 2; Sharkey's Gonzales Depo. at 65: 1-11.[50]

"A staff member from the Roosevelt Middle School administrative office requested that Deputy Sharkey respond to classroom #11 in response to an unknown request by Ms. Gonzales." MSJ No. 1 ¶ 43, at 10 (setting forth this fact).   See Response to MSJ No. 1 ¶¶ 43-44, at 6 (not disputing this fact); Sharkey Aff. ¶ 27, at 4.[51]  "The administrative staff person was unable to explain to Deputy Sharkey why he was needed."  MSJ No. 1 ¶ 44, at 10 (setting forth this fact). See Response to MSJ No. 1 ¶¶ 43-44, at 6 (not disputing this fact);[52] Sharkey Aff. ¶ 28, at 10.

"Back in the classroom, the male student may have made eye contact with J.P. when he was walking out as instructed by Ms. Gonzales though this is not certain."  MSJ No. 1 ¶ 45, at 10-11 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 45-47, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 55:19-57:4.  "Ms. Gonzales had a hold of J.P.'s arms just above the wri[s]ts."  MSJ No. 1 ¶ 46, at 11 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 45-47, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 66:6-18.  "Ms. Gonzales did not think it

---

[49]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

[50]The Court disposed of the Plaintiffs' sole response to this set of facts in note 36, supra.

[51]The Plaintiffs respond that they are "without sufficient information to admit or deny Defendant's facts 43-44 and so do[] not dispute them for the purpose of this motion only." Response to MSJ No. 1 ¶¶ 43-44, at 6.  The Court, therefore, deems the fact undisputed.

[52]The Plaintiffs respond that they are "without sufficient information to admit or deny Defendant's facts 43-44 and so do[] not dispute them for the purpose of this motion only." Response to MSJ No. 1 ¶¶ 43-44, at 6.  The Court, therefore, deems the fact undisputed.

would be a good plan for her to put J.P. in a body hold because J.P. is 'a fairly good-sized girl.'" MSJ No. 1 ¶ 47, at 11 (setting forth this fact)(quoting Sharkey's Gonzales Depo. at 47:65-66:50). See Response to MSJ No. 1 ¶¶ 45-47, at 6 (not disputing this fact).  "While Ms. Gonzales tried to hold her back, J.P. attempted to head butt, hit and bite Ms. Gonzales" to free herself from Gonzales' hold.  MSJ No. 1 ¶ 48, at 5 (setting forth unmodified version of this fact).  See Response to MSJ No. 1 ¶ 48, at 6 (not disputing this portion of the fact); Statement of Allison Gonzales at 2; Sharkey's Gonzales Depo. at 66:24-5.[53]  "J.P. was eventually able to scratch Ms. Gonzales' hand and drew blood."  MSJ No. 1 ¶ 49, at 11 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 49-50, at 6 (not disputing this fact); Sharkey's Nation Depo. at 46:9-

---

[53]Sharkey asks the Court to find undisputed that, "[w]hile Ms. Gonzales tried to hold her back, J.P. attempted to head butt, hit and bite Ms. Gonzales."  MSJ No. 1 ¶ 48, at 11.  The Plaintiffs respond: "Plaintiff disputes Defendant's fact 47.  Plaintiff does not dispute that J.P. was trying to free herself from Ms. Gonzales' hold on her.  However, nowhere in the testimony cited by Defendant did Ms. Gonzales indicate that J.P. tried to bite her."  Response to MSJ No. 1 ¶ 48, at 6.  Sharkey replies:

> Plaintiffs do not dispute that, while Ms. Gonzales was trying to hold J.P. back, J.P. attempted to head butt and hit Ms. Gonzales. Plaintiffs state that J.P. was trying to free herself from Ms. Gonzales' hold.  Deputy Sharkey does not dispute that J.P. was trying to free herself in order to go after her classmate once again.  Plaintiffs also argue that the evidence offered by Deputy Sharkey does not indicate that J.P. attempted to bite Ms. Gonzales.  Plaintiffs overlooked Deputy Sharkey's Exhibit F[, the Statement of Allison Gonzales,] wherein Ms. Gonzales stated that J.P. attempted to bite her.

Reply to Response to MSJ No. 1 ¶ 48, at 5 (citing Statement of Allison Gonzales at 2).  The Court has modified the proposed fact slightly to reflect the J.P.'s motivation in evading Gonzales; the testimony that Sharkey cited supports this fact.  See Sharkey's Gonzales Depo. at 66:25 ("[W]ell, unfortunately then [J.P.] wanted to get loose.").  As for the biting, Sharkey is correct: the Statement of Allison Gonzales states that, "[w]hile [Gonzales] held [J.P.] back she tried to head butt, hit, and bite, eventually she was able to scratch my hand, which was holding her arm (photo taken, minor injury)."  Statement of Allison Gonzales at 2 (emphasis added).  Accordingly, the Court finds the fact, as modified, undisputed.

17; Sharkey's Gonzales Depo. at 66:24-67:5; Statement of Allison Gonzales at 2.  "J.P. was able to free herself from Ms. Gonzales' hold."  MSJ No. 1 ¶ 50, at 11 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 49-50, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 67:10-11.  "J.P. ran at the other student, hitting him once again on the head."  MSJ No. 1 ¶ 51, at 11 (setting forth this fact).  See Sharkey's Gonzales Depo. at 67:12-68:5; Statement of Allison Gonzales at 2.[54]  "As the other student exited the classroom, J.P. ran out [of] the classroom in pursuit of him."  MSJ No. 1 ¶ 52, at 11 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 68:6-8; Statement of Allison Gonzales at 2.

"Ms. Zamora grabbed J.P. by her left arm and Ms. Gonzales grabbed her right arm."  MSJ No. 1 ¶ 53, at 11 (setting forth this fact).  See Response to MSJ No. 1  ¶¶ 52-66, at 6 (not disputing this fact); Statement of Allison Gonzales at 2.  "While Ms. Gonzales and Ms. Zamora were attempting to restrain her, J.P. kicked Ms. Gonzales in the leg, leaving a footprint."  MSJ No. 1 ¶ 54, at 11 (setting forth this fact).  See Response to MSJ No. 1  ¶¶ 52-66, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 68:16-17; Statement of Allison Gonzales at 2. "The incident was a rapidly evolving situation."  MSJ No. 1 ¶ 55, at 11 (setting forth this fact). See Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 57:13-15.

---

[54]The Plaintiffs respond: "Defendant's fact 51 is disputed.  Ms. Gonzales never affirmatively states that J.P. was able to hit the other student once she broke free."  Response ¶ 51, at 6.  Sharkey replies: "Again, Plaintiffs overlooked [the Statement of Allison Gonzales].  It cannot be disputed that J.P. hit her classmate a second time on the head."  Reply to Response to MSJ No. 1 ¶ 51, at 5.  Sharkey is correct: Gonzales states that, after J.P. scratched her, J.P. "was released and ran at [the male student], hitting him once again on the head."  Statement of Allison Gonzales at 2.  The Court, therefore, finds the fact undisputed.

"As he approached the classroom on foot, Deputy Sharkey saw Ms. Gonzales holding J.P." MSJ No. 1 ¶ 56, at 11 (setting forth this fact).  <u>See</u> Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact); Sharkey Aff. ¶ 29, at 4.  "Deputy Sharkey heard raised voices and saw J.P. kick Ms. Gonzales in the right upper leg."  MSJ No. 1  ¶ 57, at 12 (setting forth this fact). <u>See</u> Sharkey Aff. ¶ 31, at 4; Sharkey's Gonzales Depo. 71:2-6; Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact).  "Other school personnel had not arrived."  MSJ No. 1 ¶ 58, at 12 (setting forth this fact).  <u>See</u> Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact); Sharkey Aff. ¶ 32, at 4; Sharkey's Gonzales Depo. 69:4-6.[55]

"Deputy Sharkey ordered J.P. to stop."  MSJ No. 1 ¶ 59, at 12 (setting forth this fact). <u>See</u> Sharkey Aff. ¶ 33, at 4; Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact). "When J.P. saw Deputy Sharkey coming around the corner, she immediately stopped kicking." MSJ No. 1 ¶ 60, at 12 (setting forth this fact).  <u>See</u> Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact); Sharkey Aff. ¶ 34, at 4; Sharkey's Gonzales Depo. at 69:18-21.   "J.P. began moving  away from Deputy Sharkey, taking Ms. Gonzales and Ms. Zamora with her as they were still trying to keep a hold on J.P." MSJ No. 1 ¶ 61, at 12 (setting forth this fact).  <u>See</u> Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact); Sharkey Aff. ¶ 35; Sharkey's Gonzales Depo. at 68:20-69:3.  "Deputy Sharkey removed his handcuffs from his duty belt." MSJ No. 1 ¶ 62, at 12 (setting forth this fact).  <u>See</u> Sharkey Aff ¶ 36; Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact).   "J.P. re-entered Ms. Gonzales's classroom."  MSJ No. 1 ¶ 63, at 12 (setting forth this fact); Sharkey Aff. ¶ 37, at 4, ¶ 37.  <u>See</u> Response to MSJ No. 1 ¶¶ 52-66, at 6

---

[55]Although the cited evidence refers only to the crisis intervention team and not to all other school personnel, <u>see</u> Sharkey Aff. ¶ 32, at 4; Sharkey's Gonzales Depo. at 69:4-4, the Plaintiffs do not dispute this fact, and there is no evidence that other school personnel arrived. Accordingly, the Court has found the fact undisputed.

(not disputing this fact).  "Ms. Zamora let go of J.P. and escorted the other students outside the classroom and remained with them."  MSJ No. 1 ¶ 64, at 12 (setting forth this fact).  See Sharkey's Gonzales Depo. at 70:6-8; Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact).  "J.P. scooted herself into a small room without a door within the classroom, sat on the floor, and locked her hands together to resist being handcuffed."  MSJ No. 1 ¶ 65, at 12 (setting forth this fact).  See Sharkey Aff. ¶ 38, at 4; Sharkey's Gonzales Depo. at 70:16-71:1; Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact).  She would remain in that room on the floor crying for approximately fifteen minutes before Sharkey handcuffed her.  See Response to MSJ No. 1 ¶ Q, at 12 (setting forth a similar fact); Plaintiffs' Sharkey Depo. at 5:3-16.[56]  "Shortly thereafter, the principal and head special education teacher arrived at Ms. Gonzales's classroom."

---

[56]The Plaintiffs assert that "Defendant Sharkey arrested J.P. after she was on the floor crying for fifteen minutes because she allegedly committed a crime."  Response to MSJ No. 1 ¶ Q, at 12.  Sharkey responds:

> Disputed. Deputy Sharkey arrested and handcuffed J.P. after witnessing her kick Ms. Gonzales and after Ms. Gonzales informed him about J.P.'s misconduct against her and another student prior to the Deputy Sharkey's arrival. Deputy Sharkey waited to handcuff J.P. until another deputy arrived as Deputy Sharkey was concerned J.P. might resist being handcuffed.  The fact that J.P. began to cry after Deputy Sharkey arrived is irrelevant as it does not negate Deputy Sharkey's probable cause finding.

Reply to Response to MSJ No. 1 ¶ Q, at 12 (citations omitted).  The fact's core is undisputed: J.P. had been on the floor crying for fifteen minutes when Sharkey arrested her. The second part of the sentence is ambiguous: it is not clear whether the Plaintiffs intend to suggest that Sharkey arrested her because she allegedly committed a crime or that J.P. had been crying because she allegedly committed a crime.  No one truly disputes the first inference -- that Sharkey arrested her because she, to his mind, committed a crime -- and the cited testimony does not support the second inference, because it does not speak about the reason she was crying.  The Court has found undisputed a version of the fact that the cited testimony supports more clearly, and has placed the fact that she was crying on the floor in the narrative so that the context and narrative is clear.

MSJ No. 1 ¶ 66, at 12 (setting forth this fact); Sharkey Aff. ¶ 39, at 4.  See Response to MSJ No.

1 ¶¶ 52-66, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 70:16-71:1.  "Deputy

Sharkey's demeanor toward J.P. was very calm and professional."  MSJ No. 1 ¶ 67, at 12 (setting

forth this fact).  See Sharkey Aff. ¶ 40, at 4; Sharkey's Gonzales Depo. at 71:10-72:1.[57]  "When

---

[57]The Plaintiffs purport to dispute this fact: "Defendant reportedly told J.P. that 'we [can] do this the easy way or the hard way' and that '[t]he easy way is you turn around and let me put these handcuffs on you . . . [t]he hard way is for me to force you to, and I could break your little arms.'"  Response to MSJ No. 1 ¶ 67, at 6-7 (quoting Plaintiffs' J.H. Depo. at 200:15-201:10).  Sharkey replies:

> Plaintiffs dispute Deputy Sharkey's demeanor during his interaction with J.P., claiming he told J.P. he could handcuff her the easy way or the hard way and the hard way might result in him breaking her little arms.  Plaintiffs rely on inadmissible hearsay from J.P.'s mother, J.H., to support this allegation.  See Fed. R. Civ. P. 56(c)(2); Llewellyn v. Allstate Home Loans, Inc., 711 F.3d [at 1180] (stating that inadmissible hearsay does not create a genuine dispute and cannot support a plaintiff's opposition to summary judgment).  Therefore, J.H.'s inadmissible hearsay testimony does not create a genuine dispute.  Even assuming Plaintiffs' assertion was properly supported, it is immaterial as "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Graham v. Connor, 490 U.S. 386, 396 (1989) (emphasis added).

Reply to Response to MSJ No. 1 ¶ 67, at 5-6.
        Sharkey is correct: the statement on which the Plaintiffs rely is inadmissible hearsay.  The Plaintiffs rely on the following portion of J.H.'s deposition:

> Q.      I could ask you what was done but you weren't there so asking the question is really asking you what did you hear from other people about what happened.  And the one person I'm asking about who was there and who did witness it was your daughter.  So that's why I'm focusing in on what did your daughter tell you about the manner in which handcuffs were placed on her by Deputy Sharkey?

> A.      She told me that she was cornered in the little room and that Deputy Sharkey had told her that we could do this the easy way or the hard way and [J.P.] was quiet at that time.  She said she got quiet and she listened and nodded her head to say she understood, and he said, "The easy way is you turn around and let me put these handcuffs on you."  And she nodded her she had [sic]

---

Defendant Sharkey arrested J.P. he did not ask anyone present whether she had a disability, even though she was arrested in a special education classroom."  Response to MSJ No. 1 ¶ FF, at 14 (setting forth this fact).   See Reply to Response to MSJ No. 1 ¶¶ FF-GG, at 14 (not disputing this fact); Plaintiffs' Sharkey Depo. at 76:22-77:2.[58]

"Deputy Sharkey became concerned that J.P. might resist if he forcibly attempted to handcuff her by himself."  MSJ No. 1 ¶ 68, at 12-13 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 68-74, at 7 (not disputing this fact); Sharkey Aff. ¶ 41, at 4-5.  "Deputy Sharkey therefore requested an additional deputy be dispatched to the scene because he believed two deputies would be better able to quickly and safely control . . . J.P. if she resisted."  MSJ No. 1 ¶ 69, at 13 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 68-74, at 7 (not disputing this fact); Sharkey Aff. ¶ 44, at 5.  "While waiting for an additional deputy, Ms. Gonzales advised

---

and then she said he said, "the hard way is for me to force you to, and I could break your little arms," and she nodded her head and started crying and she turned around and put her hands by her side and he grabbed her arms to place her in handcuffs at that time.

J.H. Depo. at 200:15-201:10.  Sharkey's statement is nonhearsay, because J.H. would be offering this evidence against Sharkey -- an opposing party -- and Sharkey made that statement in his individual capacity.  See Fed. R. Evid. 801(d) (stating that, if a "statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity," the statement is nonhearsay).  The trouble is, instead, that this statement entirely rests on J.H.'s report of what J.P. told her, and J.H. offers that statement for its truth.  In other words, to read this testimony as controverting the fact -- that Sharkey acted very calmly and professionally -- the Court would have to take J.P.'s out-of-court statement that Sharkey threatened her for the truth of what it asserts -- that is, that Sharkey threatened her.  "Hearsay testimony that would not be admissible at trial is not sufficient to defeat a motion for summary judgment."  Jaramillo v. Colorado Judicial Dep't, 427 F.3d 1303, 1314 (10th Cir. 2005).  Accordingly, the Court deems this fact undisputed.

[58]Sharkey replies: "Undisputed.  However, Deputy Sharkey did not see anything that lead [sic] him to believe that J.P. had a mental health issue."  Reply to Response to MSJ No. 1 ¶¶ FF-GG, at 14.  This statement does not controvert the proposed fact.  Accordingly, the Court deems it undisputed.

Deputy Sharkey about the events that occurred in the classroom involving J.P. prior to his arrival." MSJ No. 1 ¶ 70, at 13 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 68-74, at 7 (not disputing this fact); Sharkey Aff. ¶ 45, at 5.  "Ms. Gonzales then left the room to call J.P.'s mother and inform her of the incident."  MSJ No. 1 ¶ 71, at 13 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 68-74, at 7 (not disputing this fact); Sharkey's Gonzales Depo. at 72:23-25; Sharkey Aff. ¶ 47, at 5.   "The principal also attempted to contact J.P.'s mother." MSJ No. 1 ¶ 72, at 13 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 68-74, at 7 (not disputing this fact); Sharkey's Nation Depo. at 42:7-18.  "When the other deputy arrived, Deputy Sharkey briefed him on the situation."  MSJ No. 1 ¶ 73, at 13 (setting forth this fact).   See Response to MSJ No. 1 ¶¶ 68-74, at 7 (not disputing this fact); Sharkey Aff. ¶ 48, at 5.

"Deputy Sharkey then informed J.P. she was under arrest and directed her to stand  up." MSJ No. 1 ¶ 74, at 13 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 68-74, at 7 (not disputing this fact); Sharkey Aff. ¶ 47:18-48:8.  "Deputy Sharkey told J.P., 'You will stand up and do this calmly.'"  MSJ No. 1 ¶ 75, at 13 (setting forth this fact)(quoting Sharkey's Nation Depo. at 48:7-8).[59]  "J.P. complied and Deputy Sharkey gently handcuffed her behind her back." MSJ No. 1 ¶ 76, at 13 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 76-78, at 7 (not disputing these facts); Sharkey's Nation Depo. at 48:3-8; id. 50:17-51:6; Sharkey Aff. ¶ 51, at 5. "The other deputy observed but did not intervene."  MSJ No. 1 ¶ 77, at 13 (setting forth this

---

[59]The Plaintiffs dispute this fact, relying on the argument of which the Court disposed in note 57.  See Response to MSJ No. 1 ¶ 75, at 7.  The Court will not repeat that analysis here. What is more, although Sharkey did not note as much in his reply to the Plaintiffs' purported dispute, see Reply to Response to MSJ No. 1 ¶ 75, at 6, even if admissible evidence supported the notion that Sharkey threatened J.P., that evidence would not contradict that Sharkey told J.P.: "You will stand up and do this calmly."  Accordingly, the Court deems this fact undisputed.

fact); Sharkey Aff. ¶ 53, at 4.  See Response to MSJ No. 1 ¶¶ 76-78, at 7 (not disputing these

facts); Sharkey's Nation Depo. at 50:9-14.  "Deputy Sharkey ensured that he double locked the

handcuffs to prevent them from tightening and ensured that there was a thumb-width of space, or

approximately one inch, between the handcuffs and J.P.'s wrist."  MSJ No. 1 ¶ 78, at 13 (setting

forth this fact).  See Response to MSJ No. 1 ¶¶ 76-78, at 7 (not disputing this fact); Sharkey Aff.

¶ 54, at 5-6.  "Deputy Sharkey determined that handcuffing J.P. was appropriate because of his

concern that J.P. might attempt to strike him or others, and because he needed to secure J.P. to

transport her to the Bernalillo County Juvenile Detention Center."  MSJ No. 1 ¶ 79, at 14 (setting

forth this fact).  See Sharkey Aff. ¶ 55, at 6.[60]  "Defendant Sharkey did not make an evaluation of

whether J.P. needed mental healthcare prior to transporting her to the Juvenile Detention Center

even though he admitted that J.P.'s behavior on the subject date was something that he had never

seen."  Response to MSJ No. 1 ¶ GG, at 14 (setting forth this fact).  See Reply to Response to

---

[60]The Plaintiffs purport to dispute this fact, saying that Sharkey "transported J.P. for the purpose of stopping her law breaking behavior. According to Defendant Sharkey, if a child is 'at the detention center, then they're -- it's controlled.'"  Response to MSJ No. 1 ¶ 79, at 7 (quoting Plaintiffs' Sharkey Depo. at 43:6-10).  Sharkey replies:

> This fact set forth the reasons Deputy Sharkey believed handcuffing J.P. was appropriate.  Plaintiffs do not dispute Deputy Sharkey's reasons for handcuffing J.P.  Instead, Plaintiffs add a reference to Deputy Sharkey's testimony wherein he states that a juvenile's law breaking behavior is stopped by transporting the juvenile to the detention facility.  Deputy Sharkey does not dispute his testimony though his answer to this question is not material to the Fourth Amendment inquiry.

Reply to Response to MSJ No. 1 ¶ 79, at 18.  Sharkey is correct: the testimony that the Plaintiffs cite discusses why Sharkey transported J.P. and not why he handcuffed her.  Accordingly, the Court deems this fact undisputed.

MSJ No. 1 ¶¶ FF-GG, at 14 (not disputing this fact);[61] Plaintiffs' Sharkey Depo. at 81:8-82:15.

_____

[61]The Court disposed of Sharkey's sole addition to this fact in note 52.
The Plaintiffs ask the Court to find undisputed:

> Defendant Sharkey claims to know whether a child is in need of mental health treatment. [Plaintiffs' Sharkey Depo. at] 82:16-83:12. Defendant Sharkey determined that J.P. did not required [sic] mental health treatment because she was not being "self-destructive" and because she wasn't acting as if she was "listening to voices inside her head or acting in a way where she[ was] talking to a chair or something." [Plaintiffs' Sharkey Depo. at] 85:5-12.

Response to MSJ No. 1 ¶ HH, at 15.  Sharkey replies: "Disputed.  Plaintiffs misrepresent Deputy Sharkey's testimony.  He testified only that he had received training on mental health issues involving students and then related some of his experiences.  He also testified that he did not see any indicators of J.P. being self-destructive or hallucinating."  Reply to Response to MSJ No. 1 ¶ HH, at 14.
Sharkey is correct.  The cited testimony is as follows:

> Q.     All right.  Are you trained at all in how to identify whether a child is in need of mental health treatment?
>
> A.     They will, in our classes, discuss mental health issues with students where suicide -- for example, certain signs if we were interacting and talking with the student and you know, always monitor, you know, are they cutting themselves?  I have a lot of students unfortunately who are cutters.  And I've had students, too, who will come to me and say, you know, "I'm hurt -- I'm thinking about hurting myself, or I want to end it," and I immediately  make sure to refer them directly and have one of my counselors come from my school or I'll say, "Is it okay, can we walk over, and we'll go talk to the counselor who's on scene."  So I'm aware there are signs when there's mental health, where they're hurting themselves or sexual abuse issues where I've had my students come in and tell me this and immediately refer.  I didn't see any indicators with her of self-destructive [sic] or not being -- acting of, you know, as if she's listening to voices inside her head and acting in a way where she's talking to a chair or something.  So there was no indications like that.

Plaintiffs' Sharkey Depo. at 82:16-83:12.  The Plaintiffs' proposed reading of this testimony is simultaneously too narrow and too broad: Sharkey did not hold himself out as qualified to determine whether any child needs mental health treatment, as the proposed fact suggests, and he also did not reduce his read of J.P.'s behavior to only the more extreme examples, as the Plaintiffs' quoted testimony would suggest; in context, he discussed more general signs of mental health  problems as well.  Moreover, even if he had too narrow a view of the signs needed

- 40 -

"Deputy Sharkey calmly explained to J.P. that he would be walking her out to his patrol car." MSJ No. 1 ¶ 80, at 14 (setting forth this fact). <u>See</u> Response to MSJ No. 1 ¶¶ 80-82, at 7 (not disputing this fact); Sharkey's Nation Depo. at 50:17-21; Sharkey Aff. ¶ 56, at 7. "Deputy Sharkey escorted J.P. from the class while school was in session in an effort to avoid embarrassing her in front of her peers or any other individuals who might be present between passing periods." MSJ No. 1 ¶ 81, at 13. <u>See</u> Sharkey's Nation Depo. at 51:21-52:7; Response to MSJ No. 1 ¶¶ 80-82, at 7 (not disputing this fact). "The principal followed Deputy Sharkey and J.P. out to his patrol car." MSJ No. 1 ¶ 82, at 14 (setting forth this fact). <u>See</u> Response to MSJ No. 1 ¶¶ 80-82, at 7 (not disputing this fact); Sharkey's Depo. at 51:19-20. "There was nothing that happened on September 26, 2011 that would have indicated to the principal that law enforcement was not needed." MSJ No. 1 ¶ 83, at 14 (setting forth this fact).[62] <u>See</u> Sharkey's

---

to determine whether a child needs mental health treatment, that perception would not bear on whether he had probable cause to arrest her.

The Plaintiffs ask the Court to find undisputed that, "[p]ursuant to Departmental Rules and Regulations, all Bernalillo County Deputies 'shall familiarize themselves with, and have a working knowledge of, all laws of the State of New Mexico and the ordinances of Bernalillo County, which they are required to enforce.'" Response to MSJ No. 1 ¶ II, at 15 (setting forth this fact)(quoting Bernalillo County Sheriff's Department Rules and Regulations at 1 (no date provided), filed July 30, 2013 (Doc. 95-8)). As Sharkey rightly points out, <u>see</u> Reply to Response to MSJ No. 1 ¶¶ II, at 14, the policy became effective after the events in this case, and, even if it were relevant, under Tenth Circuit law, evidence that Sharkey violated an SOP is irrelevant to the Fourth Amendment issues in this case. Accordingly, the Court will not find this fact undisputed.

[62]The Plaintiffs respond:

Defendant's fact 83 is irrelevant under the objective standard at play here, immaterial and inadmissible. Fed. R. Civ. P. 56(C)(2). Principal Cee Kay Nation is not a lawyer or law enforcement officer and cannot opine as to whether law enforcement was needed on the date in question. Fed. R. Evid. 701. Furthermore, Cee Kay Nation is of the opinion that a school resource officer may arrest a student *any* time the crisis intervention team is called because he cannot control or

Nation Depo. at 59:11-15.  "Deputy Sharkey left the school immediately to avoid interacting with J.P.'s mother as his past interaction had been unpleasant due to her mistaken belief that a BIP takes precedence over state law when a student or teacher is assaulted or battered."  MSJ No. 1 ¶ 84, at 14.  See Sharkey Aff. ¶ 58, at 14; Response to MSJ No. 1 ¶ 84, at 7 (not disputing this fact).[63]

---

interfere with an officer's job. [Deposition of Cee Kaye Nation at 63:1-64:24 (taken June 14, 2013), filed August 16, 2013 (Doc. 103-10)("Plaintiffs' Nation Depo."]

Response to MSJ No. 1 ¶ 83, at 7.  Sharkey states: "Plaintiffs correctly point out that it is immaterial that the school principal was of the opinion that Deputy Sharkey's presence was needed on the date of the incident."  Reply to Response to MSJ No. 1 ¶ 83, at 6.  First, materiality is an issue for the analysis and not for the facts.  Second, as for the suggestion that Nation cannot opine with respect to whether the situation called for law enforcement involvement, the Court does not understand her testimony to be in the nature of expert testimony, but, instead, to reflect her own lay opinion, based on her own perceptions of the events, about whether law enforcement was needed.  Finally, as for Nation's other opinions, they do not specifically controvert the proposed fact.  Accordingly, the Court deems the fact undisputed.

[63]The Plaintiffs assert that she "does not dispute Defendant's fact 84.  Plaintiffs add that Defendant also did not call J.H. until J.P. had been booked into the Juvenile Detention Center because he was so intent on avoiding her."  Response to MSJ No. 1 ¶ 84, at 7 (citing Plaintiffs' Nation Depo. at 52:6-12).  Sharkey responds that the fact is undisputed and notes that "[i]t is accurate that Deputy Sharkey stated that avoiding J.H. was in the back of his head because he did not want the situation to escalate.  While accurate, this fact is irrelevant to the Fourth Amendment issues before the Court."  Reply to Response to MSJ No. 1 ¶ 84, at 6 (citation omitted).

The Court first notes that the cited portion of the deposition, in context, reflects that Sharkey's general concern was less about avoiding J.H. as an end to itself and more as a means to avoid escalating the situation and, thereby, endangering other students:

Q.    So is it fair to say in part your decision to transport [J.P.] to the Juvenile Detention facility rather than wait for her mom to come to the school was an effort to avoid a potentially confrontational situation at the school?

A.    That is in the back of my head of I don't want a situation to escalate, but the primary issue is I had a student who was attacked twice according to the teacher.  I had a student -- or the teacher was kicked in front of

- 42 -

5.      **J.P.'s Booking at the Bernalillo County Detention Center**.

"Deputy Sharkey transported J.P. to the juvenile detention center in his patrol unit."  MSJ No. 1 ¶ 85, at 14 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 60, at 6.  "On the way to the juvenile detention center, Deputy Sharkey asked J.P. what would happen if she assaulted another student or teaching staff at Roosevelt Middle School, and J.P. responded that she would be handcuffed and arrested again."  MSJ No. 1 ¶ 86, at 14 (setting forth these facts).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 61, at 6.  "J.P. then volunteered that she would not hit anyone anymore but would use words when she was upset."  MSJ No. 1 ¶ 87, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 62, at 6.  "J.P. did not give Deputy Sharkey any indication that the handcuffs were causing her pain."  MSJ No. 1 ¶ 88, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 63, at 6-7.  "J.P. cleared the medical examination and was

---

me, and the teacher was bleeding, and I'm -- I'm not going to have that escalate in the school, because if something else happens, now, I'm responsible for that student, and if there's another issue -- and believe it or not, I have multiple issues going on, multiple problems, multiple incidents sometimes going on at my school, at my middle school, and sometimes I'll get a call for an incident going on at my elementary school, and now, I have a student who's been violent, who's attacked, and if I've got to step away or leave or she attacks again, that's my responsibility. She's under arrest.

J.H's Nation Depo. at 52:6-25.  The Plaintiffs cite only the first clause of the answer -- that is, that avoiding a potentially confrontational situation at the school was "in the back of [Sharkey's] head," because he did not "want a situation to escalate."  J.H.'s Nation Depo. at 53:11-12.  In any event, the Court will decide the fact's relevance to the Fourth Amendment issues in its analysis.

Although whether J.P.'s mother's belief that a BIP takes precedence over state law when a student or teacher is battered is mistaken could be understood as a legal conclusion and not a fact, the Plaintiffs do not dispute that her belief was mistaken.  Accordingly, the Court will consider it to be an undisputed fact.

booked into the juvenile detention center without incident."  MSJ No. 1 ¶ 89, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 64, at 7.  "Deputy Sharkey charged J.P. only with battery upon a school employee in violation of N.M.S.A. (1978), § 30-3-9 (E)."  MSJ No. 1 ¶ 90, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 67, at 7; Statement of Probable Cause-Juvenile (dated September 26, 2011), filed July 30, 2013 (Doc. 92-7).  "Deputy Sharkey submitted the incident report to the district attorney and juvenile probation office for review, ending his participat[ion] in the incident."  MSJ No. 1 ¶ 91, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 68, at 7.

"After booking J.P. into the juvenile detention center, Deputy Sharkey left J.P.'s mother a voice message on her personal cell phone informing her that J.P. had been arrested and was in custody."  MSJ No. 1 ¶ 92, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 69, at 7.   "J.P.'s mother did not return Deputy Sharkey's call."  MSJ No. 1 ¶ 93, at 7 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 70, at 7.

"The juvenile detention center released J.P. to her mother."  MSJ No. 1 ¶ 94, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey's Nation Depo. at 68:4-9.   "Deputy Sharkey did not make the determination as to whether the juvenile detention center would accept J.P. for housing or release her to her mother."  MSJ No. 1 ¶ 95, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 71, at 7.  "Deputy Sharkey was not aware that the juvenile detention center was going to release J.P. to her mother instead of accept her for housing at the

facility." MSJ No. 1 ¶ 96, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at

7 (not disputing this fact); Sharkey Aff. ¶ 72, at 7.  "The determination to release J.P. to her

mother was made by a juvenile probation and parole officer with the Children, Youth and

Families Division by conducting a detention risk assessment to determine whether J.P. posed a

significant threat to herself, a significant threat to others, or posed a flight risk."  MSJ No. 1 ¶ 97,

at 16 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this

fact);[64] Deposition of Jeannie Masterson at 57:8-14 (taken June 10, 2013), filed July 30, 2013

(Doc. 92-8)("Masterson Depo."); id. at 63:25-65:13; id. at 64:7-65:13; id. at 66:22-25; id. at

72:6-20.  "The risk assessment guidelines do not indicate that a law enforcement officer or a

probation and parole officer should consider a child's age and mental health status in

determining whether a juvenile should be transported to or housed at the juvenile detention

center."  MSJ No. 1 ¶ 98, at 16 (setting forth this fact).  See Masterson Depo. 91:6-62:12.[65]

---

[64]Strictly speaking, the testimony that Sharkey cites speaks in general terms about the comparative roles of law enforcement officers and of CYFD in deciding whether to detain an individual and does not speak about who decided to release J.P. to her mother.  The Plaintiffs do not, however,  dispute this fact, and there is no reason to suspect that the detention decision in J.P.'s case differed from the general pattern that the testimony describes.  Accordingly, the Court deems the fact undisputed.

[65]Although the cited testimony does not expressly say as much, the Court infers that the "risk assessment guidelines" to which Sharkey refers are documents that individuals in CYFD use in deciding whether to detain an individual.

The Plaintiffs purport to dispute this fact, stating:

> Defendant's fact  98 is disputed.  While an officer may not be required to personally assess whether a child's age or disability affects her status for the purpose of detainment, an officer who arrests a child is required to contact Juvenile Probation prior to transporting the child to the Detention Center. [Bernalillo County Sheriff's Department Rules and Regulations (no date provided), filed August 16, 2013 (Doc. 103-8)("Rule 349-3")].  Furthermore, officers are fully able to play a role in determining whether a child should be

_____

      detained  [Deposition of Jeannie Masterson at 67:7-68:4 (taken June 10, 2013),
      filed August 16, 2013 (Doc. 103-11)("Plaintiffs' Masterson Depo.")].

Response to MSJ No. 1 ¶ 98, at 7.  Sharkey replies:

          Plaintiffs do not dispute this statement of fact but, instead, assert that an
      officer who arrests a juvenile is required to contact juvenile probation prior to
      transporting the child to the detention center.  In support of this assertion,
      Plaintiffs cite to a BCSO SOP that became effective almost one year <u>after</u> the
      incident at issue. See [Rule 349-3 at 1].  This cannot serve to create a genuine
      dispute.  Moreover, even if Deputy Sharkey violated this SOP, the violation
      would not violate a clearly established constitutional right.  <u>Tanberg</u>, 401 F.3d at
      1167.  Plaintiffs also add that officers are "able" to play a role in determining
      whether a juvenile should be detained. Although Jeannie Masterson testified that
      officers can play a role in some cases, such testimony is immaterial.  Plaintiffs
      cite no legal authority indicating an officer has a clearly established duty under
      the Fourth Amendment to contact a juvenile probation officer before transporting
      a juvenile arrestee to a detention center.

Reply to Response to MSJ No. 1 ¶ 98, at 6-7.
      First, none of the Plaintiffs' bases for disputing this fact controvert the fact, which has to
do with the content of risk assessment guidelines.  Second, Sharkey is correct: Rule 349-3 went
into effect on May 22, 2012, long after this incident.  Further, as Sharkey indicates, even if
Sharkey violated a standard operating procedure, that evidence is irrelevant to the Fourth
Amendment inquiry.  <u>See</u> <u>Tanberg v. Sholtis</u>, 401 F.3d at 1160 ("Even if it were clear that [the
defendant officer] violated [municipal] SOPs, that violation would not transform an arrest
supported by probable cause into an unconstitutional seizure."); <u>Jonas v. Bd. of Comm'rs of
Luna Cnty.</u>, 699 F. Supp. 2d 1284 (D.N.M. 2010)(Browning, J.).
      As for the final question whether "officers are fully able to play a role in determining
whether a child should be detained," Response to MSJ No. 1 ¶ 98, at 7, it is useful to understand
the cited testimony in context:

          Q.     And you would agree with me that a law enforcement officer does
      not play a role in determining whether that juvenile should be detained or
      released?

          A.     No.  I would not agree with you.

          Q.     Please explain your reason for making that statement.

          A.     When law enforcement calls the probation officer on call and says,
      "I have this juvenile, here is what he or she is alleged to have done," many times
      the officer also says, "You know, I'm going to charge him with X Y Z.  However,

- 46 -

_____

> I believe I can send him home.  I have spoken to the mom and she will take him
> but I want to know if you all is this okay [sic]," so they will brainstorm the case
> with us on the phone.  Not always, but they play a role in some cases because they
> have gone the extra step in obtaining and securing more information that's going
> to help us that maybe isn't even captured on the risk assessment instrument.  Or
> their mental health status.  There are officers that will call us and say, "This is
> what happened.  Here is what I would like to do.  Is this okay?"

Plaintiffs' Masterson Depo. at 67:7-68:4.  This testimony does not dispute the fact asserted,
which deals with what the risk assessment guidelines state.  Accordingly, the Court deems the
fact undisputed.

Sharkey also asks the Court to find the following fact undisputed:

> Moreover, CYFD supervisor Jeannie Masterson testified that it would be
> reasonable for an officer to believe that an 11 year old female student who had
> battered a fellow student and a teacher posed a substantial risk of harm to others
> based on the criteria used to determine whether a juvenile should be housed at the
> Juvenile Detention Center.

MSJ No.1 ¶ 99, at 16 (citing Masterson Depo. 74:14-76:1).  The Plaintiffs respond:

> Defendant's fact 99 is disputed.  Ms. Masterson's testimony cited by
> Defendant was in response to a hypothetical posed by Defendant's attorney.
> Furthermore, Juvenile Probation Officer Martha Todd has indicated that it is
> never reasonable to transport a child under the age of 12 to the juvenile detention
> center. [Deposition of Martha Todd at 44:5-47:10 (taken June 10, 2013), filed
> August 16, 2013 (Doc. 103-12)("Todd Depo.")]. The question of whether it was
> reasonable to transport J.P. to the Juvenile Detention Center is an issue to be
> addressed in this case.

Response to MSJ No. 1 ¶ 99, at 8.  Sharkey replies:

> Two CYFD employees disagree as to whether it would ever be reasonable
> to transport a juvenile under the age of 12 to the detention center. This factual
> dispute notwithstanding, New Mexico law provides it is the duty of probation and
> parole officers with CYFD to determine whether a juvenile who has been taken
> into custody will be housed at the facility by assessing whether the juvenile
> ". . . (2) poses a substantial risk of harm to others . . . ."  NMSA (1978), § 32A-2-
> 11. This duty does not rest on the law enforcement officers.

Reply to Response to MSJ No. 1 ¶ 99, at 7.  The Court has not found the proposed fact to be a
fact at all, because it instead asks the Court to find undisputed a particular Child, Youth, and
Families Division employee's view whether an act is "reasonable"; that characterization of

6.     **J.P. Was Not Physically Injured as a Result of the Arrest, Handcuffing, or Transport to the Juvenile Detention Center.**

"J.P. was not physically injured as a result of the arrest, handcuffing, or transport to the Juvenile Detention Center."  MSJ No. 1 ¶ 100, at 16 (setting forth this fact).  See Deposition of [J.H.] at 205:1-7 (taken July 17, 2013), filed July 30, 2013 (Doc. 92-9)("Sharkey's J.H. Depo.").[66]  "At most, J.P. had small red marks on the inside of her wrists from the handcuffs."

---

testimony is not properly understood as a fact for summary judgment purposes.  Moreover, to the extent that the testimony could support a fact -- for example, that it is or is not reasonable to transport an eleven year old to a detention center -- the Court would be bound to view the fact in the light most favorable to the Plaintiffs, crediting Todd's testimony and not Masterson's testimony.  The Court would then confront a separate problem: what role a lay person's testimony about whether transporting a child under the age of 12 to the detention center is, as a matter of common parlance, reasonable or appropriate should play in the Fourth Amendment analysis.  Ultimately, as both parties seem to recognize, whether it was reasonable, in the Fourth Amendment sense of the word, for Sharkey to transport J.P. to the juvenile detention center is a question of law for the Court.  Accordingly, the Court does not find the proposed fact undisputed.

[66]The Plaintiffs respond:

Defendant's facts 100-105 are irrelevant, immaterial, Fed. R. Civ. P. 56(C)(1)(B), and assert a proposition that is contrary to clearly established law in the Tenth Circuit.  A plaintiff does not need to sustain physical injury to proceed against a law enforcement officer for the vindication of her Fourth Amendment rights under 42 U.S.C. Section 1983.  Grass v. Johnson, 322 Fed. Appx. 586, 589 (10th Cir. 2009)(unpublished)("The problem with this reasoning, however, is that it implicitly sanctions an officer's use of force, albeit resulting in only minor injury, that was wholly unnecessary to carry out the arrest."); Cortez v. McCauley, 478 F.3d 1108, 1129 (10th Cir. 2007); Overdorff v. Harrington, 268 F.3d 1179, 1195 (10th Cir. 2001).

Response to MSJ No. 1 ¶¶ 100-105, at 8.  Sharkey replies:

Plaintiffs do not specifically controvert Fact Nos. 100-105.  Nonetheless, Plaintiffs claim these facts are immaterial, citing three Tenth Circuit opinions for the general proposition that "[a] plaintiff does not need to sustain a physical injury to proceed against a law enforcement officer" under the Fourth Amendment. Plaintiffs ignore, however, that these cases actually support Deputy Sharkey's

MSJ No. 1 ¶ 101, at 16 (setting forth this fact).  See Sharkey's J.H. Depo. at 202:11-25.[67]  "There were no indentations on J.P.'s wrists."  MSJ No. 1 ¶ 102, at 17 (setting forth this fact).  See Sharkey's J.H. Depo. at 203:13-21.[68]  "The small red marks on J.P.'s wrists faded away before that evening."  MSJ No. 1 ¶ 103, at 17.  See Sharkey's J.H. Depo. at 203:13-21.[69]  "J.P. did not complain about any physical effects from the handcuffs."  MSJ No. 1 ¶ 104, at 17 (setting forth

---

> defense.  In Cortez v. McCauley, 478 F.3d 1108, 1129 (10th Cir. 2007), the Tenth Circuit held that even if the officers ignored plaintiff's pleas that the handcuffs were too tight and left red marks that were visible for days, plaintiff's injury was "'insufficient, as a matter of law, to support an excessive force claim if the use of handcuffs [was] otherwise justified.'" (emphasis added).  In a more recent unpublished opinion, the Tenth Circuit did not overrule Cortez.  See Grass v. Johnson, 322 Fed. Appx. [at 589] (reviewing Cortez and finding its holding to be of limited value only because that case "did not involve allegations of unjustified and actively abusive behavior by the arresting officer.").  The third case cited by Plaintiffs, Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1195 (10th Cir. 2011), is distinguishable.  In Holland, members of a police SWAT team were accused of using excessive force during the course of an arrest where they held children at gunpoint after gaining control of the situation.  The court held that the officers' use of force was excessive, reasoning:
>
> > Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.
>
> [Holland ex rel. Ovedroff v. Harrington, 268 F.3d at 1195.]
>
> Reply to Response to MSJ No. 1 ¶¶ 100-105, at 7-8.  The Plaintiffs did not specifically controvert the proposed facts, but only dispute their legal significance. The Court will, if necessary, return to the parties' legal dispute about these facts in its analysis.

[67]The Court disposed of the Plaintiffs' only response to these questions in note 66, supra.

[68]The Court disposed of the Plaintiffs' only response to these questions in note 66, supra.

[69]The Court disposed of the Plaintiffs' only response to these questions in note 66, supra.

this fact).  See Sharkey's J.H. Depo. at 204:17-25. [70]  "J.P.'s mother did not take J.P. to the

Doctor as a result of the handcuffing."  MSJ No. 1 ¶ 105, at 17 (setting forth this fact).  See

Sharkey's J.H. Depo. at 204:6-9.[71]

"Being arrested by a police officer at school is a significant" event for any child, and was

traumatic for J.P.  Response to MSJ No. 1 ¶ C, at 9 (setting forth unmodified version of this fact).

See King Depo. at 10:24-11:5.[72]

---

[70]The Court disposed of the Plaintiffs' only response to these questions in note 66, supra.

[71]The Court disposed of the Plaintiffs' only response to these questions in note 66, supra.

[72]The Plaintiffs ask the Court to conclude that "[b]eing arrested by a police officer at school is a significant and potentially traumatic event for any child."  Response to MSJ No. 1 ¶ C, at 9.  Sharkey disputes this fact, stating that "King did not testify that being arrested by a police officer at a school is a 'potentially traumatic event for any child.'  Instead, he stated, 'that's a significant event.'"  Reply to Response to MSJ No. 1 ¶ C, at 9 (quoting King Depo. at 10:24-11:5).
   The truth lies somewhere between each side's characterization of the testimony.  The testimony is as follows:

> Q.    In your opinion, was [J.P.'s] arrest while she was a student at school a traumatic event in [J.P.'s] life?
>
> [Objection by Plaintiffs' counsel:] Object to form, foundation.
>
> A.   Yes.  I would say for any child, for the police to come arrest you at school, that's a significant event.

King Depo. at 10:24-11:5.  First, given that the Plaintiffs predicated a fact based on this testimony, the Court concludes that the Plaintiffs have waived their objection to the question; in any case, the Court overrules the two objections.  King had already explained his familiarity with J.H. and the events at issue, and the fact is acceptable.  As for the testimony's substance, the Court's undisputed fact more fairly characterizes the testimony than either party characterized it: King testified that the event was traumatic in J.P.'s life and that an arrest is a significant event in any child's life.
   The County Defendants also note that this testimony is immaterial to the Fourth Amendment issues.  See Reply to Response to MSJ No. 1 ¶ C, at 9.  The Court will determine materiality in the analysis.

7.     **Charges Against J.P.; J.P.'s Competency Evaluation; Dismissal of Charges Against J.P.**

Juvenile Probation and Parole Officer ("JPPO") Angela Opperman completed a Preliminary Inquiry Determination for J.P., which indicated that "[a] Preliminary Inquiry has been completed regarding the above child. It is the recommendation of the undersigned JPPO that, pursuant to the Preliminary Inquiry, it has been determined that it is in the best interest of the child and the public that a petition be filed."

MSJ No. 1 ¶ 106, at 17 (quoting Preliminary Inquiry Determination at 1 (dated October 25, 2011), filed July 30, 2013 (Doc. 92-10)).  See Response to MSJ No. 1 ¶¶ 106-115, at 8 (not disputing these facts).  "On January 26, 2012, Children's Court Attorney Alesia Cappon filed a four count Petition, charging J.P. with the following crimes: Battery on School Personnel (Count I); Battery (County II); Interference with Educational Process (Count III); and Disorderly Conduct (Count IV)."  MSJ No. 1 ¶ 107, at 17 (setting forth this fact).  See Petition at 1-2, filed in state court in JR2012-0129 January 26, 2012, filed in federal court July 30, 2013 (Doc. 92-11). See Response to MSJ No. 1 ¶¶ 106-115, at 8 (not disputing these facts).  "Deputy Sharkey did not prepare the Petition."  MSJ No. 1 ¶ 108, at 17.  See Response to MSJ No. 1 ¶¶ 106-115, at 8 (not disputing these facts); Sharkey Aff. ¶¶ 74-75, at 8.  "Deputy Sharkey did not make the decision to or have any role in adding the charges of battery, interference with educational process or disorderly conduct which were brought for the first time against J.P. in the Petition." MSJ No. 1 ¶ 109, at 17-18 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 106-115, at 8 (not disputing these facts);[73] Sharkey Aff. ¶ 76, at 8.

"During the pendency of the charges, J.P. underwent a competency evaluation."  MSJ

---

[73]Although the Sharkey Aff. does not state that the additional charges were brought for the first time against J.P. in the Petition, given that the Plaintiffs do not dispute this fact and the absence of any evidence that those charges were brought at any earlier time, the Court infers that this statement is accurate.

No. 1 ¶ 110, at 18 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 106-115, at 8 (not

disputing this fact); Report of Evaluation for Adolescent/Children Competency Evaluation from

Clinton E. Rhyne, Ph. D., to The Honorable Judge Zamora (dated March 20, 2012), filed July 30,

2013 (Doc. 92-12)("Competency Evaluation").   "The psychologist who conducted the

competency evaluation could only provide his 'provisional' 'impressions' of J.P. because she did

not cooperate with the evaluation."   MSJ No. 1 ¶ 111, at 18 (setting forth this fact)(quoting

Competency Evaluation at 4).  See Response to MSJ No. 1 ¶¶ 106-115, at 8 (not disputing this

fact).   "The psychologist's provisional impressions were 'anxiety disorder NOS' and

'oppositional defiant disorder.'"   MSJ No. 1 ¶ 112, at 18 (setting forth this fact)(quoting

Competency Evaluation at 4)(emphasis in MSJ No. 1).  See Response to MSJ No. 1 ¶¶ 106-115,

at 8 (not disputing this fact).   "The psychologist further stated that J.P.'s 'mute posture and

complete refusal to engage the examiner is suggestive of developmental immaturity combined

with underlying mental health issues that cannot be adequately assessed under the current

circumstances.[']"   MSJ No. 1 ¶ 113, at 18 (setting forth this fact)(quoting Competency

Evaluation at 5)(emphasis in MSJ No. 1, but not in Competency Evaluation).   See Response to

MSJ No. 1 ¶¶ 106-115, at 8 (not disputing this fact).

      The psychologist opined the following regarding J.P.'s competency to stand trial:

>       The results of the current evaluation . . . did not result in
> sufficient information to render an opinion relative to her
> understanding of duties and functions of the various officers of the
> court or her appreciation of the various options that are available to
> her in her defense.  Her understanding of the nature of the charges
> pending against her and her appreciation of the range of penalties
> that could be [i]mposed against her in the event of a guilty finding
> likewise could not be assessed.  Her instant ability to effectively
> track courtroom proceedings, to assist counsel in her[] own
> defense, to effectively challenge witnesses against her, and to

testify relevantly are felt to be compromised as of the date of this
evaluation.   Accordingly, it is felt that [J.P.] may not have a
present sufficient understanding of the nature and significance of
the instant proceedings and that she is presently unable to assist her
attorney in a factual and rational manner.   It is my opinion that
[J.P.] is likely not presently competent to proceed in the matter of
the instant charges.   She is further not competent to enter into a
plea bargain arrangement with the court.

MSJ No. 1 ¶ 114, at 18 (quoting Competency Evaluation at 5-6).   See Response to MSJ No. 1

¶¶ 106-115, at 8 (not disputing this fact).   "The charges against J.P. were dismissed because the

juvenile court found her incompetent to stand trial."   MSJ No. 1 ¶ 115, at 19 (setting forth this

fact).   See Amended Order Finding the Child Incompetent and Dismissal of the Charges Nunc

Pro Tunc to May 2, 2012 at 1, filed in JR 2012-0129 May 21, 2012, filed in federal court July 30,

2013 (Doc. 92-13); Response to MSJ No. 1 ¶¶ 106-115, at 8 (not disputing this fact). [74]

---

[74]In their factual section, the Plaintiffs quote several sections of New Mexico law --
specifically, the Children's Code and Delinquency Act, N.M. Stat. Ann. §§ 32A-1-1 to 32 A-2-
33.   See Response to MSJ No. 1 ¶¶ F-I, at 9-10.   As Sharkey correctly objects, see Reply to
Response to MSJ No. 1 ¶¶ F-I, at 9-10, this tactic is not appropriate, as it does not lay out facts in
the relevant sense of the term.
    The Plaintiffs also state as follows:

        J.      The Unites States Department of Justice, Office of Community
        Oriented Policing Services has stated that [SROs] need to be trained to apply
        juvenile statutes and case law prior to being placed in schools.   **Exhibit I:** A
        Guide to Developing, Maintaining, and Succeeding With Your School Resource
        Officer Program at 9.

        K.      "In addition, [agencies should] consider training new SROs in
        child development and psychology; handling especially difficult students; the
        policies, procedures, and culture of the schools to which they will be assigned;
        and the preparation of safe school plans."   **Exhibit I** at 10.

        L.      School Resource Officers need to be trained to deal with complex
        issues associated with enforcing the law in a school setting related to the search
        and seizure of minors, the interrogation of minors, child development and
        psychology and specifics involved in working with kids in schools.   "Training can

_____

help SROs to [']unlearn['] some of the techniques they became accustomed to using on patrol duty that are not appropriate in dealing with students -- for example, resorting too quickly to using handcuffs or treating misconduct as part of a person's criminal make-up when in a student the behavior may be an example of youthful ebullience, indiscretion, immaturity, or risk taking.

Response to MSJ No. 1 ¶¶ J-L, at 10-11 (purporting to quote Unidentified Document (no date provided), filed August 16, 2013 (Doc. 103-13).

     Sharkey responds:

     Deputy Sharkey objects to Plaintiffs' additional facts lettered J-L. See Fed. R. Civ. P. 56(c)(2). Plaintiffs cite to a guide to support their contention that school resource officers should receive certain training. The pages Plaintiffs cite do not, however, address the topic of training whatsoever.  See [Doc. No. 103-13]. Therefore, Plaintiffs' "unsupported allegations are insufficient to create any genuine issue of material fact which would preclude the entry of summary judgment." Bastian v. Bureau of Prisons, 2000 WL 825713 at *2 (10th Cir. 2000). Plaintiffs' factual assertion is also immaterial because "[o]fficials sued for constitutional violations do not lose their qualified immunity because their conduct violated some . . . administrative provision." Davis, 468 U.S. at 194. It is also notable that the inside cover of the guide states, "Points of view or opinion contained in this documents [sic] are those of the authors and do not necessarily represent the official positions or policies of the U.S. Department of Justice." Finn, Peter, et al., "A Guide to Developing, Maintaining, and Succeeding with Your School Resource Officer Program," (inside cover), attached as Exhibit B.

Reply to Response to MSJ No. 1 ¶¶ J-L, at 10.

     The Court will not deem the proposed facts undisputed.  First, the Court notes that the Plaintiffs only attached to their Response to MSJ No. 1 certain pages from which they purport to quote and not pages that would identify the document.  See Unidentified Document (no date provided), filed August 16, 2013 (Doc. 103-13).  Sharkey was able to identify the document, but the exhibit confronts a second problem: as Sharkey points out, the pages that the Plaintiffs included have nothing to do with training; the exhibit does not contain the pages that the Plaintiffs purport to quote.  Third, although the Court would not normally decide this issue in its fact section -- preferring to save such matters for the analysis -- the Court fails to see how quotations from a document that a subdivision of the United States Department of Justice created has anything to say about the Fourth Amendment propriety of the search in this case.

     The Plaintiffs also ask the Court to find the following undisputed:

     In support of Defendants['] claim that they are entitled to the dismissal of Plaintiff's supervisory claims because [sic] they claim that Defendant Sharkey was trained in the areas of special education and students['] rights, including in the symptoms of J.P.'s diagnosed behavioral disorder.

8.     __Matters Discussed Only in the MSJ.__

"J.P. had a history of attention and emotional and behavioral difficulties pre-dating the arrest."  Response ¶ B, at 4 (setting forth this fact).  See Deposition of John H. King, Ph.D. at 11:22-23 (taken July 29, 2013), filed August 16, 2013 (Doc. 102-1)(" King Depo. No. 2").[75]  As diagnosed after the event, "J.P. has Attention-Deficit/Hyperactivity Disorder, Combine Type; Mathematics Disorder; Oppositional Defiant Disorder; and Adjustment Disorder with Mixed Anxiety and Depressed Mood."  Response ¶ C, at 4 (setting forth unmodified version of this fact).  See King Depo. No. 2 at 13:20-25.[76]  "J.P.'s Attention-Deficit/Hyperactivity Disorder, Combine Type was onset prior to the incident at issue in this case."  Response ¶ D, at 4 (setting

---

Response to MSJ No. 1 ¶ JJ, at 15.  Sharkey responds: "Plaintiffs do not accurately describe the training Deputy Sharkey received in the referenced document.  Deputy Sharkey received training regarding special education, a student's rights under the Family Educational Rights and Privacy Act, 20 U.S.C. §1232g ("FERPA") and Attention Deficit Hyperactive Disorder (ADHD)." Reply to Response to MSJ No. 1 ¶ JJ, at 14.  First, the Court understands the Plaintiffs' confusing proposed undisputed fact to be as follows: The Defendants argue that, because Defendant Sharkey was trained in the areas of special education and students' rights, including the symptoms of J.P.'s diagnosed behavioral disorder, the Defendants are entitled to dismissal of the Plaintiffs' supervisory liability claims.  The fact, as the Plaintiffs have phrased it, suggests that Sharkey was trained in the symptoms of J.P.'s disorder in particular, as opposed to ADHD in general.  Accordingly, the Court has not found the fact undisputed.

[75]The Court will refer to those portions of the Deposition of John H. King, Ph.D. that the Plaintiffs cite in the Response as "King Depo. No. 2" to distinguish them from the portions cited in connection with the Response to MSJ No. 1.
     The County Defendants respond: "Undisputed. This is immaterial, however, because there is no evidence that Deputy Sharkey was aware of her difficulties prior to the September 26, 2011 incident, other than one prior instance in which J.P. misbehaved while in elementary school."  Reply ¶ B, at 3.  The Court will, if necessary, discuss this fact's materiality in its analysis.

[76]The County Defendants reply:  "Undisputed. However, Dr. John King did not make these diagnoses until April 5, 2012, after the incident underlying Plaintiffs' suit."  Reply ¶ C, at 3.  The Court has added the introductory clause to clarify that fact.

forth this fact).  See King Depo. No. 2 at 23:16-23.[77]  "In an evaluation on September 2, 2008,

J.P. was exhibiting 'frequent and high intensity defiant and aggressive behavior.[']"  Response

¶ E, at 4 (setting forth this fact)(quoting Unidentified Report at 5).[78]  "J.P.'s evaluation also

documented that J.P. was nervous, disorganized, depressed and aggressive."  Response ¶ F, at 4

(setting forth this fact).  See Unidentified Report at 5.[79]  "On September 9, 2008, J.P. had

significant elevations on hyperactivity, aggression, depression, withdrawal, social skills, and

---

[77]The County Defendants note that, because J.P. had not been diagnosed with ADHD until months after this event occurred, Sharkey could not have known that J.P. had ADHD at the time of the underlying incident.  See Reply ¶ D, at 3-4.  The Court will, if necessary, return to this dispute in its analysis.

[78]Although the Plaintiffs do not attach the document that they quote to the Response, the Court has located the quoted language in an attachment to the Response to MSJ No. 1.  See Unidentified Report at 5.
   The County Defendants respond:

> Undisputed.  However, Plaintiffs offer no evidence that Deputy Sharkey was made aware of the behavior J.P. exhibited in third grade, three years before the incident at issue.  Deputy Sharkey was not a school resource officer in 2008. Deputy Sharkey did not have access to J.P.'s special education files nor had he ever been advised of this information.  Therefore, knowledge of this fact cannot be imputed to Deputy Sharkey.

Reply ¶ E, at 4 (citations omitted).  The Court will, if necessary, return to this dispute in its analysis.

[79]The County Defendants reply:

> Undisputed.  However, Plaintiffs offer no evidence that Deputy Sharkey was made aware of the behavior J.P. exhibited in second grade, four years before the incident at issue. Deputy Sharkey was not a school resource officer when J.P. was in second grade. Deputy Sharkey did not have access to J.P.'s special education files nor had he ever been advised of this information. Therefore, knowledge of this fact cannot be imputed to Deputy Sharkey.

Reply ¶ F, at 4 (citations omitted).  The Court will, if necessary, return to this dispute in its analysis.

functional communications.   J.P. also had clinically significant range on conduct problems, attention problems[,] adaptability and study skills."  Response ¶ G, at 4-5 (setting forth this fact). See Unidentified Report at 5-6.[80]

---

[80]The County Defendants substantially repeat their argument that Sharkey did not know of this behavior or have access to this information.  See Reply ¶ G, at 4.  The Court will, if necessary, return to this dispute in its analysis.

The Plaintiffs ask the Court to find undisputed that "J.P.'s categorization as emotionally disturbed defines her as a disabled child."  Response ¶ H, at 4 (citing 20 U.S.C. § 1401(3)).  As the County Defendants rightly object, see Reply ¶ 4, at 4, this statement is a legal conclusion and not a fact.  Accordingly, the Court will not find this statement to be a fact.

The Plaintiffs ask the Court to conclude that it is undisputed that,

> [a]fter J.P. kicked her teacher, J.P. went to the "timeout" closet and sat for fifteen minutes.  J.P. was alone, in a closet, sitting on the floor, and crying for approximately 15 minutes before Defendant Sharkey handcuffed her.  At no time during those 15 minutes preceding the handcuffing did J.P. create and [sic] reasonable apprehension that she was about to hurt herself or another.

Response ¶ I, at 5.  The County Defendants dispute this statement:

> While J.P. did sit on the floor in the closet crying for 15 minutes before being handcuffed, Defendants dispute Plaintiffs' assertion that J.P. did not create a reasonable apprehension that she was about to hurt another.  After he saw J.P. kick Ms. Gonzales, Deputy Sharkey removed his handcuffs from his duty belt before J.P. reentered the classroom.  J.P. then re-entered the classroom, went directly to the small room without a door that is within the classroom, sat on the floor, and locked her hands together to resist being handcuffed.  Deputy Sharkey requested that another deputy be dispatched to the scene because he was concerned that J.P. would resist being handcuffed.  In a previously filed response brief, Plaintiffs did not dispute these facts.

Reply ¶ I, at 4-5 (citations omitted).  The Court substantially agrees that the cited testimony does not support the conclusion that J.P. did not create a "reasonable apprehension" that she would soon hurt herself or someone else: Sharkey acknowledged that J.P. did not scream, yell, or attempt to hit anyone during that fifteen minutes, see Deposition of John Matthew Sharkey at 4:22-5:23 (taken July 30, 2013), filed August 16, 2013 (Doc. 102-2)("Plaintiffs' Sharkey Depo. Vol. II"), but it is too far of a leap from those statements to say that she categorically did not give anyone reason to apprehend that she was about to hurt another person.  Further, it is misleading to view her actions during those fifteen minutes in isolation, given the context: she had just attacked a student and fought with adults.  Accordingly, the Court does not find the fact that she

_____

did not create reasonable apprehension that she was about to hurt herself or another undisputed. The Plaintiffs ask the Court to find undisputed that

> Defendant Sharkey contends that he handcuffed J.P. because he believed she committed a crime, and not because he reasonably believed, that in that moment, J.P. was a threat to anyone. Defendant Sharkey does not understand the difference between a person who committed a crime in the past, and a person who is a current threat.

Response ¶ 5 (citing Plaintiffs' Sharkey Depo. Vol. II at 6:18-7:4). The County Defendants reply:

> Disputed. The portion of Deputy Sharkey's deposition testimony that Plaintiffs cite indicates that he arrested J.P. because she committed a crime by attacking a teacher and another student. He did not testify that he did not understand the difference between a person who committed a crime and one who is a current threat. Instead, the transcript indicates that Deputy Sharkey did not understand the question Plaintiffs' counsel's [sic] was attempting to frame regarding the difference between the reason for an arrest and the purpose accomplished by an arrest.

Reply ¶ J, at 5 (citation omitted). The County Defendants are correct. In context, the testimony reads as follows:

> Q.    What's the purpose of arresting her?

> A.    The purpose of arresting her was there was a criminal offense committed in my presence. She had attacked Ms. Gonzales, and also, there was problems with another student that she had gone after, attacked more than once, twice, and I wanted to make sure that she didn't hurt anyone else.

> Q.    So the first two -- let me -- they sound to be like reasons for arresting that she had committed a criminal act?

> A.    Yes.

> Q.    And that she had committed a criminal act against the teacher and a student?

> A.    Yes.

> Q.    All right. And the second one -- or the third one is, you don't want her to harm anyone else, sounds like a purpose. Do you get the distinction there?

"J.P. suffered emotional distress as a result of the handcuffing and arrest.  Some of the manifestations of this distress include  bedwetting, soiling herself while both awake and asleep, anxiety at school, she would withdraw socially, [and] depression."  Response ¶ K, at 5 (setting forth unmodified version of this fact).[81]   See Deposition of J.H. (taken July 17, 2013), filed

---

> What are you trying to prevent or accomplish in the arrest as opposed to the reason for the arrest?
>
> A.     I arrested her, because she attacked a teacher and another student.
>
> Q.     Right.
>
> A.     And she broke the law.
>
> Q.     That's a -- do you agree with me that's a reason?
>
> A.     That's why I placed her in handcuffs and arrested her.
>
> Q.     And then the purpose of the arrest is to prevent her from harming anyone else.  That's what you're trying to accomplish by arresting her?  Do you understand the distinction?
>
> A.     No, I don't.
>
> Q.     Okay.

Plaintiffs' Sharkey Depo. Vol. II at 6:18-7:4.  In context, the testimony supports neither fact that the Plaintiffs put forward.  First, Sharkey indicates that he was concerned both that J.P. would attack someone else and that she had committed a crime.  Further, although the testimony expresses confusion regarding the framing by the Plaintiffs' counsel of the theoretical distinction between "reason" and "purpose" -- probably because Sharkey did not understand or share the parsing by the Plaintiffs' counsel of the elusive distinction between retributive and consequentialist justifications for arrest -- it does not indicate that Sharkey does not understand the difference between one who has committed a crime in the past and one who currently threatens others' safety.

[81]The County Defendants object to this fact on three grounds: (i) that J.H. cannot competently testify to the cause of J.P.'s harm, because she is a lay witness; (ii) much of the cited testimony is inadmissible hearsay; and (iii) the fact is immaterial.  The first two grounds lack a sound basis; the third is best reserved for the analysis.

August 16, 2013 (Doc. 102-3)("J.H. Depo. Vol. II").  "J.P.'s harm is still in the process of being

determined as treatment is ongoing."  Response ¶ L, at 5 (setting forth this fact).  See King Depo.

No. 2 at 215:5-12.[82]

---

As to the first, the County Defendants distort that rule.  Although it is true that lay witnesses cannot generally provide opinions on causation of medical conditions, see Montoya v. Sheldon, 286 F.R.D. 602 (Oct. 7, 2012)(Browning, J.), the proposed fact is not about causation of a medical ailment, but about J.H.'s view of the arrest's effects on her daughter, based on her observations of J.P.'s behavior before and after the arrest.  Such testimony is within J.H.'s competency as a lay witness.  As for the hearsay objection, little of the testimony necessarily depends on what J.P. told J.H. and on the truth of the matters asserted therein, but instead on how J.H. saw her daughter behave.  See J.H. Depo. Vol. II at 205:13-211:14.  The exception to this point is the reference to "suicidal ideations"; J.H. would not have known about suicidal ideations unless J.P. had told her about them, and the Plaintiffs would be offering those statements to support the truth of the matter -- that J.P. had suicidal ideations.  Accordingly, the Court has struck that portion of the proposed fact.  Further, the Court has struck the word "nightmares" from the list of effects, because the Court has not found testimony related to nightmares in the cited portion of the deposition.

The Court will address materiality in its analysis.  The Court notes, however, that its removal of "nightmares" and "suicidal ideations" does not alter the analysis, which principally depends on matters within Sharkey's knowledge at the time he arrested J.P. and not on the arrest's effects on J.P.

[82]The "County Defendants do not dispute that J.P. is still in therapy. However, to the extent Plaintiffs assert that J.P.'s harm was caused by the arrest and handcuffing, Defendants adopt their objections and responses to Plaintiffs' additional fact 'K' above."  Reply ¶ L, at 5. The Court disposed of those objections in note 81, supra.

The Plaintiffs ask the Court to find undisputed that "Defendant Sharkey was aware of J.P.'s mental disability because he had been told by J.P.'s former principal after his first encounter with J.P. prior to the incident at issue in this case."  Response ¶ M, at 5.  For the reasons that the Court explained in note 11, supra, on which the County Defendants rely, see Reply ¶ M, at 6-7, the Court has not found this fact undisputed.  In brief, the fact rests on inadmissible hearsay, and even if the testimony about the first encounter with J.P. were true, it would not put Sharkey on notice that J.P. had a disability within the ADA's meaning.

The Plaintiffs ask the Court to find undisputed that "Defendant Sharkey acknowledged he knew of J.P.'s BIP and IEP at the time of the event in question in his deposition."  Response ¶ N, at 6 (citing Plaintiffs' Sharkey Depo. Vol. II at 75:11-12).  The County Defendants respond:

Disputed.  In the cited deposition testimony, Deputy Sharkey did not acknowledge that he knew about J.P.'s BIP and IEP at the time of the incident underlying this suit.  Instead, Deputy Sharkey repeated what J.H. had said to him:

"There is no admissible evidence that Plaintiffs exhausted their administrative remedies pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 14(f) - (i)."  MSJ ¶ 2, at 4 (setting forth this fact).  See Response ¶ 2, at 3 (not disputing this fact).[83]

> During the period of time prior to and during the incident which gave rise to this lawsuit, the Bernalillo County Sheriff's Office ("BCSO") maintained the following policy, which guides the actions of BCSO deputies who work as school resource officers:

> **353 SCHOOL RESOURCE OFFICER (SRO) UNIT**

> The School Resource Officer is a uniformed officer assigned to an APS middle school or high school in the unincorporated areas of

---

> "'You can't do this.  You can't even be here;' that there's a plan, and they have to handle the plan[.]" [Plaintiffs' Sharkey Depo. Vol. II at 75:10-12].  There is no evidence that J.H. ever told Deputy Sharkey about the basis for J.P.'s "plan." [Doc. No. 92-4], ¶¶ 9-15. It is also notable that Plaintiffs offer no evidence in the form of J.H.'s deposition testimony or an affidavit indicating that she advised Deputy Sharkey of the basis for J.P.'s plan.

Reply ¶ N, at 7.  The County Defendants are correct.  In context, the testimony is as follows:

> A.  When [J.P.] had been in elementary school, there was an incident where I was summoned over to the elementary school, and when I went over to the classroom that she was in and she was acting out, it had -- things had deescalated, and so everything was -- I had just stepped back and things were relatively normal, routine.  And her mom and her boyfriend arrived on scene, and mom was of the opinion of, "You can't do this.  You can't even be here;" that there's a plan, and they have to handle the plan, and it was unpleasant, and it was also unpleasant with her boyfriend who is a tall guy.

Plaintiffs' Sharkey Depo. Vol. II at 75:4-14.  In context, one could infer that Sharkey knew or should have known that, when J.P. was in elementary school, she had a BIP or an EIP.  Even still, he did not acknowledge that he knew the BIP and IEP were still in effect years later, when she was in middle school.  Moreover, even if he knew of the BIP in a general sense, that fact would not give him reason to think that J.P. was disabled within the ADA's definition of that term -- much less that she lacked the capacity to commit an intentional criminal act.

[83]The Plaintiffs assert that this fact "is immaterial.  Plaintiffs' [sic] had no duty to exhaust administrative remedies as discussed in this [Response]."  Response ¶ 2, at 3.  The Court will determine whether the IDEA required the Plaintiffs to exhaust their remedies in its analysis.

Bernalillo County on a full-time basis.  The SRO will work in a problem solving partnership with school officials, students, parents, and the community.   The SRO will provide a law enforcement resource aimed at reducing crimes and addressing issues that affect the safety and welfare of students, faculty, and staff personnel, on and around school campuses. Some activities will extend to feeder (elementary) schools based on circumstances and practical needs.

* * *

## 353-2 DUTIES AND RESPONSIBILITIES

A.      The School Resource Officer will be a visible, active law enforcement figure on campus dealing with any law enforcement related issues.

B.      Will be a classroom resource for instruction in the following areas: Gang and Drug Resistance, safety programs, crime prevention, law enforcement-related education and other areas.

C.      Work closely with school principal(s), meeting at least on a weekly basis.

D.      Act as a communication liaison with law enforcement agencies; provide basic information concerning students on campus served by the officer.

E.      Gather information regarding potential problems such as criminal activity, gang activity, student unrest, and identify particular individuals who may be a disruptive influence to the school and/or students.  This information is then passed on to the appropriate school official or retained by the SRO for continued investigation.

F.      Take steps appropriate and consistent with a law enforcement officer's duty when a crime occurs.

G.      Refer students and their families to the appropriate agencies for assistance when a need is determined.

H.      Refrain from functioning as a school disciplinarian.

- 62 -

I.      Attend meetings of parent groups and faculty-wide in-service sessions.

J.      Be available for conferences with students, parents and faculty members to assist with problems related to law enforcement and crime prevention.

K.      Confer with the school administration to develop strategies to prevent or minimize dangerous situations on or near the campus.

L.      Promote citizen awareness of law enforcement efforts on campus to ensure the peaceful operation of school related programs and build support with students.

M.      Whenever possible, attend school functions or extracurricular school events.

N.      File police reports as required by local agency.

O.      Abide by school board policies, consult with and coordinate activities through the school principal.

P.      Remain fully responsive to the chain of command of the law enforcement agency in all matters related to employment.

Q.      SRO's are not to be assigned duties regularly assigned to school personnel such as lunchroom or hall duty. Nothing should preclude an SRO from being available in areas where interaction with students is expected.

R.      When conducting formal police interviews on a school campus with a student, police personnel shall abide by department and school board policy concerning such interviews.

MSJ ¶ 3, at 5-6 (setting forth this fact)(quoting Bernalillo County Sheriff's Department Rules and Regulations (no date provided), filed July 30, 2013 (Doc. 93-1)("BCSO Rules")).  See Response ¶ 3 (not disputing this fact).[84]  "Prior to the incident which gave rise to this lawsuit,

---

[84]The Plaintiffs respond: "Plaintiffs admit Defendants' fact 3 regarding that the provided policy was in place.  The proper implementation and adequacy of said policy are questions for a trier of fact."  Response ¶ 3, at 3.  The County Defendants reply:

- 63 -

BCSO provided Deputy Sharkey with training on how to serve as School Resource Officer."

MSJ ¶ 5, at 6-7.  See NASRO School Resource Officer National Basic SRO Course Certificate

*passim* (dated February 14-18, 2011), filed July 30, 2013 (Doc. 93-2); Response ¶ 5, at 3 (not

---

> Undisputed. Plaintiffs offer no evidence disputing the implementation or adequacy of this policy. Therefore, Plaintiffs failed to establish a genuinely disputed fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)(quoting Fed. R. Civ. P. 56(e))(to meet its Rule 56 burden, the non-movant must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'")(emphasis added).

Reply ¶ 3, at 1-2.  The Plaintiffs' response does not specifically controvert the proposed fact. Accordingly, the Court deems the fact undisputed.  The Court will, if necessary, return to this issue in its analysis.

Without citing evidence, the County Defendants ask the Court to find undisputed that, "[a]t the BCSO Academy, BCSO instructed Deputy Sharkey on a variety of topics including police encounters with juveniles and individuals with physical and mental impairments."  MSJ ¶ 4, at 6.  The Plaintiffs respond: "Plaintiffs deny Defendants' fact 4 as Defendants' failed to cite a source from which they make their claim."  Response ¶ 4, at 3.  The County Defendants reply:

> Plaintiffs "deny" Fact No. 4 on the grounds that County Defendants' did not cite a source in support of this fact.  In making this assertion, Plaintiffs ignore the Supreme Court precedent holding that "with or without supporting affidavits," the movant may meet its Rule 56 burden by pointing out to the court that the non-movant "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322 & 23; Lujan v. National Wildlife Federation, 497 U.S. 871, 884-85 (1990).  It is the non-movant who must "go beyond the pleadings" to meet his Rule 56 burden.  Celotex, 477 U.S. at 324.

Reply ¶ 4, at 2.  The County Defendants are correct in that, in a no-evidence motion for summary judgment, the nonmovant must point to evidence showing the existence of a genuine and material factual dispute.  See Celotex Corp. v. Catrett, 477 at 322-23.  That said, the fact that the County Defendants described is not best conceived as pointing out the lack of evidence for a particular fact, but, instead, as asking the Court to find a particular fact undisputed.  In such a situation, the movant must point to evidence on which the Court could find the fact undisputed. Accordingly, the Court has not found this fact undisputed.

disputing this fact).[85]

During the National Basic SRO Course, Deputy Sharkey received training on the following topics:

Foundations of School Based Law Enforcement
- Early Years
- Successful SRO Programs
- Schools Today
- National Recognition of SRO Programs
- National Association of School Resource Officers
- NASRO Recognized Model Programs
- What is a School Resource Officer

The TRIAD Components
- Role: Teacher/Guest Speaker
- The Learning Process
- Effective Presentations
- Law Related Education

Role: Informal Counselor
- Effective Communication in Schools
- Adolescent Emotional Issues
- Drugs, Alcohol, and Addictive Behavior
- Dysfunctional Families
- Special Education and Student Rights

Role: Law Enforcement
- School Law
- School Safety
- Crime Prevention
- Critical Incident, Management

---

[85]The Plaintiffs respond: "Plaintiffs admit Defendants' fact 5 regarding that the defendant Sharkey received some training regarding his duties as an SRO. The adequacy of said training are questions for a trier of fact." Response ¶ 5, at 3. The County Defendants reply: "Undisputed. Plaintiffs offer no evidence disputing the adequacy of the training Deputy Sharkey received on how to serve as a school resource officer. Therefore, Plaintiffs failed to establish a genuinely disputed fact." Reply ¶ 5, at 2. The Plaintiffs have not specifically controverted the fact, which did not speak to the training's adequacy; accordingly, the Court will deem the fact undisputed. The Court will, if necessary, return to the legal dispute in its analysis.

MSJ ¶ 6, at 7 (setting forth this fact)(quoting Basic School Resource Officer Course Manual at 3 (dated March, 2007), filed July 30, 2013 (Doc. 93-3)("Course Material")).[86]   "During the National Basic SRO Course, Deputy Sharkey learned about Special Education."   MSJ ¶ 7, at 8 (setting forth unmodified version of this fact).   See Course Material at 82-92.[87]   "Specific to Plaintiffs' claims, Deputy Sharkey learned about Attention Deficit Hyperactive Disorder

_____

[86]The Plaintiffs respond: "Plaintiffs admit Defendants' fact 6 regarding that the listed subjects were discussed in Defendant Sharkey's training. The adequacy of said training and discussion of the listed topics are questions for a trier of fact."   Response ¶ 6, at 3.   "Undisputed. Plaintiffs offer no evidence disputing the adequacy of the training and discussion of the listed topics. Therefore, Plaintiffs failed to establish a genuinely disputed fact."   Reply ¶ 6, at 2 (citing Celotex Corp. v. Catrett, 744 U.S. at 324).   The Plaintiffs have not specifically controverted the fact; accordingly, the Court will deem the fact undisputed.

[87]The County Defendants ask the Court to find undisputed that Sharkey also learned about "a student's rights under Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA")."   MSJ ¶ 7, at 8.   The Court has searched the cited material multiple times and has not located any reference to FERPA.   Accordingly, the Court has not found this portion of the fact undisputed.

The Plaintiffs object that this fact is immaterial, because "FERPA is not relevant in this litigation."   Response ¶ 7, at 2.   The County Defendants respond that this fact is

Undisputed.   Plaintiffs contend that Deputy Sharkey's training about a student's rights under the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA") is immaterial to this litigation but do not cite any authority to support their contention.   This training is material to the issues before the Court. Pursuant to FERPA, Roosevelt Middle School could not release information from J.P.'s educational records, including information regarding her receipt of special education services, to Deputy Sharkey without the consent of her parents or legal guardians.   See 20 U.S.C. §1232g(b)(1).

Reply ¶ 7, at 2.   In light of the fact that the cited evidence does not support that portion of the proposed fact that relates to FERPA, this dispute is moot.

The Court notes, however, that whether Sharkey received training regarding FERPA does not change whether FERPA prevents Roosevelt Middle School from releasing J.P.'s data to Sharkey.   In other words, FERPA protects J.P.'s data from disclosure to Sharkey regardless whether Sharkey received training about FERPA.

(ADHD)."  MSJ 8, at 8 (setting forth this fact).  See Course Material at 90-91; Response ¶ 8, at 4 (not disputing this fact).[88]

## PROCEDURAL BACKGROUND

J.H., acting on J.P.'s behalf, commenced this lawsuit in New Mexico state court on December 5, 2011; Sharkey's co-Defendants removed the case to federal court on February 9, 2012.  See Notice of Removal (Doc. 1).  On June 28, 2013, J.H. filed her Second Amended Complaint.  See Doc. 85.  The Complaint alleges seven causes of action; of those, the MSJ addresses only three causes of action: (i) Sharkey lacked probable cause to arrest J.P. and that, by handcuffing her, Sharkey used excessive force, see Complaint ¶¶ 57-59, at 7; (ii) the County Defendants violated the ADA -- Bernalillo County, because it has not trained officers like Sharkey to handle the misbehavior of disabled children, and Sharkey, because he discriminated against her "by handcuffing, arresting and charging her for activity that is consistent with her

---

[88]The Plaintiffs state: "Plaintiffs admit Defendants' fact 8 regarding that Defendant Sharkey learned something about ADHD.  The extent and adequacy of said learning is a question for a trier of fact."  Response ¶ 8, at 4 (setting forth this fact).  The County Defendants state: "Undisputed.  Plaintiffs offer no evidence disputing the extent and adequacy of the training Deputy Sharkey received regarding ADHD. Therefore, Plaintiffs failed to establish a genuinely disputed fact."  Reply ¶ 8, at 2-3 (citing Celotex Corp. v. Catrett, 477 U.S. at 324).   The Plaintiffs have not specifically controverted the fact; accordingly, the Court will deem the fact undisputed.

The County Defendants ask the Court to find undisputed that "[t]here is no evidence which shows that Bernalillo County failed to properly train Deputy Sharkey in how to execute his duties as an SRO when dealing with special education students and students with disabilities."  MSJ ¶ 9, at 3.  The Plaintiffs respond: "Defendants' fact 9 is disputed. Plaintiffs assert that sufficient evidence exists in Plaintiffs' additional material facts, particularly in additional material facts J-GG in Plaintiffs' Response No. I, to illustrate Defendant County failed to properly train Defendant Sharkey."  Response ¶ 9, at 4.  In their reply, the County Defendants rely on Sharkey's responses to those facts.  See Reply ¶ 9, at 4.  The Court has disposed of all factual disputes underlying those facts elsewhere in the opinion; the proposed fact at issue -- that no evidence shows that Bernalillo County failed to properly train Sharkey -- is a legal conclusion and not a fact.  The Court will, if necessary, return to this issue in its analysis.

disabilities," Complaint ¶¶ 49-56, at 8-9; and (iii) Bernalillo County violated the ADA, because it has not developed adequate training and policies that would accommodate disabled children, and because that failure caused J.P.'s injuries, see Complaint ¶¶ 57-56 [sic], at 10.

The County Defendants move the Court to dismiss each count.  See MSJ *passim*.  First, the County Defendants assert that Sharkey is entitled to dismissal of the excessive force claim, resting their argument on qualified immunity.  See MSJ at 8.  After reviewing the familiar qualified immunity standards, see MSJ at 8-9, the County Defendants argue that, under Tenth Circuit law, de minimis injuries are insufficient to support an excessive-force claim, see MSJ at 9-10 (citing, e.g., Koch v. City of Del City, 660 F.3d 1228 (10th Cir. 2011)).  The County Defendants also submit that, as they more fully discussed in MSJ No. 1,

> Deputy Sharkey had probable cause to arrest J.P. for committing the fourth degree felony of battery on a school employee, in violation of NMSA, §30-3-9 (E). Deputy Sharkey lawfully handcuffed J.P. incident to her arrest. The undisputed facts further show that J.P. suffered no more than a *de minimis* injury as a result of being handcuffed. J.P. did not complain of any pain or injury to Deputy Sharkey or her mother.  Although J.P.'s mother saw small red marks on the insides of J.P.'s wrists from the handcuffs, the red marks faded away by that evening.  Moreover, J.P.'s mother did not believe there was a need to take J.P. to the doctor as a result of being handcuffed.  At most, the temporary redness on the inside of J.P.'s wrists was "fleeting discomfort from handcuffing." See Fisher[ v. City of Las Cruces, 584 F.3d 888, at 900 (10th Cir. 2009)].  As a matter of law, these types of injuries do not support a claim for excessive force.  See Cortez[ v. McCauly, 478 F.3d 1108, 1130 (10th Cir. 2007)].  Because J.P. suffered no more than a *de minimis* injury from the handcuffing, Plaintiffs' Fourth Amendment excessive force claim against Deputy Sharkey (Count II) must be dismissed as a matter of law.

MSJ at 10.  The County Defendants further argue that any constitutional right that Sharkey violated was not clearly established: citing cases discussing the more-than-*de-minimis*-injury requirement, they argue that J.P. did not suffer more than a *de minimis* injury, and that relevant precedent

does not clearly establish that officers can be held liable for handcuffing a suspect incident to a lawful arrest absent an actual injury.  In fact, the clearly established Tenth Circuit precedent demonstrates that Plaintiffs cannot bring a claim without an actual injury.  Deputy Sharkey was not on notice that handcuffing a suspect without causing more than a *de minimis* injury would violate that suspect's constitutional rights.

MSJ at 11-12.

Moreover, [in the County Defendants' view,] it was not clearly established as of September 26, 2011 that handcuffing a minor incident to a lawful arrest without causing more than a *de minimis* injury would convert an otherwise lawful use of force into excessive force.  See, e.g., Neague v. Cynkar, 258 F.3d 504, 508 (6th Cir. 2001) (in a case involving the handcuffing of a seventh grade student, appellate court held that "when there is no allegation of physical injury, the handcuffing of an individual incident to a lawful arrest is insufficient as a matter of law to state a claim for excessive force under the Fourth Amendment."); O'Connell v. Louisville Metro Police Dept., 2006 WL 561240 (W.D. Ky. 2006) (dismissing excessive force claim based on handcuffing of a ten year old incident to a lawful arrest because there was no allegation of physical injury).  Further, Deputy Sharkey's research did not reveal clearly established precedent that would have put Deputy Sharkey on notice that an excessive force claim could result from handcuffing a student incident to a lawful arrest absent an actual injury solely because the student received special education services or was subject to a behavior intervention plan. See S.A.S. v. Hibbing Public Schools, [No. Civ. 04-3204JRTRLE,] 005 WL 2230415 at *3 (D. Minn. 2005)(noting that both the Individuals with Disabilities Education Act and the student's behavior intervention plan contemplate the referral of criminal behavior to the police and make no mention of altering the standards by which such behavior is investigated or addressed *by the police*.") (emphasis in original); see also 20 U.S.C. §2015 (stating that "[n]othing in this subchapter shall be construed to prohibit an agency from reporting a crime committed by a child with a disability to the appropriate authorities"); 34 C.F.R. §300.535(a) ("Nothing in this part . . . prevents State law enforcement and judicial authorities from exercising their responsibilities with regard to the application of Federal and States [sic] law to crimes committed by a child with a disability.").  As such, J.P.'s eligibility for special education services or her behavior intervention plan does not alter the standards by which her behavior may be addressed by Deputy Sharkey.  For the foregoing reasons, Deputy Sharkey is entitled to the dismissal of Plaintiffs' Fourth Amendment excessive force claim (Count II) on the basis of qualified immunity.

MSJ at 12-13 (footnote omitted).  The County Defendants also state:

It is also notable that before Deputy Sharkey arrived on scene, J.P.'s

teacher, Allison Gonzales, and the teaching assistant, Gwendoline Zamora, had repeatedly attempted to de-escalate the situation without success. Despite Ms. Gonzales's and Ms. Zamora's efforts, J.P. refused to do her class work, forcefully threw a metal object across the classroom, repeatedly hit her classmate in the head, attempted to head butt and bite Ms. Gonzales, scratched Ms. Gonzales causing her to bleed, and ultimately kicked her in the thigh.

MSJ at 13 n.2.

The County Defendants also ask the Court to dismiss the ADA claims. <u>See</u> MSJ at 14.

They first set out their view of some fundamental background principles:

Title II of the ADA states:

No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity.

42 U.S.C. §§1232.

In order to state a claim under Title II of the ADA, a plaintiff must prove that: (1) he or she is a qualified individual with a disability; (2) he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial o[f] benefits, or discrimination was by reason of the plaintiff's disability. <u>Gohier v. Enright</u>, 186 F.3d 1216, 1219 (10th Cir. 1999).

Although the ADA must be broadly construed to effectuate its purpose, <u>Barden v. City of Sacramento</u>, 292 F.3d 1073, 1077 (9th Cir. 2002), courts must keep in mind that the purpose of the ADA is to place those individuals with disabilities on an equal footing, not to give them an unfair advantage, <u>Kornblau v. Dade County</u>, 86 F.3d 193, 194 (11th Cir. 1996)(citations omitted). Moreover, the application of a neutral rule that applies to disabled and nondisabled individuals alike cannot be considered discrimination on the basis of disability. <u>See</u>, <u>e.g.</u>, <u>Baird v. Rose</u>, 192 F.3d 462, 468 (4th Cir. 1999); <u>Sandison v. Michigan High School Athletic Assoc.</u>, 64 F.3d 1026, 1032, 1036 (6th Cir. 1995).

MSJ at 14. The County Defendants contend that the Court should dismiss any ADA claims

against Sharkey, because he is not a "public entity" within Title II of the ADA's meaning. MSJ

at 15 (citing, e.g., Braverman v. New Mexico, No. CIV 11-0829 JB/WDS, 2011 WL 6013587

(D.N.M. Oct. 19 2011)(Browning, J.)).

    As against Bernalillo County, the County Defendants assert that the Court should dismiss

the ADA claims, because the Plaintiffs have not exhausted their remedies under the IDEA.  See

MSJ at 15-16.  They note that, in S.A.S. v. Hibbing Public Schools,

> the plaintiffs alleged that by assisting the school district defendants in "meting out
> excessive discipline and periodically arresting the student, S.A.S., city defendants
> interfered with the student's educational rights and violated the ADA." 2005 WL
> 2230415 at *4.  The court in S.A.S. explained that the IDEA's mandate explicitly
> requires plaintiffs to "exhaust IDEA's impartial due process hearing procedures in
> order to bring a civil action."  Id.; see 20 U.S.C. §1415(f)-(i).  Although the
> plaintiff in that case was asserting an ADA claim against the city defendants who
> were responsible for arresting S.A.S., the court nonetheless dismissed plaintiff's
> claims for failure to exhaust administrative remedies pursuant to the IDEA.  See
> id. (stating that the exhaustion "requirement also applies to claims filed under the
> Constitution, the ADA, Section 504 [of the Rehabilitation Act] and other Federal
> statutes 'protecting the rights of children' with disabilities."); see also 20 U.S.C.
> §1415(l).  The  procedures a plaintiff must follow to exhaust his or her
> administrative remedies under the IDEA require the plaintiff to request and
> participate in an impartial due process hearing.  See 20 U.S.C. §1415(f)-(i).
>
>     In this case, there is no admissible evidence that Plaintiffs have exhausted
> their administrative remedies against the County Defendants as mandated by the
> IDEA.  Accordingly, Plaintiffs' ADA claims (Counts V and VI) should be
> dismissed without prejudice.

See MSJ at 15-16.

    The County Defendants also contend that J.P. has no evidence that, as of September 26,

2011, J.P. was disabled for ADA purposes.  See MSJ at 16-17.

> For purposes of the ADA, an individual is disabled if she: (1) has "a
> physical or mental impairment that substantially limits one or more major life
> activities of such individual;" (2) has "a record of such an impairment;" or (3) is
> "regarded as having such an impairment." 42 U.S.C. § 12102(1) (2000)(amended
> 2008); 29 C.F.R. §1630.2(g) (2011).  Under the ADA Amendments Act of 2008
> ("ADAAA"), "major life activities include, but are not limited to, caring for
> oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking,

standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).  Despite this expanded list, "the ADAAA left untouched the plaintiff's burden of proof; [s]he still has to prove [s]he has a disability."  Lloyd v. Montgomery Hous. Auth., 857 F. Supp. 2d 1252, 1263 (M.D. Ala. 2012).

In Plaintiffs' Second Amended Complaint, Plaintiffs make the general assertion that J.P. was "developmentally disabled." *Second Amended Complaint*, p. 1, ¶2.  However, Plaintiffs have no evidence that, as of September 26, 2011, J.P. had a diagnosed physical or mental impairment.  Krocka v. City of Chicago, 203 F.3d 507, 512 (7th Cir. 2000)(stating that a mental health condition is an "impairment" under the ADA once it has been "diagnosed by a health professional")(citations omitted); see also Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84, 133 F.3d 1054, 1059 (7th Cir. 1998)(stating that "medically diagnosed mental conditions" are impairments under the ADA); Kaltenberger v. Ohio College of Podiatric Med., 162 F.3d 432, 437 (6th Cir. 1998)(finding there is no obligation to provide an accommodation unless the plaintiff provides a proper diagnosis of a physical or mental impairment and requests an accommodation).  Nothing contained in the IEP or BIP indicate that J.P.'s behavior on or before September 26, 2011 was the result of a diagnosed physical or mental impairment that substantially limited a major life activity. Plaintiffs have not even specified the impairment J.P. allegedly had as of September 26, 2011.  See Pointdexter v. Atchison, Topeka & Santa Fe Ry., 168 F.3d 1228, 1232 (10th Cir. 1999). [sic] (stating that the plaintiff "must articulate with precision the impairment alleged").  As of September 26, 2011, the most Plaintiffs could demonstrate is that J.P. behaved poorly.  J.P.'s poor behavior is insufficient to establish an impairment for purposes of the ADA.

Plaintiffs appear to confuse J.P.'s eligibility to receive special education services with a disability for purposes of the ADA.  The two are distinct concepts. See Ellenberg v. N.M. Military Institute, 572 F.3d 815 (10th Cir. 2009)(the fact that student received special education services for many years did not establish as a matter of law that he was disabled within meaning of the ADA).  Unlike the ADA, a child does not need to show that she is substantially limited in a major life activity to be considered disabled under the IDEA.  Id. at 821.  "Although almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled."  DeMar v. Car-Freshner Corp., 49 F. Supp. 2d 84, 90 (N.D.N.Y. 1999).

Plaintiffs also have no evidence that, as of September 26, 2011, J.P.'s unidentified impairment substantially limited one of her major life activities. While J.P. may have had problems interacting with certain students and teachers on occasion, "there is no evidence tending to show she had problems interacting with people in general on a regular basis."  See Doebele v. Sprint/United Mgt. Co., 342 F.3d 1117, 1131 (10th Cir. 2003). For the foregoing reasons, Plaintiffs

cannot establish a prima facie case of disability for purposes of the ADA.

MSJ at 17-18.

The County Defendants also assert that, assuming that J.P. was disabled, they did not know J.P. was disabled, as the law requires.  See MSJ at 18-19.  The County Defendants note that Sharkey could not access J.P.'s files, that he never saw her IEP or BIP, that school officials neither informed him of the IEP or BIP nor told him that J.P. was disabled, and that Sharkey did not know why J.P. was in special education.  See MSJ at 19.  "At most," they say, "Deputy Sharkey knew that J.P. exhibited poor behavior on one or two occasions.  There is no evidence, however, that Defendants know this behavior was rooted in a disability."  MSJ at 2.  They also argue that

> any subsequently diagnosed impairment does not establish a disability for the September 26, 2011 incident at issue.  Speculation by J.P.'s mother or others that J.P. had a disability is also insufficient to create a genuine issue of material fact as to whether County Defendants had notice that J.P. had a disability when the incident at issue occurred.

> A contrary rule would require school resource officers to don white coats and correctly diagnose the school's special education students, all without the benefit of a medical degree, access the students' special education records, specific information from school officials regarding each special education student, or the ability to constantly monitor the special education students.  Although the ADAAA has an expansive definition of disability, it does not require Deputy Sharkey to be clairvoyant.  For these reasons, Plaintiffs' ADA claims (Counts V and VI) must be dismissed.

MSJ at 20 (citation omitted).

The County Defendants also argue that, because J.P. directly threatened others' health and safety, Title II of the ADA does not protect her conduct.  See MSJ at 20-21.  They elaborate:

> "Title II of the ADA prohibits discrimination in public services.  Under an exception in 42 U.S.C. § 12182(b)(3), however, a public entity is not required to

permit a disabled individual to participate in the public accommodation 'where such individual poses a direct threat to the health or safety of others.'" Calvary Christian Center v. City of Fredricksburg, 800 F. Supp. 2d 760, 770 (E.D. Va. 2011); see also Doe v. Woodford County Bd. of Ed., 213 F.3d 921, 925 (6th Cir. 2000)(stating that under Title II of the ADA a disabled person "may be excluded from participation in a program if his or her participation is a direct threat to the health and safety of others"). The statute defines "direct threat" as "a significant risk to the health or safety or others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." Id. (quoting 42 U.S.C. § 12182(b)(3)). A student who threatens her professor may be precluded from attending a university even if the behavior was precipitated by her mental illness because she posed a direct threat to the safety of others. Ascani v. Hofstra Univ.[, 173 F.3d 843, 1999 WL 220136, at *1 (2d Cir. 1999)(unpublished)].

   In this case, the following facts are undisputed: J.P. forcefully threw a metal object across the classroom; she repeatedly punched a fellow student in the head; when her teacher tried to restrain her from going after the classmate again, J.P. attempted to head butt and bite the teacher; J.P. scratched her teacher, drawing blood; and J.P. kicked her teacher. Clearly, J.P.'s continued attendance at school posed a direct threat to the safety of her classmates and her teacher. Thus, she could be removed from school and arrested for violating the law. See, e.g., Ascani, 1999 WL 220136 at *1.

MSJ at 20-21.

   The County Defendants point out that courts have recognized two genres of Title II ADA claims related to arrests: a wrongful-arrest theory and a reasonable-accommodation-during-arrest theory. See MSJ at 21-22. They cite Gohier v. Enright, 186 F.3d 1216 (10th Cir. 1999), which explains:

   The first is that police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity. See Lewis[ v. Truitt, 960 F. Supp. 175, 176-77)(S.D. Ind. 1997)]; Jackson[ v. Inhabitants of the Town of Sanford, Civ. No. 94-12-P-H, 63 U.S.L.W. 2351, 7 A.D.D. 211, 1994 WL 589617 at *1 (D. Me. Sept. 23, 1994)]. The second is that, while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees. See Gorman v. Bartch, 152 F.3d 907, 912-13 (8th Cir. 1998)(holding such claim viable); Rosen v. Montgomery

- 74 -

County, 121 F.3d 154, 157-58 (4th Cir. 1997)(suggesting in *dicta* such claim not viable); Patrice[ v. Murphy, 43 F. Supp. 2d 1156, 1160 (W.D. Wash. 1999)] (holding such claim not viable).

Gohier v. Enright, 186 F.3d at 1220.  See MSJ at 21.  They assert that the evidence does not support either theory.  See MSJ at 21.

        With respect to the first theory -- wrongful arrest -- the County Defendants suggest that Sharkey did not arrest J.P. because of legal conduct that was related to her disability.  See MSJ at 22.  They explain:

>        Even if Deputy Sharkey can be imputed with knowledge of a disability, the ADA does not preclude a police officer from taking law enforcement action when an individual with a disability commits a crime.  Deputy Sharkey did not arrest J.P. because of "legal conduct" related to her disability.  See Lewis v. Truitt, 960 F. Supp. 175, 178 (S.D. Ind. 1997); see also Jackson v. Sanford, 1994 WL 589617 at *1 & 6 (S. D. Ind. 1997)(district court held that the ADA applied to a case involving an individual who, as a result of a stroke, had physical difficulties that were confused with intoxication and resulted in an arrest for driving under the influence).  Instead, Deputy Sharkey arrested J.P. for criminal conduct.  In particular, Deputy Sharkey arrested J.P. for battery against a school employee, a fourth degree felony, in violation of NMSA (1978), §30-3-9 (E). Even assuming she battered her teacher as a result of her disability, J.P.'s conduct warranted a police response because her conduct was unlawful.  See Buben v. City of Lone Tree, 2010 WL 3894185 at *11 (D. Colo. 2010)(finding that failing to comply with officers' commands and other acts, even if resulting from a disability, warranted police response because the conduct was unlawful); see also Hainze v. Richards, 207 F.3d 795, 801 (5th Cir. 2000)("While the purpose of the ADA is to prevent the discrimination of disabled individuals, we do not think Congress intended that the fulfillment of that objective be attained at the expense of the safety of the general public.").  Therefore, Plaintiffs' ADA claim is not cognizable under the wrongful-arrest theory given the undisputed facts of this case.

MSJ at 22.

        With respect to the second, reasonable-accommodation theory, the County Defendants assert that Sharkey made reasonable accommodations:

>        Reasonable   accommodation   cases   involve   the   failure   of   police   to

reasonably accommodate a qualified individual's disability in the course of an investigation or arrest.  See, e.g., Gorman v. Bartch, 152 F.3d 907, 913 (8th Cir. 1998)(finding that paraplegic arrestee properly alleged an ADA violation after suffering injuries while being transported to jail in a van not equipped for wheelchair transport); Calloway v. Boro of Glassboro Dept. of Police, 89 F. Supp. 2d 543, 555-56 (D.N.J. 2000)(finding that plaintiff stated a valid ADA claim where police questioned plaintiff at the station house without making a reasonable accommodation for her deafness).  To determine if reasonable accommodations were made during an investigation and arrest, courts must engage in a "highly fact-specific inquiry." Bircol v. Miami-Dade County, 480 F.3d 1072, 1085-86 (11th Cir. 2007)(citing 42 U.S.C. § 12132).  "What is reasonable must be decided case-by-case based on numerous factors." Id. at 1086.

   In this case, Deputy Sharkey made reasonable modifications to his routine arrest and investigation procedures in order to ensure that J.P. did not suffer greater injury or indignity than other arrestees.  See Gohier, 186 F.3d at 1220-21. When he witnessed J.P. kick Ms. Gonzales outside the classroom, Deputy Sharkey did not take J.P. into custody in the hallway where she might be visible to her peers.  Deputy Sharkey allowed J.P. to retreat into the classroom.  Deputy Sharkey also avoided forcibly taking J.P. into custody by himself because he was concerned that J.P. might resist and an ensuing struggle could result in injuries to J.P.  Instead, Deputy Sharkey requested and waited for back-up so that if J.P. resisted, two deputies could quickly and safely gain control of her.  Deputy Sharkey spoke to J.P. in a calm, professional manner. Deputy Sharkey also gently placed the handcuffs on J.P. cognizant that he was dealing with a minor.  Additionally, Deputy Sharkey escorted J.P. to his patrol car while school was in session to avoid having J.P. unnecessarily exposed to her peers and other staff members.  The undisputed facts do not indicate that Deputy Sharkey took any action that caused J.P. to suffer greater injury or indignity than other arrestees during the course of the investigation, arrest, and transport to the juvenile detention center.

MSJ at 23-24.

   With respect to the Plaintiffs' final claim -- the failure-to-train claim -- the County Defendants argue that, "[e]ven when the evidence is viewed in the light most favorable to them, Plaintiffs cannot show that the training which Bernalillo County provided Deputy Sharkey was deliberately indifferent to or caused the alleged violation of J.P.'s rights under Title II of the ADA."  MSJ at 24.

- 76 -

In discussing a claim for failure to train under the reasonable-accommodation-during-arrest theory, the Tenth Circuit commented that plaintiff might have alleged that Title II of the ADA required the defendant city "to better train its police officers to recognize reported disturbances that are likely to involve persons with mental disabilities, and to investigate and arrest such persons in a manner reasonably accommodating their disability." Gohier v. Enright, 186 F.3d 1216, 1217 (10th Cir. 1999). However, because the plaintiff "affirmatively disclaimed reliance" on the reasonable-accommodation-during-arrest theory, the court declined to express an opinion as to the theory's applicability to the facts of the case. Id. As a result, the Tenth Circuit expressly stated that it remained an open question in this circuit whether to adopt either or both theories. Id. at 1211. Some other courts have found such claims cognizable under the ADA, Schorr v. Borough of Lemoyne, 243 F. Supp. 2d 232, 237-39 (M.D. Pa. 2003), while others have not, Thao v. City of St. Paul, 481 F.3d 565 ([8th] Cir. 2007).

Even assuming that this jurisdiction recognizes a failure to train claim under Title II of the ADA, Plaintiffs cannot establish such a claim here. See, e.g., City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989)(holding that the "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.")(footnote omitted); see also Allen v. Muskogee, Okla., 119 F.3d 837, 841-42 (10th Cir. 1997), cert. denied, 522 U.S. 1148 (1998). In this case, there is insufficient evidence to show that Bernalillo County displayed deliberate indifference to the rights of students with disabilities in the manner with which it trained Deputy Sharkey. In fact, Bernalillo County trained Deputy Sharkey on dealing with individuals who have physical and mental impairments. Deputy Sharkey was also provided significant training on issues facing a school resource officer, including dealing with students who have emotional issues and students who are disabled under the IDEA. Further, Plaintiffs cannot show that the training provided by Bernalillo County was not consistent with the governing law on Title II of the ADA. Having no evidence which identifies a deficiency in Bernalillo County's training program for Deputy Sharkey which was the moving force behind his alleged violation of the ADA, Plaintiffs' failure to train claim (Count VI) is subject to dismissal as a matter of law.

MSJ at 24-25. Accordingly, the County Defendants ask the Court to grant summary judgment on the excessive-force claim and on the two ADA claims. See MSJ at 25.

In their Response, the Plaintiffs first assert that Sharkey acted unreasonably when he handcuffed J.P. See MSJ at 6. After reviewing qualified immunity and Fourth Amendment

standards, see MSJ at 6-7, the Plaintiffs contend that "Defendants' sole basis for alleging an

absence of a constitutional violation is an allegation that J.P. was not physically injured by the

handcuffing." Response at 7.[89]  They elaborate:

> "Physical injury may be the most obvious injury that flows from the use of
> excessive force. Yet the interests protected by the Fourth Amendment are not
> confined to the right to be secure against physical harm; they include liberty,
> property and privacy interests -- a person's 'sense of security' and individual
> dignity." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1195 (10th
> Cir. 2001).  Physical injury is not required for a finding of excessive force. Id.
> Requiring a showing of actual physical injury "implicitly sanctions an officer's
> use of force, albeit resulting in only minor injury, that was wholly unnecessary to
> carry out the arrest. Our cases, including Cortez do not support that proposition."
> Grass v. Johnson, 322 F. App'x 586, 589 (10th Cir. 2009).
>
> Defendants' [sic] fail to even address the substantial and lasting injury J.P.
> incurred as a result of the handcuffing. Although her diagnosis and treatment is
> still on[]going, J.P. has clearly manifested injuries. J.P. suffers from suicidal
> ideations. As a child she believes only bad people are handcuffed, and because
> she was handcuffed, she too must be bad. J.P. has told her mother that she does
> not want to live because she is a bad person. Also as a result of the handcuffing,
> J.P. immediately began to wet and soil herself, both while awake and asleep. J.P.
> has become extremely withdrawn and is terrified of police officers. J.P.'s
> manifestations are numerous and ongoing. She still receives psychological
> treatment for her injuries resulting from the handcuffing. Plaintiffs' [sic] have
> never alleged that J.P.'s sole injury was "fleeting discomfort" as Defendants
> contend; nothing about J.P.'s injuries are fleeting.

Response at 7-8.  The Plaintiffs contend the decision of the United States Court of Appeals for

the Sixth Circuit in Neague v. Cynkar, on which the County Defendants rely for the proposition

that physical injury is required for an excessive force claim, is contrary to Tenth Circuit law. See

---

[89]The Plaintiffs purport to incorporate by reference their Response to MSJ No. 1 "to
address any arguments alluded to by Defendant that the handcuffing was incident to a valid
arrest." Response at 7 n.1. This practice is improper: the Plaintiffs may not wholesale
incorporate briefing by reference; this practice end-runs page limits. Regardless, the Court has
considered these arguments. In general, the argument is that J.P. lacked the capacity to form
criminal intent to commit the crime and that Sharkey, accordingly, lacked probable cause to
arrest.

Response at 8 n.2.

The Plaintiffs also argue that Sharkey violated certain provisions of the New Mexico Children's Code when he handcuffed J.P., and that "the Children's Code put a reasonable officer on notice that handcuffing J.P. violated her Fourth Amendment right to be free from the use of excessive force." Response ¶ 8 (capitalization and emphasis altered for readability). They explain:

> The Fourth Amendment balances the level of government intrusion on the individual's liberty against the government interest at stake. Terry v. Ohio, 392 U.S. 1, 21 (1968). An officer must point to specific facts that warrant his level of intrusion. Id.
>
> The Tenth Circuit has already clearly established that when it comes to use of force, children have a different standard. Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1193 (10th Cir. 2001). In Holland, the court engages in a lengthy discussion that force used by police officers that is objectively reasonable when used against adults, is not necessarily reasonable when used against children. Id[.] 268 F.3d 1179, 1193 (10th Cir. 2001)("Pointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances.")[.] The Tenth Circuit has already recognized use of force against children has a different standard[] than adults; yet Defendants continually argue J.P.'s age was immaterial. In addition, the Tenth Circuit has also clearly established that a person must clearly be dangerous and a threat to the officer to justify handcuffing. Manzanares v. Higdon, 575 F.3d 1135, 1150 (10th Cir. 2009). Defendant Sharkey has failed to show how a crying eleven year old child who is hiding in a closet presented a sufficient enough threat to justify his extensive use of force against that child.
>
> Police officers "are entitled to qualified immunity unless their conduct violated []clearly established **statutory** or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 752 . . . (2002)(citations and quotation marks omitted)(emphasis added). "A police violation of state law does not establish a Fourth Amendment violation. However, the question of compliance with state law may well be relevant in determining whether police conduct was reasonable for Fourth Amendment purposes." United States v. Baker, 16 F. 3d 854, 856 n.1 (8th Cir. 1994); cited for the stated proposition in United States v. Mikulski, 317 F.3d 1228, 1232 (10th Cir. 2003). See also, United States v. Sawyer, 441 F.3d 890, 897 (10th Cir. 2006). In this case, J.P. has a clearly established statutory right through the

- 79 -

Children's Code which must be considered when determining whether Defendant Sharkey's actions were objectively reasonable.  The purpose of the Delinquency Act within the Children's Code is:

> "to remove from children committing delinquent acts the adult consequences of criminal behavior, but to still hold children committing delinquent acts accountable for their actions to the extent of the child's age, education, mental and physical condition, background and all other relevant factors, and to provide a program of supervision, care and rehabilitation, including rehabilitative restitution by the child to the victims of the child's delinquent act to the extent that the child is reasonably able to do so[.]"

N.M. Stat. Ann. § 32A-2-2(A).  The statute clearly and definitively states that children who commit crimes are not to have adult consequences.  The Act also states that children are held accountable "to the extent of the child's age, education, mental and physical condition[ . . . .]" [sic] Defendants' statement that "J.P.'s age and the fact that she was eligible to receive special education services does not change the outcome" shows a disregard to the relevant law and its standards that are applicable to this case, and that were clearly established when Defendant Sharkey handcuffed J.P.  See Document 93, ¶ 3.  Handcuffing J.P. was an adult consequence to her alleged crime, not a child's consequence. Defendants' [sic] make no attempt to establish the reasonableness of Defendants' [sic] Sharkey's actions in light that J.P. was eleven and mentally disabled; instead Defendants' [sic] argue that because Defendant Sharkey's conduct was appropriate if J.P. were an adult, th[e]n it is also appropriate despite that she is a child.  This line of reasoning is contrary to law.  The absence of any argument to justify Defendant Sharkey's conduct towards a child is not sufficient to satisfy a Qualified Immunity defense because not understanding that the Children's Code is applicable to children is "plainly incompetent" and satisfies the standard in Jiron v. City of Lakewood, 392 F.3d 410 (10th Cir. 2004).

Response at 10.  The Plaintiffs also argue that a different New Mexico statute is relevant:

> The Children's Mental Health and Developmental Disabilities Act is also a relevant portion of the Children's Code applicable to this case.  See N.M. Stat. Ann. § 32A-6A-1.  J.P. has a developmental disability and a mental disorder pursuant to N.M. Stat. Ann. § 32A-6A-4 (H) and (U).  However, the Children's Mental Health and Developmental Disabilities Act is applicable to all children in New Mexico unless otherwise said in the Children's Code.  N.M. Stat. Ann. § 32A-6A-3.  According to the New Mexico Law, "Restraint and seclusion as provided for in this section is not considered treatment.  It is an emergency intervention to be used only until the emergency ceases." N.M. Stat. Ann. § 32A-

6A-9.  Defendant Sharkey was bo[u]nd to conform to all aspects of the Children's Code on September 26, 2011, including N.M. Stat. Ann. § 32A-6A-9. N.M. Stat. Ann. § 32A-6A-9 prohibits Defendant Sharkey from using handcuffs, or otherwise restraining, children like J.P. unless there is an emergency.

In Defendant Sharkey's deposition, he stated that J.P. was alone, in a closet, sitting on the floor, and crying for approximately 15 minutes before Defendant Sharkey handcuffed her.  At no time during those 15 minutes preceding the handcuffing did J.P. create and [sic] reasonable apprehension that she was about to hurt herself or another.  Defendant Sharkey contends that he handcuffed J.P. simply because he believed she committed a crime, and not because he reasonably believed, that in that moment, J.P. was a threat to anyone.

No emergency was present when Defendant Sharkey handcuffed J.P. Defendant Sharkey knew there was no emergency; otherwise he would not have waited 15 minutes to handcuff J.P.  In light that Defendant Sharkey used handcuffs and restrained J.P. in a non-emergency situation, Defendant Sharkey violated N.M. Stat. Ann. § 32A-6A-9.  N.M. Stat. Ann. § 32A-6A-9 was clearly established at the time Defendant Sharkey handcuffed J.P., and Defendant Sharkey knew or should have known it was illegal to handcuff J.P., a child, while she was sitting alone and crying in a closet.  Even if J.P.'s alleged battery on her teacher and throwing a marble constituted an emergency, the emergency had ceased by the time Defendant Sharkey had handcuffed J.P. and he was prohibited from restraining her.  Defendant Sharkey admits that he does not understand the distinction between handcuffing and arresting someone who he believes is a current threat, compared to handcuffing and arresting someone for a no longer ongoing offense.  See added facts.  But that distinction is critical to establish his reasonableness because it is critical to exercise that distinction in order to comport with the law.  Even if Defendant Sharkey had probable cause to arrest J.P., as disputed in Response No. I, it was excessive force for him to handcuff her. Defendant Sharkey violated J.P.'s Fourth Amendment Rights when he handcuffed her, and in doing so, he violated the Children's Code which was clearly established at the time he [h]andcuffed J.P. Therefore, Defendant Sharkey is not entitled to Qualified Immunity.

Response at 10-12.

The Plaintiffs turn to the ADA claims and assert that fact issues prevent summary judgment.  See Response at 12.  They expand:

Title II of the ADA prohibits an entity from discriminating against disabled persons on the basis of their disability.  42 U.S.C. §§ 1232. Defendant Sharkey arrested Plaintiff because she had a behavioral episode consistent with her

disability. If J.P. had not been disabled, she would not have committed the acts which Defendant Sharkey concluded were crimes. Therefore, Defendant Sharkey handcuffed, arrested, transported and charged J.P. because J.P. was disabled and thereby discriminated against her.

Plaintiff's Count VI of her Second Amended Complaint alleges that Defendants failed to provide accommodations for J.P. Title II of the ADA also provides that disabled persons are entitled to the same benefits, services and programs of a public entity. 42 U.S.C. §§1232. The statute requires that public entities make the same benefits, services and programs available to disabled persons, thereby requiring accommodations. Defendant Sharkey failed to provide any accommodations to J.P. in light of her disability. Therefore, Defendant County is liable.

Response at 12. They clarify that they only assert the ADA claims against Bernalillo County, so there is no reason to dismiss ADA claims as against him. See Response at 12.

The Plaintiffs contend that Title II of the ADA does not require them to exhaust their remedies. See MSJ at 13 & n. 13 (citing cases). They expand:

Although the Tenth Circuit has found that "[w]hen a plaintiff pursues a claim under the ADA or other law that protects the rights of disabled children, the IDEA 'requires her to first exhaust its administrative procedures and remedies prior to commencing her ADA suit [or suit under other federal law] if she is '*seeking relief that is also available under*' the IDEA.'" Ellenberg v. New Mexico Military Inst., 478 F.3d 1262, 1279 (10th Cir. 2007)(citations omitted). Plaintiff is not seeking redress which is available under the IDEA and the Ellenberg holding is not applicable in this case.

Defendant County is not an educational institution, nor are there statutory administrative procedures for Plaintiffs to pursue their discrimination claim against Bernalillo County. Furthermore, even if Defendants were a part of the education system, which Defendants vehemently deny, "[a]dministrative remedies are generally inadequate or futile where plaintiffs allege structural or systemic failure and seek systemwide reforms." Id., 478 F.3d 1262, 1277 (10th Cir. 2007)(citations omitted). Here, Plaintiffs are seeking system wide change where Defendant County and its officers provide disabled children in schools adequate accommodations and to discontinue discrimination because of disabilities. Plaintiffs' claims are predicated on a theory of discrimination and "the Supreme Court has long-recognized that the IDEA is simply not an anti-discrimination statute." Id[.], 478 F.3d 1262, 1280-81 (10th Cir. 2007). Plaintiff is not obligated to exhaust administrative remedies in this case.

- 82 -

Defendants' sole precedent used to predicate their claim comes from an unpublished opinion from Minnesota that is not applicable to the case at hand. In S.A.S. v. Hibbing Public Schools, 2005 WL 2230415 at *4 (D. Minn. 2005), the Plaintiffs signed a settlement agreement with another party agreeing to exhaust administrative procedures regarding their claim. The court held that "exhaustion is required in this case, based on the language included in the settlement agreement." Id. Plaintiffs were bound to their signed agreement, and the court in S.A.S. did not hold the Plaintiffs were unable to pursue ADA claims against city officials absent the agreement. Id. Here, Plaintiffs have no agreement with any other party to exhaust administrative remedies; therefore, Defendants['] motion should be denied.

Response at 13-14.

The Plaintiffs also assert that J.P. was disabled on September 26, 2011, noting that Congress does not require a formal diagnosis of disability, but instead looks only to whether the person is "substantially limited in a major life activity." Response at 14-15 (internal quotation marks omitted)(citing Wilkerson v. Shinseki, 606 F.3d 1256 (10th Cir. 2010)). They continue:

In fact, "[a] medical diagnosis is insufficient, rather, 'the ADA requires plaintiffs to offer evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial.'" [Wilkerson v. Shinseki, 606 F.3d at 1262)(citations omitted)]. Defendants' insistence that J.P. needed a formal diagnosis in order to be protected is mistaken. J.P. need only demonstrate that she had a mental impairment that substantially limited one or more of the major life activities and that either there was a record of such impairment or that she was regarded as having such impairment. In Defendants' list of undisputed facts, Defendants identify several impairments that J.P. exhibited before the incident in question that were well documented prior to Defendant Sharkey's arrest. Defendants fail to allege that any of these impairments do not limit one or more of J.P.'s major life activities. J.P. was categorized as emotionally disturbed in 2008 which defines her as a disabled child pursuant to the IDEA. 20 U.S.C.A. § 1401(3).

Response at 13. After discussing general standards under the ADA, the Plaintiffs argue that J.P.'s mental condition impairs "her to the degree that she needs to have IEPs and BIPs in order to be functional at school." Response at 15. Somewhat confusingly, they continue:

- 83 -

Defendants do not argue that J.P. was not impaired. Defendants do not argue that J.P.'s impairment substantially limited major life activities like learning and going to <u>school</u>. Defendants do not argue that J.P. was regarded as having that impairment or that the impairment was well documented. Therefore, J.P. meets the definition of disabled pursuant to the ADA without objection as Defendants merely contend J.P. was not diagnosed, which is immaterial to the ADA claim.

Defendants' use of precedent is misleading. Defendants' [sic] cite <u>Krocka v. City of Chicago</u>, 203 F.3d 507, 512 (7th Cir. 2000) in their motion stating that <u>Krocka</u> holds "a mental health condition is an 'impairment' under the ADA once it has been 'diagnosed by a health professional.'" The holding in <u>Krocka</u> does not necessitate a medical diagnosis, as Defendants would lead the court to believe, but rather states that if a medical diagnosis is sufficient to establish an impairment, but not sufficient to establish that the impairment limits a major life function. <u>Krocka v. City of Chicago</u>, 203 F.3d 507, 512 (7th Cir. 2000). Nowhere in <u>Krocka</u> does the court require an individual be specifically diagnosed in order to be defined as disabled. Defendants['] use of <u>Kaltenberger v. Ohio Coll. of Podiatric Med.</u>, 162 F.3d 432, 434 (6th Cir. 1998) is also misleading. In <u>Kalternberger</u>, the plaintiff was seeking accommodations regarding the content of a medical graduate program, which the school declined to allow. The court held that it was ill-equipped to determine what the academic content of a program should be, and made no holding regarding a diagnosis being required to establish a disability. <u>Id.</u> Defendants' assertion that Plaintiffs have failed to state an impairment that substantially limits a major life activity is plainly factually inaccurate, and Defendants' motion should be denied.

Response at 15-16. The Plaintiffs also argue that <u>Ellenberg v. New Mexico Military Institute</u>, which, they concede, held that qualifying for an IEP and a BEP is insufficient to satisfy the ADA's definition of disabled, is distinguishable:

[T]he plaintiff in that case made no factual assertion that she was substantially limited in major life activities as J.P. has. <u>Id.</u> Plaintiff in <u>Ellenberg</u> relied on the presence of a BIP alone. <u>Id.</u> Defendants ignore that the court in <u>Ellenberg</u> also held that, "Of course an IDEA disability may -- and in the majority of cases probably will -- substantially limit a major life activity." <u>Id.</u>, 572 F.3d 815, 821 (10th Cir. 2009). The court noted that "learning" was considered a major life activity in . . . the statute itself. <u>Id.</u> J.P. is well documented as having the following impairments: frequent and high intensity defiant and aggressive behavior, nervousness, disorganiz[ation], depression and aggressiveness, hyperactivity, withdrawal, impaired social skills and functional communication. J.P. also had clinically significant range on conduct problems, attention problems adaptability and study skills. Plaintiffs' [sic] have established sufficient evidence

to establish J.P. was disabled on September 26, 2011 pursuant to the ADA, and Defendants' are not entitled to summary judgment.

Response at 17.

The Plaintiffs then turn to the County Defendants' knowledge, asserting that they knew or should have known that J.P. was disabled.  See Response at 17.  They continue:

> Defendants falsely claim Defendant Sharkey had no knowledge of J.P.'s disability.  In Defendant Sharkey's deposition, Defendant Sharkey repeatedly states he always gets to know his students, he takes time to figure out what is going on with his students before he decides how to interact with them, and that he takes the students mental condition into account generally.  Defendant Sharkey makes all of these general assertions yet denies knowing anything about J.P. and her disability. In addition, Defendant Sharkey knew J.P. was in a special education classroom on September 26, 2011 when he handcuffed and arrested her. A reasonable juror could impute knowledge onto Defendant Sharkey, especially as Plaintiffs are entitled to every inference of fact in this motion.
>
> In addition, Plaintiffs know Defendant Sharkey had knowledge of J.P.'s disability because Plaintiff J.H. told him prior to the incident.  Defendant Sharkey refers to his previous encounter with Plaintiffs in his deposition.  He recalls J.H. told him, "that there's a plan, and they have to handle the plan."   Defendant Sharkey was also informed by J.P.'s principal prior to the incident that J.P. was disabled.  Defendant Sharkey had actual knowledge that J.P. had a behavioral plan, and also that Defendant Sharkey was not a part of it.

Response at 17-18 (citation omitted).

The Plaintiffs again complain that the County Defendants have misleadingly used authority, stating that the cases are distinguishable on their facts, and that the cases on which the County Defendants rely involve employment discrimination, which Title I -- not Title II -- of the ADA covers.  See Response at 18 & n. 4.  They assert that Title II of the ADA does not require that the public entity have knowledge of the disability.  See Response at 18-19.  They concede that, to recover compensatory damages based on emotional distress, they must show intentional discrimination, see Response at 19, but they contend that a fact-finder can infer intentional

discrimination from deliberate indifference, see Response at 18 & n.5.  They continue:

> Plaintiffs allege that Defendant County's inadequate training to SROs and the
> absence of any meaningful policies which provide accommodation show
> Defendants['] deliberate indifference to students in APS who have mental
> disabilities, like J.P.  Defendant Sharkey's deposition illustrates that he still does
> not think that J.P.'s mental condition was relevant to his conduct.  This attitude
> illustrates an ongoing and pervasive indifference to disabled children in school.
> Although discovery is still on[]going on this issue, Plaintiffs' [sic] have already
> alleged sufficient facts to survive summary judgment and intends [is] to
> supplement his [sic] response with supplemental material.

Response at 19.

> The Plaintiffs also argue that J.P. did not threaten others' health and safety:

> Defendants fail to recognize that Plaintiffs are not asserting this ADA
> complaint because Defendants denied J.P. access to education; Plaintiffs contend
> Defendants denied J.P. accommodation during an arrest, and discriminated
> against her.   Defendant cites an exception under 42 U.S.C. § 12182(B)(3)
> claiming J.P. was not entitled to a participate [sic] in a public program because
> she posed a direct threat to the health and safety of others.  Defendants then cite
> case law which allowed a university to expel a graduate student.  Ascani v.
> Hofstra Univ., 173 F.3d 843 (2d Cir. 1999).  Defendants' argument is immaterial
> to this case.  Plaintiffs do not assert Defendant Sharkey's arrest violated J.P.'s
> right to a public education; rather Plaintiffs' [sic] assert that Defendant Sharkey,
> as offeror of public services through his role as an officer, was obligated to
> accommodate J.P. because of her disability. Had Defendant Sharkey removed J.P.
> from the classroom and sent her home with her mother, J.P. would have similarly
> lost access to her public education, yet Plaintiffs' suit would not exist.  The issue
> is not whether J.P. was entitled to public education, but whether she was entitled
> to accommodations during arrest and the force used to accomplish that arrest.

> Furthermore, J.P. was not a "direct threat" at the time Defendant Sharkey
> handcuffed and arrested her, and was at all times entitled to the protections of the
> ADA.  "The term [']direct threat['] means a significant risk to the health or safety
> of others that cannot be eliminated by a modification of policies, practices, or
> procedures or by the provision of auxiliary aids or services." 42 U.S.C.A.
> § 12182(B)(3).  J.P. did not meet this definition.  Throughout this litigation,
> Defendants have contended that Defendant Sharkey was not bound to J.P.'s BIP
> and IED, which are procedures to intervene with J.P.'s behavior because of her
> disability.  Defendant Sharkey interrupted that procedure and violated the
> school's policy when he prevented the crisis team from handling the situation.
> Thus Defendants cannot now argue no procedure would have helped J.P. when

they also argue they are immune to the implementation of any procedure specifically set to accommodate a disabled child.

In addition, whether a disabled child who throws a marble at a wall and engages in a fight with another student poses a threat to the health and safety of others is a disputed fact in this case. Arguably, Defendants line of reasoning would lead to a conclusion that any disabled child who has a behavioral disorder which causes occasional outbursts would never be protected under the ADA, and they should all be locked up away from society. However, our national policy requires that our public schools educate rather than institutionalize disabled children. It is also undisputed in this case that J.P. was sitting calmly in a room alone crying for fifteen minutes before Defendant Sharkey handcuffed and arrested her. Defendants' [sic] cannot reasonably argue there is no disputed fact about whether J.P., an eleven year old disabled child, was a threat, not to be remedied by a policy or procedure, when she was sitting alone in a closet crying.

Response at 19-20.

The Plaintiffs contend that they have established both a discrimination theory and an absence-of-reasonable-accommodation theory under the ADA. See Response at 21-22. The Plaintiffs, in essence, assert that J.P. lacked the mental capacity to have the intent that battery on a school teacher requires:

Intent is defined as "[t]he state of mind accompanying an act." Black's Law Dictionary, 395 (4th Pocket Ed. 2011). The New Mexico Supreme Court has determined that simple battery is a general intent crime. State v. Nozie, 2009-NMSC-018, ¶ 41, 146 N.M. 142, 207 P.3d 1119 (citing State v. Duran, 80 N.M. 406, 407, 456 P.2d 880, 881 (Ct. App. 1969))(distinguishing the intent to apply force required to commit battery from the intent to injure required to commit aggravated battery). General intent is defined as "[t]he intent to perform an act even though the actor does not desire the consequences that result" and "usually takes the form of recklessness (involving actual awareness of a risk and the culpable taking of that risk) or negligence (involving blameworthy inadvertence)." Black's Law Dictionary, 396 (4th Pocket Ed. 2011). To be blameworthy a person must be found responsible for doing something wrong. Id. at 79. Responsibility, as applied to criminal law, is defined as "[a] person's mental fitness to answer in court for his or her actions." Id. at 653. One who is found to be incompetent is, by definition, lacking in mental fitness to answer for her actions, as she is determined to be unable to form the mental processes required to understand the factual circumstances of the charges, the nature and significance of proceedings against her, or "to comprehend the reasons for

- 87 -

punishment." See State v. Rotherham, 122 N.M. 246, 252, 923 P.2d 1131, 1137 (1996); State v. Flores, 2005-NMCA-135, ¶¶ 15-16, 138 N.M. 636, 124 P.3d 1175; State v. Michaelback, 2010 WL 4162560, *3 (N.M. Ct. App. 2010) (unpublished memorandum opinion).

J.P. was incapable of forming the requisite intent to commit this crime. Therefore, she did not commit the crime, and her actions were not "unlawful," but were instead manifestations of her disability. Wrongful arrest is established when the Plaintiff can show the "police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity." Gohier v. Enright, 186 F.3d 1216, 1220-21 (10th Cir. 1999). J.P. engaged in no criminal activity. Unlike in qualified immunity, Plaintiffs do not need to show that a reasonable officer would have known that J.P. lacked intent; however, as discussed in Response No. I, Defendant Sharkey was aware "there's always a question of whether a child has the ability to form criminal intent," let alone a disabled child's ability.[] [Plaintiffs' Sharkey Depo. at] 59:11-23. J.P. was not convicted of any crime because her actions were not criminal; therefore she was protected by the ADA.

J.P.'s alleged actions were insufficient to trigger an explosion at school, and similarly should not be criminalized. In Honig v. Doe, the Supreme Court recognized that federal statutes were designed to protect disabled children, even when [their] acts were arguably "dangerous." The court held:

> The "stay-put" provision prohibits state or local school authorities from unilaterally excluding disabled children from the classroom for dangerous or disruptive conduct growing out of their disabilities during the pendency of review proceedings. Section 1415(e)(3) is unequivocal in its mandate that "the child shall remain in the then current educational placement" (emphasis added), and demonstrates a congressional intent to strip schools of the unilateral authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school. This Court will not rewrite the statute to infer a "dangerousness" exception on the basis of obviousness or congressional inadvertence, since, in drafting the statute, Congress devoted close attention to Mills v. Board of Education of District of Columbia, 348 F. Supp. 866, and Pennsylvania Assn. for Retarded Children v. Pennsylvania, 334 F. Supp. 1257, and 343 F. Supp. 279, thereby establishing that the omission of an emergency exception for dangerous students was intentional.

Honig v. Doe, 484 U.S. 305, 306-07 . . . (1988).

The federal statutes that were designed to protect disabled children [impose] those protections even if a student was violent.  The actions of J.P. and students like her are indeed a public policy concern.  But public policy is to accommodate rather than institutionalize.  Although the court here was interpreting the IDEA, "'a reviewing court should not confine itself to examining a particular statutory provision in isolation.' Rather, '[t]he meaning -- or ambiguity -- of certain words or phrases may only become evident when placed in context. . . .  It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" <u>Nat'l Ass'n of Home Builders v. Defenders of Wildlife</u>, 551 U.S. 644, 666 . . . (2007).  Both the ADA and the IDEA seek to protect disabled children, and the interpretation of the statutes should be consistent.  Although this case is an ADA violation against Defendant County and not an IDEA claim against a school, the court should not find that the federal government has extended protection to disabled children with regard to expulsion or long term suspension, but does not protect those same children for the same actions from criminal arrest, a fundamentally more serious and harmful consequence than suspension.  Where a disabled child's conduct would be insufficient for long term suspension, it should certainly be insufficient for criminal actions.  Where Congress has determined conduct essentially "lawful" because of the manifestations of a disability, it will not consider that same conduct "unlawful" for the purposes of another statute with a similar purpose.  The ADA clearly protects J.P. from the wrongful arrest, and Defendants have failed to establish their burden to warrant summary judgment.

Response at 22-24.

As for the reasonable-accommodation claim, the Plaintiffs assert that

Defendants' sole argument for Defendant Sharkey's "reasonableness" stems from five facts:

1) Defendant Sharkey allowed J.P. to cry in a closet for fifteen minutes prior to her handcuffing and arrest.

2) Defendant Sharkey called in for backup to arrest the eleven year old disabled child in case she resisted.

3) Defendant Sharkey spoke to J.P. in a "calm and professional" manner.

4) Defendant Sharkey "gently" place[d] J.P. in handcuffs.

5) Defendant Sharkey handcuffed and arrested J.P. while school was in session, because that apparently limits J.P.'s exposure to ridicule by peers.

Response at 24-25.  The Plaintiffs assert that,

> [d]espite Plaintiffs' disputes that Defendant Sharkey was neither calm nor
> professional, nor Plaintiffs' contention that it is relatively impossible to "gently"
> handcuff a child, because the act in itself is damaging, Plaintiffs dispute the
> ultimate factual conclusion reached by Defendants that these five facts equate the
> reasonable accommodation mandated by the ADA.   In fact, several of the
> "accommodations" are not accommodations at all.  Defendants' argument that
> these facts equal accommodations lends itself to the acknowledgement that had
> J.P. not been disabled Defendant Sharkey would have been agitated and
> unprofessional as opposed to "calm and professional," and that he would have
> roughly handcuffed a non-disabled eleven year old as opposed to a disabled one,
> or that Defendant Sharkey would have waited for an opportune moment where all
> students were in the hallway to publicly humiliate a non-disabled student versus a
> disabled student.  Not only are the five "accommodations" not reasonable, they
> are not accommodations.  Defendant Sharkey should not have handcuffed J.P.;
> Defendant Sharkey should not have arrested J.P.; and Defendant Sharkey should
> not have transported J.P. to the detention center.  Sharkey had a multitude of less
> severe and more appropriate alternatives . . . .  The burden for the Defendant to
> show a genuine issue of material fact is far too high for defendants['] five
> "accommodations" to satisfy as a matter of law, what reasonable accommodations
> should be on a factual scenario that is relatively novel to the Tenth Circuit, and
> federal courts in general. Congress enacted the ADA because it mandated that
> disabled persons should be treated differently based on their need to
> accommodate the disability. Defendants have failed to show that Defendant
> Sharkey treated J.P. differently, let alone, [sic] with sufficient accommodations
> that satisfy the ADA.

Response at 25-26.

Finally, as for the training claim, the Plaintiffs contend that the issue of training's

adequacy is a fact issue for the jury:

> In Defendant Sharkey's own deposition, he admits not being trained on the
> psychological impacts of handcuffing children.  He also expressed an absence of
> knowledge about the resources available to him when dealing with disabled
> children, and specifies that there is no policy which mandates him to be aware of
> which children are disabled despite having a statutory duty to know and report
> said disabilities.  20 U.S.C.A. § 1415(k)(B).  These facts are enough to create a
> genuine issue of material fact that he was not adequately trained. Defendants'
> [sic] Sharkey's statements illustrate a fundamental misunderstanding of law and
> his role as an SRO which by extension shows he was inadequately trained.

Together with his acts, his training helps to illustrate [the] totality of the circumstances that lead [sic] to an eleven year old disabled child being forcibly handcuffed and needlessly transported to a detention center because of the manifestations of her disability. A reasonable juror could find that an SRO should be trained to know the impact of his actions on children, or be trained on the relevant juvenile and federal laws he is meant to enforce, or to establish policies and procedure which would allow an SRO to gain the information he needs in order to comply with procedural safeguards mandated in statutes. A reasonable juror could also find that by not having the aforementioned training, Defendants deliberately and indifferently violated J.P.'s rights. Defendants simply stating that Defendant Sharkey was adequately trained does not make it so. Defendants['] argument solely consist[s] of a statement that they had policies in place, without providing evidence that these policies and enforcement were adequate or reasonable. Defendants' addition of an adverb is not proof, and does not satisfy their "burden of showing that no genuine issue of material fact exists." EEOC v. Horizon/ MS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000).

Furthermore, Defendants'[sic] have not articulated why Plaintiffs must show a genuine issue of fact regarding training, for Plaintiffs' accommodation claim. Defendants cite Gohier v. Enright, 186 F.3d 1216 (10th Cir. 1999), which states that the plaintiff "**might** have argued that Title II required [defendant] to better train its police officers." Gohier v. Enright, 186 F.3d 1216, 1222 (10th Cir. 1999)(emphasis added). The court in Gohier was merely suggesting a hypothetical way the plaintiff in that case could have alleged lack of accommodation, but did not hold lack of training was the only theory to be pursued. Although Plaintiffs do assert that the absence of training is a lack of accommodation, it is not Plaintiffs' only grievance. As Plaintiffs discussed in (F)(b) of this section in this motion, Plaintiffs allege multiple times where Defendants failed to provide adequate accommodations. Therefore, dismissing Plaintiffs' entire Count VI would dismiss several of Plaintiffs' grievances, not just the lack of training allegation.

Response at 26-27 (emphasis in Response). The Plaintiffs, therefore, ask the Court to deny the MSJ. See Response at 27.

In the Reply, the County Defendants resist each argument. For the Fourth Amendment argument, the County Defendants submit as follows:

Plaintiffs contend that J.P.'s asserted emotional distress over being handcuffed is sufficient reason in and of itself to render her handcuffing an excessive use of force. [Doc. No. 93], pp. 8-9. In making this generalized assertion, Plaintiffs ignore the clearly established Fourth Amendment law

authorizing a police officer to arrest an individual who commits "even a very minor criminal offense" in the officer's presence.  Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001); see Koch v. City of Del City, 660 F.3d 1228, 1241 (10th Cir. 2011)(to overcome a defense of qualified immunity, a plaintiff must demonstrate that it would be readily apparent to any reasonable officer that, under clearly established law, he had no basis to effect an arrest under the circumstances).  Plaintiffs further ignore the clearly established law that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Graham v. Connor, 490 U.S. 386, 396 (1989).

In this case, it is undisputed that J.P. kicked her teacher.  It is also undisputed that J.P. scratched her teacher, drawing blood and had attempted to head butt and bite Ms. Gonzales.  It is also undisputed that J.P. had repeatedly hit another student in the head. When she saw Deputy Sharkey, J.P. retreated into the classroom, sat on the floor in a small closet type room and locked her hands together to resist being handcuffed.  Deputy Sharkey was concerned she might physically resist being handcuffed and therefore requested that another deputy respond to the scene.  Based on the foregoing undisputed facts, Deputy Sharkey had probable cause to believe that J.P. had committed the felony crime of battery on a school employee in violation of NMSA, § 30-3-9(E) by striking her teacher.  He was therefore authorized under the Fourth Amendment to place J.P. in handcuffs to effect the arrest.  It is further undisputed that Deputy Sharkey placed J.P. in handcuffs without incident and transported her to the juvenile detention center without incident.  Deputy Sharkey did not use greater force than was necessary to effect a lawful arrest.  See Atwater, 532 U.S. at 354-55 (noting that a normal lawful custodial arrest where one is handcuffed, placed in a patrol car, and taken to the police station may be inconvenient and embarrassing, but not violative of the Fourth Amendment.).

Reply at 7-8.

The County Defendants argue that the Plaintiffs incorrectly understand the law regarding

emotional-distress damages in the excessive-force context:

Plaintiffs incorrectly argue that suffering emotional distress automatically renders a use of force excessive, no matter how minimal the force used by the officer. This is an incorrect reading of the law. The force used must be unreasonable *and* the plaintiff must sustain some actual injury that is not *de minimis*, be it physical or emotional.  See Cortez v. McCauley, 478 F.3d [at 1129] (evidence of injury from use of handcuffs is "insufficient, as a matter of law, to support an excessive force claim if the use of handcuffs is otherwise justified.").  In this case, Plaintiffs have not put forward clearly established law that would have put an officer on notice that simply handcuffing an eleven year old who

- 92 -

committed a felony violates the Fourth Amendment.  See Pueblo Neighborhood Health Centers, Inc. v. Losavio, 847 F.2d at 645 (10th Cir. 1988)("The plaintiff carries the burden of convincing the court that the law was clearly established."). Plaintiffs have also failed to carry their burden of demonstrating that the law was clearly established that Deputy Sharkey's knowledge that J.P. received special education services would turn an otherwise reasonable use of force into an excessive use of force.  See id.

Plaintiffs['] reliance on Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179 (10th Cir. 2001)[,] is misplaced as it is distinguishable on its facts and the court's reasoning supports the conclusion that Deputy Sharkey's handcuffing of J.P. was reasonable.  In Holland, members of a police SWAT team were accused of using excessive force during the course of an arrest where they held children, who were not suspected of committing a crime, at gunpoint after gaining control of the situation.  The SWAT team members were dressed in green camouflage clothing with no identifying markings and hoods showing only their eyes.  Id. at 1183.  The Tenth Circuit held that the officers' conduct violated plaintiffs' Fourth Amendment rights, explaining that the unwarranted nature of the force, rather than its potential for physical harm, was what rendered it unconstitutionally excessive.  See id. at 1193-97; see also Grass v. Johnson, 2009 WL 997346 at *3 (10th Cir. 2009).  Unlike Holland, this case does not involve a child who was not suspected of a crime, was not attempting to evade the officers, and was not posing any threat.  Here, J.P. was suspected of committing a felony battery against her teacher and repeatedly battering a fellow student.  J.P. had kicked and scratched her teacher.  J.P. had also attempted to head butt and bite her teacher.  Further, she had tried to evade Deputy Sharkey by retreating into the classroom, and she locked her hands to resist being handcuffed.

Plaintiffs also erroneously rely on Manzanares v. Higdon, 575 F.3d 1135, 1150 (10th Cir. 2009) for the general proposition that "a person must clearly be dangerous and a threat to the officers to justify handcuffing." [Doc. No. 102], p. 9. In Manzanares, the Tenth Circuit stated, "We have also clearly required a particularized suspicion that a detainee is dangerous in order to justify handcuffs or other forceful techniques in an investigative detention." 575 F.3d 1150.  In this case, J.P. was under arrest, not subject to an investigative detention. Therefore, Manzanares is inapplicable.

Reply at 9.

With respect to the Plaintiffs' invocation of state law, the County Defendants note that the Plaintiffs have not identified clearly established authority with respect to the Fourth Amendment, as opposed to under state law, to support their views.  See Reply at 9-10.  They continue:

- 93 -

New Mexico may choose to impose more lenient consequences for children, but the State legislature's decision to do so does not alter the Fourth Amendment's standards. Based on the foregoing undisputed facts and clearly established Fourth Amendment law, Deputy Sharkey's decision to handcuff J.P. was reasonable. Alternatively, Deputy Sharkey is entitled to qualified immunity on Plaintiffs' excessive force claim (Count II) because Plaintiffs failed to carry their burden of demonstrating that Deputy Sharkey violated clearly established Fourth Amendment law on the use of force.

Reply at 10.  The County Defendants also note that the provisions that the Plaintiffs cite are, at

any event, irrelevant:

Notably, none of the New Mexico's Delinquency Act's provisions prohibited Deputy Sharkey's arrest and handcuffing of eleven year old J.P.  See NMSA, § 32A-2-3(A)(k) (defining a delinquent act as an offense punishable as a felony); NMSA § 32A-2-10(C) (stating that a child *under* the age of eleven shall not be held in detention); NMSA, § 32A-2-11(A)(2) (stating that a child may be taken into custody for an alleged delinquent act if a detention risk assessment is completed by CYFD and a determination is made that the child poses a substantial risk of harm to others).  Moreover, the Children's Mental Health and Developmental Disabilities Act is inapplicable here because the rights set forth therein "apply to a child who is physically present and receiving treatment or habilitation services in New Mexico."  NMSA, § 32A-6A-6.  There is no evidence that J.P. was receiving such services on September 26, 2011.

Reply at 9-10 n.1.

The County Defendants then turn to the ADA claims.  See Reply at 10.  They note that

the Plaintiffs have conceded any ADA claim as against Sharkey and ask the Court to dismiss any

such claim with prejudice.  See Reply at 10.  As for the exhaustion argument, the County

Defendants maintain that the Plaintiffs must exhaust their administrative remedies:

Plaintiffs contend that the IDEA's exhaustion requirement is inapplicable because Plaintiffs claim they are seeking "system wide change where Defendant County and its officers provide disabled children in schools adequate accommodations and to discontinue discrimination because of disabilities." [Doc. No. 102], p. 14. In their Second Amended Complaint, however, Plaintiffs seek only monetary damages for alleged injuries to J.P., not system wide reform such as injunctive relief.  See Second Amended Complaint, p. 11, ¶¶ 83-85 (filed June 28, 2013) [Doc. No. 85].  Therefore, the IDEA's exhaustion requirement as

- 94 -

articulated in <u>Ellenberg v. N.M. Military Inst.</u>, 478 F.3d 1262, 1279 (10th Cir. 2007) is applicable here.

Plaintiffs further argue that <u>S.A.S. v. Hibbing Public Schools</u>, 2005 WL 2230415 at *4 (D. Minn. 2005) is inapplicable because that case involved a settlement agreement that required plaintiffs to exhaust administrative remedies regarding their claim. <u>See</u> [Doc. No. 102], p. 14. Defendants re-read this decision several times and found no discussion regarding a settlement agreement. Instead, the court premised its decision on the IDEA's explicit mandate requiring plaintiffs to "exhaust IDEA's impartial due process hearing procedures in order to bring a civil action." 2005 WL 2230415 at *4 (dismissing an ADA claim against the city defendants who were responsible for arresting S.A.S. for failure to exhaust administrative remedies pursuant to the IDEA); <u>see</u> 20 U.S.C. §1415(f)-(i). Because Plaintiffs failed to provide this Court with admissible evidence that Plaintiffs have exhausted their administrative remedies against the County Defendants as mandated by the IDEA, Plaintiffs' ADA claims (Counts V and VI) should be dismissed without prejudice.

Reply at 10-11.

The County Defendants then discuss the Plaintiffs' argument that J.P. was disabled on

September 26, 2011:

In their Response, Plaintiffs list a number of traits or behaviors that J.P. had demonstrated over the years. <u>See</u> [Doc. No. 102], p. 17. Plaintiffs rely on <u>Sutton v. United Air Lines, Inc.</u>, 130 F.3d 893, 898 (10th Cir. 1997) to support their argument that these traits or behaviors are impairments that substantially limit the major life activities of learning and going to school. <u>See</u> [Doc. No. 102], p. 15-16. However, <u>Sutton</u> does not make a disability determination quite as simple as Plaintiffs suggest.

In <u>Sutton</u>, the Tenth Circuit acknowledged that the ADA did not define the term "impairment" and then looked to the EEOC's Interpretive Guidance on Title I of the Americans with Disabilities Act. 29 C.F.R. § 1630, App. for assistance in interpreting this term. The EEOC's Interpretative Guidance states that "'[i]t is important to distinguish between conditions that are impairments and physical, psychological, environmental, cultural and economic characteristics that are not impairments.'" <u>Sutton</u>, 130 F.3d at 899 (quoting 29 C.F.R. § 1630, App. §1630.2(h),   ¶   3). "'Hence, impairment does not include: physical characteristics . . . that are within the "normal" range and are not the result of a physiological disorder; characteristic predisposition to illness or disease; pregnancy; common personality traits such as poor judgment or quick temper where these are not the symptoms of a mental or psychological disorder; or

environmental, cultural or economic disadvantages such as poverty, lack of education or a prison record.'" Id.; see Daley v. Koch, 892 F.2d 212, 215 ([2d] Cir. 1989)(holding in Rehabilitation Act case that personality traits of "poor judgment, irresponsible behavior and poor impulse control" could be described as commonplace and "in no way r[ose] to the level of an impairment").

In this case, school personnel observed certain traits and behaviors in J.P. over the years. However, prior to September 26, 2011, there had been no determination as to whether these traits or behaviors were rooted in an impairment or disability or were simply common personality traits. See Sutton, 130 F.3d at 899 (quoting 29 C.F.R. § 1630, App. § 1630.2(h), ¶3); see also Daley, 892 F.2d at 215. For the foregoing reasons, Plaintiffs did not meet their burden of proving that . . . J.P. had a "mental impairment" that qualified as [a] disability under the ADA as of September 26, 2011.

Contrary to Plaintiffs' assertion, County Defendants' use of precedent is not misleading. In Krocka v. City of Chicago, 203 F.3d 507, 512 (7th Cir. 2000), the court found that "[b]ecause Krocka's severe depression is a medical condition diagnosed by a health professional, it qualifies as an impairment under the ADA."). This is entirely consistent with County Defendants' use of this authority in its Motion. See [Doc. No. 93], p. 17. County Defendants' citation to Kaltenberger v. Ohio College of Podiatric Med., 162 F.3d 432, 437 (6th Cir. 1998) was also accurate and is applicable here. In Kaltenberger, the court stated:

> However, the College was not obligated to provide accommodation until plaintiff had provided a proper diagnosis of ADHD and requested specific accommodation. That plaintiff told an academic counselor at the College that she thought she might have adult attention deficit disorder simply did not impose an obligation to offer accommodations.

162 F.3d at 437 (citing Goodwin v. Keuka College, 929 F. Supp. 90, 94 (W.D.N.Y. 1995)(no obligation to accommodate arose from knowledge that plaintiff was seeking testing for learning disability). In this case, Plaintiffs failed to provide evidence of a diagnosis of a mental impairment. Therefore, Plaintiffs have not meet their burden of establishing a prima facie case of disability for purposes of the ADA.

Reply at 11-13.

Turning to the question whether the County Defendants knew J.P. suffered from a disability, the County Defendants explain:

Plaintiffs erroneously claim that summary judgment cannot be granted because the parties dispute the level of knowledge Deputy Sharkey had regarding J.P.'s asserted disability.  Plaintiffs have offered nothing more than speculation and hearsay to support their contention that Deputy Sharkey was aware of J.P.'s emotional disturbance classification.  In his deposition, Deputy Sharkey testified that "I get to know my students, and *sometimes* I'll see what their struggles are." [Doc. No. 103-4], p. 34, ll. 5-6 (emphasis added).  This testimony is not tantamount to Deputy Sharkey admitting that he was specifically aware that J.P. had a disability or the nature of her asserted disability.  Further, knowing that J.P. is in a special education classroom does not amount to him knowing she was disabled for purposes of the ADA.  Notably, Plaintiffs failed to address County Defendants' citation to Morisky v. Broward County, 80 F.3d 445, 448 (11th Cir. 1996) wherein the court held that the county being made aware that plaintiff was illiterate and had taken special education courses was insufficient to put the county on notice that the plaintiff was disabled under the ADA.

Plaintiffs also claim that Deputy Sharkey was aware of J.P.'s purported disability because of a previous encounter with her mother, J.H. See [Doc. No. 102], p. 18. However, Deputy Sharkey's deposition testimony does not indicate that J.H. made him specifically aware that J.P. had a disability.  Deputy Sharkey testified that when he was called to respond to an incident involving J.P.'s misbehavior in elementary school, J.H. arrived and said, "'You can't do this. You can't even be here;' that there's a plan, and they have to handle the plan[.]" Transcript of Deposition of John Sharkey, p. 75, ll. 10-12, attached as Exhibit B. There is no evidence that J.H. ever told Deputy Sharkey about the basis for J.P.'s "plan" or that J.P. had a disability.  See [Doc. No. 92-4], ¶¶ 9-15.  It is also notable that Plaintiffs offered no evidence in the form of J.H.'s deposition testimony or an affidavit indicating that she advised Deputy Sharkey of J.P.'s disability or the basis of her BIP.  Plaintiffs' speculation otherwise is insufficient to defeat summary judgment. See Van Compernolle v. City of Zeeland, 2006 WL 1460035 at *11 (W.D. Mich. 2006)("[A]bsent knowledge of a disability, speculation about the cause of a problem does not impute knowledge to Defendants.").

Finally, Plaintiff cannot establish Deputy Sharkey's knowledge with inadmissible hearsay from J.P.'s mother as to what J.P.'s former principal, Ms. Mildren, allegedly said she told Deputy Sharkey.  See [Doc. No. 115-4], p.153, l. 7- p. 155, l. 4.  According to J.H., Ms. Mildren said she had a private discussion with Deputy Sharkey and "brought to his attention that in the behavior intervention program that they have a one-two-three-four list they go through first before they call in the school resource officer." Id., p. 153, ll. 7-17.  J.H. further testified that Ms. Mildren "did state to me that she made him aware that in the case of children who are in the Special Ed setting and especially ones who have IEP BIP, that they specifically have to follow protocol first and that it states on

there that a school resource officer is referred to as last resort." Id., p. 153, l. 25 -
p. 154, l. 10.  J.H. was not present at the meeting Ms. Mildren purportedly had
with Deputy Sharkey.  Id., p. 154, ll. 11-16.  J.H.'s testimony on this issue is
inadmissible hearsay which does not create a genuine dispute and cannot support
a plaintiff's opposition to summary judgment.  See Fed. R. Civ. P. 56(c)(2); see
also Llewellyn, 711 F.3d at 1180.  Moreover, there is nothing in J.H.'s deposition
testimony which would indicate that Ms. Mildren told Deputy Sharkey that J.P.
had a disability.

Plaintiffs alternatively argue that they "need not show knowledge to
establish a violation of Title II of the ADA." [Doc. No. 102], p. 19.  According to
Plaintiffs "intentional discrimination" can be established by showing Defendants'
deliberate indifference.  Id.  "The test for deliberate indifference in the context of
intentional discrimination comprises two prongs: (1) 'knowledge that a harm to a
federally protected right is substantially likely,' and (2) 'a failure to act upon
that . . . likelihood.'"  Barber ex rel. Barber v. Colo. Dept. of Revenue, 562 F.3d
1222, 1229 (10th Cir. 2009).  Knowledge that the plaintiff has a disability is still a
requirement of the deliberate indifference standard.  See id. (citing cases)

Reply at 13-14.

As for the direct-threat line of argument, the County Defendants state:

In their Response, Plaintiffs clarify that they do not assert Defendant
Sharkey's arrest violated her right to a public education; but instead that he, as an
offeror of services through his role as an officer, was obligated to provide her
accommodations during her arrest and with the force used to accomplish that
arrest because of her asserted disability. [Doc. 102], p. 20.  Plaintiffs would have
had Deputy Sharkey accommodate J.P. by sending her home with her mother.  Id.
However, Plaintiffs fail to cite the court to clearly established law that would have
required Deputy Sharkey to forego arresting or handcuffing J.P. after she had
committed a felony by attacking a teacher and repeatedly hitting a fellow student.
See Roberts v. City of Omaha, 2013 WL 3924326, * [sic] (8th Cir. 2013).

Alternatively, Plaintiffs argue that J.P. did not pose a direct threat at the
time Deputy Sharkey arrested and handcuffed her because he interrupted the de-
escalation process set out in her BIP. [Doc. No. 102], p. 20.  The undisputed
evidence does not support Plaintiffs' assertion. J.P.'s teacher, Allison Gonzales,
and the teacher's aide, Gwendoline Zamora, had been employing de-escalation
techniques from the moment J.P. refused to participate in the day's lesson and
begin disrupting the class by loudly tapping the metal type marble.  Ms. Gonzales
repeatedly requested she stop bouncing the marble.  Ms. Zamora asked J.P. if she
wanted some help and J.P. refused.  Ms. Gonzales also asked J.P. if she wanted to
talk to her mom or have her mother come back to school but, again, J.P. refused.

- 98 -

When J.P. exchanged words with a classmate, the other student returned to his seat to work with Ms. Gonzales.  J.P. could not see this student form her study carrel but she came around anyway and forcibly threw the marble across the room.  She then punched the other student in the back of the head.  Ms. Gonzales and Ms. Zamora made unsuccessful attempts to diffuse the situation by telling the other student to leave the classroom and trying to hold J.P. back but she attempted to head butt and bite Ms. Gonzales.  She also scratched Ms. Gonzales, drawing blood. Despite their efforts, J.P. got free and hit the student again.  Outside the classroom, Ms. Gonzales and Ms. Zamora got a hold of J.P. again in an effort to keep her from going after the other student a third time. This is when J.P. kicked Ms. Gonzales.  The undisputed facts indicate that the de-escalation strategies were not working and J.P. was becoming more and more violent. It is also undisputed that Ms. Gonzales and Ms. Zamora did not have control of J.P. It is further undisputed that upon seeing Deputy Sharkey, J.P. retreated into the classroom, sat down and crossed her hands to resist being handcuffed.  It is also undisputed that Deputy Sharkey believed that J.P. might violently resist as he attempted to handcuff her.  Under these facts, J.P. posed a significant risk to the safety of her teachers, other students, and Deputy Sharkey that was not eliminated by her teachers repeated attempts to de-escalate the situation.  The court should therefore find that J.P. posed a direct threat as a matter of law, warranting the dismissal of her Title II ADA claims.

Reply at 15-16.

As for the wrongful-arrest and reasonable-accommodation-during-arrest theories, the

County Defendants argue that the claims both fail:

In their Response, Plaintiffs claim to have asserted a cognizable ADA claim under the wrongful-arrest theory because J.P. "was incapable of forming the requisite intent to commit the crime" of battery on a school employee. [Doc. 102], p. 21-22.    Plaintiff has not, however, offered any admissible evidence to demonstrate that J.P. lacked the general intent to kick Ms. Gonzales even if J.P. did not desire the consequences that resulted.  J.P. demonstrated that her actions were intentional and well within her control because she stopped as soon as she saw Deputy Sharkey.  Such immediate cessation of her violent attack on her teacher demonstrates J.P.'s awareness that what she was doing was wrong. Because J.P. committed a crime, Defendants are entitled to summary judgment on Plaintiffs' ADA claim wrongful-arrest theory.

Likewise, Plaintiffs have failed to show any admissible evidence that Deputy Sharkey took any action that caused J.P. to suffer greater injury or indignity than other non-disabled arrestees during the course of the arrest, handcuffing and transport to the juvenile detention center.  See Gohier v. Enright,

186 F.3d 1216, 1220-21 (10th Cir. 1999).  Plaintiffs argue that even if J.P. is dangerous, she should be allowed to remain in the classroom.  The ADA only requires a reasonable accommodation, not an accommodation that would result in a significant threat of harm to others.  Therefore, Defendants are entitled to summary judgment on Plaintiffs' ADA claims under the reasonable-accommodation-during-arrest theory.

Reply at 16.

Finally, the County Defendants contend that the Plaintiffs cannot show that the County

Defendants trained Sharkey with deliberate indifference:

Even when the evidence is viewed in the light most favorable to them, Plaintiffs cannot show that the training which Bernalillo County provided Deputy Sharkey was deliberately indifferent to or caused the alleged violation of J.P.'s rights under Title II of the ADA.  Plaintiffs claim the training was inadequate because he had not been trained specifically on the psychological impacts of handcuffing children.  Deputy Sharkey had, however, been trained and had significant experience in dealing with individuals with mental impairments.  He had also been trained [in] de-escalation techniques and served as a crisis intervention officer.  The County also provided Deputy Sharkey with training on being a school resource officer, which was put on by the National Association of School Resource Officers.  Deputy Sharkey was trained on adolescent emotional issues, special education and student rights, school law, school safety, and crime prevention.  See [Doc. Nos. 93-2 and 93-3].  Further, Plaintiffs cannot show that the training provided by Bernalillo County was not consistent with the governing law on Title II of the ADA.

Plaintiffs also argue that Bernalillo County had no policy which mandated Deputy Sharkey to be aware of which children are disabled "despite having a statutory duty to know and report said disabilities." [Doc. No. 102], p. 26 (citing 20 U.S.C. § 1415(k)(B)). Plaintiffs misapply this section of the IDEA which provides that "[a]n agency reporting a crime committed by a child with a disability shall ensure that copies of the special education and disciplinary records of the child are transmitted for consideration by the appropriate authorities to whom the agency reports the crime." 20 U.S.C. § 1415(k)(9)(B). This section refers to a public school agency's obligation.  See Valentino C. v. School Dist. of Philadelphia, 2004 WL 225038 at *7 (E.D. Pa. 2004)(citing cases).  Having no evidence which identifies a deficiency in Bernalillo County's training program for Deputy Sharkey which was the moving force behind his alleged violation of the ADA, Plaintiffs' failure to train claim (Count VI) is subject to dismissal as a matter of law.

Reply at 16-17.

At the hearing, the Court heard argument first on the Fourth Amendment issues. <u>See</u> Transcript of Hearing at 37:1-4 (taken September 6, 2013)(Court)("Tr.").[90]   The County Defendants first noted that, in their view, it is undisputed that: (i) J.P. was under arrest for battering a school employee, a felony in New Mexico -- even though the felony/misdemeanor distinction does not apply, because she is a juvenile, the underlying crime is a felony battery; and (ii) handcuffs were properly placed on her calmly with appropriate spacing -- she never saw a doctor for any injuries, and the small red marks on her wrists disappeared after a day.  <u>See</u> Tr. at 37:20-38:15 (Robles).  The County Defendants noted that the Sixth Circuit has explained that it is per se reasonable to handcuff an arrestee, and also contended that no case states that you should not handcuff a juvenile, a mentally ill person, a developmentally disabled person, or a person who is otherwise disabled.  <u>See</u> Tr. at 39:16-23 (Robles).  The County Defendants conceded that physically impaired individuals are treated differently, but suggested that no case shows that police should not handcuff an individual with a mental disability.  <u>See</u> Tr. at 38:23-25 (Robles).  The County Defendants stated that, at the threshold, the Plaintiffs must point to a case similar to this one and stated that no such case exists.  <u>See</u> Tr. at 39:1-5 (Robles).  Further, they reiterated their argument that Tenth Circuit law is clear: red marks or soreness are not sufficient to assert an excessive force claim, and there is no case putting Sharkey on notice that handcuffing an eleven-year-old child with a learning disability in an otherwise lawful arrest would be unconstitutionally excessive force.  <u>See</u> Tr. at 39:6-19 (Robles).  They noted that district courts have held that, when a child is handcuffed and that handcuffing has not physically

---

[90]The Court's citations to the transcript of the hearing reflect the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

injured the child, the child cannot assert an excessive-force claim.  See Tr. at 39:19-24 (Robles).

They stated that the Plaintiffs have not identified a case supporting their theory that

psychological harm is sufficient; further, they stated that handcuffing a child with J.P.'s disability

is constitutional and that Sharkey violated no clearly established law in handcuffing her.  See Tr.

at 39:25-40:14 (Robles).  They noted that the Plaintiffs' discussion of state law and best practices

papers is beside the point, because they are irrelevant and inadmissible.  See Tr. at 40:15-22

(Robles).  They also reiterated their argument that J.H. is unqualified to comment on whether the

arrest caused J.P. to suffer psychological harm.  See Tr. at 40:23-41:12 (Robles).

The Plaintiffs first clarified their use of phrases like "excessive force" was something of a

misnomer; their claim, they stated, is "really an unreasonable seizure claim."  Tr. at 41:15-18

(Kennedy).  They noted their position that handcuffing an eleven-year-old crying in the closet for

fifteen minutes is unreasonable.  See Tr. a 41:21-24 (Kennedy).  They reiterated their argument

that Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1195 (10th Cir. 2001), is instructive

on whether injury is necessary in cases involving force or threatened force used against children.

See Tr. at 41:24-42:3 (Kennedy).  They also stated that Manzanares v. Higdon, 575 F.3d 1135,

1150 (10th Cir. 2009), stands for the notion that "we just don't simply allow law enforcement to

[handcuff] everything that they feel like handcuffing [--] that there is a decision made as to

whether a person needs to be handcuffed [based upon] the threat level of the person."  Tr. at

42:3-8 (Kennedy).  They stated that key facts are disputed: conceding that J.P. acted as the

officer saw, they noted that J.P. then cried in the closet for fifteen minutes, and that, when

Sharkey instructed her to stand up and put her hands behind her back, she was "completely

compliant."  Tr. at 42:8-16 (Kennedy).  The Plaintiffs stated that, accordingly, if Sharkey had

probable cause to arrest her, case law requires him to evaluate if J.P. is actually a threat before handcuffing her.  See Tr. at 42:16-23 (Kennedy).  Their counsel stated that J.H. is competent to testify as to the effects of these events on J.P.  See Tr. at 42:23-43:3 (Kennedy).  They also stated that handcuffing J.P., transporting her to a facility that would not accept her, and not calling J.H. is actionable.  See Tr. at 43:4-8 (Kennedy).  They also stated that the Court should consider state law in the excessive-force context, and stated that, under New Mexico law, "we have a state law that absolutely prohibits the restraint of children unless in emergency situations."  Tr. at 43:4-19 (Kennedy).

The Court asked whether it is the law that handcuffing is per se reasonable in an assault case; the Plaintiffs conceded that, where a person is in custody under arrest and transported to a jail facility, this statement correctly reflects the law, but "[n]ot in the detention situation."  Tr. at 43:22-44:4 (Court, Kennedy).  The Plaintiffs stated that, even in executing a search warrant, a police officer's decision in handcuffing individual is subject to constitutional review; the Court stated, and the Plaintiffs confirmed, that that situation presents a reasonable-suspicion question. See Tr. at 44:9-13 (Kennedy, Court).  The Court asked, and the County Defendants confirmed, that they were defending this case as a probable cause case and not a reasonable suspicion case. See Tr. at 44:12-23 (Court, Robles).  In light of that position, the Court asked the Plaintiffs why, conceding that there generally is a per se rule that handcuffing is appropriate where there is probable cause, there should be a different rule for juveniles.  See Tr. at 44:24-45:2 (Court).  The Plaintiffs stated that they primarily rested

> on the state law in the area, . . . as far as factoring into the reasonableness determination, that it's not a per se violation, we agree with that, but we think it's very informative of this situation, that children are not to be [restrained,] and . . . the state has made it very clear that children with disabilities are not to be

restrained.

So an officer essentially an officer who ignores that gets . . . himself further away from qualified immunity.

Tr. at 45:3-10 (Kennedy).  The Court stated that "if you have a state statute your reaction is well, that's something different, but it's federal court.  Isn't it basically no different whether it's [police department regulations,] guidelines, trade association, state?  None of those are really going to be very useful, admissible or otherwise for defining federal" excessive force law.  Tr. at 45:13-19 (Court).  The Court stated that it was not sure it could admit that evidence at trial; the Plaintiffs stated that, at the qualified immunity stage, it is something that the officer has to explain: "I don't think [he] has the ability to disregard clear state statute and then say he acted reasonably as a police officer and that he has qualified immunity."  Tr. at 45:25-46:11 (Kennedy).  The Court asked about the "perp walks" to which officials sometimes subject adult securities law violators, and asked how one could then, in cases involving juveniles, "say there's got to be a different analysis because state law says so?"  Tr. at 46:12-16 (Court).  She first noted that some Courts of Appeals have held perp walks unconstitutional; the Court asked if that is an excessive-force analysis, and she stated that it is a Fourth Amendment, reasonable seizure analysis, but not an excessive force analysis.  See Tr. at 46:17-25 (Kennedy, Court).  The Court then asked if the Plaintiffs' concession brought the Court back to probable-cause analysis; the Plaintiffs stated that, although probable cause matters, how the officer treats the person in custody is also of constitutional significance.  See Tr. at 47:1-5 (Court, Kennedy).  The Plaintiffs stated that it acknowledged the Court's inclination to dismiss their claim under the Fourteenth Amendment to

the Constitution of the United States of America,[91] but stated that the Fourth Amendment applies to how officers treat people in custody and prevents the state from humiliating suspects -- especially as to children, where restraints can be harmful.  See Tr. at 47:3-16 (Kennedy).  In their view, the government's interest in handcuffing J.P. was small, because she was not a threat.  See Tr. at 47:16-25 (Kennedy).

The Court asked about the Tenth Circuit cases that limit damages in handcuffing cases, noting that, under the Plaintiffs' view,  this "body of law would seem to just disappear at least for juveniles."  Tr. at 48:1-10 (Court).  The Plaintiffs stated that Holland ex rel. Overdorff v. Harrington and Grass v. Johnson, 322 F. App'x 586 (10th Cir. 2009), together stand for the notion that the Tenth Circuit would deal with minors differently; accordingly, the Plaintiffs contended that psychological injury should be actionable when an officer mistreats or abuses a minor.  See Tr. at 48:11-49:3 (Kennedy).  Upon the Court's request, the Plaintiffs confirmed that Holland ex rel. Overdorff v. Harrington is the best case from within the Tenth Circuit, and the Plaintiffs did not identify any more on-point cases outside of the Tenth Circuit.  See Tr. at 49:3-21 (Court, Kennedy).  The Plaintiffs reiterated their view that there was no reason to take J.P. to the juvenile detention facility, because the juvenile probation officer -- not the person filing a criminal complaint -- initiates charges; accordingly, in her view, the state's decision to handcuff J.P. and transport her to jail was pointless.  See Tr. at 50:23-50:9 (Kennedy).

---

[91]The Court disposed of that claim in its Order, filed September 12, 2013 (Doc. 128).  It has not filed a Memorandum Opinion giving its reasons for that decision.  The Plaintiffs have notified the Court that they intend to appeal certain of its orders, but do not list that Order among them.  See Notice of Appeal, filed April 30, 2013 (Doc. 140).  In the interest of expediting the Plaintiffs' appeal, the Court does not intend to file such a Memorandum Opinion explaining that decision at least until it gets out Memorandum Opinions promised in the orders that the Plaintiffs are appealing.

The County Defendants asserted that Holland ex rel. Overdorff v. Harrington does not control this case: in their view, that case involved using a show of force -- i.e., the use of weapons and harsh language -- against children who were not a threat.  See Tr. at 50:14-25 (Robles).  The County Defendants stated that, in a case involving the same facts, but with adults, the Tenth Circuit might find it to be an unreasonable force as well.  See Tr. at 51:1-7 (Robles).  The Court pointed to its decision in Mata v. City of Farmington, 791 F. Supp. 2d 1118 (D.N.M. 2011)(Browning, J.), where, in essence, a police officer pointed a gun at a father and his minor child during a traffic stop for father's failure to wear his seatbelt; the Court concluded that a reasonable jury could find that the officer used excessive force.  See generally 791 F. Supp. passim.  See Tr. at 52:11-14 (Court).  The County Defendants stated that Mata v. City of Farmington involved a high-end show of force in connection with a traffic violation, and asserted that the Tenth Circuit has clearly differentiated handcuffing from that sort of force.  See Tr. at 51:15-52:1 (Robles).  The County Defendants reiterated that Holland ex rel. Overdorff v. Harrington did not turn on whether the plaintiffs were juveniles, but instead on an outrageous show of force; in their view, explicitly under Sixth Circuit law and implicitly under Tenth Circuit law, once the police officer has probable cause, handcuffing the suspect is per se reasonable -- setting aside cases that involve nerve injuries and the like.  See Tr. at 52:8-20 (Robles).

As for Manzanares v. Higdon, the County Defendants pointed out that that case "is a meaningful case in the reasonable suspicion investigatory detention context, but we're way past that.  We're at the point where an officer has probable cause to arrest someone for a felony battery."  Tr. at 52:21-53:2 (Robles).  The County Defendants also asserted that the discussion regarding whether Sharkey should have taken J.P. to a detention facility or should have, instead,

made alternate arrangements is beside the point: under Tenth Circuit law, the existence of less intrusive alternatives are, in their view, irrelevant whether the officer's force application was reasonable, in light of the facts that the officer knew.  See Tr. at 53:3-12 (Robles).  They noted that one can look at this situation in hindsight "and divine different ways that it could have been handled, ways in which we would think well maybe in hindsight that could have been[,] should have been the better way of handling it.  But," they stated, under Tenth Circuit law, the use of less restrictive alternatives "would be irrelevant in determining whether the application of . . . handcuffs in this case was reasonable."  Tr. at 53:12-21 (Robles).

The County Defendants returned to the nature of the injuries and stated that, if Sharkey was to follow any body of law, he had to follow Tenth Circuit law stating that, if he arrests someone for probable cause and properly handcuffs them -- ensuring that they do not suffer long-term injury -- he has applied force properly.  See Tr. at 53:22-54:5 (Robles).  The County Defendants stated that, to hold Sharkey "accountable to a standard that's different than what the Tenth Circuit has already said is reasonable under the circumstances would be essentially rewriting the law and having the deputy follow a case that is not applicable to what we have in this matter."  Tr. at 54:6-10 (Robles).

The Court stated:

> Well, it does seem to me that the Tenth Circuit, whether they've stated it this way or not, has pretty much gotten to the point that the simple handcuffing is per se constitutional if the officer had probable cause, and we're just dealing with a probable cause situation here, not reasonable suspicion.   And then when you add to it the -- well,  I think part of that analysis is these injury cases, whether it's just red marks or numbness or something extending beyond  the hand cuffing, but I think in a second way those cases also suggest that the language of those cases is so broad and that's really all we have here, I don't -- I don't see any limitation on those.  I would be -- I would be going back and trying to carve something out.

> I think [Holland ex rel. Overdorff v. Harrington] is really a reasonable situation case. I think that's a different situation. . . . [S]o I'm inclined to think that once you establish probable cause in [the MSJ No. 1], if, in fact, that is the case and you have probable cause to arrest you can handcuff, and it really doesn't matter under Tenth Circuit law whether it's an adult or child.

> Obviously I need to[] think about this so I'll take it under advisement, but I'm inclined to grant that portion of the motion.

Tr. at 54:11-55:9 (Court).

The Court then turned to the ADA portion of the MSJ. See Tr. at 55:10-12 (Court) The County Defendants stated that it is undisputed that Sharkey did not have access to J.P.'s files and that he did not know why J.P. was in special education courses. See Tr. at 55:14-21 (Robles). The County Defendants stated that Sharkey had testified both that he had not seen anything that would lead him to think that she suffered a mental health problem and that he did not know she had a disability which would cause her to be physically violent; indeed, they pointed out, he stated in his affidavit that he had never before seen J.P. act as she did on September 26, 2011. See Tr. at 55:22-56:5 (Robles). The County Defendants stated that, rather than reciting all the reasons that the Court should dismiss the ADA claims, they would focus on the most important issue: why the ADA should not apply when the state official dealing with the disabled person does not know of the disability. See Tr. at 56:6-16 (Robles). They stated that no ADA case law requires an individual to investigate to determine the disability's nature and extent; accordingly, they stated, "on that one very simple ground the ADA claim fails, because in order for [Sharkey] to accommodate a disability he has to know what that disability is. And without knowledge of a disability there is no ADA claim." Tr. at 56:21-57:5 (Robles). They also stated that it was "troubling" that the Plaintiffs' argument would suggest, because J.P. "was disabled, that she should suffer no consequence as a result of her violation of state law." Tr. at 57:6-10 (Robles).

They stated that, from the undisputed facts, it is clear that Sharkey did not arrest J.P. because of legal conduct related to her disability, but instead for battery on a school employee. See Tr. at 57:10-14 (Robles). They stated that, even if one were to assume that striking the teacher "was a manifestation [of] or resulted from [J.P.]'s disability, [J.P.]'s conduct was nonetheless unlawful, because there is nothing about the ADA that insulates a person with a disability from the consequences of their criminal conduct." Tr. at 57:15-20 (Robles). They stated that being disabled does not mean that she is not responsible for her criminal acts; "[t]here only has to be an accommodation of her disability." Tr. at 57:20-23 (Robles). In their view, there has been no evidence or argument explaining how Sharkey could have reasonably accommodated her disability. See Tr. at 57:23-58:1 (Robles). They stated that this case is a run-of-the-mill arrest case; nothing from the record, in their view, suggests that J.P.'s disability demands a different result. See Tr. at 58:1-8 (Robles). They argued that the reasonable-accommodation-in-arrest cases -- for example, cases involving handcuffing a one-armed suspect or securing a wheelchair-bound suspect in an appropriate vehicle to be transported to a second facility -- differ entirely, and that the Plaintiffs have not argued how Sharkey should have handled her ADHD aside from letting her go free. See Tr. at 58:8-24 (Robles). They stated that the ADA does not tell those who suffer from learning disabilities like ADHD that they are not accountable for the criminal consequences of their behavior and may be released to their mother's custody. See Tr. at 58:25-59:4 (Robles). In their view, the other issues in the MSJ explain why the ADA claims are not actionable, but they wished to stress the reasons that they presented in the hearing, given the Court's limited time. See Tr. at 59:5-11 (Robles).

The Plaintiffs started by underscoring that their ADA claims are against Bernalillo

County and not against the individual officer; they reiterated their argument that the Title I cases

that the County Defendants cited are inapposite, because, under Title II,

> it's up to the county to accommodate this disabled population.  It's up . . . to the
> county to create programs and policies that accommodate the disabled population.
> And the County in this case and it[']s of record and I believe we[']re going to
> with the agreement of the defendants move to supplement the record with a
> sergeant with Bernalillo County's testimony we recently took deposition
> testimony, but even of record now the record is that the County does nothing to
> train its officers that it places in schools where there's a significant disabled
> population of the identification and the information process of informing
> themselves as to the children that they're dealing with[.] The children [they] are
> dealing with have disabilities . . . and the County has failed to create an
> accommodation for those children with disabilities.

Tr. at 59:23-60:21 (Kennedy).  The Plaintiffs stated that, under IDEA, law enforcement must

transmit to appropriate authorities information about the child, and Bernalillo County does not

train its officers in that manner.   See Tr. at 60:22-61:9(Kennedy)(citing 20 U.S.C.

1415(k)(6)(B)).  The Plaintiffs also argue that Bernalillo County does not train its officers to

identify or treat disabled children; in their view, a jury could infer that Sharkey had reason to

know that J.P. was disabled, given her BIP's content.  See Tr. at 61:11-23 (Kennedy).  They

argued that, given the increasing trend of putting police officers in schools, counties have an

increasing obligation to accommodate schoolchildren; they noted that, in this case, handcuffing

and moving J.P. traumatized her and exacerbated her disability.   See Tr. at 61:24-62:16

(Kennedy).  They disputed the County Defendants' suggestion that disabled children are not

immune from the consequences of criminal conduct, arguing that it is the Court's -- not the

police officer's -- job to determine criminal conduct's consequences; in their view, the police

officer's job is to send charges to the correct person and to deal with the child.  See Tr. at 62:10-

24 (Kennedy).  The Plaintiffs noted that, as for the County Defendants' facetious suggestion that

the Plaintiffs' position would require police officers to just release J.P., in this case, that release is what happened: after Sharkey handcuffed her and transported her to the juvenile detention center, she was immediately released to her mother.  See Tr. at 62:25-36:4 (Kennedy).

The Plaintiffs argued that their proposed accommodation is to release the child to her mother and refer the police report to the juvenile probation officer, which would have prevented the harm; and second, they argued, the police should call the probation officer ahead of time, because the officer could have told Sharkey that they would not take in J.P. for detention.  See Tr. at 63:5-13 (Kennedy).  They pointed to Buben v. City of Lone Tree, No. 08-cv-00127-WYD-MEH, 2010 WL 3894185 (D. Colo. Sept. 30, 2010)(Daniel, C.J.), in which the Honorable Wiley Y. Daniel, Chief Judge of the United States District Court for the District of Colorado, allowed a reasonable-accommodation claim to proceed where officers used a taser on a man enduring a psychotic episode.  See Tr. at 63:14-23 (Kennedy).

In the Plaintiffs' view, they have met their burden to prove that J.P. had a disability, because she had ADHD before the incident and her symptoms existed as early as 2008.  See Tr. at 63:23-64:8 (Kennedy).  They also stated, without elaboration, that they have met their burden to show that J.P. was excluded from a public benefit because of the disability.  See Tr. at 64:9-11 (Kennedy).  They argued that the Tenth Circuit's opinion in Gohier v. Enright suggests that the Tenth Circuit views favorably the idea that Title II requires law enforcement to accommodate the learning-disabled population; they noted that Bernalillo County has created a place that children with emotional disturbance can receive counseling.  See Tr. at 64:9-21 (Kennedy).  They emphasized that police officers do not initiate the process in the juvenile system, but "a separate department" begins the process; in the Plaintiffs' view, "whether . . . that department reviews a

child in custody or reviews a police report from a police officer the child is handled the same." Tr. at 64:24-65:4 (Kennedy). They stated that "the initiation of the process does not require handcuffing and transportation to a juvenile detention facility." Tr. at 65:4-6 (Kennedy). In their view, the New Mexico Children's Code and the relevant New Mexico mental health statutes have at their core avoiding institutionalizing disabled children. See Tr. at 65:1-9 (Kennedy).

The Court asked where the ADA violation occurred: the lack of a policy or the arrest itself. See Tr. at 65:13-16 (Court). The Plaintiffs suggested that there are two prongs to this area; first, they identified the wrongful-arrest prong, which they believe stands for the notion that one cannot criminalize activity that is the result of a disability, and explained that, in their view, this case falls into that category, because Bernalillo County failed to train its officers to recognize that kicking and "[th]rashing about" are symptoms of a disability. Tr. at 65:17-66:10 (Kennedy). The second prong, they said, is the failure-to-accommodate prong -- where the government entity fails to train its officers in how to deal with mentally ill persons; in their view, they satisfy this prong, again, because, where a child is mentally disabled, where state law says that children are not to be restrained outside of emergency situations, where there is no government purpose in handcuffing the child and transporting her to a jail, "the failure to train officers[, to] require them essentially to contact the parents, which is what the juvenile detention facility did, or take the parents to [an] available center for" intake, and referral to counseling "is a failure to accommodate the disability" as against Bernalillo County. Tr. at 66:11-67:8 (Kennedy). The Plaintiffs denied that they argued that the ADA modifies constitutional law for arrest, but instead "adds an extra layer of statutory protection." Tr. at 67:14-68:9 (Court, Kennedy). The Court asked if any case says that the ADA changes how criminal justice works with individual

defendants; the Plaintiffs reasserted that the Tenth Circuit recognized the wrongful-arrest and

accommodation theories, and elaborated on Gohier v. Enright's facts:

> [A] man comes at the officer with a knife and is thrashing with a knife and the
> officer shoots the man, I believe the decision was that was . . . a reasonable use of
> force.  Now the question is, can you make a claim that the situation should have
> been handled differently from the get go, that the de-escalation . . . techniques
> that are taught to law enforcement officers should may have been employed so
> that the situation does not escalate to the need to use force.
>
> So I think that's the -- in the classic use of force case that's the
> interrelationship, is that now we know that many police shootings involve [s]ome
> with mental health disabilities and under the Fourth Amendment it's inescapable
> that at that point of shooting that the threat is so great that the[ ]officer has no
> choice but to shoot.  But the question under the [ADA] is there training[] and we
> believe there is and we've dealt with cases with this is there training that puts the
> department on knowledge [sic] that if you approach the . . . situation differently
> rather than with bean bags and rather than with commands, if you [de-escalate]
> that situation differently that you can resolve that situation without the need to use
> force because the mentally ill person is not going to react in quite the same way.
>
> So in this situation assuming [there is] probable cause, assuming that the
> handcuffing is acceptable under the Fourth Amendment, under the ADA, because
> of her disability, because of the claim that the handcuffing on this child is more
> traumatic than for a normal child or a normal person[,] should the [deputy be
> trained] to accommodate that issue?  If we're dealing with a child population in
> which trauma -- we know trauma occurs to children and we know sometimes
> physical abuse occurs to children, should we -- should the County be training its
> officers that a child with perhaps PTSD because of handcuff -- or because of
> restraint by parents should not be placed in handcuffs and [instead] should be
> treated at [a] mental health facility.  So [I think that is where we are] as far as the
> ADA over[-]wrapping the Fourth Amendment.

Tr. at 68:25-70:10 (Kennedy).

The Court noted that the Plaintiffs asked for money, and not for training, in their

Complaint, and asked "is there really a claim for failure to train under the ADA"; evidently

misunderstanding the Court's question, the Plaintiffs stated that the law recognizes such a claim

- 113 -

and discussed how such a claim works in theory.  Tr. at 72:12-71:4 (Court, Kennedy).[92]

The County Defendants returned the Court's focus to undisputed facts, noting that Sharkey testified that Bernalillo County provided, and he had completed, forty hours of training dealing with those with mental health issues, including training involving learning disabilities, including ADHD, along with other disabilities.  See Tr. at 71:9-72:4 (Robles).  As for any allegation that the training was sufficient, they noted that no expert testimony in the record stated as much -- "no testimony, affidavit, deposition, what have you that says, you know what?  They should have done it differently.  They should have given more.  That was wrong what they taught.  They should have taught something different."  Tr. at 72:5-13 (Robles).  In short, in the County Defendants' view, Bernalillo County properly prepared Sharkey to arrest and transport someone with ADHD.  See Tr. at 72:14-22 (Robles).

To the question whether there is a failure to train claim under the ADA, the County

---

[92]Although the rough transcript does not make clear that the Court asked this question, because the lines run together, it is evident from the context that the Court asked this question:

> We're[] enhancing sort of the[,] it's a statutory guarantee that the Congress gave through disabled people scooter welt, [sic] but you're wanting money on this, not training, right?  This isn't injunctive relief.

> MR. KENNEDY:  Right.

> THE COURT:  Or class wide.  So is there really -- is there really a claim for failure to train under the ADA.

> MR. KENNEDY:  Oh absolutely.  I think the case law is clear on that, that the claim essentially -- it's as failure to accommodate and it's developed in the law enforcement field as a failure to train.

Tr. at 70:10-20.  The transcript probably should record the Court as asking: "Well, but you're wanting money on this, not training, right?"

Defendants noted that cases have divided and that the Tenth Circuit has not taken a position on the matter, but underscored that, in their view, even if the Court finds that the claim exists, Bernalillo County properly trained Sharkey to deal with J.P., and nothing in the record throws the training's adequacy into doubt.  See Tr. at 72:23-73:23 (Robles).

The Court stated:

> [W]ell, I need to give some thought on this.  I guess my reaction is it's strange, it's a strange claim, to try to use the ADA to decide what kind of arrest should be made, what kind of transport should be made.  Those strike me as odd.
>
> Now, if it was a claim saying the jail facility was not accommodating disabled people, that would make more sense to me, but saying it should modify arrest and the standard that you're going to use to decide whether there has been excessive force, it just strikes me as odd.  I'll have to study it to see whether I think that -- I mean, I mean as Mr. Robles said, we're often dealing with constantly in this Court with things that might be considered disabilities. . . .  I mean, how far do you -- how do you start -- do you start saying that the ADA changes the arrest[,  reasonable force, those sorts] of things?  I'm uncomfortable going there, I'll tell you that.  I mean, that doesn't mean you're not right, but I probably am going to be a reluctant person to go there.
>
> So let me give that some thought.

Tr. at 74:1-21 (Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Schs., No. CIV 11-0422 JB/KBM, 2013 WL 3462484, at *23 (D.N.M. June 28, 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If

the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."   Celotex Corp v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[93]   Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.   See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."   Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).   Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."   Fed. R. Civ. P. 56(c)(1).   It

---

[93]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.   See 10A C. Wright & A. Miller, Federal Practice & Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party.   If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the Court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified-immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.

550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. [at 586-87] (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248 (1986).  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in <u>Thomson v. Salt Lake County</u>, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]"  <u>York v. City of Las Cruces</u>, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting <u>Scott [v. Harris]</u>, 550 U.S. at 380); <u>see also</u> <u>Estate of Larsen ex. rel Sturdivan v. Murr</u>, 511 F.3d 1255, 1258 (10th Cir. 2008).

<u>Thomson v. Salt Lake Cnty.</u>, 584 F.3d at 1312.  "The Tenth Circuit, in <u>Rhoads v. Miller</u>, [352 F.

App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[94]explained that the blatant

contradictions of the record must be supported by more than other witnesses' testimony[.]"

Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation

omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility. . . .

> Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

---

[94]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, ... and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005) (citations omitted). The Court finds that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011), Johnson v. Sedgwick Cnty. Sheriff's Dep't, 461 F. App'x 756 (10th Cir. 2012), Grass v. Johnson, 322 F. App'x 586 (10th Cir. 2009), Silvan W. v. Briggs, 309 F. App'x 216 (10th Cir. 2009), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92). In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court" before inquiring into whether there are genuine issues of material fact for resolution by the jury.  584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## RELEVANT LAW REGARDING EXCESSIVE FORCE

When an officer moves for qualified immunity on an excessive force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)."  Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007). Accord Mata v. City of Farmington, 791 F.Supp. 2d 1118, 1137-38 (D.N.M. 2011)(Browning, J.). An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard."  Graham v. Connor, 490 U.S. at 394.  The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's

reasonableness standard.   See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . .").   The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. at 397.  Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. 194, 205 (2001), receded from by Pearson v. Callahan, 129 S. Ct. 808 (2009).  A court must judge the reasonableness of a particular use of force from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .   That perspective includes an examination of the information possessed by the [officers]." Weigel v. Broad, 544 F.3d 1143, 1152 (10th Cir. 2008)(citations and internal quotation marks omitted).   When an officer moves for qualified immunity on an excessive-force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007).

**1.    Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable.**

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable.  In Estate of Larsen ex. rel Sturdivan v. Murr, the Tenth Circuit stated:

> In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors.  These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

511 F.3d at 1260.  In Weigel v. Broad, 544 F.3d 1143 (10th Cir. 2008), the Tenth Circuit also provided:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted).  A court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and [must] pay careful attention to the facts and circumstances of the particular case."  Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d at 1260 (internal quotation marks omitted).   Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S. at 396.

## 2.     Least- or Less-forceful Alternatives in Excessive-Force Cases.

"To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham v. Connor."  James v. Chavez, No. 09-0540, 2011 WL 5822726, at *17 (D.N.M. Nov. 9, 2011)(Browning, J.).  The Fourth Amendment requires only that the defendant officers chose a "reasonable" method to end the threat that the plaintiff posed to the officers in a force situation, regardless of the availability of less intrusive

alternatives.  Graham v. Connor, 490 U.S. at 397.

In Michigan Department of State Police v. Sitz, 496 U.S. 444 (1990), the Supreme Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated that Brown v. Texas, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger.  Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal.  But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with government officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

496 U.S. at 453-54.  See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("[T]he reasonableness of any particular government activity does not necessarily turn on the existence of alternative 'less intrusive' means.").  "To avoid unrealistic second guessing, the Fourth Amendment does not require that an officer use the least-intrusive alternative available to protect himself or others so long as the method chosen is reasonable."  Tanner v. San Juan Sheriff's Office, 864 F. Supp. 2d 1090, 1115 (D.N.M.)(Browning, J.).

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the stop under Terry v. Ohio of a suspected drug courier in an airport.  The Supreme Court rejected Sokolow's contention that the arresting officers were "obligated to use the least intrusive means available to dispel their suspicions that he was smuggling narcotics."  490 U.S. at 11.  Instead, the Supreme Court held: "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques.  Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing."  United States v. Sokolow, 490 U.S. at 11 (internal quotation

marks and citations omitted).  Similarly, in United States v. Sharpe, 470 U.S. 675, 686-87 (1985),

the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost
> always imagine some alternative means by which the objectives of police might
> have been accomplished.  But "[t]he fact that the protection of the public might, in
> the abstract, have been accomplished by less intrusive means does not, by itself,
> render the search unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005), the Tenth Circuit

disagreed with the plaintiff's contention that expert testimony about when a police dog's use is

objectively reasonable and about how defendant Lehocky's actions violated "well established

law enforcement standards . . . should have been admitted since it would have been helpful to the

jury in determining whether Lehocky used a reasonable amount of force."  399 F.3d at 1222.  In

so holding, the Tenth Circuit explained:

> As the district court correctly noted, the Fourth Amendment "do[es] not
> require [police] to use the least intrusive means in the course of a detention, only
> reasonable ones."  United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th
> Cir. 1994).  Similarly, "violations of state law and police procedure generally do
> not give rise to a [42 U.S.C. §] 1983 claim" for excessive force.  Romero v. Bd. of
> County Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995); see also Wilson v. Meeks, 52
> F.3d 1547, 1554 (10th Cir. 1995)[, abrogated on other grounds by Saucier v. Katz,
> 533 U.S. at 205,] (holding that "violation of a police department regulation is
> insufficient for liability under section 1983" for excessive force).  Both of these
> principles of our Fourth Amendment jurisprudence stem from the proper
> perspective from which to evaluate the conduct of a police officer -- that "of a
> reasonable officer on the scene, acknowledging that the officer may be forced to
> make split-second judgments in certain difficult circumstances."  Olsen [v. Layton
> Hills Mall], 312 F.3d [1304,] 1314 [ (10th Cir. 2002)].  Together, they prevent the
> courts from engaging in "unrealistic second guessing of police officer's
> decisions."  [United States v.] Melendez-Garcia, 28 F.3d at 1052.

> Here, the only issue before the jury was whether Lehocky acted as a
> "reasonable officer" when he ordered his police dog to apprehend Marquez.  In
> making this determination, the issues of whether Lehocky used the minimum

amount of force to apprehend Marquez and whether Lehocky violated some "well established police procedure" are only tangentially related.  This is because even if it found Lehocky used more than the minimum amount of force necessary and violated police procedure, the jury could nonetheless find he acted reasonably. [United States v.] Melendez-Garcia, 28 F.3d at 1052; Romero [v. Bd. of Cnty. Comm'rs, 60 F.3d at 705].

Marquez v. City of Albuquerque, 399 F.3d at 1222.

In United States v. Melendez-Garcia, the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only reasonable ones."  28 F.3d at 1052 (internal quotation marks omitted).  See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . .  Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases.  The only test is whether what the police officers actually

did was reasonable."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under Tennessee v. Garner [471 U.S. 1 (1985)] and Graham v. Connor.").

"Thus, the clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative." Jonas v. Bd. of Comm'rs of Luna Cnty., 699 F. Supp. 2d 1284, 1296 (D.N.M. 2010)(Browning, J.). See, e.g., Blossom v. Yarbrough, 429 F.3d at 968 (quoting Medina v. Cram, 252 F.3d at 1133)("It is well settled that 'the reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury."); Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004)(stating that, in police-shooting case, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable). See also Roy v. Inhabitants of the City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)("[I]n close cases, a jury does not automatically get to second guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently."); Diaz v. Salazar, 924 F. Supp. 1088, 1100 (D.N.M. 1996)(Hansen, J.). Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means." Illinois v. Lafayette, 462 U.S. 640, 647-48 (1983). The Court has also rejected the consideration of a less intrusive alternative to end a threat. See Chamberlin v. City of Albuquerque, No. 02-0603, 2005 WL 2313527, at *2 (D.N.M. July 31, 2005)(Browning, J.)(precluding the plaintiff's police procedures expert from testifying at trial regarding alternative less intrusive means).

3.      **The Actual-Injury Requirement**.

As the Court explained in Sisneros v. Fisher, 685 F. Supp. 2d 1188 (D.N.M.

2010)(Browning, J.),

> [t]here might appear to be some tension within the Tenth Circuit case law
> whether physical injury is an element of an excessive-use-of-force claim.  The
> Tenth Circuit has stated that there is no physical-injury element, yet, in
> handcuffing cases, the Tenth Circuit has required something more than redness or
> soreness to establish the actual-injury element of an excessive-use-of-force claim.
> The Court concludes that, in the Tenth Circuit, temporary redness or soreness is,
> as a matter of law, a de minimis injury for the purpose of an excessive-use-of-
> force claim.

685 F. Supp. 2d at 1208.

The cases make clear that "actual injury," not "physical injury," is required to sustain a

claim of excessive use of force.  E.g., Fisher v. City of Las Cruces, 584 F.3d 888, 894 (10th Cir.

2009)("[T]o recover on an excessive force claim, a plaintiff must show: (1) that the officers used

greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some

actual injury caused by the unreasonable seizure that is not de minimis, be it physical or

emotional." (quoting Cortez v. McCauley, 478 F.3d 1108, 1129 n.25 (10th Cir. 2007)(en

banc)(emphasis added))).  As the Tenth Circuit explained in Vondrak v. City of Las Cruces: "We

have consistently rejected a bright-line rule requiring plaintiffs to demonstrate physical injury

when bringing excessive force claims. . . .  Nevertheless, when an excessive force claim relies

upon unduly tight handcuffing, we have held that the plaintiff must show 'some actual injury.'"

Vondrak v. City of Las Cruces, 535 F.3d at 1208 (citing Holland ex rel. Overdorff v. Harrington,

268 F.3d 1179, 1195 (10th Cir. 2001))(internal citations omitted, emphasis added).  In Cortez v.

McCauley, the Tenth Circuit explained in more depth:

> In some circumstances, unduly tight handcuffing can constitute excessive force

> where a plaintiff alleges some <u>actual</u> injury from the handcuffing and alleges that
> an officer ignored a plaintiff's timely complaints (or was otherwise made aware)
> that the handcuffs were too tight.  Although Rick Cortez complained to the officer
> that the handcuffs were too tight, the summary judgment record presents too little
> evidence of any actual injury.  We believe that a claim of excessive force requires
> some <u>actual injury that is not de minimis, be it physical or emotional.  The only
> evidence in the record is his affidavit that the handcuffs left red marks that were
> visible for days afterward.</u>  This is insufficient, as a matter of law, to support an
> excessive force claim if the use of handcuffs is otherwise justified.

<u>Cortez v. McCauley</u>, 478 F.3d at 1129 (internal citations omitted, emphasis added).  Thus, in

<u>Cortez v. McCauley</u>, the Tenth Circuit rejected Cortez' excessive-use-of-force claim, not because

he lacked physical injury, but because his injury -- in his case, a physical injury -- was de

minimis.  <u>See</u> 478 F.3d at 1129-30.  The implication is that, had Cortez alleged some emotional

injury, or some additional physical injury such as a dislocated shoulder or sprained wrist, his

injuries would have risen to a non-de minimis level and become the "actual injury" that an

excessive-use-of-force claim requires.  <u>E.g.</u>, <u>Vondrak v. City of Las Cruces</u>, 535 F.3d at 1209

(finding genuine issue of fact existed whether plaintiff suffered "actual injury" when, in addition

to unduly tight handcuffing, plaintiff provided evidence that he might have permanent nerve

damage in his wrists).

 The quintessential example is <u>Holland ex rel. Overdorff v. Harrington</u>, in which a Sheriff

deployed the SWAT team to execute an arrest warrant at a home in which the officers knew that

other persons, including children, would be present.  <u>See Holland ex rel. Overdorff v. Harrington</u>,

268 F.3d at 1192.  The Tenth Circuit had to answer the question whether the officers' action of

detaining the plaintiffs "at gunpoint, initially forcing several of them to lie down on the ground

for ten to fifteen minutes, and ultimately gathering all of them in the living room of the

residence" was an excessive use of force under the Fourth Amendment.  268 F.3d at 1192.

Ultimately, the Tenth Circuit found that it was an excessive use of force, notwithstanding the lack of any alleged physical injuries:

> The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force. Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time. These are the very ingredients relevant to an excessive force inquiry. Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use. Pointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances.

268 F.3d at 1192-93 (internal citations and quotation marks omitted). The Tenth Circuit, however, did not stop there. In response to an argument that the plaintiff's claim must fail for want of evidence of physical injury, the Tenth Circuit stated:

> Physical injury may be the most obvious injury that flows from the use of excessive force. Yet the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property and privacy interests -- a person's "sense of security" and individual dignity. No physical injury was pleaded in Baker or McDonald. Nor was physical injury alleged in <u>Bivens v. Six Unknown Named Agents</u>, 403 U.S. 388 . . . (1971), which held that officers may be held liable in damages for violating persons' Fourth Amendment rights, including the use of unreasonable force.

268 F.3d at 1195. It thus appears that the Tenth Circuit does not require evidence of physical injury to satisfy the "actual injury" element of an excessive-use-of-force claim. Neither <u>Vondrak v. City of Las Cruces</u> nor <u>Cortez v. McCauley</u> repudiate that rule. See <u>Fisher v. City of Law Cruces</u>, 584 F.3d at 897 (stating that <u>Cortez v. McCauley</u> "acknowledged -- and did not overrule -- our prior conclusion that in excessive force cases 'proof of physical injury manifested by visible cuts, bruises, abrasions or scars, is not an essential element.'"). The holdings in those

- 130 -

cases apparently demonstrate only that the Tenth Circuit has decided that the injuries alleged in those cases -- redness and pain caused by unduly tight handcuffing -- are, as a matter of law, de minimis injuries.

In some instances, emotional trauma in addition to the soreness in the plaintiff's wrists is still insufficient.  In one unpublished opinion, the Tenth Circuit held that officers committed no constitutional violation when they handcuffed and detained for over an hour two individuals who were arrested for violating Utah's obstruction-of-justice statute.  See Silvan W. v. Briggs, 309 F. App'x 216, 224 (10th Cir. 2009).  One of the detainees alleged in his affidavit that he suffered chaffing and soreness of wrists, and extreme emotional trauma, as a result of being publicly displayed in handcuffs.  See 309 F. App'x at 224.  In holding that the arresting officers did not use excessive force, the Tenth Circuit reasoned:

> While Cory and Megan were not arrested for an especially severe crime and were not actively resisting arrest or attempting to flee, the officers could have been reasonably concerned for their safety, given their awareness that Cory was a peace officer and might have been armed.  Further, Cory and Megan were released upon A.W.'s arrival at the home, and therefore, were not detained any longer than necessary to resolve the situation which necessitated police involvement. And because there is no evidence that Cory suffered more than a de minimis injury or that he notified the officers that his handcuffs were painful, he cannot maintain an excessive force claim based on unduly tight handcuffing. . . .  Similarly, there is no evidence that Cory suffered any injury from being denied liquids. . . .  Finally, while we do not doubt that being detained in handcuffs in public view would be traumatic, not every indignity -- even if it may later seem unnecessary in the peace of a judge's chambers -- rises to the level of a constitutional violation.

309 F. App'x at 224-25 (citations and internal quotation marks omitted).

### 4.   Overlapping Excessive-Force and Unlawful-Arrest Claims.

The Tenth Circuit has also explained:

[I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the

officers had for the arrest and the degree of force they used to effect it.  If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest. If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.

Cortez v. McCauley, 478 F.3d at 1127.  Moreover,

in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.

478 F.3d at 1126.  See Smith v. Kenny, 678 F. Supp. 2d 1124, 1161 (D.N.M. 2009)(Browning, J.)(noting that the finding whether the officers' use of force is "commensurate with the circumstances" depends upon whether the arrest was lawful).  Thus, if it is clear that the amount of force used would have been reasonable if the detention or arrest had been appropriate, then the plaintiff can recover damages only for the unlawful arrest -- including any damages that flow from the officers' use of force during the arrest -- but there will be no separate excessive-use-of-force claim.  See Cortez v. McCauley, 478 F.3d at 1127 (holding that a plaintiff must present evidence that the force used was more than that which would be required in effectuating a lawful arrest for the plaintiff to prevail in obtaining damages for both an unlawful arrest and the use of excessive force).

As the Court has explained:

Thus, the Court must engage in a two-part inquiry when addressing combined excessive-use-of-force and unlawful-arrest claims.  First, was there an unlawful arrest?  Second, if there was an unlawful arrest, was the amount of force used greater than what would have been necessary to [e]ffect a lawful arrest?  If the

- 132 -

amount of force used would have been reasonable to [e]ffect an arrest if an arrest had been justified, the damages for excessive force are subsumed within the damages for unlawful arrest.  It is only when the force was excessive as compared to the execution of a lawful arrest that a plaintiff can recover on both claims

Sisneros v. Fisher, 685 F. Supp. 2d 1188, 1211 (D.N.M. 2010)(Browning, J.)(citing Cortez v.

McCauley, 478 F.3d at 1126).

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."  West v. Atkins, 487

U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or

reasonably should have known that their conduct would lead to the deprivation of a plaintiff's

constitutional rights by others, and an unforeseeable intervening act has not terminated their

liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal

connection is satisfied if [the defendants] set in motion a series of events that [the defendants]

knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their]

constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The

Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C.

§ 1983.  See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is

inapplicable to Bivens[95] and § 1983 suits, a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution."); Bd. of

Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on

the basis of the existence of an employer-employee relationship with an alleged tortfeasor."

Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8,

2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).

Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for

the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

### 1.    Color of State Law.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'"

Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-

color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . .

furthers the fundamental goals of preserving an area of individual freedom by limiting the reach

of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for

conduct for which they cannot fairly be blamed."  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir.

1995).  "The traditional definition of acting under color of state law requires that the defendant in

a § 1983 action have exercised power 'possessed by virtue of state law and made possible only

---

[95]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme
Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his
authority gives rise to a cause of action for damages consequent upon his unconstitutional
conduct."  403 U.S. at 389.

because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." Jojola v. Chavez, 55 F.3d at 493.  Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations

omitted)(quoting <u>Martinez v. Colon</u>, 54 F.3d 980, 986 (1st Cir. 1995)).

      **2.**      <u>**Individual Liability.**</u>

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations. <u>Trask v. Franco</u>, 446 F.3d 1036, 1046 (10th Cir. 2006). The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" <u>Martinez v. Carson</u>, 697 F.3d at 1255 (quoting <u>Monroe v. Pape</u>, 365 U.S. 167, 187 (1961), <u>overruled in part by</u> <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. at 663). "Thus, Defendants are liable for the harm proximately caused by their conduct." <u>Martinez v. Carson</u>, 697 F.3d at 1255 (citing <u>Trask v. Franco</u>, 446 F.3d at 1046). As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ." <u>Train v. City of Albuquerque</u>, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury complained-of under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm. <u>Lippoldt v. Cole</u>, 468 F.3d

1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct." Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry." Id. In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability. See, e.g., Warner v. Orange County Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046. Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability." Martinez v. Carson, 697 F.3d at 1255. The Tenth Circuit gave an example of a superseding intervening cause, quoting the Honorable Samuel J. Alito, then-Circuit Judge for the United States Court of Appeals for the Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400). Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

- 137 -

supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting William

Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in
> determining whether the intervening act relieves the actor from liability for his
> antecedent wrongful act, and under the undisputed facts there is room for
> reasonable difference of opinion as to whether such act was wrongful or
> foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.    **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless

there is "'an affirmative link . . . between the constitutional deprivation and either the

supervisor's personal participation, [] exercise of control or direction, or [] failure to supervise.'"

Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d

1296, 1302 (10th Cir. 1997))(internal alterations omitted).  Because supervisors can be held

liable only for their own constitutional or illegal policies, and not for the torts that their

employees commit, supervisory liability requires a showing that such policies were a "deliberate

or conscious choice."   Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal

quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not

enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.

The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the

'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate,

supervisory liability for government officials based on an employee's or subordinate's

constitutional violations.  See Garcia v. Casuas, 2011 WL 7444745, at *25-*26 (citing Dodds v.

Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may [] succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  614 F.3d at 1200 n.8.  Relying on the

Supreme Court's opinion in <u>Bd. of Cnty. Comm'rs v. Brown</u>, the Tenth Circuit reasoned that two

of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal
> law, or directs an employee to do so, resolving these issues of fault and causation
> is straightforward. Section 1983 itself contains no state-of-mind requirement
> independent of that necessary to state a violation of the underlying federal right.
> In any § 1983 suit, however, the plaintiff must establish the state of mind required
> to prove the underlying violation. Accordingly, proof that a municipality's
> legislative body or authorized decisionmaker has intentionally deprived a plaintiff
> of a federally protected right necessarily establishes that the municipality acted
> culpably. Similarly, the conclusion that the action taken or directed by the
> municipality or its authorized decisionmaker itself violates federal law will also
> determine that the municipal action was the moving force behind the injury of
> which the plaintiff complains.

<u>Dodds v. Richardson</u>, 614 F.3d at 1200 n.8 (quoting <u>Bd. of Cnty. Comm'rs v. Brown</u>, 520 U.S. at

404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same

logic applies when the plaintiff sues a defendant-supervisor who promulgated, created,

implemented or possessed responsibility for the continued operation of a policy that itself

violates federal law."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit

reduced the test to what can be seen as a two-part test for supervisor liability, requiring the

plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their

subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing

their authorization or approval of such misconduct.'"  <u>Dodds v. Richardson</u>, 614 F.3d at 1200-01

(quoting <u>Rizzo v. Goode</u>, 423 U.S. 362, 371 (1976)).

**4.      Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted

injury.  <u>See</u> <u>Graves v. Thomas</u>, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish

municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an

underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that

there is a direct causal link between the policy or custom and the injury alleged.  See Graves v.

Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its

officers adequately, the plaintiff must show that the municipality's inaction was the result of

deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise

their discretion and the related public interest in encouraging the vigorous exercise of official

authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects

federal and state officials from liability for discretionary functions, and from 'the unwarranted

demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City

of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28,

2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court

deems it "untenable to draw a distinction for purposes of immunity law between suits brought

against state officials under § 1983 and suits brought directly under the Constitution against

federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  "The qualified immunity

analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil

War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled

on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics
> Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from
> government officials who have violated her constitutional or statutory rights.  But
> to ensure that fear of liability will not "unduly inhibit officials in the discharge of
> their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials
> may claim qualified immunity; so long as they have not violated a "clearly

established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1.    Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of

the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

    The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision

provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage" and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking" because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42).   Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary and the conduct is likely only to face challenges in the qualified immunity context.  Camreta v. Greene, 131 S. Ct. at 2031-32.  See Kerns v. Bader, 663 F.3d at 1181.[96]  "Courts should think carefully before

---

[96]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.   And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that
>
> > [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.
>
> 42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School

Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[97]   The Tenth Circuit will remand a case

_____

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).

[97]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

> While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases. 131 S. Ct. at 2032. As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small." It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment. Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job. The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way. Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts. The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice. The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance. Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

to the district court for further consideration when the district court has given cursory treatment

to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d

at 1182.

### 2.      Clearly Established Rights in the Qualified Immunity Analysis.

In evaluating whether the right was clearly established, a district court considers whether

---

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

888 F. Supp. 2d at 1222 n.35.

the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified

immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked

legal justification."   663 F.3d at 1183 (emphasis added).   Earlier Tenth Circuit cases, clarifying

the level of generality at which a legal rule must be defined, applied a sliding scale to determine

when the law is clearly established.   See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284

(10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional

principles, the less specificity is required from prior case law to clearly establish the violation.").

"[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a

second decision with greater specificity to clearly establish the law."   Casey v. City of Fed.

Heights, 509 F.3d at 1284.   Furthermore, "general statements of the law are not inherently

incapable of giving fair and clear warning . . . ."   Hope v. Pelzer, 536 U.S. at 741.

## LAW REGARDING TITLE II OF THE ADA'S APPLICATION TO ARRESTS

Title II of the ADA, 42 U.S.C. § § 12131-12165, commands that "no qualified individual

with a disability shall, by reason of such disability, be excluded from participation in or be

denied the benefits of such services, programs or activities of a public entity, or be subjected to

discrimination by any such entity."   42 U.S.C. § 12132.   The Tenth Circuit requires that a

plaintiff prove three factors to establish a claim under Title II: (i) that he or she is a qualified

individual with a disability; (ii) that he or she was either excluded from participation in or denied

the benefits of some public entity's services, programs, or activities, or the public entity

otherwise discriminated against the plaintiff; and (iii) that such exclusion, denial of benefits, or

discrimination was by reason of the plaintiff's disability.   See Gohier v. Enright, 186 F.3d 1216,

1219 (10th Cir. 1999)(explaining that this general standard, which tracks the language of the

statute, is "plainly correct").   "Although a plaintiff may claim intentional discrimination, the

Tenth Circuit has not yet articulated the essential elements of a claim of intentional

discrimination under Title II of the ADA or detailed what a plaintiff must plead at a minimum to establish such a claim." Braverman v. New Mexico, No. CIV 11-0829 JB/WDS, 2012 WL 5378290, at * 22 (D.N.M. Sept. 26, 2012)(Browning, J.)(citing Tyler v. City of Manhattan, 118 F.3d 1400, 1405 (10th Cir. 1997)(Jenkins, J., dissenting); Young v. City of Claremore, O.K., 411 F. Supp. 2d 1295, 1314 (N.D. Okla. 2005)).

In Gohier v. Enright, the Tenth Circuit addressed Title II's application to police conduct. In that case,

> [s]hortly after midnight, Officer [Gary] Enright responded to a dispatcher's request to investigate a disturbance on Nevada Avenue. The dispatcher reported that a man on foot had hit a caller's vehicle with a baseball bat, and that another caller complained the man was breaking car windows with a pipe. The dispatcher gave a description of the man.
>
> Soon after the report, Enright was driving south down Nevada in the vicinity of the incidents when he saw [Ernest Lucero, who suffered from paranoid schizophrenia], who did not match the description, walking south down the middle of the avenue. The area had no streetlights. Enright pulled over, turning on his highbeams and overhead flashing lights. Lucero kept walking, with his right hand clutched to his chest.
>
> Enright got out of his car, leaving it idling. He had a nightstick, pepper spray, a pistol, and a lapel microphone with which he could talk to the dispatcher. According to Enright, the following events all transpired in the 20 to 30 seconds after he left the car.
>
> Enright identified himself and asked Lucero to talk to him. Lucero, however, kept walking. Enright yelled, "Police, stop!" Lucero then stopped, 30 to 35 feet from Enright, put his right hand behind his back, and began walking toward Enright at a "fast pace." Enright described him as "crazed and wild-eyed," with his teeth gritted in a grimace and a "Charles Manson-type look."
>
> Enright did not call for backup. He drew his pistol, pointing it at a 45 degree angle at the ground between himself and Lucero. Although he ordered Lucero to show his hands, Lucero kept walking quickly toward him with his right hand hidden. Enright then leveled his pistol at Lucero and again shouted at him to show his hands.

Still advancing, Lucero raised his right hand from behind his back and began repeatedly swinging it down and forward in a stabbing motion.  He held a long, slender object that Enright thought was a knife.  Around this time, Enright decided that Lucero was mentally ill.  He also decided to retreat five to seven feet behind his car, while repeatedly ordering Lucero to "drop the knife" or "drop it."

Lucero did not do so, but instead advanced to the driver's side door of the car.  He was at this point no longer in the area illuminated by the car's headlights.  He stopped and said, "Do you like your car? It's gone."  When he began to open the car door, Enright moved forward to stop him. Lucero then let go of the door and either stepped or lunged toward Enright, making a stabbing motion with the object.  Enright shot him twice, killing him.

[Jeanne] Gohier, as representative of Lucero's estate and on her own behalf, filed a complaint stating § 1983 excessive-force and failure-to-train claims, with pendent negligence claims, against Enright and Colorado Springs. After defendants moved for summary judgment, she moved to amend her complaint to add a claim under Title II of the ADA. The district court designated a magistrate judge to hear and determine the motion to amend.  See 28 U.S.C. § 636(b)(1)(A). The magistrate judge denied the motion by written order, and Gohier moved the district court to reconsider.  See id.  The court reviewed the order, determined that it was not clearly erroneous or contrary to law, and affirmed it.

Gohier v. Enright, 186 F.3d 1216, 1217-18 (10th Cir. 1999).

The Tenth Circuit first recognized the two theories under which federal courts have

addressed claims under the ADA arising from arrests:

The first is that police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity.  See Lewis[ v. Truitt, 960 F. Supp. 175, 176-77 (S.D. Ind. 1997)]; Jackson[ v. Inhabitants of the Town of Sanford, Civ. No. 94-12-P-H, . . . 1994 WL 589617 at *1 (D. Me. Sept. 23, 1994)]. The second is that, while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.  See Gorman v. Bartch, 152 F.3d 907, 912-13 (8th Cir. 1998) (holding such claim viable); Rosen v. Montgomery County, 121 F.3d 154, 157–58 (4th Cir. 1997)(suggesting in *dicta* such claim not viable); Patrice[ v. Murphy, 43 F. Supp. 2d 1156, 1160 (W.D. Wash. 1999)] (holding such claim not viable).

This case is logically intermediate between the two archetypes envisioned by those theories.  Officer Enright did not use force on Mr. Lucero because he

- 153 -

misceived the lawful effects of his disability as criminal activity, inasmuch as Lucero's assaultive conduct was not lawful. Neither did Enright fail to accommodate Lucero's disability while arresting him for "some crime unrelated to his disability." See Patrice, 43 F. Supp. 2d at 1159. Instead, Enright used force on Lucero while Lucero was committing an assault related to his disability.

Gohier v. Enright, 186 F.3d at 1220-21. The Tenth Circuit rejected "a broad rule categorically excluding arrest from the scope of Title II," stating that "[i]t remains an open question in this circuit whether to adopt either or both the wrongful-arrest theory of Lewis and Jackson and the reasonable-accommodation-during-arrest theory of Gorman." 186 F.3d at 1221.

The Tenth Circuit held that Enright did not violate the ADA:

In two opinions on which Gohier relies, district courts declined to dismiss ADA claims alleging that police had arrested, and, in one case, beaten, persons with disabilities who had not committed any crime. See Lewis, 960 F. Supp. at 176-77; Jackson, 1994 WL 589617, at *1. See generally James D. Johnson, Note & Comment, Does the Americans with Disabilities Act Apply to the Conduct of Law Enforcement Officers Pursuant to Arrests? A Survey of Gorman v. Bartch, 14 Ga. St. U. L. Rev. 901, 920–22 (1998)(discussing cases). The police in each case misperceived the effects of a disability as illegal conduct. In Lewis, they beat and arrested, for the offense of resisting law enforcement, a deaf man who could not understand their commands; in Jackson, they arrested for drunk driving a man who was sober, and whose unsteadiness and slurred speech resulted from a past stroke. See 960 F. Supp. at 176-77, 1994 WL 589617, at *1. The court in each case relied on a passage in the ADA's legislative history to conclude that a person with a disability can state a claim for such mistreatment:

In order to comply with the non-discrimination mandate, it is often necessary to [train] public employees about disability. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in [how to recognize and aid people having] seizures. . . . Such discriminatory treatment based on disability can be avoided by proper training.

H.R. Rep. No. 101–485, pt. III (1990), reprinted in 1990 U.S.C.C.A.N. 445 (quoted at 960 F.Supp. at 178, 1994 WL 589617, at *6 n.12).

In this case, Officer Enright did not misperceive lawful conduct caused by

Mr. Lucero's disability as criminal activity and then arrest him for that conduct. Lucero's conduct was not lawful, and Enright did not arrest him. Enright used force on Lucero not to effect an arrest, but to defend himself from a perceived threat.  When he shot Lucero, he reasonably thought it necessary to do so to avoid serious harm or death.  We take judicial notice that Lucero may not have been criminally responsible under Colorado law for his unlawful conduct, and assume that said conduct was the unfortunate result of a "disability" in terms of the ADA. Nonetheless, whether or not Enright would have formally arrested Lucero, had that been possible, and whether or not a jury would ultimately have convicted Lucero of any crime, Enright's use of force in self-defense is simply unlike the wrongful arrests of Lewis and Jackson. Those men's conduct did not warrant the police response at issue in those cases, i.e., arrest. Lucero's threatening conduct, however, did warrant the police response at issue in this case, i.e., the use of force in self-defense.

* * * *

As noted above, the Eighth Circuit has held that Title II can apply to arrests in a different type of case than the wrongful-arrest scenario of Lewis and Jackson. See Gorman, 152 F.3d at 912-13 (reversing dismissal of ADA suit alleging police had discriminated against arrestee with disability by transporting him to police station in vehicle unequipped to safely accommodate people using wheelchairs). Under Gorman's rationale, Gohier might have argued that Title II required Colorado Springs to better train its police officers to recognize reported disturbances that are likely to involve persons with mental disabilities, and to investigate and arrest such persons in a manner reasonably accommodating their disability. Gohier, however, did not make any such argument under the ADA below and, on appeal, affirmatively disclaimed reliance on the theory advanced by the plaintiff in Gorman. This court thus expresses no opinion on whether a reasonable-accommodation-during-arrest theory could extend to the facts of this case.

Gohier v. Enright, 186 F.3d at 1221-22 (footnotes omitted).  In a footnote, the Tenth Circuit suggested that, under Colorado law, Lucero might have been able to escape criminal responsibility by pleading insanity.  See 186 F.3d at 1222 n.4.

The United States Court of Appeals for the Fourth Circuit recently confirmed Gohier v. Enright's understanding of the claims that plaintiffs may bring under Title II in the arrest context:

In the context of arrests, courts have recognized two types of Title II claims: (1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees.  See Gohier v. Enright . . . ; see also Gorman v. Bartch, 152 F.2d [at 912-13] (holding that a paraplegic arrestee could make out a reasonable accommodation claim under the ADA after being injured in a police van not equipped with wheelchair restraints).

Waller ex rel Estate of Hunt v. Danville, 556 F.3d 171, 174 (4th Cir. 2009)(Wilkinson, J.).

### 1.   **Wrongful Arrest Under the ADA.**

"The essence of [the wrongful arrest] theory is that the police mistake legal conduct caused by the disability as illegal conduct."  Glover v. City of Wilmington, 966 F. Supp. 2d 417, 428-29 (D. Del. 2013)(Andrews, J.).  Under this theory, a plaintiff must establish three elements: (i) the plaintiff was disabled; (ii) the arresting officers knew or should have known that the plaintiff was disabled; and (iii) the defendant arrested the plaintiff because of legal conduct related to the plaintiff's disability.  See, e.g., Lewis v. Truitt, 960 F. Supp. 175, 178 (S.D. Ind. 1997)(Godich, M.J.)("Courts have held that a plaintiff may recover under the ADA where he can show that (1) he was disabled, (2) the defendants knew or should have known he was disabled, and (3) the defendants arrested him because of legal conduct related to his disability.").

Although the second element -- that the officer knew or should have known that the plaintiff was disabled -- sometimes gets lost in the more general articulation of the test, the element was vital to the outcome in the leading cases on which the Tenth Circuit relied.  For example, Lewis v. Truitt, on which the Tenth Circuit relied in Gohier v. Enright, see 186 F.3d at 1221, presented the following facts:

Plaintiff Charles Lewis lived at 117 South 14th Street in Richmond, Indiana.  David Lewis was at this address with family and friends mourning the

- 156 -

death of Jacqueline Weaver during the late afternoon of August 13, 1994. Also present at the home were Plaintiff Daniel Lewis, Jennifer Leedy ("Leedy"), Stacey Sneed ("Sneed"), Christopher Anderson and others.

While this gathering was taking place, Defendants Truitt, McClure, and Retherford, all Richmond city police officers, arrived at Charles Lewis' home. The officers came to the address in order to take Amanda Lewis to police headquarters where an agent of Child Protective Services would be contacted to make a custody placement determination. Earlier that day, Amanda's maternal grandmother had contacted the Richmond City Police Department and requested that custody of Amanda be given to her.

The officers had not obtained a court order or a warrant prior to arriving at Charles Lewis' home. They had made no independent determination that Amanda was in need of services and made no effort to contact Detective Jon Carrico regarding the child's well-being.

Shortly after the officers arrived, they were met outside the home by Leedy, Sneed, and David and Charles Lewis. The officers explained the situation to David Lewis, who decided to cooperate with them. He told them that he would go inside and get Amanda and would accompany them to the police department. During this time, Charles Lewis expressed his belief that David should not comply with the officer's request because he believed that the officers needed to have authority to remove the child from the custody of David Lewis. The officers told David and Charles that no warrant was necessary because David had kidnapped his child.

After David Lewis entered the house, the officers attempted to speak with Charles Lewis. Sneed and Leedy tried to explain to the officers that Charles was deaf and that the best way to communicate with him was to write down questions on a piece of paper. Officer Truitt in particular refused to believe that Charles was deaf and would not write down any questions for him.

Defendants have conceded for the purposes of their Motion that Plaintiff Charles Lewis is deaf. None of the officers attempted to communicate with Charles Lewis on paper, even though at least one of the officers should have known that he was deaf (Defendant Retherford had come to Charles Lewis' home to help set up communications via teletype with the 911 emergency system). Before David Lewis returned with Amanda, Charles Lewis, Sneed, and Leedy went back into the house. They did not invite the officers inside. Despite this fact, the officers entered the home.

Upon entering the home, Defendants Truitt and McClure allegedly physically assaulted Charles Lewis. They pulled him to the floor by his hair,

handcuffed him, placed him under arrest, and proceeded to kick and hit him. Charles suffered bruises, contusions, and severe internal injuries. This force was used on Charles even though Sneed and Leedy warned the officers repeatedly that Charles was deaf and could not hear their instructions. Defendant Truitt allegedly used abusive and inappropriate language to convey her belief that they were lying and that Charles really did know what she was saying.

Leedy also warned the officers that Charles had recently undergone extensive surgery for cancer which had left a large incision on his abdomen. The stitches that had held this incision closed had recently been removed. Handcuffing Charles stretched and opened the incision, which had to be re-stitched with the aid of a mesh insert. Leedy also offered to prove that Charles Lewis was deaf by contacting the teletype system connected by the telephone to 911, which had been set up in case of an emergency. Officer Truitt told Leedy to shut-up and threw her into a large piece of furniture.

960 F. Supp. at 176-77 (citation omitted).  The Honorable John Paul Godich, United States Magistrate Judge of the United States District Court for the Southern District of Indiana, allowed the claim to go forward, explaining:

Plaintiffs argue that Defendants knew Charles Lewis was deaf but refused to take steps to communicate with him and then arrested him because he did not respond to them appropriately.  Defendants have cited to no evidence to contradict this argument. Accordingly, a genuine issue of material fact exists on the question of whether Defendants arrested Plaintiff because of his disability, and Defendants' Motion for Summary Judgment must be DENIED as to Plaintiffs' claim that Defendants arrested Charles Lewis because of his disability.

960 F. Supp. at 178-79 (citation omitted).

Similarly, in Jackson v. Inhabitants of Town of Sanford -- on which the Tenth Circuit also relied in Gohier v. Enright, see 186 F. 3d at 1221 -- the arresting officer had reason to know that the plaintiff was disabled:

On the morning of July 21, 1992, Roland Jackson was driving his car down Main Street in Sanford, Maine, when he was involved in a collision with another vehicle.  Sanford police officer Craig Sanford arrived at the scene shortly after the accident and was told by the other driver that he thought Jackson was drunk.  In fact, Jackson was not drunk but suffered from some physical difficulties, including partial paralysis of his right side and slurred speech, as a

result of a stroke several years earlier.  Upon approaching Jackson, Officer Sanford noticed that he was unsteady on his feet, swayed noticeably, slurred his speech, and appeared confused.  Officer Sanford asked Jackson whether he had been drinking.  Jackson replied that he had not been drinking, but that he had suffered a brain aneurysm that left him with some physical difficulties, and that he was using a prescription medication for high blood pressure.

Without further inquiry as to the type of medication and any side effects, Officer Sanford asked Jackson to perform field sobriety tests, which Jackson performed poorly due to his disabilities.  Believing that Jackson might be impaired by the medication, Officer Sanford arrested him for operating under the influence of intoxicating liquor and/or drugs ("OUI"). Sanford handcuffed Jackson pursuant to standard procedure and placed him in the back seat of the cruiser, where Jackson slipped face down onto the seat.  He was unable to sit up while being transported to the police station a few blocks away.

Once at the station, Officer Sanford contacted Officer Craig Andersen, the Drug Recognition Technician on duty, and requested that he evaluate Jackson. While waiting for Officer Andersen to arrive, Officer Sanford tested Jackson and determined that Jackson had not consumed any alcohol.  Officer Sanford did not inquire further as to Jackson's disabilities, or afford him the opportunity to explain them.  After about an hour, Officer Andersen arrived at the station and performed a drug influence evaluation on Jackson, in spite of Jackson's explanation that the observed symptoms of OUI actually were the result of a disability. The evaluation took approximately one hour. Officer Andersen then concluded that Jackson was not under the influence of drugs and so informed both Officer Sanford and Jackson. After Jackson's wife arrived, Jackson remained in police custody for an additional 30 to 45 minutes before he was released to go home. Officer Sanford gave Jackson a summons to appear in court on a charge of operating under the influence of intoxicating drugs. Officer Andersen, however, advised the District Attorney not to prosecute the OUI/drug charge, and it was dismissed in October 1992.  After releasing Jackson, Officer Sanford filed an adverse driver's report on Jackson to notify the Secretary of State that his driving skills may need to be re-evaluated. Jackson has been found to be a safe driver by certified driving instructors, both before and after the incident on July 21, 1992.

Jackson v. Inhabitants of Town of Sanford, 1994 WL 589617, at *1 (footnote omitted).  The

Honorable D. Brock Hornby, United States District Judge for the United States District Court for

the District of Maine, allowed an ADA claim to proceed; the analysis on this issue is somewhat

truncated, because the defendant Town of Sanford argued only that Title II of the ADA did not

apply and that only the Fourth Amendment law controlled this area.  See 1994 WL 589617, at *6.

Judge Hornby explained:

> The Town claims that the ADA is simply not applicable to the facts of this case, arguing that the only controlling law is the Fourth Amendment reasonableness test.  That contention is plainly wrong.  Title II of the ADA clearly applies to acts of discrimination by a public entity against a disabled individual. 42 U.S.C. § 12132.  The Town and its police force are a public entity and the plaintiff is a qualified individual with a disability as those terms are defined in Title II of the ADA. 42 U.S.C. § 12131.  The legislative history of the ADA demonstrates that Congress was concerned with unjustified arrests of disabled persons such as Jackson alleges here.  Therefore, summary judgment is DENIED as to Jackson's claims against the Town of Sanford based on alleged violations of the ADA.

1994 WL 589617, at *6 (footnote omitted).  Even still, the case is fully consistent with the

principle that, for a plaintiff to have a wrongful-arrest claim under Title II, the arresting officer

must know or have reason to know that the arrestee is disabled.

In Sperry v. Maes, No. 10-CV-03171-RPM, 2013 WL 4365784 (D. Colo. July 10, 2013),

the Honorable Richard P. Matsch, United States District Judge for the United States District

Court for the District of Colorado, rejected a wrongful-arrest claim where the plaintiff asserted

that, because of his disability, he did not have the requisite culpable state of mind.  That case

presented the following facts:

> On November 13, 2007, Todd Sperry's son Ethan was killed in a car crash. The next day, Sperry went to the scene and was shocked by what he saw.  He called Castle Rock Police to complain that the scene had not been cleaned properly and stated that a portion of Ethan's decapitated head was left there. Officer Williams responded and Sperry asserted that Officer Williams callously shoveled bits of what appeared to be Ethan's brain matter to the side of the road. Sperry took photographs.

> In anger and frustration, Todd Sperry repeatedly complained to Castle Rock Police Corporal Ty Peterson.  Peterson, angered by Sperry's complaints and conduct, demanded that Sperry turn over his photographs. Sperry refused. Sperry claims that, over the next thirteen months, Castle Rock Police conducted a

campaign of harassment, intimidation, and surveillance to obtain the photographs in retaliation for his criticisms of the Department.

On February 2, 2008, Todd Sperry received an "instant issue" debit card from H & R Block Bank with a balance of $1,863.09, the amount of his federal tax refund from that year.   Three days later, H & R Block sent Sperry a personalized debit card. The balance from the "instant issue" card was transferred over.

Between April 14, 2008 and June 6, 2008, Sperry used his H & R Block debit card for approximately 73 purchases at a Service Oil gas station in Castle Rock, for a total of $5,100.  Every purchase was ultimately charged back to the gas station because Sperry's debit card account had insufficient funds -- indeed, it had a balance of -$76.56 when he made his first purchase at the station.  After Sperry's card was declined for the first time on June 6, 2008, he never returned to the station.  Sperry and his family moved to California in August 2008.

Clifton Porter, a District Manager for Bradley Petroleum, owner of Service Oil, began investigating Sperry's charges.  Porter discovered that none of the 73 transactions were approved by the bank.  Whenever Sperry swiped his card, the computer would notify the store clerk that the transaction was denied and advise the clerk to call the bank for authorization.  When the clerk informed Sperry about the notification, Sperry gave the clerk the number # 1932.  When the clerk entered that number, the transaction was authorized.  It is unclear why that worked.

On July 8, 2008, Porter went to the Castle Rock Police Department to file a police report.  He met with Officer George Elder.  Porter provided Elder written statements from the gas station clerks who conducted the transactions with Sperry, the receipts for Sperry's purchases, and documents accounting for the returned charges. Elder took Porter's statement and then drafted a police report.  Thereafter, Elder was not involved in the investigation.

On July 15, 2008, Detective Jason Maes was assigned to Sperry's case. He reviewed Officer Elder's report and conducted a photo lineup. Each gas station clerk identified Todd Sperry from the lineup as the person who made the charges. Detective Maes then contacted H & R Block and spoke to Mark Bigler, a Senior Fraud Analyst. Bigler told Maes that, due to the nature of the account, Sperry should not have been able to make purchases on the card if he had insufficient funds. Bigler further stated that H & R Block did not provide Sperry a 4-digit code for transactions on the card, and that Sperry must have somehow obtained one.

On August 29, 2008, Detective Maes subpoenaed H & R Block's debit

card statements for Todd Sperry.  Upon reviewing the statements, Maes noted that Sperry never added additional funds to the debit card; the debit card already had a negative balance when Sperry first used the card at the gas station; and that, on a couple of occasions, Sperry made multiple purchases at the station on the same day.  Detective Maes also found it suspicious that Sperry used the card with such frequency, then never returned to the station after it was declined.

Based on the circumstances, Detective Maes determined that there was probable cause that Todd Sperry had committed theft under Colorado Revised Statutes § 18-4-401(a).  Maes completed an Affidavit in Support of Arrest on September 4, 2008, detailing his investigation and findings. Detective Maes had no contact with the Douglas County District Attorney's Office about Sperry's case until July 9, 2011, when he was asked to re-interview Mark Bigler and the two gas station clerks.  Otherwise he was unconnected to the prosecution.

Upon reviewing Detective Maes' Affidavit, the Deputy District Attorney Chris Gall found probable cause to file a Motion for Arrest Warrant, which was granted on November 7, 2008. Charges were filed against Sperry in Douglas County court. On January 7, 2009, Orange County, California Sheriff's deputies arrested Sperry pursuant to the warrant. Sperry was released on bond. From January 2009 to September 2010, three Douglas County Deputy District Attorneys -- Kristine Rolfes, Jay Williford, and Brittany Martin -- worked on Sperry's case.  Each of them believed that probable cause existed based on their review of the case file.

The District Attorney agreed to dismiss the charges against Sperry on September 30, 2010, five days before trial, after Sperry agreed to repay Bradley Petroleum for the charges incurred on his card.  This lawsuit ensued.

Sperry v. Maes, 2013 WL 3465784, at *1-2.  Judge Matsch analyzed the ADA claim as follows:

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity."  42 U.S.C. § 12132.  Title II claims can arise from police investigations and arrests under two theories. The first is that the police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity.  See Gohier v. Enright, 186 F.3d 1216, 1220 (10th Cir. 1999). The second is that, while the police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees. Id. at 1220-21.

For the wrongful arrest theory to apply, the conduct that is mistaken for criminal activity must actually be lawful. Thus, the theory applied to a case where a stroke victim was arrested for driving under the influence, even though he had actually been driving sober, see Jackson v. Town of Sanford, No. 94-12-P-H, 1994 WL 589617, at *6 (D. Me. Sept. 23, 1994), and to a case where a deaf man was charged with resisting arrest, when in fact he simply could not hear the officers' orders, see Lewis v. Truitt, 960 F. Supp. 175, 178 (S.D. Ind. 1997). In Gohier, by comparison, the Tenth Circuit concluded that the theory did not apply when a schizophrenic man physically threatened a police officer; even though the court concluded that the man's behavior was related to his disability, the behavior was not lawful -- rather, it was assault. See Gohier, 186 F.3d at 1221.

Todd Sperry argues here that his conduct was lawful because, given his disability, he could not have formed the *mens rea* required for theft under Colorado law. While that may have been apparent with the benefit of hindsight, the wrongful arrest theory focuses on the circumstances known to the officer at the time an arrest is made, and how police responded. Compare Lewis, 960 F. Supp. at 176-77 (arrest for resisting law enforcement unwarranted because officers knew man was deaf), with Gohier, 186 F.3d at 1222 (use of force in self-defense warranted given threatening conduct of man known to the officer to be mentally ill). The question is not whether the police were ultimately correct in assessing the legality of the plaintiff's conduct, but whether that assessment was reasonable. See Gohier, 186 F.3d at 1222 ("When [the officer] shot [the schizophrenic man], he reasonably thought it necessary to do so to avoid serious harm or death.")[.] As discussed above, construing the facts and drawing all reasonable inferences in Sperry's favor, he has only established that Defendants knew that he behaved erratically following his son's death, which led to him being placed on a temporary medical hold, and that he had general mental health issues. There is nothing in the record to suggest that Defendants were aware that Sperry's disability made him incapable of handling his financial affairs. And given Sperry's course of conduct -- charging $5,000 to an overdrawn card at a single location in two months by somehow overriding the transaction system, then abruptly stopping once his card was declined -- it was reasonable for Defendants to believe that he was behaving intentionally. Based on that record, Defendants' decision to arrest Sperry was not unwarranted.

In support of his reasonable accommodation theory, Sperry appears to argue that Defendants should have inquired about his disability during the investigation or factored it into their assessment of his conduct. Plaintiff does not cite to any statute or case law establishing that the ADA's reasonable accommodation requirement includes a duty to investigate a disability in all criminal inquiries. Even assuming the ADA imposes such a duty where there is reason to believe a disability exists, here, Sperry's course of conduct did not bear any indicia of mental illness or infirmity. Defendants did not have reason to

believe that Sperry was manifesting mental illness as opposed to defrauding the gas station. Defendants' failure to consider Sperry's disability in evaluating his conduct does not amount to a failure to accommodate, since they were not aware of its extent and severity.

Finally, Sperry nods to <u>Gohier</u>'s dicta concerning a failure to train, presumably to argue that the Town of Castle Rock's failure to provide mental health training for police officers amounted to a failure to accommodate. But Sperry does not flesh out his argument in any meaningful depth, and the Court will not do so for him.

<u>Sperry v. Maes</u>, 2013 WL 3465784, at *5-*6.

### 2.    **Reasonable Accommodation During Arrest.**

"The essence of [the reasonable accommodation during arrest] theory is that once the police have a situation under control, the police have a duty to accommodate a disability." <u>Glover v. City of Wilmington</u>, 96 F. Supp. 2d at 429. The seminal case in this area is the decision of the United States Court of Appeals for the Eighth Circuit in <u>Gorman v. Bartch</u>. In that case, a wheelchair-bound man, Gorman, tried to enter a bar's dance floor; a bar employee denied him access to the dance floor, pulled his wheelchair up the steps down to the dance floor, and evicted him from the bar. <u>See</u> <u>Gorman v. Bartch</u>, 152 F.3d at 909. The wheelchair-bound man told two nearby police officers what happened; he argued with them, and "they eventually arrested him for trespassing and called for transportation to take him to the police station." 152 F. 3d at 909.

In response to the call officer Neil Becker arrived with a patrol wagon that was not equipped with a wheelchair lift or wheelchair restraints. Gorman told the police that the van was not properly equipped for him to ride in it, and that due to his use of a urine bag it would be necessary for him to go to the bathroom before he was transported. The officers lifted Gorman from his chair and placed him on a bench inside the van. Gorman states that they complied with his instructions on how to lift him from his chair, but not with his requests that he be allowed to go to the bathroom prior to transport or that they place the seat cushion from his wheelchair underneath him to help support his legs. Because of his paraplegia

Gorman was not independently able to maintain himself upright on the bench, and the police tied him with his belt to a mesh wall behind the bench and also fastened a seatbelt around him.  During the drive to the station the belts came loose, and Gorman fell to the floor.  The fall injured his shoulders and back severely enough to require surgery and also broke his urine bag, leaving him soaked in his own urine.

152 F.2d at 909.  The Eighth Circuit held that Gorman has a good a Title II claim, explaining:

Our task in considering whether Gorman's allegations come under the ambit of the federal statutes has been made easier by the Supreme Court's unanimous decision on June 15 in Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206 . . . (1998).  In applying Title II of the ADA to state prisons and prison services, Justice Scalia emphasized the broad language used by Congress and its choice not to include exceptions.  Id.  . . . 118 S. Ct. at 1954.  State prisons "fall squarely within the statutory definition of 'public entity'" since § 12131(1)(B) defines public entity as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." Id.  . . . 118 S. Ct. at 1954-55.  The Court categorically rejected the argument that the statutory prohibition against excluding a qualified individual with a disability from participating in or receiving the "benefits of the services, programs, or activities of a public entity" does not apply to prison services because they do not fit the common understanding of "benefits" or "services," for "[t]he text of the ADA provides no basis for distinguishing these programs, services, and activities." Id. . . . 118 S. Ct. at 1955.

Application of Yeskey to the claims in this case shows that they also fit under the ADA.  A local police department falls "squarely within the statutory definition of 'public entity,'" id. . . . 118 S. Ct. at 1954, just like a state prison.  The fact that Gorman may not have "volunteered" to be arrested does not mean he was not eligible to receive transportation service to the police station. Covered programs or services do not need to be voluntary, for "the words [of the statute] do not connote voluntariness." Id.  . . . 118 S. Ct. at 1955.  A qualified individual may participate in a service on either a voluntary or a mandatory basis, as illustrated by Justice Scalia's example of a drug addict required to participate in a treatment program.  Id.  Transportation of an arrestee to the station house is thus a service of the police within the meaning of the ADA. The fact that the statute can be "applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth."  Id.  . . . 118 S.Ct. at 1956 (internal citations omitted).  It was therefore error [for the district court] to conclude that Gorman was not a "qualified individual with a disability" who "meets the essential eligibility requirements for the receipt of services."  42 U.S.C. § 12131.

The stated purpose of the ADA also demonstrates its applicability to transportation of arrestees.   In the statement of findings and purpose at the beginning of the statute, Congress noted that "discrimination against individuals with disabilities persists in such critical areas as . . . transportation . . . institutionalization ... and access to public services" and that disabled individuals face the discriminatory effects of "failure to make modifications to existing facilities and practices." 42 U.S.C. 12101(a). Congress enacted the ADA to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b).

The regulations promulgated to guide implementation of the statute are also instructive.   The Department of Justice specified that the statutory term "program" includes "the operations of the agency or organizational unit of government receiving or substantially benefitting from the Federal assistance awarded, e.g., a police department or department of corrections." 28 C.F.R. § 42.540.   The regulations also indicate that "benefit" includes "provision of services, financial aid, or disposition (i.e., handling, decision, sentencing, confinement, or other prescription of conduct)." Id.  The commentary also made clear that "[t]he general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities." 28 C.F.R. § 35, App. A, Subpart B.

Gorman" allegations that the defendants denied him the benefit of post-arrest transportation appropriate in light of his disability fall within the framework of both Title II of the ADA and § 504 of the Rehabilitation Act.  The defendants are representatives of the Kansas City police establishment, a department of local government and a public entity.  Arrestee transportation is a program or service of the department as shown by record evidence that vehicles are dispatched by the department to transport arrestees.  The statutes must be interpreted broadly to include the ordinary operations of a public entity in order to carry out the purpose of prohibiting discrimination.  Innovative Health Systems v. City of White Plains, 117 F.3d 37, 44-45 ([2d] Cir. 1997).  The "benefit" Gorman sought in this case was to be handled and transported in a safe and appropriate manner consistent with his disability.  See 28 C.F.R. § 35.130(b)(1) (public entity may not provide services in a manner denying disabled individuals equal benefit of the service). His allegations are different from cases in which plaintiffs sought unique benefits or services.  See[,] e.g., Aswegan[ v. Bruhl, 113 F.3d 109, 110 (8th Cir. 1997)]; Lue v. Moore, 43 F.3d 1203, 1206 (8th Cir. 1994)(Rehabilitation Act did not require creation of new prison vocational training program).

Gorman v. Bartch, 152 F.3d at 912-13 (footnote omitted).

3.        **The Unclear Status of Failure-to-Train Claims**.

Whether a failure-to-train claim exists under Title II remains a disputed issue.  Gohier v. Enright referred to the concept in passing, but there is little authority on the point.  Those cases that discuss the theory typically pass on deciding whether it exists, disposing of the dispute on other bases.  See, e.g., Thao v. City of St. Paul, 481 F.3d 565, 567-68 (8th Cir. 2007)(Bright, J.)(declining to decide the issue, because the Plaintiffs "failed to demonstrate that more 'adequate' training to accommodate the mentally ill would have required a different response"); Buchanan v. Maine, 469 F.3d 158, 177 (1st Cir. 2006)(Lynch, J.)("An argument that police training, which was provided, was insufficient does not present a viable claim that [the plaintiff] was 'denied the benefits of services . . . of a public entity" by reason of his mental illness, as required under 42 U.S.C. § 12132.").

It seems reasonably clear, however, that in the absence of proof of an underlying violation of ADA, a failure-to-train claim would also fail:

> Because we conclude that any duty of reasonable accommodation was met in these circumstances, we do not reach the question of whether the ADA supports a claim for failure to train. While plaintiff attempts to pose training in dealing with those with mental health problems as an "accommodation," it is well-settled that the failure to train must have caused some violation of law for an action against a municipality to lie.

Waller ex rel. Estate of Hunt v. Danville, 556 F.3d at 177 n.3.  See also Bates ex rel. Johns v. Chesterfield Cnty., 216 F. 3d 367, 373 (4th Cir. 2000)(Wilkinson, C.J.)("As the officers did not discriminate against Bates by reason of his disability, Bates' additional ADA claim that the County failed to adequately train its officers also fails.").

<u>**ANALYSIS**</u>

The Court will grant the MSJ.  The Court first concludes that the Sharkey is entitled to qualified immunity, because he did not violate J.P.'s Fourth Amendment right to be free from the use of excessive force, and because he did not violate any clearly established right.  The Court next concludes that summary judgment is appropriate as to the ADA claims, because no County Defendant deprived J.P. of any right that the ADA protects.

**I.      SHARKEY IS ENTITLED TO QUALIFIED IMMUNITY, BECAUSE HE DID NOT VIOLATE J.P.'S CONSTITUTIONAL RIGHTS, AND BECAUSE, IN THE ALTERNATIVE, ANY RIGHT THAT HE VIOLATED WAS NOT CLEARLY <u>ESTABLISHED ON SEPTEMBER 26, 2011.</u>**

The Court concludes that Sharkey is entitled to qualified immunity, because he did not violate J.P.'s constitutional right to be free from the use of excessive force -- much less any clearly established constitutional right -- when he handcuffed her incident to a lawful arrest. Despite the Plaintiffs' contrary insistence, Sharkey lawfully arrested J.P., and, given that he had probable cause to conclude that she had recently committed a violent offense, his decision to handcuff her, for his and others' safety, was objectively reasonable.  Moreover, even if Sharkey violated J.P.'s constitutional rights, he violated no clearly established law.   Accordingly, summary judgment is appropriate as to the excessive-force claim.

A largely undefended assumption underlies the Plaintiffs' briefing: that J.P.'s disability rendered her categorically incapable of forming general intent.   No evidence supports that assumption.  As background information about how New Mexico understands intent, it is useful to look, not to the recursive series of alternate definitions that the Plaintiffs discussed in their briefing, <u>see</u> Response at 22, but instead to a statement of New Mexico law: the Uniform Jury

Instructions.[98]  The general criminal intent instruction provides:

> In addition to the other elements of _____ (*identify crime or crimes*), the state must prove to your satisfaction beyond a reasonable doubt that the defendant acted intentionally when he committed the crime. A person acts intentionally when he purposely does an act which the law declares to be a crime [, even though he may not know that his act is unlawful].  Whether the defendant acted intentionally may be inferred from all of the surrounding circumstances, such as the manner in which he acts, the means used, [and] his conduct [and any statements made by him].

NMRA, Crim. UJI 14-141 (footnotes omitted).[99]  See State v. Gonzales, 2005-NMCA-031, ¶ 23, 137 N.M. 107, 107 P.3d 547, ("general intent is only the intention to make the bodily movement which constitutes the act which the crime requires" (internal quotation marks omitted)).  See also United States v. Miera, No. CR 12-3111 JB, 2013 WL 6504297, at *16 (D.N.M. Nov. 22, 2013)(Browning, J.)(discussing New Mexico law on general intent).  That is, all the state needs to show to satisfy the general intent instruction is that a person purposely did an act.  Even with the benefit of hindsight, there is no evidence that any disability J.P. has deprives her of the ability to purposely act.[100]

---

[98]Although the juvenile justice system differs from the adult justice system, see N.M. Stat. Ann. 32A-2A-1 to -33, the instruction still accurately reflects New Mexico law on criminal intent.

[99]"The  Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law."  Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F. Supp. 2d 1200, 1211 n.2 (D.N.M. 2011)(Browning, J.)(citing State v. Wilson, 1994-NMSC-0009, ¶ 5, 116 N.M. 793, 867 P.2d 1175).

[100]Moreover, in their Response to MSJ No. 1, the Plaintiffs attribute to J.P. a motive for her acts.  They state: "Plaintiff does not dispute that J.P. was trying to free herself from Ms. Gonzales' hold on her."  Response to MSJ No. 1 ¶ 48, at 6.  Given that the Plaintiffs attributed a motive to J.P., it is difficult to see how they could credibly maintain that J.P. did not intend to kick Ms. Gonzales.

Even if the Plaintiffs' assumption were, with the benefit of evidence collected *ex post* during litigation, borne out, the ultimate question is not whether Sharkey's judgment was correct, but whether probable cause supported it.  Ample evidence supports his judgment: minutes before Sharkey arrived, everyone concedes, J.P. attacked a fellow student and a teacher.  When she saw Sharkey, she slinked away into an office, held her hands in a posture to avoid handcuffing, and cried, showing both consciousness of guilt and an effort to avoid her actions' consequences.  In short, Sharkey saw J.P. kick her teacher, heard what happened, and, in light of all the circumstances, concluded that J.P. had probably committed the crime.  Indeed, in light of the undisputed facts before the Court, it seems likely that she committed the crime, and it is difficult to fault Sharkey for concluding likewise.[101]

Even if Sharkey knew all evidence then available -- including evidence that federal privacy law conceals from him[102] -- he still would not have concluded otherwise.  In fact, had

_____

[101]The Court recognizes that Sharkey has stated that whether a person whom he is investigating has a disability plays no role in his investigation or in his decision to arrest that person.  See Response to MSJ No. 1 ¶ R, at 12 (setting forth a similar fact); Plaintiffs' Sharkey Depo. at 7:5-21.  If one understands Sharkey to believe that whether a person has a disability is irrelevant to the probable-cause determination, he misunderstands the law: in some situations -- like that in Lewis v. Truitt, where the police had good reason to believe the person ignoring their commands was deaf -- whether a person is disabled is relevant to the probable-cause determination.  Nonetheless, Sharkey's statement does not change the Court's conclusion.  First, Sharkey did not know or have reason to know that J.P. was disabled within the ADA's definition -- much less that any disability she had rendered her incapable of forming criminal intent.  Second, Fourth Amendment probable cause inquiry is an objective test that does not depend on Sharkey's subjective thought processes.  See Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *30 (D.N.M. Apr. 30, 2014)(Browning, J.)(" Probable cause is measured against an objective standard.").

[102]The Plaintiffs' repeated suggestion that the IDEA requires Sharkey to access these files and transmit them to appropriate authorities rests on a misreading of the IDEA.  The relevant statutory provision provides:

Sharkey ever seen the BIP, what it reveals would only have reinforced his conclusion.  Listed in

her BIP is the following statement: "[J.P.] will frequently lash out at peers and adults in the

classroom.  This behavior manifests as cussing, throwing objects and furniture <u>with the intent to</u>

<u>cause harm</u>, as well as physical and verbal aggression <u>to cause harm to peers and/or adults</u>."  BIP

at 1 (emphasis added).  Although the statements in the BIP are not legal conclusions, they would

---

(6) Referral to and action by law enforcement and judicial authorities

    (A) Rule of construction

    Nothing in this subchapter shall be construed to prohibit an agency from reporting a crime committed by a child with a disability to appropriate authorities or to prevent State law enforcement and judicial authorities from exercising their responsibilities with regard to the application of Federal and State law to crimes committed by a child with a disability.

    (B) Transmittal of records

    An agency reporting a crime committed by a child with a disability shall ensure that copies of the special education and disciplinary records of the child are transmitted for consideration by the appropriate authorities to whom the agency reports the crime.

20 U.S.C. § 1415(k)(6).  To see the statement in full context is to see the Plaintiffs' mistake. "The agency" refers to "[a]ny State educational agency, State agency, or local educational agency that receives assistance under [the relevant provision if IDEA]," which requires those agencies to "establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies."  20 U.S.C. § 1415(a).  Sharkey is not the agency providing education; he is the state law enforcement authority to whom the crime has been reported.  Accordingly, he had no duty to transmit those records.  Nor could he: as the County Defendants stated, with no substantive rebuttal, FERPA bars the school from releasing those records to Sharkey.  <u>See</u> 20 U.S.C. §1232g(b)(1) (stating that "[n]o funds shall be made available under any applicable program to any educational agency which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein [with one inapplicable exception]) of students without the written consent of their parents to any individual, agency, or organization, other than" in enumerated, and inapplicable, exceptions).  IDEA does not command Sharkey to distribute information that FERPA forbids the school district from giving to him in the first place.

- 171 -

not have dissuaded him from concluding that she could purposely act.

That J.P.'s charges were dismissed because the juvenile court found her incompetent to stand trial does not change the analysis.  The Plaintiffs' conclusion does not follow, both because the legal issues of competency and intent differ and, more fundamentally, because the arrest underlying this lawsuit traumatized J.P.  By the Plaintiffs' own theory, the event traumatized J.P.; by their own theory, then, it is inappropriate to infer J.P.'s pre-trauma mental condition from her post-trauma mental condition.  Whether she was competent to stand trial <u>after</u> enduring her traumatic arrest does not mean she was incapable of purposely acting <u>before</u> being arrested. What is more, the issue at the Fourth Amendment stage is not whether J.P. <u>in fact</u> had the requisite mental state, but whether Sharkey <u>had probable cause to conclude</u> that she had the requisite mental state.   The Court concludes that Sharkey had such probable cause.

In short, the Plaintiffs ask the Court to conclude that: (i) J.P. lacked the capacity to purposely act; (ii) Sharkey knew or should have known that J.P. had a disability which deprived her of the capacity to purposely act; and (iii) he, therefore, arrested her wrongfully.  But: (i) she has identified no evidence that J.P.'s disability deprived her of the capacity to purposely act -- and the evidence is strong that she purposely acted on this occasion; (ii) she has identified no evidence that Sharkey knew that she suffered from a disability that would deprive her of the capacity to purposely act; and (iii) even if he knew of the evidence that undergirded her disability -- which FERPA hides from his eyes, for J.P.'s privacy's sake -- that evidence would not have given him any reason to doubt that she could not purposely act.   Accordingly, the Court concludes that Sharkey handcuffed J.P. pursuant to a lawful arrest.

With those facts in mind, the excessive-force analysis is straightforward. [103]

---

[103]The Court acknowledges that, during the hearing, the Plaintiffs stated that this claim is "really an unreasonable seizure claim," Tr. at 41:15-18 (Kennedy), as opposed to a true excessive force claim.   The claim on which the County Defendants move for summary judgment is, however, an excessive force claim.   It appears in the Complaint as:

## COUNT IV: FOURTH AMENDMENT VIOLATIONS: EXCESSIVE USE OF FORCE

68.     Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

69.     J.H. told Defendant Sharkey that her daughter's APS behavior intervention prohibited the use of handcuffs on Plaintiff.

70.     Defendant Sharkey's use of force under the circumstances was objectively unreasonable as handcuffs were not a part of J.P.'s BIP and Defendant Sharkey had been specifically advised that said restraints were inappropriate.

71.     Defendant Sharkey's use of force was also objectively unreasonable because J.P. did not resist Defendant, is an eleven year old mentally disabled child, and lacked the mental capacity to  commit a delinquent act.

Complaint ¶¶ 68-71, at 8.  This claim in the Complaint is an excessive force claim and not an unreasonable seizure claim.   Moreover, to the extent that the Plaintiffs intended to raise an unreasonable seizure claim, the facts would not support it.   It is true that, in rare circumstances, the manner in which law enforcement carries out a search or a seizure that probable cause justifies can call for a particular balancing:

Where probable cause has existed, the only cases in which we have found it necessary actually to perform the "balancing" analysis involved searches or seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests -- such as, for example, seizure by means of deadly force, see Tennessee v. Garner, 471 U.S. 1 . . . (1985), unannounced entry into a home, see Wilson v. Arkansas, 514 U.S. 927 . . . (1995), entry into a home without a warrant, see Welsh v. Wisconsin, 466 U.S. 740 . . . (1984), or physical penetration of the body, see Winston v. Lee, 470 U.S. 753 . . . (1985).

Whren v. United States, 517 U.S. 806, 818 (1996).  This case does not present such facts: there was nothing out of the ordinary about the manner in which Sharkey arrested J.P. for a violent offense that he had witnessed.   Any balancing of factors, whether under an extraordinary-case

Further, no unreasonable seizure claim is present.  Under Graham v. Connor,

>        [d]etermining whether the force used to effect a particular seizure is
> "reasonable" under the Fourth Amendment requires a careful balancing of "'the
> nature and quality of the intrusion on the individual's Fourth Amendment
> interests'" against the countervailing governmental interests at stake.  Id., at 8,
> quoting United States v. Place, 462 U.S. 696, 703 . . . (1983).  Our Fourth
> Amendment jurisprudence has long recognized that the right to make an arrest or
> investigatory stop necessarily carries with it the right to use some degree of
> physical coercion or threat thereof to effect it.  See Terry v. Ohio, 392 U.S., at 22-
> 27 . . . .  Because "[t]he test of reasonableness under the Fourth Amendment is not
> capable of precise definition or mechanical application,"  Bell v. Wolfish, 441
> U.S. 520, 559 . . . (1979), however, its proper application requires careful
> attention to the facts and circumstances of each particular case, including the
> severity of the crime at issue, whether the suspect poses an immediate threat to
> the safety of the officers or others, and whether he is actively resisting arrest or
> attempting to evade arrest by flight.  See Tennessee v. Garner, 471 U.S., at 8-
> 9 . . . (the question is "whether the totality of the circumstances justifie[s] a
> particular sort of . . . seizure").

Graham v. Connor, 490 U.S. at 396.  The Plaintiffs ask the Court to focus on that J.P. was a juvenile and that she was disabled.  Those two data points matter, but other data points matter, too: this disabled or limited juvenile had, very recently, attacked both a peer and an authority figure -- drawing blood in the latter case.  It took two adults, one on each arm, to subdue her.  Sharkey was within the Fourth Amendment's boundaries when he decided, as the undisputed facts show that he did, that, given his concern that J.P. could attempt to strike him or others, it was necessary to handcuff her.  Although she did not, ultimately, actively resist arrest, that fact does not prohibit Sharkey from handcuffing her to prevent her from lashing out again.  Accordingly, the amount of force used to effect the seizure was reasonable.

---

analysis or otherwise, would lead to the same conclusion: because Sharkey's exercise of force was, based on the totality of the circumstances known to him, objectively reasonable, he did not violate the Fourth Amendment.  Moreover, he did not violate any clearly established Fourth Amendment law; accordingly, he is entitled to qualified immunity.

None of the Plaintiffs' contrary arguments is sound.  First, none of the Tenth Circuit cases

on which the Plaintiffs rely teaches that Sharkey's acts were unreasonable.  Holland ex rel.

Overdorff v. Harrington differs substantially, because that case involved officers pointing loaded

guns at innocent children playing basketball near where a SWAT team would execute a search

warrant:

> Randy Joe Holland,18, Marty Shane Holland, 8, and Ray Walker, 24, were playing basketball in the driveway. Three SWAT Team deputies approached rapidly, brandishing weapons; one of them pointed his weapon at the three young men and ordered them to lie face down on the ground, and continued pointing his weapon at them as they lay there.

> Three SWAT deputies next encountered Anthony "Scotty" Holland, 14, near the bunkhouse and at gunpoint ordered him to lie on the ground. He was kept in a prone position for nearly 10 minutes.

268 F.3d at 1183-84.  The Tenth Circuit explained:

> Taken in the light most favorable to the plaintiffs-appellees, the facts alleged concerning the pointing of firearms at the child bystanders found at the Heflin residence on April 16, 1996 show the officers' conduct violated a constitutional right.  While the SWAT Team's initial show of force may have been reasonable under the circumstances, continuing to hold the children directly at gunpoint after the officers had gained complete control of the situation outside the residence was not justified under the circumstances at that point. This rendered the seizure of the children unreasonable, violating their Fourth Amendment rights.

268 F.3d at 1193.  In context, even the case's reference to using force on children suggests only

that "[p]ointing a gun directly at a child calls for" heightened "sensitivity to what may be

justified or may be excessive under all the circumstances":

> The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force.  Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time.  These are the very ingredients relevant to an excessive force inquiry.  Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it

- 175 -

may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.   Pointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances.

268 F.3d at 1192-93 (internal quotation marks and citation omitted).   See Mata v. City of Farmington, 791 F. Supp. 2d at 1154-55 (discussing Holland ex rel. Overdorff v. Harrington). The Tenth Circuit included the reference to children in a discussion of another factor: whether the officer pointed the gun directly at the person or whether the officer merely readied the gun. That the target of a use of force is a child is one factor in the reasonableness calculus, but it is not the only factor.   Holland ex rel. Overdorff v. Harrington is not merely distinguishable, but entirely different: it involved pointing firearms directly at entirely innocent children who happened to be in the wrong place at the wrong time -- not handcuffing a child who had recently, to the officer's eyes, violently attacked a peer and her teacher.

Grass v. Johnson is also not to the contrary.   As alleged in that case, a police officer handcuffed a driving-under-the-influence suspect, fastened the suspect's seatbelt in the patrol car, and "punched [the suspect] in the face, giving him a black eye."   322 F. App'x at 587.   It is in that context that the Tenth Circuit resisted a reading of its precedent that would "implicitly sanction[] an officer's use of force, albeit resulting in only minor injury, that was wholly unnecessary to carry out the arrest."   322 F. App'x at 589 (emphasis added).   Further, the Tenth Circuit specifically noted that, taking the plaintiff's facts as true, the officer's "use of force came after [the plaintiff] was subdued and not posing a threat to anyone."   322 F. App'x at 590. Punching someone in the face after he is handcuffed and secured in a patrol vehicle is unnecessary to arrest that person; that situation differs in magnitude from handcuffing J.P. only a

few minutes after J.P. had attacked a peer and her teacher.   Further, J.P. had not yet been "subdued"; indeed, J.H. complains about the act of subduing her.   Grass v. Johnson does not, therefore, dictate a contrary result.

Manzanares v. Higdon does not, as the Plaintiffs assert, support the proposition that "the Tenth Circuit has . . . clearly established that a person must clearly be dangerous and a threat to the officer to justify handcuffing."  Response at 9.  That case states that, based on Tenth Circuit law, "any reasonable officer would understand that it is unconstitutional to handcuff someone absent probable cause or an articulable basis to suspect a threat to officer safety combined with reasonable suspicion."   Manzanares v. Higdon, 575 at 1150 (emphasis added).   Accordingly, threats to officer safety are not necessary to justify handcuffing.   As the Court has already explained, Sharkey had probable cause to arrest J.P.  What is more, although Sharkey expressly disclaimed reliance on a reasonable suspicion theory -- evidently believing it unnecessary, given that he had probable cause to arrest -- because J.P. had recently harmed a peer and an adult, Sharkey had reasonable suspicion coupled with a threat to his safety.

Although the discussion about J.P.'s emotional damages evokes sympathy, it does not alter the excessive-force outcome.  Although the Court agrees that "[p]hysical contact is not required for an excessive force claim -- patently unreasonable conduct is," Cortez v. McCauley, 478 at 1131, pointing out as much leaves the Court in the same place: answering the antecedent question whether Sharkey used objectively unreasonable force.  That question's answer does not depend on whether his use of objectively reasonable force upset J.P., even severely.  Indeed, the contrary rule would have perverse consequences: if an excessive force claim would lie every time an arrestee complained that being properly arrested and properly handcuffed upset him,

there would be no end to excessive force cases.  Although Sharkey's arrest and handcuffing of J.P. has injured her, in the sense that she suffers from it, her suffering does not make his otherwise reasonable arrest and handcuffing of J.P. excessive force.

The discussion about New Mexico law is also of no help to the Plaintiffs' cause.  First, the Court notes that the Plaintiffs misread qualified immunity law.  They quote the following language from Hope v. Pelzer for the undisputed proposition that qualified immunity shields police officers from damages unless they violated "'clearly established **statutory** or constitutional rights of which a reasonable person would have known.'"  Response at 9 (quoting Hope v. Pelzer, 536 U.S. at 739)(emphasis in Response, but not in Hope v. Pelzer)(internal quotation marks omitted).  From this argument, the Plaintiffs suggest that, so long as Sharkey violated some clearly established statutory right *x*, Sharkey can be held liable for violating constitutional right *y*:  "In this case, J.P. has a clearly established statutory right through the Children's Code which must be considered when determining whether Defendant Sharkey's actions were objectively reasonable."  Response at 9.  That reading of qualified immunity is wrong: the Plaintiffs seek recovery for an alleged Fourth Amendment violation; the relevant body of law for determining whether the alleged Fourth Amendment right was clearly established is Fourth Amendment law.  The Plaintiffs cannot end run qualified immunity by locating a state statute, asserting that J.P. had clearly established rights under that statute, asserting that Sharkey violated that right, importing that right into Fourth Amendment law, and stating that, therefore, Sharkey violated clearly established Fourth Amendment law and is not entitled to qualified immunity.  It is true, of course, that state law is not wholly irrelevant in all Fourth Amendment cases.  See United States v. Mikulski, 317 F.3d at 1232 ("'[T]he question of

compliance with state law may well be relevant in determining whether police conduct was reasonable for Fourth Amendment purposes.'" (quoting United States v. Baker, 16 F.3d at 856 n.1)).  That said, an "officer['s] violation of state law is not, without more, necessarily a federal constitutional violation."   United States v. Mikulski,   317 F.3d at 1232.  It is simply a non sequitur to, as the Plaintiffs suggest, equate every "clearly established" statutory right with a "clearly established" Fourth Amendment right.[104]

_____

[104]Although the Plaintiffs do not raise this argument in the Response, in the Response to MSJ No. 1, they suggest that the Fourth Amendment imposes upon Sharkey a duty to investigate. See Response to MSJ No. 1 at 21 (citing, e.g., Baptiste v. J.C. Penny Co., 147 F.3d 1252 (10th Cir. 1998)).  The failure-to-investigate cases are inapposite: in the archetypical failure-to-investigate case, police officers ignore readily available exculpatory evidence, instead relying on evidence that is speculative or otherwise not "reasonably trustworthy," in light of the totality of the circumstances.  Baptiste v. J.C. Penny Co., 147 F.3d at 1258-59 (collecting cases).  First, Sharkey watched J.P. kick Gonzales; together with witness reports and his observations of injuries at the scene, that eyewitness information gave him enough information to conclude that, based on the totality of the circumstances, despite any emotional or behavioral limitations she had, she had purposely kicked Gonzales.  Second, even if Sharkey could have investigated, nothing that Sharkey could have found out would have indicated that J.P. had a disability that renders her incapable of purposely acting: no such exculpatory information existed at that time, because she had not been diagnosed with any particular disorder that would render her incapable of purposely acting, and even the information that exists now does not show that she lacked the capacity to purposely act.  Accordingly, even taking into account the duty-to-investigate cases, Sharkey had probable cause to believe J.P. had committed a delinquent act and did not violate the Fourth Amendment.  Further, in the alternative, the Court concludes, Sharkey did not violate any clearly established Fourth Amendment law.

Further, in the Response to MSJ No. 1, the Plaintiffs note that, under the common-law infancy defense, a child of J.P.'s age was presumed to be incapable of committing the crime.  See Response to MSJ No. 1 at 16.  As the Supreme Court of New Mexico described it:

The infancy defense required the prosecution to prove that when a child subject to the rebuttable presumption committed the alleged offense, the child "manifested a consciousness of guilt, and a discretion to discern between good and evil." 4 William Blackstone, Commentaries on the Laws of England 23-24 (1769) . . . . The State had to prove the child's criminal capacity to the jury beyond a reasonable doubt.   See Commonwealth v. Mead, 92 Mass. 398, 399 (1865) ("[T]he question whether, in committing an offence, such child in fact acted with intelligence and capacity, and an understanding of the unlawful character of the

What is more, the Plaintiffs have not pointed to any state law that Sharkey violated.  The

Plaintiffs first cite this statement from the "[p]urpose of act" portion of the Delinquency Act:

> The purpose of the Delinquency Act is:
>
> A. consistent with the protection of the public interest, to remove from children committing delinquent acts the adult consequences of criminal behavior, but to still hold children committing delinquent acts accountable for their actions to the extent of the child's age, education, mental and physical condition, background and all other relevant factors, and to provide a program of supervision, care and rehabilitation, including rehabilitative restitution by the child to the victims of the child's delinquent act to the extent that the child is reasonably able to do so[.]

N.M. Stat. Ann. § 32A-2-2(A).  The Plaintiffs ask the Court to conclude that Sharkey violated

this statement of purpose, because "[h]andcuffing J.P. was an adult consequence to her alleged

crime, not a child's consequence."  Response at 10.  First, the argument begs the question: the

very thing disputed is whether handcuffing was an appropriate consequence for J.P., or a

consequence that only adults should endure.    Second, the Plaintiffs' quote of this statute is

selective: they begin the quote at the words "to remove from children committing delinquent acts

the adult consequences of criminal behavior," Response at 9 (quoting N.M. Stat. Ann. § 32A-2-

2(A)), omitting the qualifying introductory phrase "consistent with the protection of the public

interest," N.M. Stat. Ann. § 32A-2-2(A) (emphasis added).   It is not consistent with the

---

act charged, is to be determined by the jury upon the evidence, and in view of all the circumstances attending the alleged criminal transaction.").

State v. Rudy B., 2010-NMSC-49, ¶ 49, 149 N.M. 22, 243 P.3d 726.  There are two problems with the Plaintiffs' argument.  First, the common-law infancy defense was, by its terms, a prosecution-stage presumption and not an arrest-stage presumption.   Second, even if this common-law infancy defense applied to Sharkey, J.P. manifested a consciousness of guilt and a discretion to discern between good and evil: when she saw Sharkey, she stopped fighting, slinked away from him, hid in a corner, held her hands to resist handcuffing, and cried.  Her actions upon a law enforcement authority's arrival tend to show that she felt guilty and that she knew what she did was wrong.

protection of the public interest to immunize children from all consequences of criminal behavior that adults might also endure.  Third, the Plaintiffs' broad reading of the statement of purpose makes no sense, given that the body of the act imposes penalties a version of which adults also endure.  To pick just two: (i) it explains that "[a] child may be taken into custody . . . <u>pursuant to the laws of arrest for commission of a delinquent act</u>," N.M. Stat. Ann. 32A-2-2(A) -- adults are taken into custody, too; and (ii) it provides for detention of children, <u>see</u> N.M. Stat. Ann. § 32A-2-12 -- adults are detained, too.  Fourth, and probably most important, such broadly worded statements of purpose, although relevant for determining legislative intent, do not create legal rights and liabilities of their own force.  The Plaintiffs' attempt to turn this legislative throat clearing into a concrete right that Sharkey violated fails on its own terms -- as does their attempt to turn that concrete right into clearly established Fourth Amendment law.

The Plaintiffs' argument under the Children's Mental Health and Developmental Disabilities Act also fails, but for a different reason.  The Plaintiffs quote the following two sentences: "Restraint and seclusion as provided for in this section is not considered treatment.  It is an emergency intervention to be used only until the emergency ceases."  N.M. Stat. Ann. § 32A-6A-9.  The Plaintiffs ask the Court to conclude that these sentences prohibit "Sharkey from using handcuffs, or otherwise restraining, children like J.P. unless there is an emergency." Response at 11.  The Plaintiffs skipped over six words in that quote: "as provided for in this section."  N.M. Stat. Ann. § 32A-6A-9.  The statute's "[r]ights related to treatment and habilitation" "apply to a child who is physically present <u>and receiving treatment or habilitation services in New Mexico</u>."  N.M. Stat. Ann. at 32A-6A-6.  J.P. is not such a child.[105]  Further, the

_____

[105]Under the statute,  "'treatment' means provision of behavioral health services based on

- 181 -

next subsection of the statute details the "[r]estraint and seclusion" of which the quoted language

speaks, see N.M. Stat. Ann. § 62A-6A-10, and the context of which that subsection speaks is the

mental-health-treatment context and not the criminal-justice context.  Sharkey did not restrain or

seclude J.P. under that subsection as a treatment method; he "restrained" her, in the common

sense of the term, using handcuffs because she had recently committed a violent act.  The

Children's Mental Health and Developmental Disabilities Act has nothing to say about this event.

        In short, the Plaintiffs' attempted reworking of qualified immunity law fails. First, the

Plaintiffs misunderstand the role of state law in developing clearly established law; the state

statutory sections on which she relies do not alter Fourth Amendment law's contours.  Second,

even if the Plaintiffs could generate clearly established Fourth Amendment law by pointing to

disparate state statutes that Sharkey might have violated, Sharkey did not violate the statutes on

---

evaluation of the child, aimed at assisting the child to prevent, correct or ameliorate a mental
disorder. The purpose of treatment is to enable the child to attain, maintain or regain maximum
functioning."  N.M. Stat. Ann. § 32A-6A-4(DD).  Further,

> "habilitation" means services, including behavioral health services based on
> evaluation of the child, that are aimed at assisting the child to prevent, correct or
> ameliorate a developmental disability. The purpose of habilitation is to enable the
> child to attain, maintain or regain maximum functioning or independence.
> "Habilitation" includes programs of formal, structured education and treatment
> and rehabilitation services.

N.M. Stat. Ann. § 32A-6A-4(K).  Finally,

> "behavioral health services" means a comprehensive array of professional and
> ancillary services for the treatment, habilitation, prevention and identification of
> mental illnesses, behavioral symptoms associated with developmental disabilities,
> substance abuse disorders and trauma spectrum disorders.

N.M. Stat. Ann. § 32A-6A-4(B).  In short, then, the statute describes the mental health treatment
programs available for children in New Mexico.  There is no evidence that J.P. was undergoing
that sort of treatment.

- 182 -

which the Plaintiffs rely.

As the Court has explained, none of the cases or statutes that the Plaintiffs cite are on point; at most, in the aggregate, they stand for the proposition that the state should treat children well. That obvious point is not enough to make it clearly established that an officer who learns that a child -- even a disabled child -- had recently violently attacked a fellow student and her teacher, drawing blood in the latter instance, cannot arrest and handcuff that child. The Court concludes that Sharkey did not violate J.P.'s constitutional right to be free from excessive force.

Further, in the alternative, the Court concludes that Sharkey did not violate any clearly established constitutional right. The Tenth Circuit interprets qualified immunity's clearly established law prong rigorously, indicating that, where "a distinction [between cases] might make a constitutional difference," the law is not clearly established. Kerns v. Bader, 663 at 1187 (emphasis in original). The Plaintiffs have not identified any case similar to this one that reach the result they seek. Accordingly, Sharkey did not violate clearly established law, and is entitled to qualified immunity on the Plaintiffs' Fourth Amendment excessive force claim. Summary judgment is, therefore, appropriate.

## II.    SUMMARY JUDGMENT IS APPROPRIATE AS TO THE ADA CLAIMS.

The Court concludes that summary judgment is appropriate as to each of the Plaintiffs' ADA claims. Although the Court concludes that plaintiffs may bring both a wrongful-arrest claim and a reasonable-accommodation-during-arrest claim under the ADA, the evidence supports neither claim. Further, because there has been no underlying ADA violation, and because there is no evidence of deliberate indifference, the failure-to-train claim must also fail.

Before delving into the evidence for the ADA claims, the Court first will lay out the two

purported ADA claims as they appear in the Complaint.  First, under the label "Violation of ADA

in Criminalizing Disabilities and Suspending Children for Manifestations of Disabilities,"

Complaint at 8 (capitalization and emphasis altered for readability), the Plaintiffs allege as

follows:

> 49.      Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding  paragraphs as if re-alleged fully herein.

> 50.      Section 42 U.S.C. Section12132 of the ADA provides:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity , [sic] or be subject to discrimination by such entity.

> 51.      Defendants owed Plaintiff a duty of care to operate within APS schools in a manner  that secured the rights of their disabled students to a free public education and to be free of unnecessary restraints and to be free of unnecessary transportation of students from public school.

> 52.      Plaintiff suffers from a disability.

> 53.      Defendants through the use of handcuffs, arrests, charges and school suspensions  discriminated against Plaintiff by way of taking law enforcement and criminal prosecution action against Plaintiff due to her disability.

> 54.      Defendant Bernalillo County Commissioners has failed to properly train Defendant Sharkey and others in how to react to behavioral disruption from children with disabilities.  The restraint, arrest and charging of children with disabilities for actions that are not criminal acts or actions that are part of a child's disability violates the ADA.

> 55.      Defendant Sharkey discriminated against Plaintiff by handcuffing, arresting and charging her for activity that is consistent with her disabilities. Bernalillo County has discriminated against children with disabilities by suspending children with disabilities due to the disabilities of the children.

> 56.      The handcuffing, arrest, and charging of children with disabilities for crimes such as disorderly conduct, interference with public education and assault and battery is in violation of  the American with Disabilities Act because it punishes children with disabilities for the manifestation of their disabilities.

Complaint ¶¶ 49-56, at 8-9.   Second, under the label "Lack of Accommodation for Children

with Disabilities," Complaint at 10 (capitalization and emphasis altered for readability), the

Plaintiffs allege:

>     57.     Plaintiff hereby incorporates by reference each of the allegations
> set forth in the preceding paragraphs as if re-alleged fully herein.
>
>     58.     The effect of handcuffing, arrest and charging of crimes on
> children with disabilities is greater than on children who do not suffer from
> disabilities.
>
>     59.     The handcuffing, arrest and charging of children with disabilities
> inflicts greater damage on children with disabilities due to their lack of full
> emotional and cognitive development and their lacking cognitive and emotional
> coping skills.
>
>     60.     Defendant Bernalillo County has failed and refused to develop
> adequate training and policies to accommodate children with disabilities, to
> minimize any contact with law enforcement, to properly implement BIP's without
> the aid or intervention of law enforcement; and to minimize the effect of any
> charges filed against children with disabilities
> .
>     61.     The failure of Defendant to properly accommodate disabled
> children is a violation of the American with Disabilities Act.
>
>     54 [sic].     It is illegal to arrest, detain and charge children for the
> manifestations of their behavioral disability.
>
>     55.     The actions of Defendant proximately caused damages to Plaintiff
> in loss of liberty, embarrassment, humiliation and mental and emotional distress.
>
>     56.     Defendant acted willfully, knowingly and purposefully and/or with
> deliberate indifference to deprive the Plaintiff of her Constitutional Rights.  As a
> result of the nature of Defendant's conduct, plaintiff is entitled to recover punitive
> damages against the individual Defendant.

Complaint ¶¶ 57-56 [sic], at 10.

In light of applicable law, the Complaint is muddled: it refers to facts that are irrelevant

to an ADA claim, and it does not cleanly recite the elements of the Title II claims arising out of

arrests that courts have recognized.  The first claim refers to suspensions -- and that reference does not connect to any factual allegation in the Complaint's body -- and alludes to a right "to a free public education and to be free of unnecessary restraints and to be free of unnecessary transportation of students from public school," Complaint ¶ 51, at 9; whatever the validity of that assertion about educational rights, those are not rights that the ADA, which bars discrimination and benefit deprivation based on disability, protects, at least as against Bernalillo County. Bernalillo County would be the wrong defendant for a claim about school policies and actions: under New Mexico law, it is the local school board that adopts educational policies for a school district and that has the capacity to sue and be sued.  See N.M. Stat. Ann. § 22-5-4(E). The Plaintiffs recognize as much: in their Response, they assert that "Defendant County is not an educational institution, nor are there any statutory administrative procedures for them  to their discrimination claim against Bernalillo County."  Response at 13.  With that statement, the Plaintiffs implicitly recognize that their claim is not truly about education; it is, instead, about discrimination in law enforcement.  In any event, the remainder of the claim focuses entirely on the ADA, and -- in substance, although not in form -- suggests a wrongful arrest claim, see Complaint ¶ 53, at 9; id. ¶ 55, at 9, and a failure-to-train claim, see Complaint ¶ 54, at 9.

The second count is also confusing.  Although it labels itself as a lack-of-accommodation claim, its substance is that Bernalillo County failed to train its employees with respect to wrongful arrest of the disabled and reasonable accommodation during arrest of the disabled. Further, it refers in its last paragraph to "Constitutional rights," Complaint ¶ 56, at 9, while the body of the claim is a statutory claim under the ADA.

Despite that the Complaint does not squarely lay out its facts under the applicable

theories of liability, the Court can extract from it enough information that it can credibly analyze

evidence as it relates to the liability theories that exist. Those claims are: a wrongful-arrest

claim; a failure-to-reasonable-accommodate-during-arrest claim; and a failure-to-train claim.

The Court will address each in turn.

> **A.   THE PLAINTIFFS WERE NOT REQUIRED TO EXHAUST THEIR ADMINISTRATIVE REMEDIES UNDER THE IDEA BEFORE BRINGING THEIR ADA CLAIMS, BECAUSE THEY DO NOT SEEK RELIEF AVAILABLE UNDER THE IDEA.**

Once the claims are properly constituted under applicable law, it is clear that IDEA

exhaustion does not bar them, because the Plaintiffs seek relief that is not available under the

IDEA. The Tenth Circuit has explained IDEA exhaustion as follows:

> The IDEA permits plaintiffs to file a complaint "with respect to <u>any matter relating to</u> . . . the provision of a free appropriate public education." <u>Hayes ex rel. Hayes[ v. Unified Sch. Dist. No. 377</u>, 377 F.2d 809, 813 (10th Cir. 1989)] (<u>citing</u> 20 U.S.C. § 1415(b)(1)(E)) (emphasis and omission in original). Thus, we have held that whenever a plaintiff brings a claim that is "educational in nature" purporting to challenge the provision of educational services by a local school district, the claim is "presumptively redressable" through the IDEA's administrative procedures. <u>See</u> <u>Padilla ex rel. Padilla</u>, 233 F.3d [1268, 1275 (10th Cir. 2000)] (listing cases). This holds true regardless of what statute the plaintiff purports to cite as the basis for the suit. <u>Id.</u>; <u>Hayes ex rel. Hayes</u>, 877 F.2d at 812 ("In other words, when parents choose to file suit under another law that protects the rights of handicapped children -- and the suit could have been filed under the [IDEA] -- they are first required to exhaust the [IDEA's] remedies to the same extent as if the suit had been filed originally under the [IDEA's] provisions.") (internal citation omitted). The benefits of exhaustion fully support this rule, as it allows educational professionals to have the first crack at designing a program to meet a disabled student's specific needs.

<u>Fllenberg v. N.M. Military Inst.</u>, 478 F.3d 1262, 1280 (10th Cir. 2007). It also explained when

this exhaustion is excused:

> Failure to exhaust is excused if the relief plaintiffs seek is not "available" under the IDEA. <u>See</u> 20 U.S.C. § 1415(i)(2); <u>Cudjoe ex rel. Cudjoe[ v. Indep. Sch. Dist. No. 12</u>, 297 F.3d 1058, 1065 (10th Cir. 2002)]. Exhaustion is also not

required if pursuing administrative remedies would be futile or if "an agency has adopted a policy or pursued a practice of generally [sic] applicability that is contrary to the law." Urban ex rel. Urban, 89 F.3d at 724 (citing H.R.Rep. No. 99–296 (1985)).

\* \* \* \*

Relief is available whenever the plaintiff could attain "relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers." Cudjoe ex rel. Cudjoe, 297 F.3d at 1066. The "dispositive question generally is whether the plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies." Padilla ex rel. Padilla, 233 F.3d at 1276.

Ellenberg v. N.M. Military Inst, 478 F3d at 1276.

Although this case arises in an educational setting, the Plaintiffs are not challenging a local school district's provision of educational services, seeking relief that is "educational in nature," Ellenberg v. N.M. Military Inst., 748 F.3d at 1280. They are not suing the local school board -- the entity in New Mexico that adopts education policies for local schools -- for failing to provide the free appropriate public education that the IDEA demands; although the events occurred on a school campus, the events of which the Plaintiffs complain are Sharkey's and Bernalillo County's law enforcement actions. That is, they are suing because they think Sharkey wrongfully arrested J.P. and failed to reasonably accommodate her disability during his arrest, and because they think Bernalillo County has not trained its officers in how to interact with disabled children in an educational setting. No remedy for this violation is available under IDEA, which governs agencies that receive federal dollars under the IDEA. See 20 U.S.C. § 1415.

S.A.S. ex rel. W.S. v. Hibbing Public Schools is not to the contrary.[106] To understand

---

[106]The Plaintiffs evidently read the wrong case: its discussion of S.A.S. ex rel. W.S. v.

why, one must consider the plaintiffs' complaint in that case:

> Plaintiffs allege that by assisting the District defendants [-- that is, "Hibbing Public Schools, the Hibbing Board of Education, the current and former Superintendent of the Hibbing Public Schools, and various other administrators and employees of the School District," 2005 WL 2230415, at *1 --] in meting out excessive discipline and periodically arresting S.A.S., the City defendants [-- that is, "the City of Hibbing, the Chief of Police, and various other employees of the Police Department including the School Liason officers from both the middle school and the high school," 2005 WL 2230415, at *1 -- ] interfered with S.A.S.'s educational rights in violation of the IDEA, section 504 of the Rehabilitation Act, and the ADA. (See, e.g., Complaint at 89 ("The City [and] HPD . . . have intentionally engaged in a pattern and practice of knowing deprivations of plaintiffs' rights under the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act."); Pls.' Mem. Opp. S.J. at 21 ("Defendants are liable for violating his rights under both the ADA and Rehabilitation Act by denying him the benefits of participating in his public education program.").)

S.A.S. ex rel. W.S. v. Hibbing Pub. Schs., 2005 WL 2230415, at *4 (footnote omitted).  That is, the plaintiffs in that case complained "that the City defendants acquiesced and participated in the District defendants' practice of denying special education and related services addressing S.A.S.'s disability by instituting criminal charges against S.A.S. for behavior related to his disability rather than employing measures called for or in line with his individual education plan."  2005 WL 2230415, at *2 (emphasis added).  Regardless whether such a claim would be colorable, it is not a claim present here: in this case, the substance of the Complaint is not that the County Defendants deprived J.P. of special education services, but that Sharkey wrongfully arrested her or failed to accommodate her disability while he arrested her, and that Bernalillo County failed to train him in that regard.  No relief for that violation is available under the ADA.

---

Hibbing Public Schools is entirely off point.  See Response at 14.

- 189 -

Accordingly, IDEA exhaustion does not bar the Plaintiffs' claim.[107]

    **B.**    **FACT ISSUES PRECLUDE SUMMARY JUDGMENT IN THE COUNTY DEFENDANTS' FAVOR WHETHER J.P. IS DISABLED WITHIN THE ADA'S MEANING.**

Although the Court grants the MSJ, it will not grant the MSJ on the basis that J.P. is not disabled.  Given the evidence that J.P. suffers from ADHD and other impairments, that her impairments substantially limit her ability to learn, and that her symptoms extend back to years before the events at issue, there is a genuine issue of material fact whether she was disabled on September 26, 2011.  Accordingly, summary judgment on this basis is inappropriate.

Under Tenth Circuit law, to show that one has an actual disability under the ADA,

> a plaintiff must show that an impairment substantially limits at least one major life activity.  See Bristol v. Bd. of County Comm'rs, 281 F.3d 1148, 1158 (10th Cir.), rev'd in part on other grounds, 312 F.3d 1213 (10th Cir. 2002)(en banc). This definition contains three elements. First, the plaintiff must have a recognized impairment; second, the plaintiff must identify one or more appropriate major life activities; and third, the plaintiff must show that the impairment substantially limits one or more of those activities.  Id. at 1156. The plaintiff "must articulate with precision the impairment alleged and the major life activity affected by that impairment," Poindexter[ v. Atchison, Topeka & Santa Fe Ry., 168 F.3d 1227, 1232 (10th Cir. 1999)], and the court is to analyze only those activities identified by the plaintiff.  Id. at 1231-32.  Whether the plaintiff has an impairment within the meaning of the ADA is a question of law for the court to decide.  See Bristol, 281 F.3d at 1156-57; Poindexter, 168 F.3d at 1230. Whether the conduct affected is a major life activity for purposes of the Act is also a legal question for the court. See Bristol, 281 F.3d at 1157; Poindexter, 168 F.3d at 1230. However, ascertaining whether the impairment substantially limits the major life activity is a factual question for the jury.  See Bristol, 281 F.3d at 1157.

Doebele v. Sprint/United Mgt. Co., 342 F.3d 1117, 1129 (10th Cir. 2003).

There is no substantial dispute as to the first and second elements of the claim.  First,

---

[107]The Court does not rest its decision on the Plaintiffs' contention that they are seeking system-wide relief.  As the County Defendants pointed out, the Plaintiffs' Complaint requests only compensatory damages and not some other form of system-wide relief.  See Complaint at 11-12.

ADHD may, in appropriate circumstances, be a recognized impairment under the ADA.  See Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 155 (1st Cir. 1998)("On the facts of a specific case, a plaintiff diagnosed with ADHD may have a mental impairment within the meaning of the statute.").  Second, the Plaintiffs have identified an appropriate major life activity: learning.  See Doyal v. Okla. Heart, Inc., 213 F.3d 492, 496 (10th Cir. 2000)(listing learning as a major life activity).  The substantial dispute in this case is, as it usually is in ADHD cases under the ADA, whether J.P.'s impairments substantially limit her ability to learn.  See, e.g., Johnson v. Sedgwick Cnty. Sheriff's Dep't, 461 F. App'x 756, 753 (10th Cir. 2012)(stating that ADHD is not a disability under the ADA where the plaintiff "provided no evidence that it substantially limited a major life activity").

The Court concludes that, viewing the evidence in the light most favorable to J.P., a jury could reasonably conclude that she was disabled within the meaning that the ADA gives that term.  It is true that J.P.'s eligibility for a BIP or IEP does not, of its own force, mean that she is disabled under the ADA.  See Ellenberg v. N.M. Military Inst., 572 F.3d at 824.  That argument is not, however, the Plaintiffs': viewing the evidence in the light most favorable to J.P., they have identified a major life activity -- learning -- and have adduced evidence that J.P.'s impairments -- ADHD principally among them -- substantially limit that major life activity.   As the Court explained above:  "J.P. had a history of attention and emotional and behavioral difficulties pre-dating the arrest."  Response ¶ B, at 4 (setting forth this fact).  See King Depo. No. 1 at 11:22-23.  As diagnosed after the event, "J.P. has Attention-Deficit/Hyperactivity Disorder, Combine Type; Mathematics Disorder; Oppositional Defiant Disorder; and Adjustment Disorder with Mixed Anxiety and Depressed Mood."  Response ¶ C, at 4 (setting forth unmodified version of this

fact).  See King Depo. No. 2 at 13:20-25.  "J.P.'s Attention-Deficit/Hyperactivity Disorder, Combine Type was onset prior to the incident at issue in this case."  Response ¶ D, at 4 (setting forth this fact).  See King Depo. No. 2 at 23:16-23.  "In an evaluation on September 2, 2008, J.P. was exhibiting 'frequent and high intensity defiant and aggressive behavior.[']"  Response ¶ E, at 4 (setting forth this fact)(quoting Unidentified Report at 5).  "J.P.'s evaluation also documented that J.P. was nervous, disorganized, depressed and aggressive."  Response ¶ F, at 4 (setting forth this fact).  See Unidentified Report at 5.  "On September 9, 2008, J.P. had significant elevations on hyperactivity, aggression, depression, withdrawal, social skills, and functional communications.  J.P. also had clinically significant range on conduct problems, attention problems[,] adaptability and study skills."  Response ¶ G, at 4-5 (setting forth this fact).  See Unidentified Report at 5-6.  These sorts of activities are not, as the County Defendants suggest, "common personality traits such as poor judgment or quick temper [that] are not the symptoms of a mental or psychological disorder."  Sutton v. United Air Lines, Inc., 130 F.3d at 898.  That medical officials had not diagnosed her as having an impairment or disability at the time does not mean she was not, in fact, disabled at the time.

The authority that the County Defendants cite is not to the contrary.  The Seventh Circuit's decisions in Krocka v. City of Chicago and Duda v. Board of Education say only that a medical condition diagnosed by a health professional qualifies as an impairment under the ADA; they do not say that all non-diagnosed conditions do not qualify as impairments under the ADA. See Krocka v. City of Chicago, 203 F.3d at 512; Duda v. Bd. of Educ., 133 F.3d at 1059.  In other words, what Krocka v. City of Chicago identifies as a sufficient condition, the County Defendants try to use as a necessary condition.  That usage is incorrect.  Further, the Sixth

Circuit's decision in Kaltenberger v. Ohio College of Podiatric Medicine stands for the proposition, explained more fully below, that a state entity "was not obligated to provide accommodation until plaintiff had provided a proper diagnosis of ADHD and requested specific accommodation," 162 F.3d at 437 (emphasis added); it does not state that she was not disabled within the ADA's meaning until a medical professional diagnosed her.

The Court suspects that the genesis of this line of argument was, in truth, that the Plaintiffs had not identified J.P.'s impairment at the time the County Defendants drafted their MSJ.  See MSJ at 18 ("Plaintiffs have not even identified the impairment J.P. allegedly had as of September 26, 2011 . . . .   As of September 26, 2011, the most Plaintiffs could demonstrate is that J.P. behaved poorly.   J.P.'s poor behavior is insufficient to establish an impairment for purposes of the ADA.").   The Plaintiffs have now, in their Response, identified J.P.'s impairments -- "Attention-Deficit/Hyperactivity Disorder, Combine Type; Mathematics Disorder; Oppositional Defiant Disorder; and Adjustment Disorder with Mixed Anxiety and Depressed Mood," Response ¶ C, at 4.  Although the County Defendants are entitled to argue to a jury that J.P. did not have a disability that substantially limited her ability to learn on September 26, 2011, because it had not developed at that time, the Plaintiffs have submitted evidence that the symptoms underlying J.P.'s condition extended as far back as 2008.   See Response ¶ 5, at 4-5 ("On September 9, 2008, J.P. had significant elevations on hyperactivity, aggression, depression, withdrawal, social skills, and functional communications.   J.P. also had clinically significant range on conduct problems, attention problems[,] adaptability and study skills.").

There is, therefore, a genuine dispute of material fact whether J.P. was disabled within

the ADA's meaning.  She has an impairment -- ADHD and similar disorders; she has identified an appropriate major life activity -- learning; she has identified evidence that, if believed, would lead a jury to conclude that her impairment substantially limits her ability to learn; and she has identified evidence that, if believed, would lead a jury to conclude that she suffered this disability on September 26, 2011.  Accordingly, summary judgment on the basis that she lacked a disability within the ADA's meaning is inappropriate.

### C.   THE COURT WILL GRANT THE MSJ AS TO ANY CLAIM UNDER TITLE II OF THE ADA AGAINST SHARKEY IN HIS INDIVIDUAL CAPACITY, BECAUSE, AS THE PARTIES AGREE, NO SUCH CLAIM EXISTS.

The Court will grant summary judgment as to any claim under Title II of the ADA against Sharkey in his individual capacity.  As the County Defendants pointed out, see MSJ at 15, there is no such claim under Title II of the ADA.  See Braverman v. New Mexico, 2011 WL 6013587, at *22.  The Plaintiffs implicitly recognize as much, suggesting that they assert any such claim only against Bernalillo County.  See Response at 13.  The Complaint is not, however, entirely clear on this point; it lists Sharkey's acts along with Bernalillo County's acts.  See, e.g., Complaint ¶¶ 49-56, at 9.  Accordingly, to ensure a clean record, the Court will grant summary judgment as to any Title II claim asserted against Sharkey in his individual capacity.

### D.   THERE ARE CLAIMS UNDER THE ADA FOR WRONGFUL ARREST AND FAILURE TO REASONABLY ACCOMMODATE A DISABILITY DURING ARREST.

The Court concludes that it is appropriate to recognize wrongful-arrest and reasonable-accommodation claims under the ADA.  Although the Tenth Circuit has not expressly adopted the claims, the Tenth Circuit has discussed the claims, and no party has argued with any vigor that the theories do not, or should not, exist.  Further, the Court reaches the same conclusion on

its own.

It is useful first to review general background standards regarding Title II. That statue, 42 U.S.C. §§ 12131-12165, commands that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of such services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Tenth Circuit requires that a plaintiff prove three factors to establish a claim under Title II: (i) that he or she is a qualified individual with a disability; (ii) that he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or the public entity otherwise discriminated against the plaintiff; and (iii) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. See Gohier v. Enright, 186 F.3d at 1219 (explaining that this general standard, which tracks the language of the statute, is "plainly correct").

The Court acknowledges a certain awkwardness in referring to arrest as a benefit of a service, program, or activity. Indeed, the Fourth Circuit initially doubted whether arrest could fit into the ADA's language. See Rosen v. Montgomery Cnty. Maryland, 121 F.3d at 157-58. After the Supreme Court of the United States decided Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206 (1998), which holds that Title II covers state prisons, Rosen v. Montgomery Cnty. Maryland is no longer good law on that point: Pennsylvania Department of Corrections v. Yeskey rejected the statutory-awkwardness arguments on which Rosen v. Montgomery County Maryland depended. Indeed, the Fourth Circuit has since discussed both a wrongful-arrest claim and a reasonable-accommodation claim, without mentioning Rosen v. Montgomery County Maryland. See Waller ex rel. Estate of Hunt v. Danville, 556 F.3d at 174.

Further, despite this initial awkwardness, upon close examination, Title II's language covers arrests. The Honorable Yvette Kane, United States District Judge for the United States District Court for the Middle District of Pennsylvania, has placed it within the "excluded from participation in or be denied the benefits of such services, programs or activities of a public entity" language:

> Although to the lay reader [the ADA's] language may suggest only commonly available and publicly shared accommodations such as parks, playgrounds, and transportation, the Act in no way limits the terms "services, programs, or activities," and appears to include all core functions of government. Among the most basic of these functions is the lawful exercise of police powers, including the appropriate use of force by government officials acting under color of law.

Schorr v. Borough of Lemoyne, 243 F. Supp. 2d 232, 235 (M.D. Penn. 2003). To elaborate, (i) being arrested only for crimes -- and not for manifestations of disabilities -- and (ii) being arrested in a manner that one's disability does not make more painful or humiliating than typical arrests are both, in at least a broad sense of the word, benefits of government activities.

Although this construction is not an implausible theory of how wrongful-arrest claims fit under the statute, the Court concludes that the theories more naturally fit under the "no qualified individual with a disability shall, by reason of such disability . . . be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Wrongful arrest and failing to reasonably accommodate a disability during arrest seem to fit more comfortably into the catchall anti-discriminatory clause in the end of the sentence. Indeed, the Tenth Circuit has recognized that arrests need not be shoehorned into that language. See Gohier v. Enright, 186 F.3d at 1220 (implicitly endorsing reading "or be subjected to discrimination by" as encompassing arrests). Particularly given the well-established principle that courts should interpret antidiscrimination statutes broadly, see, e.g., Trainor v. Apollo Metal Specialties, Inc., 918 F.3d 976, 983 (10th Cir. 2002)("'In our review

- 196 -

of the antidiscrimination laws we must be mindful of their remedial purposes, and liberally interpret their provisions to that end.'" (quoting Wheeler v. Hurdman, 825 F.2d 257, 262 (10th Cir. 1987))); Kelley v. City of Albuquerque, 375 F. Supp. 2d 1183, 1224 (D.N.M. 2004)(Browning, J.)("A statute which is remedial in nature should be liberally construed." (internal quotation marks omitted), the Court concludes that the ADA countenances a version of these theories.

There remains, however, the question what the appropriate standards should be. It is true, one case on which the Tenth Circuit relied suggests that a wrongful-arrest claim under the ADA requires proof of three elements: (i) the plaintiff was disabled; (ii) the arresting officer knew or should have known that the plaintiff was disabled; and (iii) the defendant arrested the plaintiff because of legal conduct related to the plaintiff's disability. See, e.g., Lewis v. Truitt, 960 F. Supp. at 178. Another case on which the Tenth Circuit relied, however, suggests that, if probable cause to arrest is present, a plaintiff has no ADA claim. See Patrice v. Murphy, 43 F. Supp. 2d at 1161 ("[P]laintiff was arrested because she probable cause existed, as discussed more fully below, not because she is disabled. Absent a causal link between plaintiff's disability and the injury of which she complains (her arrest), there can be no claim under § 12132."). The Tenth Circuit declined to address the propriety of any of these tests, specifically noting that "[i]t remains an open question in this circuit whether to adopt either or both the wrongful-arrest theory of Lewis and Jackson and the reasonable-accommodation-during-arrest-theory of Gorman[ v. Bartch]." 186 F.3d at 1221.

The Court concludes that, on balance, the probable-cause standard is the appropriate standard for ADA wrongful arrest claims. The Court begins with the statute's language: "no

qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of such services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Under either the excluded-from-a-benefit language or the subjected-to-discrimination language, the proper standard for the wrongful-arrest theory is probable cause.  The "service" of which a citizen enjoys a "benefit" is "the lawful exercise of police powers, including the appropriate use of force by government officials acting under color of law."  Schorr v. Borough of Lemoyne, 243 F. Supp. 2d at 235.  To say that an officer has lawfully exercised an arrest power is to say that the officer will exercise that power only when he has probable cause to arrest the citizen; the "benefit" that a citizen derives from the appropriate use of force in the arrest context is that police will arrest the citizen based only on probable cause to believe that the citizen committed a criminal offense.  Under the subjected-to-discrimination theory, the logic is even clearer.  The baseline against which "discrimination" is measured is the right that all citizens enjoy: the right to be arrested only based on probable cause.

To say that the proper standard is whether the police officer has probable cause to arrest is not to render the disability irrelevant.  The probable cause inquiry depends on "facts known to the arresting officer at the time of the arrest."  Buck v. City of Albuquerque, 549 F.3d at 1281.  If the facts known to the officer include information about an individual's disability -- and particularly if the information known to the officer about an individual's disability would exculpate the defendant -- those facts inform the probable cause calculus.

To be clear, this standard leaves the ADA's wrongful arrest claim with meaningful work to do.  Constitutional litigation against individuals imposes barriers to recovering damages and

achieving systemic change that claims under the Title II of the ADA against public entities do not.  In other words, the ADA creates different sorts of remedies than might be available in a constitutional case.

This approach accords with persuasive case law.  In <u>Bates ex rel Johns v. Chesterfield County, Va.</u>, Chief Judge J. Harvie Wilkinson of the Fourth Circuit rejected an ADA wrongful-arrest claim, explaining:

> Bates . . . contends that the defendants violated the Americans with Disabilities Act.  <u>See</u> 42 U.S.C. §§ 12132, 12134 (1994).  Section 12132 provides, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." <u>Id.</u> § 12132.  Bates alleges that his "unjustified detainment and abuse" constituted discrimination against him by reason of his disability.  Specifically, Bates contends that the officers should have been aware of his autism throughout the September 28 incident and should have taken this condition into account when interacting with him.  Bates argues that if they had, he would not have been detained or arrested and the ensuing scuffle would not have occurred.
>
> We need not undertake an independent ADA inquiry in this case because our Fourth Amendment scrutiny has already accounted for all the situation's circumstances.  For in evaluating the validity of an investigatory stop, a court must consider " 'the totality of the circumstances-- the whole picture.'" <u>Sokolow,</u> 490 U.S. at 8 . . . (quoting <u>United States v. Cortez,</u> 449 U.S. 411, 417 . . . (1981)).  And in examining a claim of excessive force, a court must ask whether the officers' conduct was " 'objectively reasonable' in light of the facts and circumstances confronting them." <u>Graham,</u> 490 U.S. at 397 . . . .  Just like any other relevant personal characteristic -- height, strength, aggressiveness -- a detainee's known or evident disability is part of the Fourth Amendment circumstantial calculus.
>
> Here, we have concluded that under all the circumstances the officers' actions were objectively reasonable.  Officer Genova had a reasonable, articulable suspicion that criminal activity was afoot when he conducted his initial investigatory stop.  <u>See</u> <u>Terry,</u> 392 U.S. at 30-31 . . . .  The officers' use of force against Bates was also objectively reasonable -- both the force used before the officers were aware or should have been aware of Bates' autism and the force used after they were notified of the disability.  <u>See</u> <u>Graham,</u> 490 U.S. at 396-99 . . . .  And Bates was not arrested because of his disability.  Rather, he was

arrested because there was probable cause to believe that he assaulted a police officer. Thus the stop, the use of force, and the arrest of Bates were not by reason of Bates' disability, but because of Bates' objectively verifiable misconduct. Such reasonable police behavior is not discrimination. As a result, there has been no ADA violation.

Bates ex rel. Johns v. Chesterfield Cnty., Va., 216 F.3d at 373. See Bircoll v. Miami-Dade Cnty., 410 F. Supp. 2d 1280, 1285 (S.D. Fl. 2006)("To have a cause of action for discrimination under the ADA, there must be a causal link between a plaintiff's disability and the wrongful arrest; i.e., no other probable cause for the arrest exists."); Sperry v. Maes, 2013 WL 3465784, at *6 (granting summary judgment on a false-arrest claim because a plaintiff had not presented facts that would allow a reasonable juror to find that police officers "denied him the Town's services, programs, or activities, or discriminated against him because of his mental illness. Rather, the record clearly shows that Defendants investigated his conduct and arrested him because there was probable cause to believe that he had committed debit card fraud."); Patrice v. Murphy, 43 F. Supp. 2d at 1161 ("[P]laintiff was arrested because she probable cause existed, as discussed more fully below, not because she is disabled. Absent a causal link between plaintiff's disability and the injury of which she complains (her arrest), there can be no claim under § 12132.").

Finally, the probable-cause standard has important practical benefits. First, police officers know and understand -- or, at least, should know and understand -- the probable cause standard. A different, heightened standard would significantly burden law enforcement vis-à-vis the disabled. Second, a heightened standard would afford disabled individuals a greater protection against the unlawful exertion of arrest power than nondisabled individuals enjoy -- and the ADA is an antidiscrimination statute intended "to level the playing field," Murphy v.

United Parcel Service, Inc., 946 F Supp. 872, 877 (D. Kan. 1996)(Crow, J.), and not to create rights that other citizens do not enjoy.   Third, courts are familiar with the probable cause standard, which makes the standard relatively administrable.   Accordingly, the Court concludes that if a police officer has probable cause to arrest a disabled person, the disabled person does not have an ADA claim against the police officer.

The Court agrees with the existing reasonable-accommodation-during-arrest theory, which provides that, "while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." Gohier v. Enright, 186 F.3d at 1220.   That claim fits within the "subjected to discrimination" language.   Accordingly, in an appropriate case, the Court would apply the reasonable-accommodation-during-arrest theory as it exists.

### E.   SHARKEY DID NOT WRONGFULLY ARREST J.P. WITHIN THE ADA'S MEANING.

The Court concludes that summary judgment is appropriate as to the wrongful-arrest claim.   First, the Court concludes that, under the proper, no-probable-cause standard, Sharkey had probable cause to arrest J.P.; therefore, J.P. has no wrongful-arrest claim.   Even under the more generous standard, a wrongful-arrest claim under the ADA requires proof of three elements: (i) the plaintiff was disabled; (ii) the arresting officer knew or should have known that the plaintiff was disabled; and (iii) the defendant arrested the plaintiff because of legal conduct related to the plaintiff's disability as the ADA defines that term.   See, e.g., Lewis v. Truitt, 960 F. Supp. at 178.    The Plaintiffs' claim fails on elements (ii) and (iii).   Sharkey did not know or have reason to know that J.P. was disabled within the ADA's meaning.   Further, even

if he did know or have reason to know of J.P.'s disability, J.P.'s conduct was not lawful.

As the Court has already explained, Sharkey had probable cause to arrest J.P.  The Court need not repeat that analysis here.  The Court will, however, for the parties' benefit, also analyze the issue under the three-part standard that other courts have applied.

The Court has found undisputed that Sharkey did not know or have reason to know that J.P. was disabled within the ADA's definition of that term, much less that J.P.'s disability rendered her incapable of purposely acting.  The Plaintiffs ask the Court infer to the contrary, so the Court will, once again, lay out its reasons for rejecting this inference.  As the Court has explained, there is no evidence that J.P.'s disability or limitations rendered her incapable of purposely acting.  Even if there were such evidence, Sharkey's knowledge of that condition is another matter: the evidence on which the Plaintiffs base the inference they seek is largely off-point, making the inference speculative.  No reasonable jury could leap from the information that Sharkey had to the conclusion that the Plaintiffs seek.  First, the Plaintiffs point to the underlined portion of the following testimony:

> Q.     Does it not interfere with the educational process when a student talks out of turn?
>
> A.     I can't answer that, because I would have -- if you gave me a specific, if you gave me a specific, if you give me a police report or something like that.  Just a broad, "Oh, no, I wouldn't do that," I take into consideration -- because unfortunately I get to know my students, and sometimes I'll see what their struggles are.
>
> Q.     Right.
>
> A.     And I could see where they would do it if it's a chronic issue, it's a chronic problem, where it's a constant disruption that this student is creating over and over and over with different classes, or specifically where the student would be bullying the teacher, then I could see using logic and reason and incidents and past history and that type of thing where a deputy or a cop or officer would write

it up and charge him.

Plaintiffs' Sharkey Depo. at 33:24-34:15 (emphasis added).   It requires an unreasonable inference to leap from that general aside about getting to know his students and, sometimes, seeing their struggles to knowledge that J.P. was disabled within the ADA's definition of that term -- much less that her disability or limitation rendered her incapable of purposely acting, which would have exculpated her.

Second, the Plaintiffs point out that Sharkey knew J.P. was in a special education classroom.  That much is true, and it is fair to say that, from that fact, he could have inferred that she had some educational or behavioral limitations.  It is, however, too much of a leap from "J.P. is in a special education class" to "J.P. is disabled within the ADA's definition of that term" -- let alone to "J.P. is a disabled within the ADA's definition of that term, and her disability renders her incapable of purposely acting."

Third, the Plaintiffs point to this answer from Sharkey's deposition:

> A.      When [J.P.] had been in elementary school, there was an incident where I was summoned over to the elementary school, and when I went over to the classroom that she was in and she was acting out, it had -- things had deescalated, and so everything was -- I had just stepped back and things were relatively normal, routine.  And her mom and her boyfriend arrived on scene, and mom was of the opinion of, "You can't do this.  You can't even be here;" that there's a plan, and they have to handle the plan, and it was unpleasant, and it was also unpleasant with her boyfriend who is a tall guy.

Sharkey Depo. Vol. III at 75:4-14.  As the Court explained earlier, in context, the most of which Sharkey was aware is that there was, when J.P. was in elementary school, "a plan" -- not expressly a BIP or an EIP, but "a plan" -- that, in J.H.'s view, barred his presence.  Reading the evidence in the light most favorable to J.P., one could view this statement as indicating that Sharkey knew or should have known that, when J.P. was in elementary school -- years before the

events underlying this lawsuit -- she had a BIP and an IEP.  It would not, however, lead a reasonable jury to conclude to conclude that Sharkey knew or should have known that this BIP and IEP remained in effect when she entered middle school.  Moreover, even if he knew or should have been able to infer that "plan" referred to a BIP or an EIP that remained in effect when she entered middle school, that fact would not give him reason to conclude that J.P. was disabled within the ADA's definition of that term, because BIPs and EIPs do not require the existence of such a disability.  Again, it is fair to conclude that he should have been able to infer from that information that J.P. had some form of educational or behavioral limitations.  It is, however,  too great a leap from "during elementary school, J.P. had 'a plan' that, in her mother's view, bars Sharkey's presence" to "J.P. has a disability in the ADA's definition of that term," let alone to "J.P. has a disability that renders her incapable of purposely acting."

Fourth, and finally, the Plaintiffs ask the Court to find that "Defendant Sharkey was aware of J.P.'s mental disability because he had been told by J.P.'s former principal after his first encounter with J.P. prior to the incident at issue in this case."  Response to MSJ No. 1 ¶ X, at 13. See Deposition of J.H. at 153:25-154:10 (taken July 17, 2013), filed August 16, 2013 (Doc. 103-9)("Plaintiffs' J.H. Depo.").  Sharkey replies:

> Plaintiffs contend that "Deputy Sharkey was aware of J.P.'s mental disability because he had been told by J.P.'s former principal after his first encounter with J.P. prior to the incident at issue in this case." [Response to MSJ No. 1 ¶ X, at 13].  In support of this allegation, Plaintiffs rely on testimony from J.P.'s mother as to what J.P.'s former principal, Ms. Mildren, allegedly said she told Deputy Sharkey.  See [Sharkey's J.H. Depo. Vol. II at 153:7-155:4]. According to J.H., Ms. Mildren said she had a private discussion with Deputy Sharkey and "brought to his attention that in the behavior intervention program that they have a one-two-three-four list they go through first before they call in the school resource officer."  Id.[ at 153:7-17].  J.H. further testified that Ms. Mildren "did state to me that she made him aware that in the case of children who are in the Special Ed setting and especially ones who have IEP BIP, that they

specifically have to follow protocol first and that it states on there that a school resource officer is referred to as last resort." Id.[ at 153:25-154:10]. J.H. was not present at the meeting Ms. Mildren said she had with Deputy Sharkey. Id.[ at 154:11-16]. J.H.'s testimony on this issue is inadmissible hearsay which does not create a genuine dispute and cannot support a plaintiff's opposition to summary judgment. See Fed. R. Civ. P. 56(c)(2); see also Llewellyn, 711 F.3d at 1180. Moreover, there is nothing in J.H.'s deposition testimony which would indicate that Ms. Mildren told Deputy Sharkey that J.P. had a "mental disability." At most, J.H.'s hearsay testimony indicates that Ms. Mildren spoke to Deputy Sharkey generally about the protocol for responding to an incident involving a student's behavioral outburst. A behavioral outburst is certainly different than a "mental disability." In short, a student can have a behavioral outburst without having a mental disability.

Reply to Response to MSJ No. 1 ¶ X, at 12-13. As the Court explained earlier, Sharkey is correct: Mildren has made an out-of-court statement, and the Plaintiffs seek to admit it for the truth of what it asserts -- that Mildren told Sharkey about the role of SROs with respect to special-education students, particularly those with BIPs. Further, even if the testimony were not inadmissible hearsay, it would not give Sharkey any meaningful knowledge about J.P.'s condition -- much less knowledge that would lead him to conclude that, because of her condition, she could not purposely act.

In short, then, although the evidence would allow a reasonable jury to conclude that Sharkey knew or should have known that J.P. suffered from educational or behavioral limitations, the Plaintiffs have not provided admissible evidence that would allow a jury reasonably to find that Sharkey knew or should have known of that J.P. was disabled within the ADA's definition of that term -- or, more to the point, that any disability or limitation that J.P. had deprived her of the capacity to purposely act. The Court is conscious that, at the summary judgment stage, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.

See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (emphasis added)).  Even still, however, for the Court to deny the MSJ, it must conclude that genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  It must also conclude that there is more than a mere "scintilla" of evidence; the Plaintiffs cannot avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  This case presents, at most, a mere scintilla of evidence -- evidence that is merely colorable and is not significantly probative -- that Sharkey knew that J.P. was disabled within the ADA's definition of that term.  Accordingly, the Court concludes that, taking the record as a whole, a rational trier of fact could not find that Sharkey knew or should have known of J.P.'s disability -- or, more significantly, that her disability would render her incapable of forming criminal intent; accordingly, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Further, even if Sharkey knew or should have known of J.P.'s disability, her claim would confront a separate problem: her conduct was not lawful.  For the reasons that the Court has already explained, the Plaintiffs' contrary argument -- that J.P. lacked the capacity to form general intent -- lacks a sound basis either in the law or in the facts.  The Court will not repeat itself here, save to point out that: (i) no evidence supports the notion that J.P. categorically could

not purposely act; (ii) the evidence available supports the contrary inference; and (iii) the fact that charges against her were subsequently dismissed does not, as the Plaintiffs suggest, mean that "J.P. was not convicted of any crime <u>because her actions were not criminal</u>," Response at 23 (emphasis added).

J.P.'s claim is far from the wrongful-arrest claims that courts have recognized.  In the leading cases on which the Tenth Circuit relied in <u>Gohier v. Enright</u>, the police officers knew or had very good reason to know that the subject had a disability that would innocently explain what otherwise appeared to be the *actus reus* of a crime or to strongly indicate that the subject had committed a crime.  In <u>Lewis v. Truitt</u>, other individuals told police officers on the scene that the suspect was deaf and could not, therefore, hear them; despite the others' protests, the officers refused to believe that information or to write questions for him, beat him savagely, and arrested him, because he did not respond to the officers as they wished.  In other words, the officers were told, on scene, that the suspect had a disability -- deafness -- that innocently explained what otherwise appeared to be a crime -- failing to comply with police instructions.  In <u>Jackson v. Inhabitants of Town of Sanford</u>, despite that the suspect explained that a stroke had partially paralyzed him and caused him to slurred his speech, a police officer arrested him for operating under the influence, because of his flawed performance on field sobriety tests -- flaws that his disability explained.  In both cases, someone told officers at the scene that the person suffered a disability that would innocently explain their actions; the police ignored that information and arrested the person anyway.  Those cases differ materially from the facts here: there is no evidence that J.P.'s disability would innocently explain her attacking her teacher and a peer, and there is no evidence that Sharkey knew or should have known of J.P.'s disability, as the ADA

defines that term.

Finally, the Plaintiffs' arguments about statutes other than the ADA are irrelevant, as are arguments about the general policy concerns related to protection of disabled children that those statutes reflect.  It is, of course, true that "the ADA and the IDEA seek to protect disabled children."  Response at 24.  It is not, however, true that, because the IDEA protects children from expulsion or long-term suspension, the ADA must protect children from criminal arrest.  The syllogism follows from a false premise: that overlapping statutes must identically remedy nonidentical harms that nonidentical defendants commit against overlapping-but-nonidentical victims.  Further, although it is true that, in some ways, criminal arrest is "a fundamentally more serious and harmful consequence than suspension," Response at 24, it is also true that criminal activity -- here, battery -- is a fundamentally more serious and harmful act than the sort of misbehavior that would lead to suspension.  Further, IDEA expressly disclaims the notion that its provisions prohibit law enforcement from doing its job:

> Nothing in this subchapter shall be construed to prohibit an agency from reporting a crime committed by a child with a disability to appropriate authorities or to prevent State law enforcement and judicial authorities from exercising their responsibilities with regard to the application of Federal and State law to crimes committed by a child with a disability.

20 U.S.C. § 1415(k)(6)(A).  Accordingly, the Plaintiffs' discussion of <u>Honig v. Doe</u>, 484 U.S. at 306-07, which did not interpret the ADA, and of other federal statutes that protect children is beside the point in considering this ADA claim.

### F.   SHARKEY DID NOT FAIL TO REASONABLY ACCOMMODATE J.P.'S DISABILITY WHILE ARRESTING HER.

The Court further concludes that J.P.'s reasonable-accommodation-during-arrest claim also fails.  The Plaintiffs have not identified any reasonable accommodation that Sharkey failed

to provide which caused J.P. to suffer any greater injury or indignity during the arrest than any non-disabled arrestee would have suffered.  Accordingly, summary judgment is appropriate.

First, the Court notes that, because Sharkey did not know of J.P.'s disability as the ADA defines that term, Sharkey -- and, accordingly, Bernalillo County -- did not fail to reasonably accommodate her disability.  As the Tenth Circuit has explained, "[a] public entity cannot know that a modification to its services under the ADA is necessary if it does not first understand that an individual requires such modification because he is disabled."  Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d 1185, 1196 (10th Cir. 2007)(Tacha, C.J.)(emphasis in original).  In Robertson v. Las Animas County Sheriff's Department, a deaf pretrial detainee sued a sheriff's department, alleging that the department knew that he was deaf but did not reasonably accommodate his deafness leading up to or during his probable cause hearing, because it had not provided him with communication services appropriate for his disability:

> After completing the booking process, a detention officer placed Mr. Robertson in a "pod," a large jail cell containing several individual cells.  The next morning, Mr. Robertson wished to contact his attorney.  The pod contained a telephone, which other inmates could use to place outgoing calls anytime between the hours of 6:30 a.m. and 11:00 p.m.  The phone was of no use to Mr. Robertson, however, because it was not equipped with a teletypewriter ("TTY") or a telecommunication device for the deaf ("TDD").  A sign affixed to the wall of his cell advised that, if an inmate wanted to contact someone, he or she should leave a note in a slot in the cell.  Because the cell did not contain paper or a writing implement Mr. Robertson borrowed some paper and a pencil from another inmate.  He wrote a message stating that he wanted to talk with his attorney and left it in the slot.  The note did not indicate that he could not use the phone, nor did it contain a request for a TTY or a TDD.  No one responded to his note. The cell also contained an intercom system, which permitted an inmate to contact a detention officer in "Master Control."  Mr. Robertson did not attempt to contact anyone through the intercom system, explaining that "[i]f a detention officer spoke back, I wouldn't have heard him, and that detention officer would[,] more likely than not, have ignored the call the same way my note went ignored."

> Several hours after Mr. Robertson left the note in the slot, a detention

officer escorted him from his cell to a room in the detention facility where he was to observe and participate in his probable cause hearing by closed-circuit television.  The officer did not tell Mr. Robertson where they were going and Mr. Robertson did not ask.  Though Mr. Robertson had not spoken with his attorney that day, his attorney was present in the courtroom during the probable cause hearing.  Because Mr. Robertson cannot hear voices projected through mechanical devices, he did not know that he was attending his probable cause hearing, and he could not hear what the judge and his attorney were saying.  He told the detention officer that he could not hear what was going on, but she did nothing about it. Other inmates, who were also present in the room for their probable cause hearings, were able to hear the judge and respond to questions posed to them.  Mr. Robertson does not know whether the judge asked him any questions.  Following the hearing, the court entered an order dismissing the case against Mr. Robertson for lack of probable cause.  No one at the facility told him that his case was dismissed.  He learned of this disposition from his attorney later that day when he was released from custody.

Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1189-90.  He sued, among others, the sheriff's department and the sheriff, alleging that they "violated Title II of the ADA by not providing him with telephone services while he was imprisoned and by not allowing him to participate in his probable cause hearing."  500 F.3d at 1190.  The Tenth Circuit reversed the district court's grant of summary judgment, because there were genuine issues of material fact "as to whether Mr. Robertson is disabled within the meaning of the ADA, whether the detention facility knew of his disability, and whether the detention facility knew an accommodation was necessary to enable him to participate in its services to the same extent as a non-disabled prisoner."  500 F.3d at 1200.  In doing so, the Tenth Circuit explained:

In the context of Title I ADA claims, we have explained that, when an individual's disability is not obvious, the individual must inform its employer of the disability before the employer can be held liable under the ADA for failing to provide a reasonable accommodation.  See, e.g., Smith v. Midland Brake, Inc., 180 F.3d 1154, 1171-72 (10th Cir. 1999)(en banc).  This is a "duty dictated by common sense lest a disabled [individual] keep his disability a secret and sue later for failure to accommodate."  Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1134 (7th Cir. 1996). This duty is no less applicable in the context of Title II claims.  Thus, before a public entity can be required under the ADA to provide an

auxiliary aid necessary to afford an individual an equal opportunity to participate in the entity's services, programs, or activities, the entity must have knowledge that the individual is disabled, either because that disability is obvious or because the individual (or someone else) has informed the entity of the disability.

Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1196.  The Tenth Circuit imposed an

further standard with respect to knowledge of a plaintiff's need for an accommodation:

> Once a public entity has knowledge of an individual's disability, the entity must also have knowledge that an individual requires an accommodation of some kind to participate in or receive the benefits of its services.  In other words, the entity must have knowledge that an individual's disability limits her ability to participate in or receive the benefits of its services.  See Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 164 (5th Cir. 1996)(noting the "ADA requires employers to reasonably accommodate limitations, not disabilities").  This knowledge may derive from an individual's request for an accommodation.  In certain instances, however, this knowledge will follow from the entity's knowledge of the individual's disability and his need for, or attempt to participate in or receive the benefits of, a certain service.  That is, the entity will know of the individual's need for an accommodation because it is "obvious."  See, e.g., Kiman[v. N.H. Dep't of Corr., 451 F.3d 274, 283 (1st Cir. 2006)], 451 F.3d at 283 (noting, in a Title II case that, "the ADA's reasonable accommodation requirement usually does not apply unless triggered by a request," but "sometimes the person's [disability and concomitant] need for an accommodation will be obvious; and in such cases, different rules may apply" (alteration, quotation, and citation omitted)); Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 n. 7 (1st Cir. 2001) (noting, in a Title I case, that a request for an accommodation may not be required when the disabled individual's needs are "obvious"); Duvall v. County of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001)("When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required . . . ." (emphasis added)).  When a disabled individual's need for an accommodation is obvious, the individual's failure to expressly "request" one is not fatal to the ADA claim.  See, e.g., Chisolm v. McManimon, 275 F.3d 315, 330 (3d Cir. 2001)(reversing district court's holding that a request for an accommodation was necessary when the public entity "had knowledge of [plaintiff's] hearing disability but failed to discuss related issues with him").

> Thus, a public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation.

Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1197-98 (footnote omitted).

Although Robertson v. Las Animas County Sheriff's Department was not a reasonable-accommodation-in-arrest case, it was a Title II case, and the Court sees no sound reason to conclude that its knowledge requirement should not extend to this Title II case as well.[108]  The logic behind the requirement applies with equal force: a disabled arrestee, no less than a disabled pretrial detainee, should not be able to keep his disability secret and sue later for a failure to accommodate.  See Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1196 ("This is a 'duty dictated by common sense lest a disabled [individual] keep his disability a secret and sue later for failure to accommodate.'" (quoting Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d at 1134)).  Similarly, the entity must also know that the arrestee requires an accommodation, either because the need is obvious or because the arrestee requests an accommodation.  The alternative would effectively impose a strict-liability regime on police officers who, as far as they knew, were doing nothing more than securing a suspect as usual.

The contours of the reasonable-accommodation-during-arrest claim are somewhat less clear than the wrongful-arrest claim's contours are, but the core of the claim is that, "while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees."  Gohier v. Enright, 186 F.3d at 1220 (emphasis added)(citing, e.g., Gorman v.

---

[108]Given this published Tenth Circuit case -- which no party cited in the briefing -- the parties' squabble regarding whether the County Defendants had fairly characterized cases from outside of the Tenth Circuit is irrelevant.  See, e.g., Response at 18 (criticizing the County Defendants' use of precedent); Reply at 11-13 (replying to criticism).

Bartch, 152 F.3d at 912-13).   The Plaintiffs have not identified a reasonable accommodation that Sharkey should have taken.   The Plaintiffs' theory of what Sharkey should have done has been something of a moving target.   In briefing, they asserted: "Defendant Sharkey should not have handcuffed J.P.; Defendant Sharkey should not have arrested J.P.; and Defendant Sharkey should not have transported J.P. to the detention center.   Sharkey had a multitude of less severe and more appropriate alternatives."   Response at 25.   During the hearing, they instead identified as a proposed accommodation that law enforcement should release the child to her mother and refer the police report to the juvenile probation officer, which would have prevented the harm; and second, they argue, one should call the probation officer ahead of time, because the officer could have told Sharkey that they would not take J.P. in for detention.   See Tr. at 63:5-13 (Kennedy).

The proposed accommodations are not reasonable accommodations.   The requested accommodations -- no handcuffing, no arrest, no transportation to a juvenile detention center, a requirement that law enforcement immediately release the child to the mother and refer a police report to a juvenile probation officer, and a requirement that the police call a probation officer ahead of time rather than transport the child to a detention center -- are in effect requests that Bernalillo County exempt disabled children from the normal consequences of violent delinquent acts; the ADA inflicts no such requirement.

New Mexico's statutory scheme governing child detention is carefully constructed to respect a child's interests.   New Mexico law requires "[a] person taking a child into custody" to, "with all reasonable speed," do one of the following:

> (1) release the child to the child's parent, guardian or custodian or an adult authorized by the child's parent, guardian or custodian and issue verbal counsel or warning as may be appropriate;

(2) release the child to the child's parent, guardian or custodian or an adult authorized to sign on behalf of the child's parent, guardian or custodian upon written promise to bring the child before the court when requested by the court.  If the parent, guardian or custodian or an adult authorized to sign on behalf of the child's parent, guardian or custodian fails, when requested, to bring the child before the court as promised, the court may order the child taken into custody and brought before the court;

(3)  deliver the child to a place of detention as provided in Section 32A-2-12 NMSA 1978;

(4) deliver the child to a medical facility, if available, if the child is believed to be suffering from a serious illness that requires prompt treatment or prompt diagnosis;

(5) deliver the child to an evaluation facility, if available, if the person taking the child into custody has reasonable grounds to believe the child presents a likelihood of serious harm to the child's self or others or is suffering from some other serious mental condition or illness that requires prompt treatment or prompt diagnosis; or

(6) deliver the child to a center or organization that the court or the department recognizes as an alternative to secure detention.

N.M. Stat. Ann. § 32A-2-10(A) (emphasis added).  The subsection to which the underlined subsection refers details which facilities are appropriate for which children.  See N.M. Stat. Ann. 32(A)-2-12.  The requirement that a child be taken in person to a place of detention "with all reasonable speed" serves an important purpose: the child's physical presence better enables CYFD to carry out its statutory duty to determine whether it should detain a child.  New Mexico law provides:

A. Unless ordered by the court pursuant to the provisions of the Delinquency Act, a child taken into custody for an alleged delinquent act shall not be placed in detention unless a detention risk assessment instrument is completed and a determination is made that the child:

(1) poses a substantial risk of harm to himself;

(2) poses a substantial risk of harm to others; or

- 214 -

(3) has demonstrated that he may leave the jurisdiction of the court.

B. The criteria for detention in this section shall govern the decisions of all persons responsible for determining whether detention is appropriate prior to a detention hearing, based upon review of the detention risk assessment instrument.

C. The department shall develop and implement a detention risk assessment instrument. The department shall collect and analyze data regarding the application of the detention risk assessment instrument. On January 1, 2004, the department shall provide the legislature with a written report with respect to its collection and analysis of data regarding the application of the detention risk assessment instrument.

N.M. Stat. Ann. § 32A-2-11.  It is difficult to imagine how, absent knowledge that a child has a

known mental health issue and would not, therefore, be appropriate for a given detention facility,

a CYFD probation officer could competently carry out his or her duties to look out for the child's

safety and others' safety based only on information gleaned from a telephone conversation with a

police officer.[109]

---

[109]The Court confines its observations about a CYFD probation officer's responsibilities to situations where, as here, the officer does not know that the child suffers from a mental health problem.  After the parties completed summary judgment briefing, the Plaintiffs supplemented their Response to MSJ No. 1 with the following exchange between the Plaintiffs' counsel and a CYFD supervisor during her deposition:

Q.     Now, in the last hypothetical Mr. Robles gave you about the eleven-year-old who has been alleged to have battered a teacher and fellow students, assuming that that's true, and assuming there are mental health issues with this child, could that, in that situation in 2011, that officer had the ability to call the detention center before transportation to do a risk assessment; is that fair?

A.     Yes.

Q.     And as far as your knowledge and understanding, the detention facility would have given him a risk assessment score over the telephone?

A.     Yes.

Q.      They wouldn't have said, "No, you have to bring her down here."

A.      Right.

Q.      And if she is a child who has a significant history of mental health issues and a behavioral intervention plan and individualized education plan, are there facilities or are there alternatives for the child rather than taking her to detention?

A.      Yes.  And it's very much like the not hypothetical but real case I mentioned where the family is actually at our office before law enforcement gets there with the child.  So it happens.

Q.      And the child has a known mental health issue?

A.      Yes.

Q.      But is repeatedly taken to the detention center?

A.      Yes.

Q.      And there's really no need for that; is that fair?

A.      Correct.

Q.      And when I say no need for that, no government need for that in terms of what you do and how you do your job?

A.      Correct.  There's no benefit to it.

Q.      Right.  I think Mr. Robles put it in terms of less efficient, but to clarify, it's less efficient to take her to the detention center in the situations that we described as hypothetical, but it also doesn't serve any purpose --

A.      Correct.

Q.      -- as far as the government, as far as your position is concerned?

A.      Right.  I would also argue that the time that it would take for the officer to transport the child to the detention center is now time that particular school is left less protected or less --

Q.      Have you talked about that with officers in the schools?

- 216 -

In essence, the Plaintiffs want New Mexico to restructure its juvenile justice system and create a separate track for children with certain educational or behavioral limitations -- a track that allows CYFD probation officers to shortcut their statutory obligations to the public and to the child based only on a police officer's telephone call, even where the police officer does not know that the child has a serious mental health issue. Ultimately, that system would not serve the child -- because the child would not be able to present her side of the story, at least not without a police officer holding a telephone to her ear -- or the public -- because a telephone call might not deliver information whether a child substantially risks harm to others that would have been obvious in person. The ADA requires reasonable accommodation and not wholesale restructuring of a juvenile justice system as respectful of children's interests as New Mexico's.

It is noteworthy that nothing about Sharkey's arrest of J.P. was out of the ordinary, save that he, viewing the facts in the light most favorable to the Plaintiffs, arrested a disabled juvenile,

---

A.      Yes.

Q.      And they seem to be responsive to that idea?

A.      Very.

Deposition of Jeannie Masterson at 96:2-98:11 (taken June 10, 2013), filed September 6, 2013 (Doc. 125). The Plaintiffs did not discuss how this testimony figures into the ADA analysis; the Court is largely on its own in interpreting the testimony's significance. In any event, the Court's discussion of how a CYFD probation officer carries out his or her duties depends on the fact that the arresting police officer does not, as the hypothetical in the deposition discusses, know that the child suffers from a mental health issue and tell the CYFD probation officer that information. That situation would call for a different procedure: indeed, under the statute, if a person takes a child into custody and "has reasonable grounds to believe the child presents a likelihood of serious harm to the child's self or others or is suffering from some other serious mental condition or illness that requires prompt treatment or prompt diagnosis" may, with "all reasonable speed," "deliver the child to an evaluation facility, if available," as opposed to a place of detention. N.M. Stat. Ann. § 32A-2-10A(6) (emphasis added). Further, here, although Sharkey knew or should have known that J.P. suffered from some form of educational or behavioral limitations, he did not know that she suffered from any "mental health issue."

as the ADA defines that term.  For example: (i) he handcuffed her "gently," Sharkey Aff. ¶ 51, at

5 -- despite the Plaintiffs' contrary suggestion that "it is relatively impossible to 'gently' handcuff

a child, because the act in itself is damaging," Response at 25, it is possible to handcuff a child in

a gentle manner; (ii) he ensured that he double locked the handcuffs to prevent them from

tightening and ensured that there was a thumb-width of space, or approximately one inch,

between the handcuffs and J.P.'s wrist, see Sharkey Aff. ¶ 54, at 5-6; (iii) he calmly explained to

J.P. that he would be walking her out to his patrol car, see Sharkey's Nation Depo. at 50:17-21;

Sharkey Aff. ¶ 56, at 7; and (iv) he escorted J.P. from the class while school was in session in an

effort to avoid embarrassing her in front of her peers or any other individuals who might be

present between passing periods, see Sharkey's Nation Depo. at 51:21-52:7.  The Plaintiffs have

pointed to nothing out of the ordinary about the arrest, protesting only that Sharkey arrested and

handcuffed J.P. and transported her to a juvenile detention center -- as New Mexico law

permits.[110]

---

[110]The parties offered CYFD employees' testimony on the reasonableness of putting an eleven-year-old child in a detention center.  Despite that the Plaintiffs secured one probation officer's testimony that it would not be appropriate for the detention center to detain an eleven-year-old child, the fact remains that New Mexico allocates the decision whether to detain a child to CYFD and not to law enforcement officials.  In fact, as the Court has explained, as soon as Sharkey took J.P. into custody, New Mexico law required Sharkey to, "with all reasonable speed," transport her to one of several locations, including the detention center to which he delivered her.  N.M. Stat. Ann. § 32A-2-10(A).  Given the possibility that J.P. could have posed a substantial risk of harm to others, that one probation officer does not believe it would be appropriate for the detention center to detain an eleven-year-old does not change that statutes authorized Sharkey to deliver J.P. to a detention facility so that CYFD could perform its statutory obligation to decide that question.

The Court also notes that New Mexico law implicitly contemplates that children as young as eleven may be detained.  A New Mexico statute provides:

> A child under the age of eleven shall not be held in detention.  If a child
> under the age of eleven poses a substantial risk of harm to the child's self or

The Court contrasts such ordinary facts to the seminal reasonable-accommodation case,

Gorman v. Bartch.   That case involved officer's transport of a wheelchair-bound man in the

following painful and humiliating circumstances:

> In response to the call officer Neil Becker arrived with a patrol wagon that
> was not equipped with a wheelchair lift or wheelchair restraints.  Gorman told the
> police that the van was not properly equipped for him to ride in it, and that due to
> his use of a urine bag it would be necessary for him to go to the bathroom before
> he was transported.  The officers lifted Gorman from his chair and placed him on

---

others, a peace officer may detain and transport that child for emergency mental
health evaluation and care in accordance with Section 32A-6A-19 NMSA 1978.

N.M. Stat. Ann. § 32A-2-10(C).  Accordingly, it is not the law in New Mexico that children
eleven or older should never be held in detention; instead, New Mexico law reflects the state's
decision that children younger than eleven should not be detained, but that it might be
appropriate, in some circumstances, to detain children eleven or older.

The Court also notes that the Plaintiffs have not produced evidence showing that, because
Sharkey failed to accommodate her disability, J.P. suffered greater injury or indignity in the
process of being arrested than a nondisabled arrestee would have suffered.  Indeed, the primary
source of information about J.P.'s injury is J.H. -- and, although the Court has concluded that
J.H. may testify, in a general sense, about the arrest's effects on J.H., she would not be qualified
to compare J.P. to a nondisabled child and explain why the search would cause J.P. to suffer
greater injury or indignity than a nondisabled child would have suffered.  The day of the hearing,
the Plaintiffs filed, without explanation, additional pages of Dr. King's deposition.   See
Plaintiff's Notice of Filing of Supplemental Exhibit, filed September 6, 2013 (Doc. 125).  As it
relates to this question, the testimony in that portion of the deposition is, at best, speculative: the
only clear medical statements in that excerpt are Dr. King's statement that the arrest did not
cause the diagnoses that Dr. King gave her, and a suggestion that Dr. King could not testify, to a
reasonable degree of medical probability, whether the arrest exacerbated J.P.'s conditions.   See
Deposition of John H. King at 67:17 (taken July 19, 2013), filed September 6, 2013 (Doc. 125-
1).  The Plaintiffs' counsel had to drag Dr. King through a series of leading questions before he
suggested that J.P. suffered any more than a "normal, well-adjusted child" would have.
Doc. 125-1 at 69:8-13.   Moreover, he did not explicitly connect these symptoms to J.P.'s
disabilities.  The Plaintiffs' theory of J.P.'s disability is that her impairments substantially limit
her ability to learn; it is not obvious why a learning disability would cause J.P. to experience
greater injury or indignity in the process of being arrested than a nondisabled arrestee would
have suffered.  Accordingly, the Plaintiffs have failed to produce evidence from which a
reasonable jury could conclude that J.P. suffered any greater injury or indignity than a
nondisabled arrestee would have suffered as a result of any failure by Sharkey to reasonably
accommodate her disability.  Accordingly, summary judgment is appropriate.

a bench inside the van.  Gorman states that they complied with his instructions on how to lift him from his chair, but not with his requests that he be allowed to go to the bathroom prior to transport or that they place the seat cushion from his wheelchair underneath him to help support his legs. Because of his paraplegia Gorman was not independently able to maintain himself upright on the bench, and the police tied him with his belt to a mesh wall behind the bench and also fastened a seatbelt around him.  During the drive to the station the belts came loose, and Gorman fell to the floor.  The fall injured his shoulders and back severely enough to require surgery and also broke his urine bag, leaving him soaked in his own urine.

152 F.2d at 909.  The manner of Sharkey's arrest of J.P. was utterly ordinary; the manner of Gorman's arrest was made humiliating and painful, because the officers did not accommodate his disability.   Further, Gorman's disability was obvious, and he requested only that he be transported in a manner that did not humiliate or injure him.   J.P.'s disability here was far from obvious, and she requested no accommodation at all; the Plaintiffs' complaint now is, in essence, that the juvenile justice system is structurally flawed.  In sum, Gorman v. Bartch is far removed from this case.  The Plaintiffs have not pointed to a reasonable-accommodation case similar to this one, and the Court has not found any.  Accordingly, for all the foregoing reasons, summary judgment is appropriate as to this claim.

### G.   ANY FAILURE-TO-TRAIN CLAIM FAILS, BECAUSE THERE IS NO UNDERLYING ADA VIOLATION, AND BECAUSE THERE IS NO EVIDENCE OF DELIBERATE INDIFFERENCE.

The Court concludes that any failure-to-train claim under the ADA fails.  First, because there is no underlying ADA violation, any failure to train did not cause a violation of the ADA. Second, there is no evidence of deliberate indifference.

Because there is no underlying ADA violation, the failure-to-train claim must also fail. Although the existence and contours of a failure-to-train claim in this context are still emerging, it seems clear that any failure to train must have caused an underlying violation for a failure-to-

train claim to lie.  As the Honorable J. Harvie Wilkinson, United States Circuit Judge for the

Fourth Circuit, explained in a similar case:

> Because we conclude that any duty of reasonable accommodation was met in these circumstances, we do not reach the question of whether the ADA supports a claim for failure to train. While plaintiff attempts to pose training in dealing with those with mental health problems as an "accommodation," it is well-settled that the failure to train must have caused some violation of law for an action against a municipality to lie.

Waller ex rel. Estate of Hunt v. Danville, 556 F.3d at 177 n.3.   See Bates ex rel. Johns v.

Chesterfield County, 216 F. 3d 367, 373 (4th Cir. 2000)(Wilkinson, C.J.)("As the officers did not

discriminate against Bates by reason of his disability, Bates' additional ADA claim that the

County failed to adequately train its officers also fails.").   This rule is not unique to the ADA

context; it mirrors the traditional rule in failure-to-train claims under 42 U.S.C. § 1983.   See

generally City of Canton v. Harris, 489 U.S. 378 (1989). The Court has concluded that Sharkey

did not violate J.P.'s rights under the ADA.  Accordingly, the failure-to-train claim must fail.

The claim also fails for a separate reason: there is no evidence of deliberate indifference.

The Plaintiffs ask for the following relief:

> Plaintiff requests this Court enter Judgment against Defendants in an amount sufficient to compensate J.P. for her damages, for punitive damages against Defendant Sharkey as determined by a jury, for the attorneys' fees and costs of this action, for prejudgment interest and post judgment [sic] interest as provided by law, and for such other and further relief as the Court deems just and proper.

Complaint at 11-12.  Accordingly, the only specific request for relief against Bernalillo County is

for compensatory damages.  The Plaintiffs concede that, to recover compensatory damages under

the ADA, they must prove, at a minimum, that Bernalillo County acted with deliberate

indifference -- that is, they must satisfy the same deliberate indifference standard that applies

under the Rehabilitation Act.  See Response at 29 & n.5.  "'Deliberate indifference requires both

knowledge that a harm to a federally protected right is substantially likely, and a failure to act

upon that . . . likelihood.'" Barber ex rel. Barber v. Colorado Dep't of Revenue, 562 F.3d 1222,

1229 (10th Cir. 2009)(quoting Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1119 (9th Cir.

2001))(applying the Rehabilitation Act's deliberate-indifference standard, which also applies

under the ADA).[111]   The Plaintiffs' sole argument on the deliberate indifference point is as

---

[111]Although the Tenth Circuit has not yet stated as much, the Plaintiffs agree with this principle, citing district court authority from within the Tenth Circuit that reflects the principle. The Honorable Clarence A. Brimmer, United States District Judge for the United States District Court for the District of Wyoming, has cogently analyzed the issue:

> The remedies for a violation of Title II of the ADA and section 504 of the Rehabilitation Act are coextensive with each other and linked to Title VI of the Civil Rights of Act of 1964. 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 2000d–7(a)(2).  Under Title VI, a plaintiff cannot recover compensatory damages unless she proves intentional discrimination.  Alexander v. Sandoval, 532 U.S. 275, 282-83 . . . (2001).
>
> The Tenth Circuit has held that to be entitled to compensatory damages under section 504 of the Rehabilitation Act, a plaintiff must prove the defendant intentionally discriminated against her on the basis of disability.  Powers v. MJB Acquisition Corp., 184 F.3d 1147, 1153 (10th Cir. 1999). The Tenth Circuit explained that "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."  Id.
>
> Compensatory damages are likewise available under Title II of the ADA. 42 U.S.C. § 12133.  However, the Tenth Circuit has never held that Title II of the ADA requires proof of intentional discrimination in order for a plaintiff to be entitled to compensatory damages.  Davoll v. Webb, 194 F.3d 1116, 1142 (10th Cir. 1999)(specifically declining to address the issue); Meyers v. Colo. Dep't of Human Services, No. 02–1054, 2003 WL 1826166, *2 (10th Cir. 2003) (unpublished).
>
> This Court finds that because Title II of the ADA and section 504 of the Rehabilitation Act both require proof that a public entity discriminated against a plaintiff on the basis of her disability, the standard for awarding compensatory damages under both statutes should likewise be the same. Therefore, this Court concludes that to be entitled to compensatory damages under Title II of the ADA,

follows:

> Plaintiffs allege that Defendant County's inadequate training to SROs and the
> absence of any meaningful policies which provide accommodation show
> Defendants deliberate indifference to students in APS who have mental
> disabilities, like J.P.  Defendant Sharkey's deposition illustrates that he still does
> not think that J.P.'s mental condition was relevant to his conduct.  This attitude
> illustrates an ongoing and pervasive indifference to disabled children in school.
> Although discovery is still on[]going on this issue, Plaintiffs' [sic] have already
> alleged sufficient facts to survive summary judgment and intends to supplement
> his response with supplemental material.

Response at 19.  The Plaintiffs have not, however, provided any evidence that Bernalillo County

knew that harm to the disabled population's federally protected rights was substantially likely to

result from its policies, or that it failed to act on that likelihood.   Accordingly, summary

judgment on the failure-to-train claim is appropriate.[112]

**IT IS ORDERED** that on the County Defendants' Motion for Partial Summary Judgment

No. II: Dismissal of Counts II, V and VI of Plaintiffs' Second Amended Complaint, filed July 30,

2013 (Doc. 93), is granted.

---

> a plaintiff must prove the defendant intentionally discriminated against her on the
> basis of disability.  See Delano–Pyle v. Victoria County, Tex., 302 F.3d 567, 574
> (5th Cir. 2002); Duvall v. County of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001).
> The standard for proving intentional discrimination under Title II of the ADA is
> the same deliberate indifference standard employed under the Rehabilitation Act.
> Powers, 184 F.3d at 1153; Delano-Pyle, 302 F.3d at 575; Duvall, 260 F.3d at 1138.

Swenson v. Lincoln County School District No. 2, 260 F. Supp. 2d 1136, 1145 (D. Wyo. 2003).
The Court finds this analysis persuasive.

[112]The Court does not base its decision on the "direct threat" exception in 42 U.S.C.
§ 12182(b)(3).  By its terms, that provision applies to Title III of the ADA, and there is a similar
provision under Title I, see 42 U.S.C. § 1223(b).  Some courts have seen fit to remedy the
anomaly by reading Title II to contain such a provision, see, e.g., Dadian v. Village of Wilmette,
239 F.3d 839, 841 (7th Cir. 2001), and the Department of Justice has promulgated a regulation
applying a similar version of this provision in the Title II context, see 28 C.F.R. § 35.139.  The
Court need not reach the issue in this case, because it decides the case on other bases, but
would be reluctant to read into a statute words that the statute does not contain.

UNITED STATES DISTRICT JUDGE

Counsel:

Joseph P. Kennedy
Shannon L. Kennedy
Kennedy Law Firm
Albuquerque, New Mexico

       *Attorneys for the Plaintiffs*

Luis E. Robles
Marcus J. Rael, Jr.
Frank T. Apodaca
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

-- and --

Terri S. Beach
Miller Stratvert P.A.
Albuquerque, New Mexico

       *Attorneys for Defendants Bernalillo County and J.M. Sharkey*

Jeremy K. Harrison
Megan Muirhead
Modrall Sperling Roehl Harris & Sisk P.A.
Albuquerque, New Mexico

       *Attorneys for Defendants Cee Kaye Nation and Alison Gonzales*