## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

J.H., on behalf of her minor child, J.P.,

       Plaintiffs,

vs.                                                                    No. CIV 12-0128 JB/LAM

BERNALILLO COUNTY, and
J.M. SHARKEY, Bernalillo County Deputy,

       Defendants.

### UNSEALED MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on Defendant J.M. Sharkey's Motion for Partial Summary Judgment No. I: Dismissal of Plaintiffs' Fourth Amendment Illegal Seizure Claim (Count I) Based on Qualified Immunity, filed July 30, 2013 (Doc. 92)("MSJ No. 1"). The Court held a hearing on September 6, 2013. The primary issue is whether the Court should grant summary judgment on the claim of Plaintiffs J.H., on behalf of her minor child, J.P., that Defendant J.M. Sharkey violated the rights of J.P., an eleven-year-old girl, under the Fourth Amendment to the Constitution of the United States of America when he arrested her, handcuffed her, and transported her to the juvenile detention center following an altercation at Roosevelt Elementary School in Bernalillo County, New Mexico. The Court will grant the MSJ No. 1. Sharkey did not violate J.P.'s Fourth Amendment right to be free from unlawful seizure when he arrested her. Given J.P.'s recent attack on a student and on a school employee, Sharkey

---

[1]In its Sealed Memorandum Opinion, filed Nov. 4, 2014 (Doc. 154)("Sealed MO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MO before the Court published a public version of the Sealed MO. See Sealed MO at 1 n.1. The Court gave the parties fourteen calendar days to provide notice of any proposed redactions. See Sealed MO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MO in its unsealed form.

had probable cause to do so.  Sharkey's decision to transport J.P. to the juvenile detention center similarly did not violate any right that the Fourth Amendment secures.  Moreover, even if Sharkey violated J.P.'s Fourth Amendment rights by either arresting her or transporting her to the juvenile detention center, such rights were not clearly established.  Accordingly, Sharkey is entitled to qualified immunity, and the Court will grant summary judgment as to the Plaintiffs' Fourth Amendment unlawful seizure claim.

## **FACTUAL BACKGROUND**

The Court will discuss the factual background in multiple parts.  First, the Court needs to point out several formatting notes.  Throughout their summary judgment briefing, the parties incorporated by reference most of the basic facts from MSJ No. 1, from the Plaintiff's Response to Defendant Sharkey's Motion for Partial Summary Judgment No. I: Plaintiff's Fourth Amendment Illegal Seizure Claim (Count I) Based on Qualified Immunity, filed August 16, 2013 (Doc. 103)("Response to MSJ No. 1"), and from the Reply to Plaintiffs' Response to J.M. Sharkey's Motion for Partial Summary Judgment No. I: Dismissal of Plaintiffs' Fourth Amendment Illegal Seizure Claim (Count I) Based on Qualified Immunity, filed September 3, 2013 (Doc. 115)("Reply to Response to MSJ No. 1").  The Court separated out the facts from the briefing on MSJ No. 1 from the facts in other motions.  The Court has below included only the facts in MSJ No. 1.  Those facts are substantially identical to those that the Court used in its Unsealed Memorandum Opinion, filed July 8, 2014 (Doc. 152), on pages two through fifty-four.

Confusion over the parties' names plagues the briefing.  Sometimes the parties -- including the Plaintiffs -- refer to J.H. on behalf of her minor child J.P. as a singular Plaintiff, see, e.g., Response to MSJ No. 1 at 1 ("Plaintiff, J.H. on behalf of J.P., a minor, hereby responds to" MSJ No. 1), and sometimes the parties refer to J.H. and J.P. as plural Plaintiffs, see, e.g.,

Plaintiffs' Response to Defendants' Motion for Partial Summary Judgment No. II: Dismissal of Counts II, V, and VI of Plaintiffs' Second Amended Complaint at 2, filed August 16, 2013 (Doc. 102)("Plaintiffs hereby respond to Defendants' 'undisputed' numerical material facts."). Given that even the Plaintiffs' briefing does not clearly prefer one name over the other, the Court will refer to J.H., on behalf of her minor child, J.P., in the plural as Plaintiffs, because the caption refers to them in the plural.  Where the Court quotes the briefings, however, it will not change the parties' naming conventions, because changing the parties' naming conventions would confuse rather than enlighten the reader.

The facts proceed in seven parts.  First, the Court provides background on J.P.  Second, the Court discusses Sharkey's background, his training, and his role at Roosevelt Middle School.  Third, the Court discusses the procedure for handling a de-escalation event.  Fourth, the Court discusses the September 26, 2011, events.  Fifth, the Court discusses J.P.'s booking at the Bernalillo County Detention Center.  Sixth, the Court discusses the arrest's effects on J.P.  Seventh, and finally, the Court discusses the charges against J.P., her competency evaluation, and the circumstances surrounding the dropping of her charges.

### 1.    <u>Background on J.P.</u>

"J.P. has qualified as emotionally disturbed since at least 2008."  Response to MSJ No. 1 ¶ A, at 9 (setting forth this fact).  <u>See</u> Unidentified Report at 5-6 (taken July 19, 2013), filed August 16, 2013 (Doc. 103-1)("Unidentified Report").[2] According to John King, Ph. D., who diagnosed J.P. after the incident underlying this case, her present condition is such that

---

[2]Sharkey replies: "Deputy Sharkey does not dispute that J.P. met the eligibility of emotionally disturbed class placement.  That said, it is also undisputed that Deputy Sharkey was unaware of the reason for J.P.'s eligibility to receive special education services."  Reply to Response to MSJ No. 1 ¶ A, at 8 (citation omitted).  D.N.M.LR-Civ. 56.1(b) states:

[s]he doesn't think about the consequences.  And she just kind of reacts, instead of thinks about it.  So if some other child upsets her, instead of being able to step back and think about and analyze the situation, she just reacts right away.  And her reaction is with anger and aggression.

Deposition of John H. King, Ph. D. at 36:25-37:6 (taken July Depo. at 36:25-37:6), filed August 16, 2013 (Doc. 103-1)("King Depo.").  See Neuropsychological Evaluation Report at 1 (dated April 5, 2012), filed September 3, 2013 (Doc. 115-1).[3]

---

The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).   The local rules regarding summary judgment thus require the responding party to "specifically controvert[]" the movant's fact or else the fact is deemed admitted.  D.N.M.LR-Civ. 56.1(b).  Because Sharkey has not specifically controverted the fact, the Court will deem it undisputed.  The Court notes, however, that it has elsewhere disposed of the parties' dispute whether Sharkey knew of J.P.'s condition.

The Court treats this fact as substantially incorporating the following fact that the Plaintiffs added in their Response to MSJ No. 1 ¶ 1, at 3: "J.P. has exhibited the symptoms which led to her arrest since at least 2008."  See Reply to Response to MSJ No. 1 ¶ 1, at 1 (not disputing this fact).

[3]The Plaintiffs ask the Court to find undisputed that

J.P.'s diagnosed emotional disturbance causes her to have issues specifically with controlling her impulses.  "She doesn't think about the consequences.  And she just kind of reacts, instead of thinks about it.  So if some other child upsets her, instead of being able to step back and think about and analyze the situation, she just reacts right away.  And her reaction is with anger and aggression."

Response to MSJ No. 1 ¶ D, at 9 (quoting King Depo. at 36:25-37:6).  Sharkey responds:

Disputed.  Plaintiffs do not support their statement regarding "J.P.'s diagnosed emotional disturbance."   John King's diagnosis of J.P. occurred after the September 26, 2011 incident.  See Neuropsychological Evaluation Report, p. 1 (dated April 5, 2012), attached hereto as Exhibit A.  Therefore, Deputy Sharkey did not have the benefit of Dr. King's evaluation of J.P. which renders the evaluation immaterial.  See Buck v. City of Albuquerque, 549 F.3d 1269, 1281(10th Cir. 2008)(stating that the probable cause inquiry depends upon "facts known to the arresting officer at the time of the arrest"); see also Saucier[ v. Katz,

> J.P. received special education services because "she has the eligibility of
> Emotional Disturbance.  She has difficulty regulating her emotions.  Her mood
> can vary from one minute to the next.  At her best, she can be a very cooperative,
> helpful girl who is a natural leader.  However, she also has had episodes of violent
> verbal and physical acting out towards other students and adults.   More
> commonly, J[.P.] can also shut down and refuse to interact with anyone for hours
> at a time."

MSJ No. 1 ¶ 1, at 4 (setting forth this fact).  See Response to MSJ No. 1 ¶ 1, at 2 (not disputing

this fact); Individualized Education Program at 3, dated October 19, 2010, filed July 30, 2013

(Doc. 91-1)("IEP").

> J.P. "requires specific, direct 1:1 or small group instruction in the area of
> academics and social emotional issues to compensate for social emotional
> deficits.  This instruction cannot be appropriately or adequately addressed in the
> regular education setting because J[.P.] is unable to maintain her emotions in the
> larger group setting and impedes the learning of herself and other[s]."

MSJ No. 1 ¶ 2, at 5 (setting forth this fact).  See Response to MSJ No. 1 ¶ 2, at 3 (not disputing

this fact); IEP at 10.  "J.P.'s IEP team also prepared a [Behavioral Intervention Plan ("BIP")] for

J.P. because she exhibited frequent verbal and physical aggression towards fellow students and

staff, and interventions were needed to redirect her behavior."  MSJ No. 1 ¶ 3, at 5 (setting forth

---

433 U.S. 194, 207 (2008), receded from by Pearson v. Callahan, 555 U.S. 223
(2009)]("Excessive force claims . . . are evaluated for objective reasonableness
based upon the information the officers had when the conduct occurred.").

Reply to Response to MSJ No. 1 ¶ D, at 9 (emphasis in original).  The Court has modified the
proposed fact to reflect that Dr. King diagnosed J.P. only after the events in this lawsuit.
Although the Court agrees that the relevant facts for Fourth Amendment purposes are those that
Sharkey knew at the time he arrested her, the Court includes the fact as useful background
information about J.P.

The Plaintiffs ask the Court to find undisputed that "[n]either J.P. nor J.H. are
malingering or misrepresenting J.P.'s symptoms."  Response to MSJ No. 1 ¶ E, at 9 (citing King
Depo. at 50:19-51:5; 61:14-62:12).  Sharkey argues: "Disputed.  In ruling on Deputy Sharkey's
summary judgment motions, testimony on the issue of whether Plaintiffs are malingering or
misrepresenting J.P.'s symptoms may not be considered by this Court."  Reply to Response to
MSJ No. 1 ¶ E, at 9 (citing, e.g., Seamons v. Snow, 206 F.3d 1021 (10th Cir. 2000)).  The
Plaintiffs' characterizations of their credibility are not properly considered facts for summary
judgment purposes.  The Court will not, therefore, find this fact undisputed.

this fact). <u>See</u> Response to MSJ No. 1 ¶ 3-7, at 3 (not disputing this fact)[4]; Behavior Intervention

Plan (dated March 3, 2011), filed July 30, 2013 (Doc. 92-3)("BIP").   "J.P.'s behavior had

resulted in physical harm to both peers and staff."   MSJ No. 1 ¶ 4, at 5 (setting forth this fact).

<u>See</u> Response to MSJ No. 1 ¶ 3-7, at 3 (not disputing this fact);[5] BIP at 1.

> The BIP indicated that the following is the targeted behavior for J.P.: "J[.P.] will
> frequently lash out at peers and adults in the classroom.   This behavior manifests
> as cussing, throwing objects and furniture with the intent to cause harm, as well as
> physical and verbal aggression to cause harm to peers and/or adults."

---

[4]The Plaintiffs do not dispute this fact, "which appears to be Defendant's [sic] general description of J.P.'s Behavioral Intervention Plan (BIP).   Plaintiff, however, directs the Court to pages 2-3 of [the BIP] where that document states that 'Administration will determine **IF** the need for APS police or other law enforcement is necessary.'"   Response to MSJ No. 1 ¶ 3-7, at 3 (emphasis in original).   Sharkey "does not dispute that this language is contained in the BIP.   It is undisputed, however, that Deputy Sharkey received a call from the administrative office asking him [to] respond to [Allison] Gonzales' classroom."   Reply to Response to MSJ No. 1 ¶¶ 3-7, at 2.   In the end, the Plaintiffs' additional note about the BIP does not specifically controvert the fact.   Accordingly, the Court deems this fact undisputed.

The Plaintiffs ask the Court to find undisputed that "[t]he BIP program is a special education program designed to address emotional, academic, and behavioral needs of students that require more support and structure to allow children to succeed in school."   Response to MSJ No. 1 ¶ B, at 9 (quoting Unidentified Report at 2).   Sharkey responds:

> Disputed.   The [regulations under the Individuals with Disabilities Education Act,
> 20 U.S.C. §§ 1400-82 ("IDEA"),] indicate that "in the case of a child whose
> behavior impedes his or her learning or that of others" the IEP team should
> consider "positive behavioral interventions, strategies, and supports to address
> that behavior."   20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.346(a)(2)(i).
> Plaintiffs' description of a BIP is broader than that contained in the IDEA.

Reply to Response to MSJ No. 1 ¶ B, at 8.   Sharkey is correct that a BIP's legal function is somewhat narrower than the Plaintiffs suggest.   Accordingly, the Court will not find this fact undisputed.

[5]The Court disposed of the parties' sole additional dispute regarding this fact in note 4, <u>supra</u>.

MSJ No. 1 ¶ 5, at 5 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 3-7, at 3 (not disputing this fact);[6] BIP at 1.  "According to her BIP, J.P.'s behavior is a performance deficit, meaning she 'knows how to perform the desired behavior, but does not consistently do so.'" MSJ No. 1 ¶ 6, at 5 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 3-7, at 3 (not disputing this fact);[7] BIP at 1.  "The presumed reason for J.P.'s behavior was 'task/consequence avoidance.'"  MSJ No. 1 ¶ 7, at 5 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 3-7, at 3 (not disputing this fact);[8] BIP at 1.

J.P. was "categorized as emotionally disturbed for IEP purposes" at the time of the incident underlying this case.  MSJ No. 1 ¶ 8 at 6 (setting forth unmodified version of this fact). See Response to MSJ No. 1 ¶ 8, at 3 (not disputing this portion of the fact).[9]

---

[6]The Court disposed of the parties' sole additional dispute regarding this fact in note 4, supra.

[7]The Court disposed of the parties' sole additional dispute regarding this fact in note 4, supra.

[8]The Court disposed of the parties' sole additional dispute regarding this fact in note 4, supra.

[9]The Plaintiffs respond:

> J.P. had been diagnosed as emotionally disturbed at the time of the incident underlying this lawsuit.  Plaintiff disputes the underlying contention that J.P.'s disability was not to be afforded deference based on her diagnosis of emotionally disturbed, as she has exhibited the same symptoms that she was arrested for since 2008.  Furthermore, Plaintiff's status as emotionally disturbed is sufficient to trigger both the Americans with Disabilities Act and the Individuals with Disabilities Education Act, [respectively].  42 U.S.C.A. § 12102(A)(1) (West 2013); 20 U.S.C.A. § 1401(3)(A)(i-ii) (West 2013) . . . .

Response to MSJ No. 1 ¶ 8, at 3.  Sharkey replies, in essence, that the Plaintiffs have conflated J.P.'s eligibility for special education services with a medical diagnosis.  See Reply to Response to MSJ No. 1 ¶ 8, at 2.  They cite cases showing that the two concepts are distinct.  See Reply to Response to MSJ No. 1 ¶ 8, at 2 (citing, e.g., Bowers v. Nat. Collegiate Athletic Ass'n, 563 F. Supp. 2d 508 (D.N.J. 2008)).  In the end, to the extent that the Plaintiffs ask the Court to

According to the BIP, "In the event that J[.P.] physically harms a peer or adult (by direct contact or by throwing an object with the intent to harm)[,] [t]he crisis team will be called.  If necessary, appropriate physical management may be employed by trained personnel to ensure the safety of J[.P.] and/or other persons involved in the crisis situation.  J[.P.]'s Mother will be called.  Administration will determine if the need for APS Police or other law enforcement is necessary."

MSJ No. 1 ¶ 9, at 6 (quoting BIP at 3)(setting forth this fact).  <u>See</u> Response to MSJ No. 1 ¶ 9, at 3 (not disputing this fact).  "The crisis intervention team is comprised of members of Roosevelt Middle School staff 'that have been trained in de-escalation' and 'are called in to any situation where a . . . teacher or staff member needs assistance.'"  MSJ No. 1 ¶ 10, at 6 (quoting Deposition of Cee Kaye Nation at 32:6-11 (taken June 14, 2013), filed July 30, 2013 (Doc. 92-2)("Sharkey's Nation Depo."))(setting forth this fact).  <u>See</u> Response to MSJ No. 1 ¶ 10, at 8 (not disputing this fact).[10]

### 2.   <u>Sharkey's Background and Training; His Role at Roosevelt Middle School</u>.

Prior to becoming a School Resource Officer [("SRO")] Defendant Sharkey was a field training officer for cadets and detectives, a fi[el]d investigator, a firearms instructor, a crisis intervention officer, a special weapons and tactics (SWAT) officer on the entry team, a sniper, a crisis negotiator, a property crimes detective, a narcotics detective, a FBI fugitive and gang task force detective, a civil deputy assigned to serve domestic violence orders and civil summonses, and has been assigned to execute mental health pick-up orders.

Response to MSJ No. 1 ¶ V, at 13.  <u>See</u> Reply to Response to MSJ No. 1 ¶ V-W, at 12 (not disputing this fact); Deposition of John Matthew Sharkey at 12:13-13:5 (taken July 30, 2013), filed August 16, 2013 (Docs. 103-4, 103-5, 103-6, & 103-7 ("Plaintiffs' Sharkey Depo.").

conclude that, as a matter of law, J.P.'s eligibility for special education services is a disability under the ADA, the proposed addition is a legal conclusion and not a fact.  The Court will, if necessary, return to this question in its analysis.

[10]The Plaintiffs state only that they do "not dispute that a crisis intervention team of personnel trained in de-escalation is maintained at Roosevelt Middle School."  Response to MSJ No. 1 ¶ 9, at 3.  To the extent that the Plaintiffs suggest that they do not agree with the remainder of the fact, the Plaintiffs have not specifically controverted the proposed fact.  Accordingly, the Court deems the fact undisputed for purposes of the MSJ.  <u>See</u> D.N.M.LR-Civ. 56.1(b)

"Defendant Sharkey has had the opportunity to interact with several citizens who had mental health challenges throughout the course of his career.  When dealing with citizens dealing with mental health challenges Defendant Sharkey seeks voluntary compliance through de-escalation techniques."  Response to MSJ No. 1 ¶ W, at 13 (citation omitted)(setting forth this fact).  See Reply to Response to MSJ No. 1 ¶ V-W, at 12 (not disputing this fact);[11] Plaintiffs' Sharkey Depo. at 13:13-15; id. at 14:7-12.

---

[11]The Plaintiffs ask the Court to find undisputed that "Defendant Sharkey was aware of J.P.'s mental disability because he had been told by J.P.'s former principal after his first encounter with J.P. prior to the incident at issue in this case."  Response to MSJ No. 1 ¶ X, at 13 (citing Deposition of [J.H.] at 153:25-154:10 (taken July 17, 2013), filed August 16, 2013 (Doc. 103-9)("Plaintiffs' J.H. Depo.")).  Sharkey replies:

> Plaintiffs contend that "Deputy Sharkey was aware of J.P.'s mental disability because he had been told by J.P.'s former principal after his first encounter with J.P. prior to the incident at issue in this case." [Response to MSJ No. 1 ¶ X, at 13].  In support of this allegation, Plaintiffs rely on testimony from J.P.'s mother as to what J.P.'s former principal, Ms. Mildren, allegedly said she told Deputy Sharkey.  See [Deposition of [J.H.] at 153:7-155:4 (taken July 17, 2013), filed August 3, 2013 (Doc. 115-4)("Sharkey's J.H. Depo. Vol. II")].  According to J.H., Ms. Mildren said she had a private discussion with Deputy Sharkey and "brought to his attention that in the behavior intervention program that they have a one-two-three-four list they go through first before they call in the school resource officer."  Id.[ at 153:7-17].  J.H. further testified that Ms. Mildren "did state to me that she made him aware that in the case of children who are in the Special Ed setting and especially ones who have IEP BIP, that they specifically have to follow protocol first and that it states on there that a school resource officer is referred to as last resort."  Id.[ at 153:25-154:10].  J.H. was not present at the meeting Ms. Mildren said she had with Deputy Sharkey.  Id.[ at 154:11-16].  J.H.'s testimony on this issue is inadmissible hearsay which does not create a genuine dispute and cannot support a plaintiff's opposition to summary judgment.  See Fed. R. Civ. P. 56(c)(2); see also Llewellyn[ v. Allstate Home Loans, Inc., 711 F.3d 1173, 1180 (10th Cir. 2013)].  Moreover, there is nothing in J.H.'s deposition testimony which would indicate that Ms. Mildren told Deputy Sharkey that J.P. had a "mental disability."  At most, J.H.'s hearsay testimony indicates that Ms. Mildren spoke to Deputy Sharkey generally about the protocol for responding to an incident involving a student's behavioral outburst.  A behavioral outburst is certainly different than a "mental disability."  In short, a student can have a behavioral outburst without having a mental disability.

"Defendant Sharkey became a School Resource Officer because he wanted a 'constructive, positive' assignment where he could help people rather than targeting certain crimes."  Response to MSJ No. 1 ¶ M, at 11 (quoting Plaintiffs' Sharkey Depo. at 12:1-9) (setting forth this fact).  See Reply to Response to MSJ No. 1 ¶ M, at 10-11 (not disputing this fact); Plaintiffs' Sharkey Depo. at 19:10-20:2.  Sharkey's purpose is to keep his students safe and not to arrest his students; even so, on occasion, he gets involved in criminal investigations -- for example, when the Children, Youth, and Families Department of the State of New Mexico ("CYFD") contacts him, or when he must deal with those who commit drug offenses or violent crimes -- and he arrests students, particularly when an offense involves battery on students or staff, or a drug offense.  See Response to MSJ No. 1 ¶ M, at 11 (setting forth this fact).  See also Plaintiffs' Sharkey Depo. at 19:10-20:2; id. at 28:1-5; Deposition of John Sharkey at 20:12-21:12 (taken July 30, 2013), filed September 3, 2013 (Doc. 115-3).[12]  "In pursuance of this goal,

_____

Reply to Response to MSJ No. 1 ¶ X, at 12-13.  Sharkey is correct: Mildren has made an out-of-court statement, and the Plaintiffs seek to admit it for the truth of what it asserts -- that Mildren told Sharkey about the role of SROs with respect to special-education students, particularly those with BIPs.  Further, even if the testimony were not inadmissible hearsay, it would not give Sharkey any reason to conclude that J.P. was disabled within the ADA's meaning -- much less knowledge that would lead him to conclude that, because of any such disability, she could not form general intent to commit crimes, as the Plaintiffs allege.  Accordingly, the Court has not found this fact undisputed.

[12]The Plaintiffs ask the Court to find undisputed that

Defendant Sharkey tries to get to know his students and has the opportunity to see what their struggles are.  [Plaintiffs' Sharkey Depo. at] 34:4-15.  Defendant Sharkey became a School Resource Officer because he wanted to have a "constructive, positive" assignment where he could help people rather than targeting certain crimes. [Plaintiffs' Sharkey Depo. at] 12:1-9; 19:10-20:2.  Defendant Sharkey's admitted purpose is not to arrest students, but to keep students safe. [Plaintiffs' Sharkey Depo. at] 28:1-5.  In pursuance of this goal, Defendant Sharkey claims to take into consideration the struggles that the children he works with are faced by. [Plaintiffs' Sharkey Depo. at] 34:4-6.

_____

Response to MSJ No. 1 ¶ M, at 11.  Sharkey replies:

> This paragraph contains four statements of fact contrary to the requirements of
> D.N.M.LR-Civ. 56(b) which states that "each additional fact must be lettered[.]"
> Deputy Sharkey objects to the first statement of fact contained in this paragraph to
> the extent it states he "has the opportunity to see what [the students'] struggles
> are" and that he "claims to take into consideration the struggles that the children
> he works with are faced by."  [Doc. No. 103], p. 11, ¶ M.  In the cited testimony,
> Deputy Sharkey stated that "*sometimes* I'll see what their struggles are."  [Doc.
> No. 103-4], p. 34, ll. 5-6.  Deputy Sharkey has also specifically testified as
> follows regarding J.P.: "I didn't see anything that lead [sic] me to think that she --
> there was a mental health issue."  [Doc. 103-7], p. 81, ll. 8-13; see [Doc. No. 92-
> 4, ¶15 ("I had no knowledge that J.P. had any sort of disability that would cause
> her to be physically violent to classmates or teachers.").  Deputy Sharkey testified
> that he had never seen J.P. behave the way she did on September 26, 2011.  [Doc.
> No. 103-5], p. 82, ll. 4-9.  He also testified he did not know the reason why J.P.
> was in a special education class.  Id., p. 81, l. 14-p. 82, l. 3. Although Deputy
> Sharkey testified it is not his purpose to arrest students, he has also testified that
> "there are times where there's criminal investigations, whether it's drugs or a
> battery or I'm contacted by CYFD . . . ."  Id., p. 19, ll. 21-24. Deputy Sharkey
> testified he does arrest students who commit drug offenses or crimes of violence
> such as battery.  See Transcript of Deposition of John Sharkey, p. 20, l. 12 – p. 21,
> 12 (July 30, 2013), attached as Exhibit C.

Reply to Response to MSJ No. 1 ¶ M, at 10-11.

Although the Plaintiffs' briefing contains four separate fact statements, in violation of the
local rules, the Court has considered each fact, because it is in the interest of justice to decide the
matter on the merits rather than to punish the Plaintiffs for this violation of the local rules by
ignoring the facts.

As for the first of the several facts in this paragraph, the Court concludes that Sharkey is
correct: the Plaintiffs slightly mischaracterized Sharkey's testimony.  The Court's version of the
fact more accurately reflects the proposed testimony.  The Court has elsewhere disposed of the
parties' dispute whether Sharkey knew that J.P. was disabled.

The Court does not understand Sharkey to object to the second sentence in this paragraph
-- that is, that he "became a School Resource Officer because he wanted a 'constructive,
positive' assignment where he could help people rather than targeting certain crimes."  Response
to MSJ No. 1 ¶ M, at 11 (setting forth this fact)(quoting Plaintiffs' Sharkey Depo. at 12:1-9).

As for the third sentence -- regarding Sharkey's disposition toward arresting students --
the Court has modified the proposed fact to reflect that, although it is not his purpose  to arrest
students, but to keep his students safe, he will, on occasion, arrest students.

For the fourth and final sentence -- regarding whether Sharkey takes his students'
struggles into account when interacting with them -- the Court has modified the proposed fact to
clarify that, in context, Sharkey referred to those struggles of which he knows and not to all
struggles that his students endure.

- 11 -

Defendant Sharkey claims to take into consideration the struggles that the children he works with [face]" -- at least when he is aware of those struggles.  Response to MSJ No. 1 ¶ M, at 11 (setting forth unmodified version of this fact).  See Plaintiffs' Sharkey Depo. at 34:4-6.[13]

 "Deputy Sharkey was hired by the Bernalillo County Sheriff's Office on January 30, 1989.  Deputy Sharkey retired in March 2007.  After being retired for approximately two years, Deputy Sharkey was rehired by the Bernalillo County Sheriff's Office in September 2009."  MSJ No. 1 ¶ 11, at 6 (setting forth these facts).  See Response to MSJ No. 1 ¶¶ 11-12, at 3 (not disputing these facts); Affidavit of John M. Sharkey ¶¶ 1-3, at 1 (executed July 30, 2013), filed July 30, 2013 (Doc. 92-4)("Sharkey Aff.").  "For the 2011-2012 school year, Deputy Sharkey was assigned to be the school resource officer at Roosevelt Middle School."  MSJ No. 1 ¶ 12, at 6 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 11-12, at 3 (not disputing this fact); Sharkey Aff. ¶ 4, at 3.

"Deputy Sharkey did not have access to J.P.'s special education files."  MSJ No. 1 ¶ 13, at 6 (setting forth this fact).  See Response to MSJ No. 1 ¶ 13, at 4 (not disputing this fact); Sharkey's Nation Depo. at 25:13-16; id. at 26:56-28:34.[14]  "Deputy Sharkey was not part of

---

[13]The Court disposed of the parties' discussion of this fact in note 12, supra.

[14]The Plaintiffs assert that they dispute this fact:

Defendant's fact 13 is disputed.  Plaintiff does not dispute that Defendant did not have access to J.P.'s special education files; however, this does not mean Defendant was totally unaware of Plaintiff's emotional disturbance.  [Plaintiffs' Sharkey Depo. at 81:8-82:15]  (stating that he had never seen J.P. act out as she had on the date of the subject incident).  Defendant Sharkey is aware of where special education students are located on the campus of Roosevelt Middle School and knows that there are different teachers associated with different special education challenges.  [Plaintiffs' Sharkey Depo. at 62:24-63:10].  Also, federal law mandates that "An agency reporting a crime committed by a child with a disability shall ensure that copies of the special education and disciplinary records of the child are transmitted for consideration by the appropriate authorities to

Roosevelt Middle School's crisis intervention team," although he was generally aware when someone calls the team, and has witnessed the crisis team in action.  MSJ No. 1 ¶ 14, at 6 (setting forth unmodified version of this fact).  See Response to MSJ No. 1 ¶ 14, at 3 (not

_____

> whom the agency reports the crime."  20 U.S.C.1415 (K)(B)(6).  Thus, Sharkey was required to not only determine whether J.P. had a disability; he was also required to transmit the information to the District Attorney's Office.

Response to MSJ No. 1 ¶ 13, at 4.  Sharkey replies:

> Plaintiffs contend this fact is disputed but then proceed to state that they do not dispute the specific fact asserted by Deputy Sharkey.  Instead, Plaintiffs add that Deputy Sharkey was not completely unaware of J.P.'s emotional disturbance.  However, the cited portion of Deputy Sharkey's deposition testimony states only that "I've never seen [J.P.] act like that" and that he did not see anything that lead [sic] him to believe that "there was a mental health issue."  See [Doc. No. 103-7], p. 81, l. 8- p. 82, l. 15.  Plaintiffs also add that Deputy Sharkey "is aware where special education students are located" on campus and "knows there are different teachers associated with different special education challenges."  Plaintiffs' citation to Deputy Sharkey's testimony does not entirely support these allegations.  Instead, Deputy Sharkey testified that he knows which teachers have special education classes generally but does not know and has not been told which teachers have students with behavioral or mental health issues.  See [Doc. No. 103-6], p. 62, l. 24 - p. 63, l. 10.  In an effort to support their contention that Deputy Sharkey was aware of J.P.'s emotional disturbance, Plaintiffs misapply a section of the IDEA which provides that "[a]n agency reporting a crime committed by a child with a disability shall ensure that copies of the special education and disciplinary records of the child are transmitted for consideration by the appropriate authorities to whom the agency reports the crime."  20 U.S.C. §1415(k)(9)(B).  This section refers to a public school agency's obligation.  See Valentino C. v. Sch. Dist. of Phila., 2004 WL 225038, at *7 (E.D. Pa. 2004)(citing cases).  Moreover, Plaintiffs offer no evidence that Roosevelt Middle School officials complied with this provision or provided Deputy Sharkey with any specific information regarding J.P. immediately after the incident.

Reply to Response to MSJ No. 1 ¶ 13, at 3.  In the end, the Court agrees with Sharkey that the Plaintiffs do not dispute the fact, but instead seek to qualify it or to add another fact.  Because the Plaintiffs have not specifically controverted the proposed fact, the Court deems the fact undisputed.  As to the legal arguments that the Plaintiffs embed in their Response to MSJ No. 1, the Court will, if necessary, consider them in its analysis.

disputing this fact);[15] Sharkey's Nation Depo. 32:3-4; Sharkey Aff. ¶ 21, at 3.   Moreover,

"Sharkey has personally seen the school's Crisis Intervention Team deescalate students involved

in screaming, yelling, and throwing desks around."  Response to MSJ No. 1 ¶ P, at 12 (setting

forth this fact).  See Reply to Response to MSJ No. 1 ¶ P, at 11 (not disputing this fact);

Plaintiffs' Sharkey Depo. at 64:6-24.   At the time of the event, "Deputy Sharkey's main

responsibility as a school resource officer at Roosevelt Middle School was to help keep the

campus safe."   MSJ No. 1 ¶ 15, at 7 (setting forth unmodified version of this fact).   See

Sharkey's Nation Depo. at 26:25-27:9; Sharkey Aff. ¶ 16, at 3.[16]  "Deputy Sharkey is 'always

---

[15]The Plaintiffs assert:

Defendant's fact 14 is disputed.  Plaintiff does not dispute the contention that
Defendant Sharkey is not part of the formal crisis intervention team at Roosevelt
Middle School.  [Plaintiffs' Sharkey Depo. at] 63:15-64:5. However, Defendant
Sharkey "will generally be aware that they're calling them out" and there have
been times where he is in the immediate area and has witnessed the crisis
intervention team in action.  [Plaintiffs' Sharkey Depo. at] 64:6-24.

Response to MSJ No. 1 ¶ 14, at 4.  Sharkey replies that the fact is "[u]ndisputed.  However,
Plaintiffs add that Deputy Sharkey is generally aware when the crisis intervention team is called
out and has witnessed them in action.  Deputy Sharkey does not dispute this general allegation."
Reply to Response to MSJ No. 1 ¶ 14, at 4.  Because the Response to MSJ No. 1 does not
specifically controvert the proposed fact, the Court deems the fact undisputed.   See
D.N.M.LR-Civ. 56.1(b).  The Court has, however, modified the proposed fact to reflect the
undisputed addition.

[16]The Plaintiffs assert:

Defendant's fact 15 is disputed.   See **Exhibit D:** Bernalillo County Sheriff's
Department Rules and Regulations 353 et seq. (Effective May 22, 2012)
hereinafter "BCSD Rules") available at http://www.bernalillocountysheriff.com/
sop.html (Section III).  Among Defendant Sharkey's duties as a school resource
officer are to "[t]ake steps appropriate and consistent with a law enforcement
officer's duty when a crime occurs," **Exhibit D:** BCSD Rule 353-2(F), to
"[r]efrain from functioning as a school disciplinarian," **Exhibit D:** BCSD Rule
353-2(H), and to "[b]e available for conferences with students, parents and faculty
members to assist with problems related to law enforcement and crime
prevention."  **Exhibit D:** BCSD Rule 353- 2(J).

- 14 -

extremely calm'[ and] 'never raises his voice.'"  MSJ No. 1 ¶ 16, at 7 (setting forth unmodified

version of this fact)(quoting Sharkey's Nation Depo. at 29:8-16).  See Response to MSJ No. 1

¶ 16, at 5 (not disputing this portion of the fact).[17]

　　　"Defendant Sharkey 'get[s] to know the students very, very well, because [he] know[s]

them from elementary school all the way until they get . . . to middle school.'"  Response to MSJ

No. 1 ¶ N, at 11 (setting forth unmodified version of this fact)(quoting Plaintiffs' Sharkey Depo.

_____

Response to MSJ No. 1 ¶ 15, at 4-6.  Sharkey argues that the cited evidence does not support the disputed fact for two reasons: (i) the policy that they cite went into effect some eight months after the events at issue; (ii) "to the extent Plaintiffs imply that Deputy Sharkey did not comply with certain provisions of the SOP, the law is clearly established that the violation of an SOP is irrelevant to a Fourth Amendment inquiry."  Reply to Response to MSJ No. 1 ¶ 15, at 4 (citing, e.g., Tanberg v. Sholtis, 401 F.3d 1151, 1167 (10th Cir. 2005)).  Sharkey is correct that the cited evidence does not dispute that, at the time of the events at issue, his main responsibility was campus safety: in addition to the two problems that Sharkey identified, the cited evidence that Sharkey had multiple responsibilities does not controvert the fact that his main responsibility at the time was campus safety.  Accordingly, the Court deems the fact undisputed.  The Court has, however, slightly modified the fact to clarify that the limited timeframe in which this hierarchy of responsibilities applies also applies to the time of the events underlying this lawsuit.

[17]Sharkey asks the Court to conclude that "Deputy Sharkey is 'always extremely calm,' 'never raises his voice,' and treats all students and staff with respect."  MSJ No. 1 ¶ 16, at 7 (quoting Sharkey's Nation Depo. 29:8-16).  The Plaintiffs respond:

　　　Defendant's fact 16 is disputed.  Defendant did not treat J.P. with respect when he ignored her Behavioral Intervention Plan and arrested her in lieu of allowing the crisis intervention team to do their job or at least calling J.H. Document 92-3 (Defendant's Exhibit C).  Defendant did not treat J.H. nor J.P. with respect by refusing to contact J.H. until J.P. was out of his custody at the Juvenile Detention Center.  Id.; [Plaintiffs' Sharkey Depo. at] 75:2-76:21; 77:17-78:10.   Whether Defendant Sharkey is a good human is immaterial to whether he acted with objective reasonableness.

Response to MSJ No. 1 ¶ 16, at 5.  "Deputy Sharkey concedes that evidence of his good character is immaterial to the Fourth Amendment's objective reasonableness inquiry."  Reply to Response to MSJ No. 1 ¶ 16, at 4.  The Court's disposition of the MSJ does not turn on this dispute about Sharkey's character.  The Court has, however, modified the fact to reflect that, in light of the events underlying this case, whether Sharkey "treats all students and staff with respect," MSJ No. 1 ¶ 16, at 7, is disputed.

at 74:12-15).[18]   Sharkey gets to know his students and, sometimes, sees what their struggles are, and takes those struggles of which he knows into account when he interacts with them.  See Plaintiffs' Sharkey Depo. at 34:4-6.[19]   Sharkey likes his students and cares about his students very much; he does not want to arrest them and does not take that decision lightly.  See Response to MSJ No. 1 ¶ N, at 11 (setting forth a similar fact); Plaintiffs' Sharkey Depo. at 74:23-25.[20]

    "Defendant Sharkey . . . knows that there are different teachers associated with different special education challenges," and knows that certain teachers, including Gonzales, who have special education students.  Response to MSJ No. 1 ¶ O, at 11-12 (setting forth unmodified version of this fact).  See Plaintiffs' Sharkey Depo. at 62:24-63:10.[21]   Sharkey did not know,

---

[18] Sharkey states that this fact is undisputed, but underscores his position that he lacked knowledge of J.P.'s mental health issues.  See Reply to Response to MSJ No. 1 ¶ N, at 11.  The Court has elsewhere addressed the parties' dispute whether Sharkey knew that J.P. was disabled within the ADA's meaning, and the Court will not repeat itself here.

[19] The Court disposed of the parties' discussion of this fact in note 12, supra.

[20] The parties disputed the wording of this proposed fact.  See Response to MSJ No. 1 ¶ N, at 11 ("He does not like to arrest his students because he likes them and cares about them very much." (internal quotation mark omitted)); Reply to Response to MSJ No. 1 at 11 (quibbling with the wording, based on the quote).  The Court's fact reflects Sharkey's testimony.  See Plaintiffs' Sharkey Depo. at 74:23-25 ("I don't want to arrest my students.  I like them.  I care about them very much, and it's not something that I take lightly.").  The Court disposed of the parties' other disputes regarding this fact in note 12, supra.

[21] The Plaintiffs ask the Court to find undisputed that "Defendant Sharkey is aware of where special education students are located on the campus of Roosevelt Middle School and knows that there are different teachers associated with different special education challenges."  Response to MSJ No. 1 ¶ O, at 11-12 (setting forth this fact).  Sharkey replies:

Objection.  Plaintiffs' statement is not an accurate summary of Deputy Sharkey's testimony.  When asked if he knew where the special education kids are and where they are located, Deputy Sharkey responded, "I know from -- that I have -- for example, Ms. Gonzales, she has challenged students.  They don't tell me, 'This is where our students who have behavior issues, mental health issues, special needs issues, that type of thing.  It's just that she has special classes.'"

however, whether J.P. had a disability within the ADA's meaning before he arrested her; further, he had no reason to find out whether she had a disability, because whether a person that he is investigating has a disability plays no role in his investigation or in his decision to arrest that person.  See Response to MSJ No. 1 ¶ R, at 12 (setting forth a similar fact); Plaintiffs' Sharkey Depo. at 7:5-21.[22]  Sharkey was aware, or should have been aware, that J.P. suffered from some educational and behavioral limitations; he did not, however, know or have reason to know that she was disabled within the ADA's definition of that term, or that any disability which she had would deprive her of the capacity to form general criminal intent.  See Plaintiffs' Sharkey Depo. at 33:24-34:15 ("I get to know my students, and sometimes I'll see what their struggles are."); Plaintiffs' Sharkey Depo. at 62:24-63:5 ("Ms. Gonzales, she has special students. . . .  [S]he has special classes."); Deposition of John Sharkey at 75:9-12 (taken July 30, 2013), filed September 3, 2013 (Doc. 115-2)("Sharkey Depo. Vol. III")("And her mom and her boyfriend arrived on

---

Reply to Response to MSJ No. 1 ¶ O, at 11 (quoting Plaintiffs' Sharkey Depo. at 62:24-63:5).

   Sharkey is correct: he did not testify that he knew where all the children in special education classes are located on Roosevelt Middle School's campus.  Sharkey did, however, know that certain teachers, including Ms. Gonzales, had special education students.  The Court has, therefore, modified the proposed fact.  Sharkey testified, however, that he thought "they have different teachers for different challenges."  Plaintiffs' Sharkey Depo. at 62:10.  The Court has, therefore, left that portion of the fact intact.

   [22]The Plaintiffs ask the Court to find undisputed that "Defendant Sharkey did not know nor claims to have had any reason to ascertain whether J.P. had a disability prior to arresting her as whether a person he is investigating has a disability has no role in how he investigates or makes decisions to arrest."  Response to MSJ No. 1 ¶ R, at 12.  Sharkey replies: "This is not a coherent sentence.  To the extent portions make sense, Deputy Sharkey does not dispute he did not know or have reason to know that J.P. had an alleged disability. The remainder of the sentence is irrelevant in assessing Deputy Sharkey's actions and decisions."  Reply to Response to MSJ No. 1 ¶ R, at 12.  The sentence is confusing, but its meaning is not unintelligible.  The Court has constructed this sentence based on what it thinks the Plaintiffs intended the sentence to communicate and what the cited testimony supports.  As for relevance, the Court will return to that issue, if necessary, in its analysis.

scene, and mom was of the opinion of, 'You can't do this, you can't even be here;' that there's a

plan, and they have to handle the plan.").[23]

"Defendant Sharkey [was] trained in the Americans with Disabilities Act when he was

trained to become a School Resource Officer in 2010."   Response to MSJ No. 1 ¶ S, at 12

(setting forth this fact).  See Reply to Response to MSJ No. 1 ¶¶ S-T, at 12  (not disputing this

fact); Plaintiffs' Sharkey Depo. at 7:22-8:6.  "Defendant Sharkey knows 'that there are certain

accommodations that are made for students that have a disability.'"  Response to MSJ No. 1 ¶ T,

at 12  (setting forth this fact)(quoting Plaintiffs' Sharkey Depo. at 8:10-13).  See Reply to

Response to MSJ No. 1 ¶¶ S-T, at 12 (not disputing this fact).[24]  Sharkey has been trained as

---

[23]The parties dispute Sharkey's level of knowledge of J.P.'s condition throughout the
briefing.  The Court concludes that this statement of the fact best reconciles what the evidence
supports, taking it in the light most favorable to the Plaintiffs: because Sharkey knew J.P. was in
a special education classroom, because he knew of a prior incident involving J.P. in elementary
school where J.H. had spoken about a "plan" -- which, in context, probably was a reference to
her BIP or IEP -- and because he generally gets to know his students well, Sharkey either knew
or should have known that J.P. had some educational or behavioral limitations.  Nothing that
Sharkey knew, however, would have given him knowledge or reason to know that J.P. had a
disability as the ADA defines that term -- that is, "a physical or mental impairment that
substantially limits one or more major life activities of [an] individual." 42 U.S. § 12102.
Perhaps a teacher familiar with J.P.'s classroom performance could speak to whether her
impairments "substantially limit" her ability to learn.  An SRO's interactions with a student are,
however, more limited: although an SRO would, incidental to his or her day-to-day interactions
with a student, be able to infer that a given child has some limitations, he would have no reason
to determine that that condition "substantially limits" an individual student's learning ability.

Further, as the Court explains elsewhere, that Sharkey knew or had reason to know that
J.P. had a BIP or an IEP in elementary school does not mean that he knew that, some three years
later, when she had gone to middle school, any BIP or IEP was still in effect.  Finally, the Court
underscores, nothing of which Sharkey was aware would have given Sharkey knowledge or
reason to know that, because of her disability or limitations, J.P. could not form criminal intent.

[24]The Plaintiffs ask the Court to find undisputed that

Defendant Sharkey knows that School Resource Officers "will have students that
we interact with who have disabilities, whether it's a learning disability or
behavioral disabilities, challenges that young people have that go to school and to
realize that no[t] every student would be the same."  He also knows that there will

- 18 -

follows: "If I remember correctly it was discussed as to we will have students that we interact with who have disabilities, whether it's a learning disability or behavioral disabilities, challenges that young people have that go to school and to realize that not every student would be the same."  Plaintiffs' Sharkey Depo. at 9:2-12.  See Response to MSJ No. 1 ¶ U, at 12 (setting forth similar facts); Reply to Response to MSJ No. 1 ¶ U, at 12 (not disputing this fact).[25]  "Defendant Sharkey was a Crisis Intervention Officer and has been trained in de-escalation techniques" in general, though not in de-escalation techniques as they relate to special needs or students with mental-health issues.  Response to MSJ No. 1 ¶ U, at 12-13 (setting forth unmodified version of these facts).  See Plaintiffs' Sharkey Depo. at 10:20-11:22.[26]  "Defendant Sharkey has never been trained on the possible psychological effects on children being restrained."  Response to

_____

be different types of students who have different special needs. [Plaintiffs' Sharkey Depo. at] 9:3-12.  Defendant Sharkey was a Crisis Intervention Officer and has been trained in de-escalation techniques.  [Plaintiffs' Sharkey Depo. at] 10:20-25.  However, Defendant Sharkey was never trained specifically in dealing with special needs children or mental health issues with students.  [Plaintiffs' Sharkey Depo. at] 11:18-12.

Response to MSJ No. 1 ¶ U, at 12-13.  Sharkey replies: "Disputed.  Deputy Sharkey testified that he had received deesclation training as a crisis intervention officer but had not received specific training in 'deesclation techniques' as they relate to students with special needs."  Reply to Response to MSJ No. 1 ¶ U, at 12.  The Court has altered the first sentence in the quoted paragraph from the Plaintiffs' Response to MSJ No. 1 to remove an awkwardness in its phrasing and has combined it with the second sentence to eliminate redundancy.  The Court has modified the last two sentences, because Sharkey is correct: Sharkey did not testify that he was never trained in any form about dealing with special needs children or dealing with students with mental health issues, but that he was not trained with respect to de-escalation techniques as they relate to those children.  See Plaintiffs' Sharkey Depo. at 10:20-11:22.

[25]The Court disposed of the parties' objections to this fact in note 24, supra.

[26]The Court disposed of the parties' objections to this fact in note 24, supra.

MSJ No. 1 ¶ EE, at 14 (setting forth this fact).  See Reply to Response to MSJ No. 1 ¶ EE, at 14

(not disputing this fact); Plaintiffs' Sharkey Depo. at 71:24-72:4.[27]

During his deposition, "Defendant Sharkey agreed that there's always a question of

whether a child has the ability to form criminal intent."  Response to MSJ No. 1 ¶ CC, at 14

(setting forth this fact).  See Plaintiffs' Sharkey Depo. at 59:11-23.[28]  "Defendant Sharkey

determined that J.P., an emotionally disturbed eleven-year-old child, had the requisite criminal

intent to commit the crime of [b]attery."  Response to MSJ No. 1 ¶ DD, at 14 (setting forth this

fact).  See Plaintiffs' Sharkey Depo. at 56:2-57:20.[29]

> Defendant Sharkey has no knowledge of whether a child he arrests will be housed
> at the Juvenile Detention Center and is not fully aware of the booking process for
> juveniles or how a risk assessment is employed to determine whether a child is
> subject to custody.  Defendant Sharkey believes that taking a child to the
> detention center, even if they will not be housed there, is appropriate because it
> accomplishes the purpose of stopping law breaking behavior. According to
> Defendant Sharkey, if a child is "at the detention center, then they're -- it's
> controlled."

Response to MSJ No. 1 ¶ Y, at 13 (setting forth this fact)(citations omitted).  See Reply to

Response to MSJ No. 1 ¶ Y, at 13 (not disputing this fact); Plaintiffs' Sharkey Depo. at

---

[27]The Court disposed of the parties' objections to this fact in note 24, supra.

[28]Sharkey replies: "Undisputed.  In this case, however, Deputy Sharkey believed that J.P. had the intent to batter Ms. Gonzales."  Reply to Response to MSJ No. 1 ¶¶ CC, at 13-14.  That much of the factual assertion is undisputed, as the next fact in this paragraph underscores. Because Sharkey did not specifically controvert the proposed fact, the Court deems it undisputed.

[29]Sharkey replies: "Deputy Sharkey does not dispute he determined that J.P. had the requisite criminal intent to commit the crime of battery.  Deputy Sharkey was not aware that J.P. was emotionally disturbed and was not sure of her exact age."  Reply to Response to MSJ No. 1 ¶¶ DD, at 14.  This statement does not specifically controvert the fact; accordingly, the Court deems it undisputed.  The Court does not read this sentence to mean that Sharkey knew she was eleven years old or that she was emotionally disturbed, but to mean that Sharkey found that J.P., who was then eleven and emotionally disturbed, had the requisite criminal intent to commit battery.

42:24:44:10.[30]   "Defendant Sharkey proffered that even if law-enforcement purposes are fulfilled

by direct release to a child's parent, transporting a child to the Detention Center is appropriate

---

[30]Sharkey replies: "Undisputed. However, Plaintiffs' factual allegation as to the purpose accomplished by taking a juvenile to the detention center even if the juvenile will not be housed there is irrelevant.  At the time she was booked, Deputy Sharkey did not know that J.P. would not be accepted for housing."  Reply to Response to MSJ No. 1 ¶ Y, at 13.  The Court will return to this fact's relevance, if necessary, in the analysis.

The Plaintiffs ask the Court to find undisputed that, "[i]n his deposition[,] Defendant Sharkey  agreed that the Juvenile Detention Center's release of J.P. to J.H. had the same effect as if he had released J.P. to J.H. himself."  Response to MSJ No. 1 ¶ Z, at 14.  Sharkey replies: "Disputed.  Deputy Sharkey did not testify that releasing J.P. directly to J.H. was an option on September 26, 2011 nor did he testify that the juvenile detention center's release of J.P. to J.H. had the same effect as if he had released J.P. to J.H. himself."  Reply to Response to MSJ No. 1 ¶ Z, at 13 (citing Plaintiffs' Sharkey Depo. at 49:10-50:3).

Sharkey is correct.  The testimony reads:

Q.      Well, she was released immediately essentially, and the time that she was in the detention facility was the time it took her mom to get down there to pick her up.  So, I mean, I guess to the extent that your goal was to stop the law breaking behavior by putting her in a correctional facility wasn't accomplished, I guess, I mean, because she's released right away to her mom?

A.      To her mom, but she wasn't at Roosevelt Middle School any more.  So I didn't have any concern of her attacking another teacher or another student.  So it was stopped.

Q.      Okay.  Well, how was the option of releasing her to her mom from the school directly rather than taking her to the detention facility?

A.      I -- that may be an option --

Q.      Okay.

A.      -- for some, if a deputy chose to do that or an officer did that.

Plaintiffs' Sharkey Depo. at 49:11-50:3.  Sharkey did not say that the Juvenile Detention Center's release of J.P. to J.H. had the same effect as if he had released J.P. to J.H. directly from the school; to say that something is "an option" is not to say that all options have the same effect.  Accordingly, the Court will not find this fact undisputed.

The Plaintiffs ask the Court to find undisputed that "J.P. was immediately released from the juvenile detention center, whom had no legal basis to detain her."  Response to MSJ No. 1 ¶ AA, at 14.  Sharkey disputes this fact, pointing out that the document on which J.H. relies neither indicates that J.P. was immediately released nor that there was no legal basis for the

because a child's angry parent could pose a threat to the safety of the school or its personnel."
Response to MSJ No. 1 ¶ BB, at 14 (setting forth this fact).  See Plaintiffs' Sharkey Depo. at
50:11-52:5.[31]

### 3. Procedure for Handling a De-Escalation Event.

"A de-escalation event usually involves a student who is being aggressive."  MSJ No. 1
¶ 17, at 7 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 17-21, at 5 (not disputing this
fact); Sharkey's Nation Depo. at 62:3-10.   "At Roosevelt Middle School, when a special
education classroom calls the office via intercom [or on the office telephone] requesting
assistance from the crisis intervention team, office staff contacts the principal 'or the admin' on
the walkie-talkie."  MSJ No. 1 ¶ 18, at 7 (setting forth this fact)(quoting Sharkey Nation Depo. at
34:21-35:3).  Response to MSJ No. 1 ¶¶ 17-21, at 5 (not disputing this fact).[32]  "Deputy Sharkey
also has a walkie-talkie so when a call goes out for the crisis intervention team, he hears it as
well and responds to the area."  MSJ No. 1 ¶ 19, at 17 (setting forth this fact).  See Response to
MSJ No. 1 ¶¶ 17-21, at 5 (not disputing this fact); Sharkey's Nation Depo. at 35:11-18; Sharkey

_____

juvenile detention center to detain her.  See Reply to Response to MSJ No. 1 ¶ AA, at 13.
Sharkey also cites New Mexico law generally explaining the basis on which juveniles may be
detained.  See N.M. Stat. Ann. § 32A-2-11.  Sharkey is correct: the cited document demonstrates
neither that she was released immediately nor that the facility made any sort of determination
about the legal basis for her release or detention.  Accordingly, the Court will not find this fact
undisputed.

[31]Sharkey replies: "Plaintiffs' allegations are irrelevant. It is undisputed that Deputy
Sharkey witnessed J.P. kick Ms. Gonzales and, thus, had probable cause to arrest her.  Plaintiffs'
discussion of alternatives to booking J.P. is, therefore, irrelevant.  See Atwater v. City of Lago
Vista, 532 U.S. 318, 354 (2001)."  Reply to Response to MSJ No. 1 ¶ BB, at 13.  The Court will,
if necessary, return to relevancy in its analysis.  Because Sharkey did not specifically controvert
the proposed fact, the Court deems it undisputed.

[32]The Court has modified the proposed fact slightly, because the testimony reflects that
the office staff would contact the other members of the crisis intervention team "on their office
phone or buzzing into [sic] their office."  Sharkey's Nation Depo. at 3:21-35:3.

Aff. ¶ 18, at 3.    "Deputy Sharkey allows the crisis intervention team 'to do what they need to do' and 'he's there if it escalates to a point where [the team] can't contain it.'"  MSJ No. 1 ¶ 20, at 7 (setting forth this fact)(quoting Sharkey's Nation Depo. at 35:11-18).  <u>See</u> Response to MSJ No. 1 ¶¶ 17-21, at 5 (not disputing this fact); Sharkey Aff. ¶¶ 22-25, at 3.  "It is a safe practice to have Deputy Sharkey close at hand because a situation can get out of hand very quickly."  MSJ No. 1 ¶ 21, at 7 (setting forth this fact).  <u>See</u>  Response to MSJ No. 1 ¶¶ 17-21, at 5 (not disputing this fact); Sharkey's Nation Depo. at 61:12-62:2; Sharkey Aff. ¶ 23, at 3.  "Deputy Sharkey is generally expected to take immediate control of the situation if he arrives on scene first and sees somebody being struck, in danger of being battered, or a situation quickly escalating."  MSJ No. 1 ¶ 22, at 8 (setting forth this fact).  <u>See</u> Sharkey's Nation Depo. at 36:15-19; Sharkey Aff. ¶¶ 25-26, at 3.[33]

---

[33]The Plaintiffs purport to dispute this fact, citing provisions of the BIP:

> According to J.P.'s BIP "[i]n the event that [J.P.] physically harms a peer **or adult** (by direct contact or by throwing an object with the intent to harm). (*sic*) The crisis team will be called.  If necessary **appropriate** physical management may be employed by trained personnel to ensure the safety of [J.P.] and/or other persons involved in the crisis situation. [J.P.'s] mother will be called.  Administration will determine if the need for APS Police or other law enforcement is necessary."  <u>Id.</u>  Regardless of Defendant's hindsight contentions the plain language of J.P.'s BIP does not authorize her arrest.

Response to MSJ No. 1 ¶ 22, at 5 (emphasis in original).  Sharkey replies that "[t]he BIP is immaterial . . . to the question of whether Deputy Sharkey had probable cause to arrest J.P.  Moreover, the BIP guides the conduct of school employees, not police officers."  Reply to Response to MSJ No. 1 ¶ 22, at 4 (citations omitted).

The Court concludes that the fact is undisputed.  First, the Plaintiffs' contentions about what J.P.'s BIP required do not contravert the fact -- which speaks about what Sharkey was "generally expected" to do.  MSJ No. 1 ¶ 22, at 8.  Second, although the Court will, if necessary, return to this issue in the analysis, because the issue of the BIP's role in Sharkey's arrest is important to the parties' portrayal of the facts, the Court clarifies here that Sharkey is essentially correct:  the BIP does not change the Fourth Amendment standards that govern Sharkey's conduct in arresting J.P.  The IDEA, from which the BIP arises, governs the conduct of state educational officials that receive federal financial assistance:

4.      **The Incident on September 26, 2011.**

"In the fall of 2011, J.P. was placed in Ms. Allison Gonzales's sixth grade special education class at Roosevelt Middle School."  MSJ No. 1 ¶ 23, at 8 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 23-26, at 8 (not disputing this fact); Plaintiffs' Second Amended Complaint for Recovery of Damages due to Deprivation of Civil Rights and Rights Under the Americans with Disabilities Act, ¶ 5, at 1, filed June 28, 2013 (Doc. 85)("Complaint"); id. ¶ 25, at 4.  "Ms. Gonzales was employed as a teacher with the Albuquerque Public Schools."  MSJ No. 1 ¶ 24, at 8 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 23-26, at 8 (not disputing this fact); Deposition of Allison Gonzales at 13:6-17 (taken June 13, 2013), filed July 30, 2013 (Doc. 92-5)("Sharkey's Gonzales Depo."); Complaint ¶ 5, at 1; id. ¶ 25, at 4.  "There were [sic] a total of seven (7) students in Ms. Gonzales's class, including J.P."  MSJ No. 1 ¶ 25, at 8 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 23-26, at 8 (not disputing this fact); Sharkey's

---

Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies.

20 U.S.C.A. § 1415(a).  Indeed, the IDEA expressly disclaims the notion that a Court should understand the IDEA to impose a heightened burden on law enforcement officers:

Nothing in this subchapter shall be construed to prohibit an agency from reporting a crime committed by a child with a disability to appropriate authorities or to prevent State law enforcement and judicial authorities from exercising their responsibilities with regard to the application of Federal and State law to crimes committed by a child with a disability.

20 U.S.C. § 1415(k)(6)(A).  In short, the BIP has little or nothing to say about whether Sharkey violated the Fourth Amendment when he arrested J.P. -- or about what he is generally expected to do when he arrives upon a violent event.  That analysis depends on objective reasonableness in light of the facts known to him at the time and not on provisions in a BIP created under a statute that expressly preserves law enforcement officers' rights to enforce the law.

Gonzales Depo. at 14:20-22. "Ms. Gonzales also had a teaching assistant, Gwendoline Zamora." MSJ No. 1 ¶ 26, at 8 (setting forth this fact). See Response to MSJ No. 1 ¶¶ 23-26, at 8 (not disputing this fact); Sharkey's Gonzales Depo. at 17:22-18:3. "Deputy Sharkey was aware that J.P. was assigned to a class that provided special education services, but he was not aware of the reason for her placement in that class as children receive special education services for a variety of reasons." MSJ No. 1 ¶ 27, at 8 (setting forth this fact). See Sharkey Aff. ¶ 8, at 2.[34]

"On September 26, 2011, J.P. was disrupting the classroom after arriving late to school." MSJ No. 1 ¶ 28, at 9 (setting forth this fact). See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact);[35] Statement by Allison Gonzales at 2 (dated September 26, 2011), filed July

---

[34]The Plaintiffs respond: "Defendant's fact 27 is disputed. While Defendant may not have been aware of why J.P. was eligible for special education classes, Plaintiff reminds Defendant that he had previously  interacted with J.P. for a behavioral issue and should have been aware that J.P. had emotional/behavioral problems." Response to MSJ No. 1 ¶ 27, at 6 (citing Plaintiffs' Sharkey Depo. at 75:2-76:21). Sharkey replies:

> Plaintiffs concede that Deputy Sharkey may not have been aware of why J.P. was eligible for special education classes. They, nonetheless, conten[d] that he should have been aware that she had emotional/behavioral problems since he was aware of one prior instance of misbehavior. Plaintiffs do not offer any competent evidence or legal authorities to support this leap of logic. Prior to the September 26, 2011 incident, Deputy Sharkey was only aware that J.P. had one instance of misconduct during elementary school which had been resolved before his arrival to the area.

Reply to Response to MSJ No. 1 ¶ 27, at 5.
    The Court deems the fact undisputed. That Sharkey was aware of a single incident of misbehavior does not controvert the proposed fact: the fact is that Sharkey did not know why J.P. had been placed in that class and not whether he should have known that reason, based on this single other interaction. Accordingly, the Court deems the fact undisputed for purposes of this opinion.
    [35]The Plaintiffs respond:

> Plaintiff does not dispute Defendant's facts 28-42. Plaintiff notes, however, that by Defendant's admission, it was the crisis intervention team that was called to assist with J.P., not Defendant. Plaintiff further notes that while J.P. did throw her

30, 2013 (Doc. 92-6); Sharkey's Gonzales Depo. at 54:19-56:13.  "When asked to participate in the lesson she responded, 'I'm not doing shit.'"  MSJ No. 1 ¶ 29, at 9 (setting forth this fact)(quoting Statement by Allison Gonzales at 2).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact).[36]  "J.P. then began to disrupt the class by loudly tapping a metal type marble."  MSJ No. 1 ¶ 30, at 9 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact);[37] Sharkey's Gonzales Depo. at 55:19-56:19.  "J.P. ignored repeated requests from Ms. Gonzales and peers to stop bouncing the marble."  MSJ No. 1 ¶ 31, at 9 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 55:19-56:19; id. at 58:19-59:11.[38]  "Ms. Zamora asked J.P. if she wanted some help and she said, 'no.'"  MSJ No. 1 ¶ 32, at 9 (setting forth this fact)(quoting Statement of Allison Gonzales at 2).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact).[39]  "Ms. Gonzales then asked J.P. if she wanted to talk to her mom or maybe her mom could come back to school in an effort to 'change the environment, change the action, that might be a support as well.'"  MSJ No. 1 ¶ 33, at 9 (setting forth this fact)(quoting Sharkey's Gonzales Depo. at 60:13-19).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact);

---

marble across the room she did not intend to strike anyone with it, in fact, she did not even see where it went.

Response to MSJ No. 1 ¶¶ 28-42, at 6 (citing Deposition of Allison Gonzales at 62:23-63:4 (taken June 13, 2013), filed August 16, 2013 (Doc. 103-3)).  This statement does not specifically controvert the proposed fact.  The Court, therefore, deems the fact undisputed.

[36]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

[37]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

[38]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

[39]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

Statement of Allison Gonzales at 2.[40]  "J.P. responded that her mother was at work and could not come to the school."  MSJ No. 1 ¶ 34, at 9 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact);[41] Statement of Allison Gonzales at 2.  "J.P. then called another [sic] male student a 'butt head' which elicited a response from him, and they exchanged words."  MSJ No. 1 ¶ 35, at 9 (setting forth this fact)(quoting Statement of Allison Gonzales at 2).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 55:19-56:19.[42]  "The other student then returned to his seat to work with Ms. Gonzales."  MSJ No. 1 ¶ 36, at 9 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Statement of Allison Gonzales at 2.[43]

"J.P. could not see her peers from her study carrel, so no eye contact took place from the time the other student took his seat."  MSJ No. 1 ¶ 37, at 10 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact);[44] Statement of Allison Gonzales at 2; Sharkey's Gonzales Depo. at 61:23-62:11.   "J.P. then came around her study carrel and forcefully threw the metal marble across the room where it hit the wall hard, bounced back and rolled to the other side of the classroom."  MSJ No. 1 ¶ 38, at 10 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Statement of Allison Gonzales at 2; Sharkey's Gonzales Depo. at 55:19-56:19.[45]  "J.P. then punched the other student in the back

---

[40]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

[41]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

[42]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

[43]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

[44]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

[45]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

of the head with her fist."  MSJ No. 1 ¶ 39, at 10 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Statement of Allison Gonzales at 2; Sharkey's Gonzales Depo. at 55:19-56:9; id. at 63:8-19.[46]

"Ms. Gonzales stood up and placed her body between both students to stop the altercation."  MSJ No. 1 ¶ 40, at 10 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Statement of Allison Gonzales at 2;  Sharkey's Gonzales Depo. at 55:19-57:4; id. at 63:20-23.[47]  "As J.P. attempted to strike the male student again, Ms. Gonzales moved J.P. toward the side of the room and immediately instructed the male student to leave the classroom."  MSJ No. 1 ¶ 41, at 10 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Statement of Allison Gonzales at 2; Sharkey's Gonzales Depo. at 55:19-57:4.[48]  "Ms. Gonzales directed Ms. Zamora to call the office on the intercom to request assistance from the crisis intervention team."  MSJ No. 1 ¶ 42, at 10 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 28-42, at 6 (not disputing this fact); Statement of Allison Gonzales at 2; Sharkey's Gonzales Depo. at 65: 1-11.[49]

"A staff member from the Roosevelt Middle School administrative office requested that Deputy Sharkey respond to classroom #11 in response to an unknown request by Ms. Gonzales."  MSJ No. 1 ¶ 43, at 10 (setting forth this fact).   See Response to MSJ No. 1 ¶¶ 43-44, at 6 (not

---

[46]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

[47]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

[48]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

[49]The Court disposed of the Plaintiffs' sole response to this set of facts in note 35, supra.

disputing this fact); Sharkey Aff. ¶ 27, at 4.[50]   "The administrative staff person was unable to explain to Deputy Sharkey why he was needed."   MSJ No. 1 ¶ 44, at 10 (setting forth this fact). See Response to MSJ No. 1 ¶¶ 43-44, at 6 (not disputing this fact).[51]

"Back in the classroom, the male student may have made eye contact with J.P. when he was walking out as instructed by Ms. Gonzales though this is not certain."   MSJ No. 1 ¶ 45, at 10-11 (setting forth this fact).   See Response to MSJ No. 1 ¶¶ 45-47, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 55:19-57:4.   "Ms. Gonzales had a hold of J.P.'s arms just above the wri[s]ts."   MSJ No. 1 ¶ 46, at 11 (setting forth this fact).   See Response to MSJ No. 1 ¶¶ 45-47, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 66:6-18.   "Ms. Gonzales did not think it would be a good plan for her to put J.P. in a body hold because J.P. is 'a fairly good-sized girl.'"   MSJ No. 1 ¶ 47, at 11 (setting forth this fact)(quoting Sharkey's Gonzales Depo. at 47:65-66:50). See Response to MSJ No. 1 ¶¶ 45-47, at 6 (not disputing this fact).   "While Ms. Gonzales tried to hold her back, J.P. attempted to head butt, hit and bite Ms. Gonzales" to free herself from Gonzales' hold.   MSJ No. 1 ¶ 48, at 5 (setting forth unmodified version of this fact).   See Response to MSJ No. 1 ¶ 48, at 6 (not disputing this portion of the fact); Statement of Allison Gonzales at 2; Sharkey's Gonzales Depo. at 66:24-5.[52]   "J.P. was eventually able to scratch

---

[50]The Plaintiffs respond that they are "without sufficient information to admit or deny Defendant's facts 43-44 and so do[] not dispute them for the purpose of this motion only." Response to MSJ No. 1 ¶¶ 43-44, at 6.   The Court, therefore, deems the fact undisputed.

[51]The Plaintiffs respond that they are "without sufficient information to admit or deny Defendant's facts 43-44 and so do[] not dispute them for the purpose of this motion only." Response to MSJ No. 1 ¶¶ 43-44, at 6.   The Court, therefore, deems the fact undisputed.

[52]Sharkey asks the Court to find undisputed that, "[w]hile Ms. Gonzales tried to hold her back, J.P. attempted to head butt, hit and bite Ms. Gonzales."   MSJ No. 1 ¶ 48, at 11.   The Plaintiffs respond: "Plaintiff disputes Defendant's fact 47.   Plaintiff does not dispute that J.P. was trying to free herself from Ms. Gonzales' hold on her.   However, nowhere in the testimony

Ms. Gonzales' hand and drew blood."  MSJ No. 1 ¶ 49, at 11 (setting forth this fact).  See

Response to MSJ No. 1 ¶¶ 49-50, at 6 (not disputing this fact); Sharkey's Nation Depo. at

46:9-17; Sharkey's Gonzales Depo. at 66:24-67:5; Statement of Allison Gonzales at 2.  "J.P. was

able to free herself from Ms. Gonzales' hold."  MSJ No. 1 ¶ 50, at 11 (setting forth this fact).

See Response to MSJ No. 1 ¶¶ 49-50, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at

67:10-11.  "J.P. ran at the other student, hitting him once again on the head."  MSJ No. 1 ¶ 51, at

11 (setting forth this fact).  See Sharkey's Gonzales Depo. at 67:12-68:5; Statement of Allison

Gonzales at 2.[53]  "As the other student exited the classroom, J.P. ran out [of] the classroom in

---

cited by Defendant did Ms. Gonzales indicate that J.P. tried to bite her."  Response to MSJ No. 1
¶ 48, at 6.  Sharkey replies:

> Plaintiffs do not dispute that, while Ms. Gonzales was trying to hold J.P. back,
> J.P. attempted to head butt and hit Ms. Gonzales. Plaintiffs state that J.P. was
> trying to free herself from Ms. Gonzales' hold.  Deputy Sharkey does not dispute
> that J.P. was trying to free herself in order to go after her classmate once again.
> Plaintiffs also argue that the evidence offered by Deputy Sharkey does not
> indicate that J.P. attempted to bite Ms. Gonzales.  Plaintiffs overlooked Deputy
> Sharkey's Exhibit F[, the Statement of Allison Gonzales,] wherein Ms. Gonzales
> stated that J.P. attempted to bite her.

Reply to Response to MSJ No. 1 ¶ 48, at 5 (citing Statement of Allison Gonzales at 2).  The
Court has modified the proposed fact slightly to reflect the J.P.'s motivation in evading
Gonzales; the testimony that Sharkey cited supports this fact.  See Sharkey's Gonzales Depo. at
66:25 ("[W]ell, unfortunately then [J.P.] wanted to get loose.").  As for the biting, Sharkey is
correct: the Statement of Allison Gonzales states that, "[w]hile [Gonzales] held [J.P.] back she
tried to head butt, hit, and bite, eventually she was able to scratch my hand, which was holding
her arm (photo taken, minor injury)."  Statement of Allison Gonzales at 2 (emphasis added).
Accordingly, the Court finds the fact, as modified, undisputed.

[53]The Plaintiffs respond: "Defendant's fact 51 is disputed.  Ms. Gonzales never
affirmatively states that J.P. was able to hit the other student once she broke free."  Response
¶ 51, at 6.  Sharkey replies: "Again, Plaintiffs overlooked [the Statement of Allison Gonzales].
It cannot be disputed that J.P. hit her classmate a second time on the head."  Reply to Response to
MSJ No. 1 ¶ 51, at 5.  Sharkey is correct: Gonzales states that, after J.P. scratched her, J.P. "was
released and ran at [the male student], hitting him once again on the head."  Statement of Allison
Gonzales at 2.  The Court, therefore, finds the fact undisputed.

pursuit of him."  MSJ No. 1 ¶ 52, at 11 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 68:6-8; Statement of Allison Gonzales at 2.

"Ms. Zamora grabbed J.P. by her left arm and Ms. Gonzales grabbed her right arm."  MSJ No. 1 ¶ 53, at 11 (setting forth this fact).  See Response to MSJ No. 1  ¶¶ 52-66, at 6 (not disputing this fact); Statement of Allison Gonzales at 2.  "While Ms. Gonzales and Ms. Zamora were attempting to restrain her, J.P. kicked Ms. Gonzales in the leg, leaving a footprint."  MSJ No. 1 ¶ 54, at 11 (setting forth this fact).  See Response to MSJ No. 1  ¶¶ 52-66, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 68:16-17; Statement of Allison Gonzales at 2. "The incident was a rapidly evolving situation."  MSJ No. 1 ¶ 55, at 11 (setting forth this fact). See Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 57:13-15.

"As he approached the classroom on foot, Deputy Sharkey saw Ms. Gonzales holding J.P."  MSJ No. 1 ¶ 56, at 11 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact); Sharkey Aff. ¶ 29, at 4.  "Deputy Sharkey heard raised voices and saw J.P. kick Ms. Gonzales in the right upper leg."  MSJ No. 1  ¶ 57, at 12 (setting forth this fact). See Sharkey Aff. ¶ 31, at 4; Sharkey's Gonzales Depo. 71:2-6; Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact).  "Other school personnel had not arrived."  MSJ No. 1 ¶ 58, at 12 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact); Sharkey Aff. ¶ 32, at 4; Sharkey's Gonzales Depo. 69:4-6.[54]

---

[54]Although the cited evidence refers only to the crisis intervention team and not to all other school personnel, see Sharkey Aff. ¶ 32, at 4; Sharkey's Gonzales Depo. at 69:4-4, the Plaintiffs do not dispute this fact, and there is no evidence that other school personnel arrived. Accordingly, the Court finds the fact undisputed.

"Deputy Sharkey ordered J.P. to stop."   MSJ No. 1 ¶ 59, at 12 (setting forth this fact).

See Sharkey Aff. ¶ 33, at 4; Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact).

"When J.P. saw Deputy Sharkey coming around the corner, she immediately stopped kicking."

MSJ No. 1 ¶ 60, at 12 (setting forth this fact).   See Response to MSJ No. 1 ¶¶ 52-66, at 6 (not

disputing this fact); Sharkey Aff. ¶ 34, at 4; Sharkey's Gonzales Depo. at 69:18-21.   "J.P. began

moving  away from Deputy Sharkey, taking Ms. Gonzales and Ms. Zamora with her as they were

still trying to keep a hold on J.P."   MSJ No. 1 ¶ 61, at 12 (setting forth this fact).   See Response

to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact); Sharkey Aff. ¶ 35; Sharkey's Gonzales

Depo. at 68:20-69:3.   "Deputy Sharkey removed his handcuffs from his duty belt." MSJ No. 1

¶ 62, at 12 (setting forth this fact).   See Sharkey Aff ¶ 36; Response to MSJ No. 1 ¶¶ 52-66, at 6

(not disputing this fact).   "J.P. re-entered Ms. Gonzales's classroom."   MSJ No. 1 ¶ 63, at 12

(setting forth this fact); Sharkey Aff. ¶ 37, at 4, ¶ 37.   See Response to MSJ No. 1 ¶¶ 52-66, at 6

(not disputing this fact).   "Ms. Zamora let go of J.P. and escorted the other students outside the

classroom and remained with them."   MSJ No. 1 ¶ 64, at 12 (setting forth this fact).   See

Sharkey's Gonzales Depo. at 70:6-8; Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this

fact).   "J.P. scooted herself into a small room without a door within the classroom, sat on the

floor, and locked her hands together to resist being handcuffed."   MSJ No. 1 ¶ 65, at 12 (setting

forth this fact).   See Sharkey Aff. ¶ 38, at 4; Sharkey's Gonzales Depo. at 70:16-71:1; Response

to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact).   She remained in that room on the floor

crying for approximately fifteen minutes before Sharkey handcuffed her.   See Response to MSJ

No. 1 ¶ Q, at 12 (setting forth a similar fact); Plaintiffs' Sharkey Depo. at 5:3-16.[55]

---

[55]The Plaintiffs assert that "Defendant Sharkey arrested J.P. after she was on the floor crying for fifteen minutes because she allegedly committed a crime."   Response to MSJ No. 1 ¶ Q, at 12.   Sharkey responds:

"Shortly thereafter, the principal and head special education teacher arrived at Ms. Gonzales's classroom." MSJ No. 1 ¶ 66, at 12 (setting forth this fact); Sharkey Aff. ¶ 39, at 4. See Response to MSJ No. 1 ¶¶ 52-66, at 6 (not disputing this fact); Sharkey's Gonzales Depo. at 70:16-71:1. "Deputy Sharkey's demeanor toward J.P. was very calm and professional." MSJ No. 1 ¶ 67, at 12 (setting forth this fact). See Sharkey Aff. ¶ 40, at 4; Sharkey's Gonzales Depo. at 71:10-72:1.[56] "When Defendant Sharkey arrested J.P. he did not ask anyone present whether

_____

> Disputed. Deputy Sharkey arrested and handcuffed J.P. after witnessing her kick Ms. Gonzales and after Ms. Gonzales informed him about J.P.'s misconduct against her and another student prior to the Deputy Sharkey's arrival. Deputy Sharkey waited to handcuff J.P. until another deputy arrived as Deputy Sharkey was concerned J.P. might resist being handcuffed. The fact that J.P. began to cry after Deputy Sharkey arrived is irrelevant as it does not negate Deputy Sharkey's probable cause finding.

Reply to Response to MSJ No. 1 ¶ Q, at 12 (citations omitted). The fact's core is undisputed: J.P. had been on the floor crying for fifteen minutes when Sharkey arrested her. The second part of the sentence is ambiguous: it is not clear whether the Plaintiffs intend to suggest that Sharkey arrested her because she allegedly committed a crime or that J.P. had been crying because she allegedly committed a crime. No one truly disputes the first inference -- that Sharkey arrested her because she, to his mind, committed a crime -- and the cited testimony does not support the second inference, because it does not speak about the reason she was crying. The Court has found undisputed a version of the fact that the cited testimony supports more clearly, and has placed the fact that she was crying on the floor in the narrative so that the context and narrative is clear.

[56]The Plaintiffs purport to dispute this fact: "Defendant reportedly told J.P. that 'we [can] do this the easy way or the hard way' and that '[t]he easy way is you turn around and let me put these handcuffs on you . . . [t]he hard way is for me to force you to, and I could break your little arms.'" Response to MSJ No. 1 ¶ 67, at 6-7 (quoting Plaintiffs' J.H. Depo. at 200:15-201:10). Sharkey replies:

> Plaintiffs dispute Deputy Sharkey's demeanor during his interaction with J.P., claiming he told J.P. he could handcuff her the easy way or the hard way and the hard way might result in him breaking her little arms. Plaintiffs rely on inadmissible hearsay from J.P.'s mother, J.H., to support this allegation. See Fed. R. Civ. P. 56(c)(2); Llewellyn v. Allstate Home Loans, Inc., 711 F.3d [at 1180] (stating that inadmissible hearsay does not create a genuine dispute and cannot support a plaintiff's opposition to summary judgment). Therefore, J.H.'s

inadmissible hearsay testimony does not create a genuine dispute.  Even assuming Plaintiffs' assertion was properly supported, it is immaterial as "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Graham v. Connor, 490 U.S. 386, 396 (1989)(emphasis added).

Reply to Response to MSJ No. 1 ¶ 67, at 5-6.

Sharkey is correct: the statement on which the Plaintiffs rely is inadmissible hearsay. The Plaintiffs rely on the following portion of J.H.'s deposition:

> Q.      I could ask you what was done but you weren't there so asking the question is really asking you what did you hear from other people about what happened.  And the one person I'm asking about who was there and who did witness it was your daughter.  So that's why I'm focusing in on what did your daughter tell you about the manner in which handcuffs were placed on her by Deputy Sharkey?

> A.      She told me that she was cornered in the little room and that Deputy Sharkey had told her that we could do this the easy way or the hard way and [J.P.] was quiet at that time.  She said she got quiet and she listened and nodded her head to say she understood, and he said, "The easy way is you turn around and let me put these handcuffs on you."  And she nodded her she had [sic] and then she said he said, "the hard way is for me to force you to, and I could break your little arms," and she nodded her head and started crying and she turned around and put her hands by her side and he grabbed her arms to place her in handcuffs at that time.

J.H. Depo. at 200:15-201:10.  Sharkey's statement is nonhearsay, because J.H. would be offering this evidence against Sharkey -- an opposing party -- and Sharkey made that statement in his individual capacity.  See Fed. R. Evid. 801(d) (stating that, if a "statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity," the statement is nonhearsay).  The trouble is, instead, that this statement entirely rests on J.H.'s report of what J.P. told her, and J.H. offers that statement for its truth.  In other words, to read this testimony as controverting the fact -- that Sharkey acted very calmly and professionally -- the Court would have to take J.P.'s out-of-court statement that Sharkey threatened her for the truth of what it asserts -- that is, that Sharkey threatened her.  "Hearsay testimony that would not be admissible at trial is not sufficient to defeat a motion for summary judgment."  Jaramillo v. Colorado Judicial Dep't, 427 F.3d 1303, 1314 (10th Cir. 2005).  Accordingly, the Court deems this fact undisputed.

she had a disability, even though she was arrested in a special education classroom."  Response

to MSJ No. 1 ¶ FF, at 14 (setting forth this fact).    See Reply to Response to MSJ No. 1

¶¶ FF-GG, at 14 (not disputing this fact); Plaintiffs' Sharkey Depo. at 76:22-77:2.[57]

    "Deputy Sharkey became concerned that J.P. might resist if he forcibly attempted to

handcuff her by himself."  MSJ No. 1 ¶ 68, at 12-13 (setting forth this fact).  See Response to

MSJ No. 1 ¶¶ 68-74, at 7 (not disputing this fact); Sharkey Aff. ¶ 41, at 4-5.  "Deputy Sharkey

therefore requested an additional deputy be dispatched to the scene because he believed two

deputies would be better able to quickly and safely control . . . J.P. if she resisted."  MSJ No. 1

¶ 69, at 13 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 68-74, at 7 (not disputing this

fact); Sharkey Aff. ¶ 44, at 5.  "While waiting for an additional deputy, Ms. Gonzales advised

Deputy Sharkey about the events that occurred in the classroom involving J.P. prior to his

arrival." MSJ No. 1 ¶ 70, at 13 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 68-74, at

7 (not disputing this fact); Sharkey Aff. ¶ 45, at 5.  "Ms. Gonzales then left the room to call J.P.'s

mother and inform her of the incident."  MSJ No. 1 ¶ 71, at 13 (setting forth this fact).  See

Response to MSJ No. 1 ¶¶ 68-74, at 7 (not disputing this fact); Sharkey's Gonzales Depo. at

72:23-25; Sharkey Aff. ¶ 47, at 5.   "The principal also attempted to contact J.P.'s mother." MSJ

No. 1 ¶ 72, at 13 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 68-74, at 7 (not

disputing this fact); Sharkey's Nation Depo. at 42:7-18.  "When the other deputy arrived, Deputy

Sharkey briefed him on the situation."  MSJ No. 1 ¶ 73, at 13 (setting forth this fact).  See

Response to MSJ No. 1 ¶¶ 68-74, at 7 (not disputing this fact); Sharkey Aff. ¶ 48, at 5.

---

[57]Sharkey replies: "Undisputed.  However, Deputy Sharkey did not see anything that lead [sic] him to believe that J.P. had a mental health issue."  Reply to Response to MSJ No. 1 ¶¶ FF-GG, at 14.  This statement does not controvert the proposed fact.  Accordingly, the Court deems it undisputed.

"Deputy Sharkey then informed J.P. she was under arrest and directed her to stand up."

MSJ No. 1 ¶ 74, at 13 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 68-74, at 7 (not

disputing this fact); Sharkey Aff. ¶ 47:18-48:8.  "Deputy Sharkey told J.P., 'You will stand up

and do this calmly.'"  MSJ No. 1 ¶ 75, at 13 (setting forth this fact)(quoting Sharkey's Nation

Depo. at 48:7-8).[58]  "J.P. complied and Deputy Sharkey gently handcuffed her behind her back."

MSJ No. 1 ¶ 76, at 13 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 76-78, at 7 (not

disputing these facts); Sharkey's Nation Depo. at 48:3-8; id. 50:17-51:6; Sharkey Aff. ¶ 51, at 5.

"The other deputy observed but did not intervene."  MSJ No. 1 ¶ 77, at 13 (setting forth this

fact); Sharkey Aff. ¶ 53, at 4.  See Response to MSJ No. 1 ¶¶ 76-78, at 7 (not disputing these

facts); Sharkey's Nation Depo. at 50:9-14.  "Deputy Sharkey ensured that he double locked the

handcuffs to prevent them from tightening and ensured that there was a thumb-width of space, or

approximately one inch, between the handcuffs and J.P.'s wrist."  MSJ No. 1 ¶ 78, at 13 (setting

forth this fact).  See Response to MSJ No. 1 ¶¶ 76-78, at 7 (not disputing this fact); Sharkey Aff.

¶ 54, at 5-6.  "Deputy Sharkey determined that handcuffing J.P. was appropriate because of his

concern that J.P. might attempt to strike him or others, and because he needed to secure J.P. to

transport her to the Bernalillo County Juvenile Detention Center."  MSJ No. 1 ¶ 79, at 14 (setting

forth this fact).  See Sharkey Aff. ¶ 55, at 6[59]  "Defendant Sharkey did not make an evaluation of

---

[58]The Plaintiffs dispute this fact, relying on the argument of which the Court disposed in note 56.  See Response to MSJ No. 1 ¶ 75, at 7.  The Court will not repeat that analysis here. What is more, although Sharkey did not note as much in his reply to the Plaintiffs' purported dispute, see Reply to Response to MSJ No. 1 ¶ 75, at 6, even if admissible evidence supported the notion that Sharkey threatened J.P., that evidence would not contradict that Sharkey told J.P.: "You will stand up and do this calmly."  Accordingly, the Court deems this fact undisputed.

[59]The Plaintiffs purport to dispute this fact, saying that Sharkey "transported J.P. for the purpose of stopping her law breaking behavior.  According to Defendant Sharkey, if a child is 'at the detention center, then they're -- it's controlled.'"  Response to MSJ No. 1 ¶ 79, at 7 (quoting Plaintiffs' Sharkey Depo. at 43:6-10).  Sharkey replies:

whether J.P. needed mental healthcare prior to transporting her to the Juvenile Detention Center even though he admitted that J.P.'s behavior on the subject date was something that he had never seen."  Response to MSJ No. 1 ¶ GG, at 14 (setting forth this fact).  See Reply to Response to MSJ No. 1 ¶¶ FF-GG, at 14 (not disputing this fact);[60] Plaintiffs' Sharkey Depo. at 81:8-82:15.

_____

> This fact set forth the reasons Deputy Sharkey believed handcuffing J.P. was appropriate.  Plaintiffs do not dispute Deputy Sharkey's reasons for handcuffing J.P.  Instead, Plaintiffs add a reference to Deputy Sharkey's testimony wherein he states that a juvenile's law breaking behavior is stopped by transporting the juvenile to the detention facility.  Deputy Sharkey does not dispute his testimony though his answer to this question is not material to the Fourth Amendment inquiry.

Reply to Response to MSJ No. 1 ¶ 79, at 18.  Sharkey is correct: the testimony that the Plaintiffs cite discusses why Sharkey transported J.P. and not why he handcuffed her.  Accordingly, the Court deems this fact undisputed.

[60]The Court disposed of Sharkey's sole addition to this fact in note 52.  The Plaintiffs ask the Court to find undisputed:

> Defendant Sharkey claims to know whether a child is in need of mental health treatment.  [Plaintiffs' Sharkey Depo. at] 82:16-83:12. Defendant Sharkey determined that J.P. did not required [sic] mental health treatment because she was not being "self-destructive" and because she wasn't acting as if she was "listening to voices inside her head or acting in a way where she[ was] talking to a chair or something."  [Plaintiffs' Sharkey Depo. at] 85:5-12.

Response to MSJ No. 1 ¶ HH, at 15.  Sharkey replies: "Disputed.  Plaintiffs misrepresent Deputy Sharkey's testimony.  He testified only that he had received training on mental health issues involving students and then related some of his experiences.  He also testified that he did not see any indicators of J.P. being self-destructive or hallucinating."  Reply to Response to MSJ No. 1 ¶ HH, at 14.

Sharkey is correct.  The cited testimony is as follows:

> Q.      All right.  Are you trained at all in how to identify whether a child is in need of mental health treatment?

> A.      They will, in our classes, discuss mental health issues with students where suicide -- for example, certain signs if we were interacting and talking with the student and you know, always monitor, you know, are they cutting themselves?  I have a lot of students unfortunately who are cutters.  And I've had

"Deputy Sharkey calmly explained to J.P. that he would be walking her out to his patrol car." MSJ No. 1 ¶ 80, at 14 (setting forth this fact). See Response to MSJ No. 1 ¶¶ 80-82, at 7 (not disputing this fact); Sharkey's Nation Depo. at 50:17-21; Sharkey Aff. ¶ 56, at 7. "Deputy Sharkey escorted J.P. from the class while school was in session in an effort to avoid embarrassing her in front of her peers or any other individuals who might be present between passing periods." MSJ No. 1 ¶ 81, at 13. See Sharkey's Nation Depo. at 51:21-52:7; Response to MSJ No. 1 ¶¶ 80-82, at 7 (not disputing this fact). "The principal followed Deputy Sharkey and J.P. out to his patrol car." MSJ No. 1 ¶ 82, at 14 (setting forth this fact). See Response to

---

students, too, who will come to me and say, you know, "I'm hurt -- I'm thinking about hurting myself, or I want to end it," and I immediately make sure to refer them directly and have one of my counselors come from my school or I'll say, "Is it okay, can we walk over, and we'll go talk to the counselor who's on scene." So I'm aware there are signs when there's mental health, where they're hurting themselves or sexual abuse issues where I've had my students come in and tell me this and immediately refer. I didn't see any indicators with her of self-destructive [sic] or not being -- acting of, you know, as if she's listening to voices inside her head and acting in a way where she's talking to a chair or something. So there was no indications like that.

Plaintiffs' Sharkey Depo. at 82:16-83:12. The Plaintiffs' proposed reading of this testimony is simultaneously too narrow and too broad: Sharkey did not hold himself out as qualified to determine whether any child needs mental health treatment, as the proposed fact suggests, and he also did not reduce his read of J.P.'s behavior to only the more extreme examples, as the Plaintiffs' quoted testimony would suggest; in context, he discussed more general signs of mental health problems as well. Moreover, even if he had too narrow a view of the signs needed to determine whether a child needs mental health treatment, that perception would not bear on whether he had probable cause to arrest her.

The Plaintiffs ask the Court to find undisputed that, "[p]ursuant to Departmental Rules and Regulations, all Bernalillo County Deputies 'shall familiarize themselves with, and have a working knowledge of, all laws of the State of New Mexico and the ordinances of Bernalillo County, which they are required to enforce.'" Response to MSJ No. 1 ¶ II, at 15 (setting forth this fact)(quoting Bernalillo County Sheriff's Department Rules and Regulations at 1 (no date provided), filed July 30, 2013 (Doc. 95-8)). As Sharkey rightly points out, see Reply to Response to MSJ No. 1 ¶¶ II, at 14, the policy became effective after the events in this case, and, even if it were relevant, under Tenth Circuit law, evidence that Sharkey violated an SOP is irrelevant to the Fourth Amendment issues in this case. Accordingly, the Court will not find this fact undisputed.

MSJ No. 1 ¶¶ 80-82, at 7 (not disputing this fact); Sharkey's Depo. at 51:19-20.  "There was

nothing that happened on September 26, 2011 that would have indicated to the principal that law

enforcement was not needed."  MSJ No. 1 ¶ 83, at 14 (setting forth this fact).[61]  See Sharkey's

Nation Depo. at 59:11-15.  "Deputy Sharkey left the school immediately to avoid interacting

with J.P.'s mother as his past interaction had been unpleasant due to her mistaken belief that a

BIP takes precedence over state law when a student or teacher is assaulted or battered."  MSJ No.

1 ¶ 84, at 14.  See Response to MSJ No. 1 ¶ 84, at 7 (not disputing this fact); Sharkey Aff. ¶ 58,

at 14.[62]

---

[61]The Plaintiffs respond:

> Defendant's fact 83 is irrelevant under the objective standard at play here,
> immaterial and inadmissible. Fed. R. Civ. P. 56(C)(2). Principal Cee Kay Nation
> is not a lawyer or law enforcement officer and cannot opine as to whether law
> enforcement was needed on the date in question. Fed. R. Evid. 701. Furthermore,
> Cee Kay Nation is of the opinion that a school resource officer may arrest a
> student *any* time the crisis intervention team is called because he cannot control or
> interfere with an officer's job. [Deposition of Cee Kaye Nation at 63:1-64:24
> (taken June 14, 2013), filed August 16, 2013 (Doc. 103-10)("Plaintiffs' Nation
> Depo.")]

Response to MSJ No. 1 ¶ 83, at 7.  Sharkey states: "Plaintiffs correctly point out that it is
immaterial that the school principal was of the opinion that Deputy Sharkey's presence was
needed on the date of the incident."  Reply to Response to MSJ No. 1 ¶ 83, at 6.  First,
materiality is an issue for the analysis and not for the facts.  Second, as for the suggestion that
Nation cannot opine with respect to whether the situation called for law enforcement
involvement, the Court does not understand her testimony to be in the nature of expert testimony,
but, instead, to reflect her own lay opinion, based on her own perceptions of the events, about
whether law enforcement was needed.  Finally, as for Nation's other opinions, they do not
specifically controvert the proposed fact.  Accordingly, the Court deems the fact undisputed.

[62]The Plaintiffs assert that they "do[] not dispute Defendant's fact 84.  Plaintiffs add that
Defendant also did not call J.H. until J.P. had been booked into the Juvenile Detention Center
because he was so intent on avoiding her."  Response to MSJ No. 1 ¶ 84, at 7 (citing Plaintiffs'
Nation Depo. at 52:6-12).  Sharkey responds that the fact is undisputed and notes that "[i]t is
accurate that Deputy Sharkey stated that avoiding J.H. was in the back of his head because he did
not want the situation to escalate.  While accurate, this fact is irrelevant to the Fourth

**5.      J.P.'s Booking at the Bernalillo County Detention Center.**

"Deputy Sharkey transported J.P. to the juvenile detention center in his patrol unit."  MSJ

No. 1 ¶ 85, at 14 (setting forth this fact).   See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not

disputing this fact); Sharkey Aff. ¶ 60, at 6.  "On the way to the juvenile detention center, Deputy

Sharkey asked J.P. what would happen if she assaulted another student or teaching staff at

Roosevelt Middle School, and J.P. responded that she would be handcuffed and arrested again."

MSJ No. 1 ¶ 86, at 14 (setting forth these facts).   See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not

disputing this fact); Sharkey Aff. ¶ 61, at 6.  "J.P. then volunteered that she would not hit anyone

_____

Amendment issues before the Court."   Reply to Response to MSJ No. 1 ¶ 84, at 6 (citation
omitted).
        The Court first notes that the cited portion of the deposition, in context, reflects that
Sharkey's general concern was less about avoiding J.H. as an end to itself and more as a means
to avoid escalating the situation and, thereby, endangering other students:

        Q.      So is it fair to say in part your decision to transport [J.P.] to the
        Juvenile Detention facility rather than wait for her mom to come to the school was
        an effort to avoid a potentially confrontational situation at the school?

        A.      That is in the back of my head of I don't want a situation to
        escalate, but the primary issue is I had a student who was attacked twice
        according to the teacher.  I had a student -- or the teacher was kicked in front of
        me, and the teacher was bleeding, and I'm -- I'm not going to have that escalate in
        the school, because if something else happens, now, I'm responsible for that
        student, and if there's another issue -- and believe it or not, I have multiple issues
        going on, multiple problems, multiple incidents sometimes going on at my school,
        at my middle school, and sometimes I'll get a call for an incident going on at my
        elementary school, and now, I have a student who's been violent, who's attacked,
        and if I've got to step away or leave or she attacks again, that's my responsibility.
        She's under arrest.

J.H.'s Nation Depo. at 52:6-25.  The Plaintiffs cite only the first clause of the answer -- that is,
that avoiding a potentially confrontational situation at the school was "in the back of [Sharkey's]
head," because he did not "want a situation to escalate."  J.H.'s Nation Depo. at 53:11-12.  In any
event, the Court will decide the fact's relevance to the Fourth Amendment issues in its analysis.
        Although whether J.P.'s mother's belief that a BIP takes precedence over state law when a
student or teacher is battered is mistaken and could be understood as a legal conclusion and not a
fact, the Plaintiffs do not dispute that her belief was mistaken.  Accordingly, the Court will
consider it to be an undisputed fact.

anymore but would use words when she was upset."  MSJ No. 1 ¶ 87, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 62, at 6.  "J.P. did not give Deputy Sharkey any indication that the handcuffs were causing her pain."  MSJ No. 1 ¶ 88, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 63, at 6-7.  "J.P. cleared the medical examination and was booked into the juvenile detention center without incident."  MSJ No. 1 ¶ 89, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 64, at 7.  "Deputy Sharkey charged J.P. only with battery upon a school employee in violation of N.M.S.A. (1978), § 30-3-9 (E)."  MSJ No. 1 ¶ 90, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 67, at 7; Statement of Probable Cause-Juvenile (dated September 26, 2011), filed July 30, 2013 (Doc. 92-7).  "Deputy Sharkey submitted the incident report to the district attorney and juvenile probation office for review, ending his participat[ion] in the incident."  MSJ No. 1 ¶ 91, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 68, at 7.

"After booking J.P. into the juvenile detention center, Deputy Sharkey left J.P.'s mother a voice message on her personal cell phone informing her that J.P. had been arrested and was in custody."  MSJ No. 1 ¶ 92, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 69, at 7.  "J.P.'s mother did not return Deputy Sharkey's call."  MSJ No. 1 ¶ 93, at 7 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey Aff. ¶ 70, at 7.

"The juvenile detention center released J.P. to her mother."  MSJ No. 1 ¶ 94, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this fact); Sharkey's Nation Depo. at 68:4-9.  "Deputy Sharkey did not make the determination as to

- 41 -

whether the juvenile detention center would accept J.P. for housing or release her to her mother."
MSJ No. 1 ¶ 95, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not
disputing this fact); Sharkey Aff. ¶ 71, at 7.  "Deputy Sharkey was not aware that the juvenile
detention center was going to release J.P. to her mother instead of accept her for housing at the
facility."  MSJ No. 1 ¶ 96, at 15 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at
7 (not disputing this fact); Sharkey Aff. ¶ 72, at 7.  "The determination to release J.P. to her
mother was made by a juvenile probation and parole officer with the Children, Youth and
Families Division by conducting a detention risk assessment to determine whether J.P. posed a
significant threat to herself, a significant threat to others, or posed a flight risk."  MSJ No. 1 ¶ 97,
at 16 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 85-97, at 7 (not disputing this
fact);[63] Deposition of Jeannie Masterson at 57:8-14 (taken June 10, 2013), filed July 30, 2013
(Doc. 92-8)("Masterson Depo."); id. at 63:25-65:13; id. at 64:7-65:13; id. at 66:22-25; id. at
72:6-20.  "The risk assessment guidelines do not indicate that a law enforcement officer or a
probation and parole officer should consider a child's age and mental health status in
determining whether a juvenile should be transported to or housed at the juvenile detention
center."  MSJ No. 1 ¶ 98, at 16 (setting forth this fact).  See Masterson Depo. 91:6-62:12.[64]

---

[63]Strictly speaking, the testimony that Sharkey cites speaks in general terms about the
comparative roles of law enforcement officers and of CYFD in deciding whether to detain an
individual and does not speak about who decided to release J.P. to her mother.  The Plaintiffs do
not, however, dispute this fact, and there is no reason to suspect that the detention decision in
J.P.'s case differed from the general pattern that the testimony describes.  Accordingly, the Court
deems the fact undisputed.

[64]Although the cited testimony does not expressly say as much, the Court infers that the
"risk assessment guidelines" to which Sharkey refers are documents that individuals in CYFD
use in deciding whether to detain an individual.  The Plaintiffs purport to dispute this fact,
stating:

_____

Defendant's fact 98 is disputed.   While an officer may not be required to personally assess whether a child's age or disability affects her status for the purpose of detainment, an officer who arrests a child is required to contact Juvenile Probation prior to transporting the child to the Detention Center. [Bernalillo County Sheriff's Department Rules and Regulations (no date provided), filed August 16, 2013 (Doc. 103-8)("Rule 349-3")].   Furthermore, officers are fully able to play a role in determining whether a child should be detained  [Deposition of Jeannie Masterson at 67:7-68:4 (taken June 10, 2013), filed August 16, 2013 (Doc. 103-11)("Plaintiffs' Masterson Depo.")].

Response to MSJ No. 1 ¶ 98, at 7.  Sharkey replies:

Plaintiffs do not dispute this statement of fact but, instead, assert that an officer who arrests a juvenile is required to contact juvenile probation prior to transporting the child to the detention center.   In support of this assertion, Plaintiffs cite to a BCSO SOP that became effective almost one year <u>after</u> the incident at issue. See [Rule 349-3 at 1].  This cannot serve to create a genuine dispute.   Moreover, even if Deputy Sharkey violated this SOP, the violation would not violate a clearly established constitutional right.  <u>Tanberg</u>, 401 F.3d at 1167.  Plaintiffs also add that officers are "able" to play a role in determining whether a juvenile should be detained. Although Jeannie Masterson testified that officers can play a role in some cases, such testimony is immaterial.  Plaintiffs cite no legal authority indicating an officer has a clearly established duty under the Fourth Amendment to contact a juvenile probation officer before transporting a juvenile arrestee to a detention center.

Reply to Response to MSJ No. 1 ¶ 98, at 6-7.
          First, none of the Plaintiffs' bases for disputing this fact controvert the fact, which has to do with the content of risk assessment guidelines.  Second, Sharkey is correct: Rule 349-3 went into effect on May 22, 2012, long after this incident.  Further, as Sharkey indicates, even if Sharkey violated a standard operating procedure, that evidence is irrelevant to the Fourth Amendment inquiry.  <u>See</u> <u>Tanberg v. Sholtis</u>, 401 F.3d at 1160 ("Even if it were clear that [the defendant officer] violated [municipal] SOPs, that violation would not transform an arrest supported by probable cause into an unconstitutional seizure."); <u>Jonas v. Bd. of Comm'rs of Luna Cnty.</u>, 699 F. Supp. 2d 1284 (D.N.M. 2010)(Browning, J.).
          As for the final question whether "officers are fully able to play a role in determining whether a child should be detained," Response to MSJ No. 1 ¶ 98, at 7, it is useful to understand the cited testimony in context:

          Q.      And you would agree with me that a law enforcement officer does
     not play a role in determining whether that juvenile should be detained or
     released?

          A.      No.  I would not agree with you.

- 43 -

_____

> Q.      Please explain your reason for making that statement.
>
> A.      When law enforcement calls the probation officer on call and says, "I have this juvenile, here is what he or she is alleged to have done," many times the officer also says, "You know, I'm going to charge him with X Y Z. However, I believe I can send him home. I have spoken to the mom and she will take him but I want to know if you all is this okay [sic]," so they will brainstorm the case with us on the phone. Not always, but they play a role in some cases because they have gone the extra step in obtaining and securing more information that's going to help us that maybe isn't even captured on the risk assessment instrument. Or their mental health status. There are officers that will call us and say, "This is what happened. Here is what I would like to do. Is this okay?"

Plaintiffs' Masterson Depo. at 67:7-68:4. This testimony does not dispute the fact asserted, which deals with what the risk assessment guidelines state. Accordingly, the Court deems the fact undisputed.

Sharkey also asks the Court to find the following fact undisputed:

> Moreover, CYFD supervisor Jeannie Masterson testified that it would be reasonable for an officer to believe that an 11 year old female student who had battered a fellow student and a teacher posed a substantial risk of harm to others based on the criteria used to determine whether a juvenile should be housed at the Juvenile Detention Center.

MSJ No.1 ¶ 99, at 16 (citing Masterson Depo. 74:14-76:1). The Plaintiffs respond:

> Defendant's fact 99 is disputed. Ms. Masterson's testimony cited by Defendant was in response to a hypothetical posed by Defendant's attorney. Furthermore, Juvenile Probation Officer Martha Todd has indicated that it is never reasonable to transport a child under the age of 12 to the juvenile detention center. [Deposition of Martha Todd at 44:5-47:10 (taken June 10, 2013), filed August 16, 2013 (Doc. 103-12)("Todd Depo.")]. The question of whether it was reasonable to transport J.P. to the Juvenile Detention Center is an issue to be addressed in this case.

Response to MSJ No. 1 ¶ 99, at 8. Sharkey replies:

> Two CYFD employees disagree as to whether it would ever be reasonable to transport a juvenile under the age of 12 to the detention center. This factual dispute notwithstanding, New Mexico law provides it is the duty of probation and parole officers with CYFD to determine whether a juvenile who has been taken into custody will be housed at the facility by assessing whether the juvenile " . . . (2) poses a substantial risk of harm to others . . . ." NMSA (1978), § 32A-2-11. This duty does not rest on the law enforcement officers.

**6.      J.P. Was Not Physically Injured as a Result of the Arrest, Handcuffing, or Transport to the Juvenile Detention Center.**

"J.P. was not physically injured as a result of the arrest, handcuffing, or transport to the

Juvenile Detention Center."  MSJ No. 1 ¶ 100, at 16 (setting forth this fact).  See Deposition of

[J.H.] at 205:1-7 (taken July 17, 2013), filed July 30, 2013 (Doc. 92-9)("Sharkey's J.H.

Depo.").[65]  "At most, J.P. had small red marks on the inside of her wrists from the handcuffs."

---

Reply to Response to MSJ No. 1 ¶ 99, at 7.  The Court has not found the proposed fact to be a fact at all, because it instead asks the Court to find undisputed a particular Child, Youth, and Families Division employee's view whether an act is "reasonable"; that characterization of testimony is not properly understood as a fact for summary judgment purposes.  Moreover, to the extent that the testimony could support a fact -- for example, that it is or is not reasonable to transport an eleven year old to a detention center -- the Court would be bound to view the fact in the light most favorable to the Plaintiffs, crediting Todd's testimony and not Masterson's testimony.  The Court would then confront a separate problem: what role a lay person's testimony about whether transporting a child under the age of 12 to the detention center is, as a matter of common parlance, reasonable or appropriate should play in the Fourth Amendment analysis.  Ultimately, as both parties seem to recognize, whether it was reasonable, in the Fourth Amendment sense of the word, for Sharkey to transport J.P. to the juvenile detention center is a question of law for the Court.  Accordingly, the Court does not find the proposed fact undisputed.

[65]The Plaintiffs respond:

Defendant's facts 100-105 are irrelevant, immaterial, Fed. R. Civ. P. 56(C)(1)(B), and assert a proposition that is contrary to clearly established law in the Tenth Circuit.  A plaintiff does not need to sustain physical injury to proceed against a law enforcement officer for the vindication of her Fourth Amendment rights under 42 U.S.C. Section 1983.  Grass v. Johnson, 322 Fed. Appx. 586, 589 (10th Cir. 2009)(unpublished)("The problem with this reasoning, however, is that it implicitly sanctions an officer's use of force, albeit resulting in only minor injury, that was wholly unnecessary to carry out the arrest."); Cortez v. McCauley, 478 F.3d 1108, 1129 (10th Cir. 2007); Overdorff v. Harrington, 268 F.3d 1179, 1195 (10th Cir. 2001).

Response to MSJ No. 1 ¶¶ 100-105, at 8.  Sharkey replies:

Plaintiffs do not specifically controvert Fact Nos. 100-105.  Nonetheless, Plaintiffs claim these facts are immaterial, citing three Tenth Circuit opinions for the general proposition that "[a] plaintiff does not need to sustain a physical injury to proceed against a law enforcement officer" under the Fourth Amendment.

MSJ No. 1 ¶ 101, at 16 (setting forth this fact).  See Sharkey's J.H. Depo. at 202:11-25.[66]  "There

were no indentations on J.P.'s wrists."  MSJ No. 1 ¶ 102, at 17 (setting forth this fact).  See

Sharkey's J.H. Depo. at 203:13-21.[67]  "The small red marks on J.P.'s wrists faded away before

that evening."  MSJ No. 1 ¶ 103, at 17.  See Sharkey's J.H. Depo. at 203:13-21.[68]  "J.P. did not

complain about any physical effects from the handcuffs."  MSJ No. 1 ¶ 104, at 17 (setting forth

---

Plaintiffs ignore, however, that these cases actually support Deputy Sharkey's defense.  In Cortez v. McCauley, 478 F.3d 1108, 1129 (10th Cir. 2007), the Tenth Circuit held that even if the officers ignored plaintiff's pleas that the handcuffs were too tight and left red marks that were visible for days, plaintiff's injury was "'insufficient, as a matter of law, to support an excessive force claim if the use of handcuffs [was] otherwise justified.'" (emphasis added).  In a more recent unpublished opinion, the Tenth Circuit did not overrule Cortez.  See Grass v. Johnson, 322 Fed. Appx. [at 589] (reviewing Cortez and finding its holding to be of limited value only because that case "did not involve allegations of unjustified and actively abusive behavior by the arresting officer.").  The third case cited by Plaintiffs, Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1195 (10th Cir. 2011), is distinguishable.  In Holland, members of a police SWAT team were accused of using excessive force during the course of an arrest where they held children at gunpoint after gaining control of the situation.  The court held that the officers' use of force was excessive, reasoning:

> Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.

[Holland ex rel. Ovedroff v. Harrington, 268 F.3d at 1195.]

Reply to Response to MSJ No. 1 ¶¶ 100-105, at 7-8.  The Plaintiffs did not specifically controvert the proposed facts, but only dispute their legal significance. The Court will, if necessary, return to the parties' legal dispute about these facts in its analysis.

[66]The Court disposed of the Plaintiffs' only response to these questions in note 65, supra.

[67]The Court disposed of the Plaintiffs' only response to these questions in note 65, supra.

[68]The Court disposed of the Plaintiffs' only response to these questions in note 65, supra.

this fact).  See Sharkey's J.H. Depo. at 204:17-25. [69]  "J.P.'s mother did not take J.P. to the Doctor as a result of the handcuffing."  MSJ No. 1 ¶ 105, at 17 (setting forth this fact).  See Sharkey's J.H. Depo. at 204:6-9.[70]  "Being arrested by a police officer at school is a significant" event for any child, and was traumatic for J.P.  Response to MSJ No. 1 ¶ C, at 9 (setting forth unmodified version of this fact).  See King Depo. at 10:24-11:5.[71]

### 7.    Charges Against J.P.; J.P.'s Competency Evaluation; Dismissal of Charges Against J.P.

_____

[69]The Court disposed of the Plaintiffs' only response to these questions in note 65, supra.

[70]The Court disposed of the Plaintiffs' only response to these questions in note 65, supra.

[71]The Plaintiffs ask the Court to conclude that "[b]eing arrested by a police officer at school is a significant and potentially traumatic event for any child."  Response to MSJ No. 1 ¶ C, at 9.  Sharkey disputes this fact, stating that "King did not testify that being arrested by a police officer at a school is a 'potentially traumatic event for any child.'  Instead, he stated, 'that's a significant event.'"  Reply to Response to MSJ No. 1 ¶ C, at 9 (quoting King Depo. at 10:24-11:5).

The truth lies somewhere between each side's characterization of the testimony.  The testimony is as follows:

> Q.      In your opinion, was [J.P.'s] arrest while she was a student at school a traumatic event in [J.P.'s] life?
>
> . . . .
>
> A.      Yes.  I would say for any child, for the police to come arrest you at school, that's a significant event.

King Depo. at 10:24-11:5.  First, given that the Plaintiffs predicated a fact based on this testimony, the Court concludes that the Plaintiffs have waived their objection to the question; in any case, the Court overrules the two objections.  King had already explained his familiarity with J.H. and the events at issue, and the fact is acceptable.  As for the testimony's substance, the Court's undisputed fact more fairly characterizes the testimony than either party characterized it: King testified that the event was traumatic in J.P.'s life and that an arrest is a significant event in any child's life.

The County Defendants also note that this testimony is immaterial to the Fourth Amendment issues.  See Reply to Response to MSJ No. 1 ¶ C, at 9.  The Court will determine materiality in the analysis.

Juvenile Probation and Parole Officer ("JPPO") Angela Opperman completed a
Preliminary Inquiry Determination for J.P., which indicated that "[a] Preliminary
Inquiry has been completed regarding the above child.  It is the recommendation
of the undersigned JPPO that, pursuant to the Preliminary Inquiry, it has been
determined that it is in the best interest of the child and the public that a petition
be filed."

MSJ No. 1 ¶ 106, at 17 (quoting Preliminary Inquiry Determination at 1 (dated October 25,
2011), filed July 30, 2013 (Doc. 92-10)).  See Response to MSJ No. 1 ¶¶ 106-115, at 8 (not
disputing these facts).  "On January 26, 2012, Children's Court Attorney Alesia Cappon filed a
four count Petition, charging J.P. with the following crimes: Battery on School Personnel (Count
I); Battery (County II); Interference with Educational Process (Count III); and Disorderly
Conduct (Count IV)."  MSJ No. 1 ¶ 107, at 17 (setting forth this fact).  See Petition at 1-2, filed
in state court in JR2012-0129 January 26, 2012, filed in federal court July 30, 2013 (Doc. 92-11).
See Response to MSJ No. 1 ¶¶ 106-115, at 8 (not disputing these facts).  "Deputy Sharkey did
not prepare the Petition."  MSJ No. 1 ¶ 108, at 17.  See Response to MSJ No. 1 ¶¶ 106-115, at 8
(not disputing these facts); Sharkey Aff. ¶¶ 74-75, at 8.  "Deputy Sharkey did not make the
decision to or have any role in adding the charges of battery, interference with educational
process or disorderly conduct which were brought for the first time against J.P. in the Petition."
MSJ No. 1 ¶ 109, at 17-18 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 106-115, at 8
(not disputing these facts);[72] Sharkey Aff. ¶ 76, at 8.

"During the pendency of the charges, J.P. underwent a competency evaluation."  MSJ
No. 1 ¶ 110, at 18 (setting forth this fact).  See Response to MSJ No. 1 ¶¶ 106-115, at 8 (not
disputing this fact); Report of Evaluation for Adolescent/Children Competency Evaluation from

---

[72]Although the Sharkey Aff. does not state that the additional charges were brought for
the first time against J.P. in the Petition, given that the Plaintiffs do not dispute this fact and the
absence of any evidence that those charges were brought at any earlier time, the Court infers that
this statement is accurate.

Clinton E. Rhyne, Ph. D., to The Honorable Judge Zamora (dated March 20, 2012), filed July 30, 2013 (Doc. 92-12)("Competency Evaluation").   "The psychologist who conducted the competency evaluation could only provide his 'provisional' 'impressions' of J.P. because she did not cooperate with the evaluation."   MSJ No. 1 ¶ 111, at 18 (setting forth this fact)(quoting Competency Evaluation at 4).   See Response to MSJ No. 1 ¶¶ 106-115, at 8 (not disputing this fact).   "The psychologist's provisional impressions were 'anxiety disorder NOS' and 'oppositional defiant disorder.'"   MSJ No. 1 ¶ 112, at 18 (setting forth this fact)(quoting Competency Evaluation at 4)(emphasis in MSJ No. 1).   See Response to MSJ No. 1 ¶¶ 106-115, at 8 (not disputing this fact).   "The psychologist further stated that J.P.'s 'mute posture and complete refusal to engage the examiner is suggestive of developmental immaturity combined with underlying mental health issues that cannot be adequately assessed under the current circumstances.[']"   MSJ No. 1 ¶ 113, at 18 (setting forth this fact)(quoting Competency Evaluation at 5)(emphasis in MSJ No. 1, but not in Competency Evaluation).   See Response to MSJ No. 1 ¶¶ 106-115, at 8 (not disputing this fact).

The psychologist opined the following regarding J.P.'s competency to stand trial:

> The results of the current evaluation . . . did not result in sufficient information to render an opinion relative to her understanding of duties and functions of the various officers of the court or her appreciation of the various options that are available to her in her defense.  Her understanding of the nature of the charges pending against her and her appreciation of the range of penalties that could be [i]mposed against her in the event of a guilty finding likewise could not be assessed.  Her instant ability to effectively track courtroom proceedings, to assist counsel in her[] own defense, to effectively challenge witnesses against her, and to testify relevantly are felt to be compromised as of the date of this evaluation.  Accordingly, it is felt that [J.P.] may not have a present sufficient understanding of the nature and significance of the instant proceedings and that she is presently unable to assist her attorney in a factual and rational manner.  It is my opinion that [J.P.] is likely not presently competent to proceed in the matter of

the instant charges.  She is further not competent to enter into a
plea bargain arrangement with the court.

MSJ No. 1 ¶ 114, at 18 (quoting Competency Evaluation at 5-6).  See Response to MSJ No. 1

¶¶ 106-115, at 8 (not disputing this fact).  "The charges against J.P. were dismissed because the

juvenile court found her incompetent to stand trial."  MSJ No. 1 ¶ 115, at 19 (setting forth this

fact).  See Amended Order Finding the Child Incompetent and Dismissal of the Charges Nunc

Pro Tunc to May 2, 2012 at 1, filed in JR 2012-0129 May 21, 2012, filed in federal court July 30,

2013 (Doc. 92-13); Response to MSJ No. 1 ¶¶ 106-115, at 8 (not disputing this fact).[73]

_____

[73]In their factual section, the Plaintiffs quote several sections of New Mexico law --
specifically, the Children's Code and Delinquency Act, N.M. Stat. Ann. §§ 32A-1-1 to 32 A-2-
33.  See Response to MSJ No. 1 ¶¶ F-I, at 9-10.  As Sharkey correctly objects, see Reply to
Response to MSJ No. 1 ¶¶ F-I, at 9-10, this tactic is not appropriate, as it does not lay out facts in
the relevant sense of the term.
        The Plaintiffs also state as follows:

   J.      The Unites States Department of Justice, Office of Community Oriented
           Policing Services has stated that [SROs] need to be trained to apply
           juvenile statutes and case law prior to being placed in schools.  **Exhibit I:**
           A Guide to Developing, Maintaining, and Succeeding With Your School
           Resource Officer Program at 9.

   K.      "In addition, [agencies should] consider training new SROs in child
           development and psychology; handling especially difficult students; the
           policies, procedures, and culture of the schools to which they will be
           assigned; and the preparation of safe school plans."  **Exhibit I** at 10.

   L.      School Resource Officers need to be trained to deal with complex issues
           associated with enforcing the law in a school setting related to the search
           and seizure of minors, the interrogation of minors, child development and
           psychology and specifics involved in working with kids in schools.
           "Training can help SROs to [']unlearn['] some of the techniques they
           became accustomed to using on patrol duty that are not appropriate in
           dealing with students -- for example, resorting too quickly to using
           handcuffs or treating misconduct as part of a person's criminal make-up
           when in a student the behavior may be an example of youthful ebullience,
           indiscretion, immaturity, or risk taking."

_____

Response to MSJ No. 1 ¶¶ J-L, at 10-11 (purporting to quote Unidentified Document (no date provided), filed August 16, 2013 (Doc. 103-13)).

     Sharkey responds:

> Deputy Sharkey objects to Plaintiffs' additional facts lettered J-L. <u>See</u> Fed. R. Civ. P. 56(c)(2). Plaintiffs cite to a guide to support their contention that school resource officers should receive certain training. The pages Plaintiffs cite do not, however, address the topic of training whatsoever. <u>See</u> [Doc. No. 103-13]. Therefore, Plaintiffs' "unsupported allegations are insufficient to create any genuine issue of material fact which would preclude the entry of summary judgment." <u>Bastian v. Bureau of Prisons</u>, 2000 WL 825713 at *2 (10th Cir. 2000). Plaintiffs' factual assertion is also immaterial because "[o]fficials sued for constitutional violations do not lose their qualified immunity because their conduct violated some . . . administrative provision." <u>Davis</u>, 468 U.S. at 194. It is also notable that the inside cover of the guide states, "Points of view or opinion contained in this documents [sic] are those of the authors and do not necessarily represent the official positions or policies of the U.S. Department of Justice." Finn, Peter, *et al.*, "A Guide to Developing, Maintaining, and Succeeding with Your School Resource Officer Program," (inside cover), attached as Exhibit B.

Reply to Response to MSJ No. 1 ¶¶ J-L, at 10.

     The Court will not deem the proposed facts undisputed. First, the Court notes that the Plaintiffs only attached to their Response to MSJ No. 1 certain pages from which they purport to quote and not pages that would identify the document. <u>See</u> Unidentified Document (no date provided), filed August 16, 2013 (Doc. 103-13). Sharkey was able to identify the document, but the exhibit confronts a second problem: as Sharkey points out, the pages that the Plaintiffs included have nothing to do with training; the exhibit does not contain the pages that the Plaintiffs purport to quote. Third, although the Court would not normally decide this issue in its fact section -- preferring to save such matters for the analysis -- the Court fails to see how quotations from a document that a subdivision of the United States Department of Justice created has anything to say about the Fourth Amendment propriety of the search in this case.

     The Plaintiffs also ask the Court to find the following undisputed:

> In support of Defendants['] claim that they are entitled to the dismissal of Plaintiff's supervisory claims because [sic] they claim that Defendant Sharkey was trained in the areas of special education and students['] rights, including in the symptoms of J.P.'s diagnosed behavioral disorder.

Response to MSJ No. 1 ¶ JJ, at 15. Sharkey responds: "Plaintiffs do not accurately describe the training Deputy Sharkey received in the referenced document. Deputy Sharkey received training regarding special education, a student's rights under the Family Educational Rights and Privacy Act, 20 U.S.C. §1232g ("FERPA") and Attention Deficit Hyperactive Disorder (ADHD)." Reply to Response to MSJ No. 1 ¶ JJ, at 14. First, the Court understands the Plaintiffs' confusing proposed undisputed fact to be as follows: The Defendants argue that, because Defendant

**PROCEDURAL BACKGROUND**

J.H., acting on J.P.'s behalf, commenced this lawsuit in New Mexico state court on December 5, 2011; Sharkey's co-Defendants removed the case to federal court on February 9, 2012.  See Notice of Removal (Doc. 1).  On June 28, 2013, the Plaintiffs filed the Plaintiffs' Second Amended Complaint for Recovery of Damages due to Deprivation of Civil Rights and Rights Under the Americans with Disabilities Act ¶ 48, at 6, filed June 28, 2013 (Doc. 85)("Second Amended Complaint").  The Second Amended Complaint alleges, among other things, that Sharkey violated J.P.'s Fourth Amendment right to be free from unlawful seizure when he arrested her and transported her to a juvenile detention facility on September 26, 2011.  See Second Amended Complaint *passim*.

1.    **MSJ No. 1.**

Sharkey filed the MSJ No. 1 on July 30, 2013.  See MSJ No. 1 at 1.  In the MSJ No. 1, Sharkey asks the Court to grant summary judgment on Count I of the Second Amended Complaint, which alleges that Sharkey violated the Fourth Amendment by unlawfully seizing J.P.  See MSJ No. 1 at 1.  Sharkey argues that the Court should grant summary judgment on Count I for two reasons: (i) he lawfully arrested J.P.; and (ii) even if he unlawfully arrested J.P., it was not clearly established that his actions were unlawful.  See MSJ No. 1 at 1, 20.

---

Sharkey was trained in the areas of special education and students' rights, including the symptoms of J.P.'s diagnosed behavioral disorder, the Defendants are entitled to dismissal of the Plaintiffs' supervisory liability claims.  The fact, as the Plaintiffs have phrased it, suggests that Sharkey was trained in the symptoms of J.P.'s disorder in particular, as opposed to ADHD in general.  Accordingly, the Court has not found the fact undisputed.

Sharkey argues that he lawfully arrested J.P., because he had probable cause to believe that she "had committed the fourth degree felony of battery on a school employee."  MSJ No. 1 at 20.  Sharkey explains that probable cause exists "where the facts and circumstances within the arresting officer's knowledge and of which they [sic] had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to have the belief that the offense has been or is being committed by the person to be arrested."  MSJ No. 1 at 20 (quoting United States v. Alonso, 790 F.2d 1489, 1486 (10th Cir. 1986))(internal quotation marks omitted).  Sharkey states that the crime of battery upon a school employee is "'the unlawful, intentional touching or application of force to the person of a school employee while [he or she] is in the lawful discharge of [his or her] duties, when done in a rude, insolent or angry manner.'"  MSJ No. 1 at 21-22 (alteration in Motion but not source)(quoting N.M. Stat. Ann.. § 30-3-9).  Sharkey contends that the following facts established probable cause that J.H. had committed battery on a school employee: (i) Gonzales was a "school employee" under N.M. Stat. Ann. § 30-3-9(A)(2), because she was a teacher with the Albuquerque Public Schools when the incident occurred; (ii) after J.P. struck one of her classmates, Gonzales and Zamora tried to restrain J.P. to prevent her from doing it again; (iii) while trying to get away from Gonzales and Zamora, J.P. scratched Gonzales' hand, causing Gonzales to bleed, and then kicked Gonzales in the thigh; (iv) Sharkey witnessed J.P. kick Gonzales; (v) when J.P. saw Sharkey she immediately stopped kicking Gonzales and retreated to the classroom; and (vi) all of these events occurred during school hours while Gonzales was lawfully discharging her duties as a teacher.  See MSJ No. 1 at 22.

Sharkey next addresses the Plaintiffs' argument that he should not have arrested J.P., because J.P. "lacked the mental capacity to commit a delinquent act."  MSJ No. 1 at 24 (quoting

the Second Amended Complaint ¶ 48, at 6).  Sharkey explains that, when he arrested J.P., he knew that she was receiving special education services, but was not aware of her diminished mental capacity.  See MSJ No. 1 at 24 (citation omitted).  Sharkey states that, "[e]ven assuming for purposes of this motion only that J.P. lacked the mental capacity to commit a delinquent act, it does not negate a finding of probable cause."  MSJ No. 1 at 24 (citation omitted).  In support of this contention, Sharkey cites S.A.S. ex rel. W.S. v. Hibbing Public Schools, CIV. 04-3204 JRT/RLE, 2005 WL 2230415 (D. Minn. Sept. 13, 2005).  See MSJ No. 1 at 23.  Sharkey points out that, in that case, officers arrested two disabled students for being disruptive in class and fighting with other students.  See MSJ at 23 (citing S.A.S. ex rel. W.S. v. Hibbing Pub. Sch., 2014 WL 2230415, at *3).  Quoting from the opinion, which the Honorable John R. Tunheim, United States District Judge for the District of Minnesota authored, Sharkey states: "[W]hile it is possible that S.A.S.'s disability might be considered in attempting to fashion an appropriate sentence . . . that any of the officers may have known S.A.S. was disabled is not relevant to whether they appropriately determined that probable cause existed to bring criminal charges against S.A.S."  MSJ No. 1 at 23 (quoting S.A.S. ex rel. W.S. v. Hibbing Pub. Sch., 2014 WL 2230415, at *3)(internal quotation marks omitted).  Sharkey contends that it was reasonable for him to believe that J.P. had intentionally kicked Gonzales and knew that what she had done was wrong, because she immediately stopped kicking Gonzales and retreated to the classroom when she saw Sharkey.  See MSJ No. 1 at 24.

Sharkey next turns to the Plaintiffs' argument that he unlawfully arrested J.P., because he "'knew or should have known that the juvenile detention center would not accept J.P. for housing.'"  MSJ No. 1 at 24 (quoting Second Amended Complaint ¶ 51, at 6).  Sharkey argues that "Plaintiffs' assertions are factually erroneous and immaterial to a Fourth Amendment

- 54 -

probable cause determination." MSJ No. 1 at 24. Sharkey points out that the CYFD probation and parole officers, and not police officers, determine whether to accept a juvenile at the juvenile detention center. See MSJ No. 1 at 24-25. Sharkey argues, however, that, even if he knew or should have known that the detention center would not house J.P., there is no legal authority indicating that a detention facility's decision not to house a suspect negates a probable cause finding. See MSJ No. 1 at 25.

Sharkey argues that, even if he unlawfully arrested J.P., he is entitled to qualified immunity, because it was not clearly established that his actions were unlawful. See MSJ No. 1 at 20, 26. Sharkey points out that, "to be clearly established, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" MSJ No. 1 at 26 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Sharkey contends that the Plaintiffs cannot point to a Supreme Court or Tenth Circuit case "which states that an officer would lack probable cause for an arrest for battery on a school employee in these circumstances." MSJ No. 1 at 26. To the contrary, Sharkey states, "authority from other jurisdictions establish[es] that there was in fact probable cause in similar factual circumstances." MSJ No. 1 at 26 (citing Allen v. Elbert County, No. CIV 09-0066 (CDL), 2010 WL 1257568 (M.D. Ga. Mar. 25, 2010)(holding that deputies had arguable probable cause to arrest eleven-year-old student for battery for getting into a fight with another student and hitting a teacher as he struggled to get free from her grasp)). Sharkey concludes his qualified immunity argument by stating that, "[b]ecause it was not clearly established that [he] lacked probable cause to arrest J.P. for battery on a school employee under these circumstances, [he] is entitled to qualified immunity on Plaintiffs' Fourth Amendment illegal seizure claim (Count I)." MSJ No. 1 at 26.

2.    <u>**The Plaintiffs' Response.**</u>

The Plaintiffs responded to the MSJ No. 1 on August 16, 2013.  <u>See</u> Plaintiff's Response to Defendant Sharkey's Motion for Partial Summary Judgment No. I: Plaintiff's Fourth Amendment Illegal Seizure Claim (Count I) Based on Qualified Immunity, filed August 16, 2013 (Doc. 103)("Response").  The Plaintiffs ask the Court to deny the MSJ No. 1.  <u>See</u> Response at 1. The Plaintiffs argue that Sharkey lacked probable cause to believe that J.P. committed battery on a school employee, because J.P.'s age and diminished mental capacity prevented her from forming the general intent necessary to commit battery.  <u>See</u> Response at 18-22.  The Plaintiffs argue that, at common law, a child between seven and fourteen was presumed to be incapable of committing a criminal act.  <u>See</u> Response at 18-19 (citations omitted).  In the Plaintiffs' view, because J.P. was eleven years old when the incident occurred, Sharkey should have presumed that she was incapable of committing a crime.  <u>See</u> Response at 18-19.

The Plaintiffs argue, moreover, that J.P.'s mental disability "exacerbates her inability to commit a criminal act."  Response at 19.  The Plaintiffs assert that, because J.P. was ultimately found incompetent to stand trial, she could not have formed the general intent necessary to commit battery on a school employee.  <u>See</u> Response at 19.  The Plaintiffs point out that a number of factors indicate that Sharkey knew or should have known that J.P. was mentally disabled: (i) Sharkey had previously interacted with J.P.; (ii) he arrested J.P. in a special education classroom; (iii) he was trained about the ADA and knew that students with disabilities and special needs attend the school; and (iv) he was trained and certified in de-escalation techniques.  <u>See</u> Response at 20.  In the Plaintiffs' view, "[a]n objectively reasonable school resource officer in [Sharkey's] position would have recognized that J.P. could not form the requisite intent to commit a battery and, therefore, would not have probable cause to arrest her

for battery upon a school employee."  Response at 21.  The Plaintiffs contend that Sharkey's

failure to investigate J.P.'s mental disability before arresting her "render[s] his probable cause

determination insufficient as a matter of law."  Response at 21 (citation omitted).

The Plaintiffs argue that New Mexico's Delinquency Act, N.M. Stat. Ann. §§ 32A-2-1

through 32A-2-33 ("NMDA"), required Sharkey to consider J.P.'s age and mental disability

before arresting her.  See Response at 22.  According to the Plaintiffs, the NMDA

> treats children accused of delinquent acts differently than it treats adults and is
> specifically designed "to remove from children committing delinquent acts the
> adult consequences of criminal behavior, but to still hold children committing
> delinquent acts accountable for their actions to the extent of the child's age,
> education, mental and physical condition, background and all other relevant
> factors."

Response 23 (quoting N.M. Stat. Ann. § 32A-2-2A).  The Plaintiffs argue that Sharkey "willfully

ignore[d]" N.M. Stat. Ann. § 32A-2-2A by failing to consider J.P.'s age, education, mental and

physical condition before arresting her.  Response at 23.  The Plaintiffs further argue that

Sharkey had no legitimate reason for arresting and transporting J.P. to the juvenile detention

center, because she did not meet the detention criteria.  See Response at 24.  The Plaintiffs

explain that J.P. sat on the floor of an empty room attached to the classroom while crying for

fifteen minutes before Sharkey arrested her.  See Response at 24.  In the Plaintiffs' view, J.P.'s

actions indicated that she "posed no risk of harm to anyone and no facts indicate any exigency

which justified her detention."  Response at 24.

The Plaintiffs argue, alternatively, that genuine issues of material fact prevent the Court

from granting summary judgment at this stage.  See Response at 24-25.  The Plaintiffs contend

that the parties dispute whether Sharkey was aware of J.P.'s mental disability before he arrested

her.  See Response at 25.  The Plaintiffs argue that Sharkey is "attempting at this juncture to

claim absolute ignorance to the fact that J.P. was diagnosed with emotional disturbance when he

arrested her."   Response at 25.   In the Plaintiffs' view, multiple facts contradict Sharkey's argument: (i) Sharkey had prior interactions with J.R. regarding her BIP; (ii) Sharkey is the kind of officer who gets to know his students; and (iii) Sharkey was trained in special education and students' rights.  See Response at 25.  The Plaintiffs further contend that "federal law mandates that Sharkey actually discover and transmit J.P.'s special education file to the District Attorney's Office."  Response at 25-26.  The Plaintiffs assert that, accordingly, "a jury should consider [Sharkey's] failure to discover [J.P.'s] disability despite federal law requiring an inquiry into the reasonableness question."  Response at 26.

    **3.**    **Sharkey's Reply.**

    Sharkey replied to the Response on September 3, 2013.   See Reply to Plaintiffs' Response to Defendant J.M. Sharkey's Motion for Partial Summary Judgment No. I: Dismissal of Plaintiffs' Fourth Amendment Illegal Seizure Claim (Count I) Based on Qualified Immunity, filed September 3, 2013 (Doc. 115)("Reply").   Sharkey first addresses the Plaintiffs' argument that, because J.P. was eleven years old at the time of the incident, there was a rebuttable presumption that she was incapable of forming the requisite criminal intent for battery of a school employee.  See Reply at 15.  Sharkey argues that this presumption applies only to a prosecutor at trial and not to a police officer's probable-cause determination.  See Reply at 15. Sharkey contends that the Plaintiffs do not cite -- and he could not find -- a case in which a court has required an officer to consider this presumption before finding probable cause.  See Reply at 15 (citation omitted).

    Sharkey argues that the Plaintiffs have offered no evidence indicating that J.P. was incapable of forming the requisite intent for battery on a school employee or that Sharkey was aware of such a disability.   See Reply at 15-16.  Sharkey argues that J.P.'s BIP belies the

Plaintiffs' contention, because it states that J.P. "knows how to perform the desired behavior, but does not consistently do so." Reply at 16 & n.1 (citation omitted). Turning to the Plaintiffs' argument that the NMDA required Sharkey to consider J.P.'s age and mental condition in finding probable cause, Sharkey states that, even assuming that the Plaintiffs' argument is accurate, violating state law is not a per se violation of the United States Constitution. See Reply at 16 (citing, e.g., United States v. Jones, 701 F.3d 1300, 1309-10 (10th Cir. 2012)).

Sharkey next addresses the Plaintiffs' contention that he had no legitimate reason to transport J.P. to the juvenile detention facility. See Reply at 16-17. Sharkey asserts that the Plaintiffs "ignore the undisputed fact that J.P. hit her classmate twice in the head and violently struggled with and battered" Gonzales. Reply at 16-17. Sharkey argues that these actions justified detention. See Reply at 17 (citing N.M. Stat. Ann. § 32A-2-11A(2)(stating that secure detention is warranted where a child "poses substantial risk of harm to others"); id. at § 32A-2-10C ("A child *under* the age of eleven shall not be held in detention.")(emphasis in Reply but not source)). Sharkey contends that the Plaintiffs' argument also fails to acknowledge "the provision of the Delinquency Act that imposes the duty to complete a risk assessment on the CYFD probation officer, not the law enforcement officer." Reply at 17 (citing N.M. Stat. Ann. §§ 32A-2-5(A), 32A-2-11(C)). Sharkey contends that, even if he violated the NMDA by arresting J.P. and transporting her to the detention center, "such violation does not negate his probable cause finding." Reply at 17 (citing United States v. Jones, 701 F.3d at 1309-10).

Sharkey next turns to the Plaintiffs' argument that there are genuine issues of material fact which preclude summary judgment. See Reply at 17-18. Sharkey maintains that the Plaintiffs' "asserted disputes are not genuine." Reply at 17. Sharkey contends that the Plaintiffs have offered "nothing more than mere speculation and hearsay to support their contention that

[he] was aware of J.P.'s emotional disturbance classification." Reply at 17.  Sharkey asserts that, even if the Court accepts the Plaintiffs' version of the facts, his knowledge of J.P.'s emotional disturbance classification is immaterial, because the Plaintiffs have not demonstrated that it was clearly established when he arrested J.P. that a student's classification as emotionally disturbed is relevant to his probable-cause finding.  See Reply at 17-18.  Sharkey contends that summary judgment is therefore warranted.  See Reply at 18.

### 4.    The September 6, 2013, Hearing.

The Court held a hearing on September 6, 2013.  See Transcript of Hearing (taken September 6, 2013)("Tr.").[74]  Sharkey began by asserting that the Plaintiffs' illegal seizure argument, "reduced to its essence," is that it is morally wrong for a police officer to arrest a developmentally disabled child.  Tr. at 7:11-15 (Robles).  Sharkey explained that, despite the Plaintiffs' contentions, the relevant question in deciding the MSJ No. 1 is whether J.P.'s arrest was legal.  See Tr. at 7:19-21 (Robles).  Sharkey argued that, although the Plaintiffs have tried to create genuine issues of material fact by focusing on Sharkey's purported violations of standard operating procedures, such violations are inadmissible in a § 1983 case.  See Tr. at 7:22-8:13 (Robles)(citing Solis-Marrufo v. Bd. of Comm'rs, No. CIV 11-0107 JB/KBM, 2013 WL 1658278 (D.N.M. Mar. 29, 2013)(Browning, J.)).  Sharkey explained that the Supreme Court has held that an officer's violation of a state law is insufficient to defeat the officer's probable cause finding under the Fourth Amendment.  See Tr. at 8:13-17 (Robles)(citing Virginia v. Moore, 553 U.S. 164 (2008)).  Sharkey asserted that, accordingly, even if he violated New Mexico state law

---

[74]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

when he arrested J.P., such violations would not lead to any genuine issues of material fact that would preclude summary judgment.  See Tr. at 8:23-24 (Robles).

Sharkey reiterated the argument from his Response that an officer may lawfully arrest an individual so long as the officer has probable cause to believe that the individual has committed "even a very minor criminal offense in [the officer's] presence."  Tr. at 10:3-8 (Robles)(citation omitted).  Sharkey explained that "[i]t is clear and undisputed that [Sharkey] witnessed J.P. kick a teacher . . . [which is] a felony violation of state law."  Tr. at 10:12-15 (Robles).  Sharkey pointed out that J.P. stopped kicking the teacher and retreated to the classroom as soon as she saw Sharkey.  See Tr. at 10:16-11:15 (Robles).  Sharkey argued that these actions indicated that J.P. possessed the requisite mens rea to commit battery upon a school employee.  See Tr. at 11:16-17 (Robles).

Sharkey stated that, although the Plaintiffs have tried to "look into Deputy Sharkey's mind about what his motives were" for arresting J.P., the Supreme Court has held that an officer's subjective intent is irrelevant under the Fourth Amendment.  See Tr. at 11:18-25 (Robles)(citing Whren v. United States, 522 U.S. 1119 (1998)).  Sharkey contended that, moreover, "a disability does not exempt anyone from abiding [by] the law."  Tr. at 11:25-12:2 (Robles).  Sharkey asserted that the Plaintiffs have not cited a case in which a court has required an officer to have more than probable cause before arresting a developmentally disabled person. See Tr. at 12:11-15 (Robles).  Sharkey alleged that, by contrast, he has cited "certain district court cases which in similar factual circumstances have found the arrest of children of this age who had disabilities to be constitutional."  Tr. at 12:16-19 (Robles).  In Sharkey's view, there is sufficient undisputed evidence for the Court to conclude that he had probable cause to arrest J.P. See Tr. at 12:21-25 (Robles).

The Court asked the Plaintiffs what disputed material facts preclude summary judgment. See Tr. at 13:5-9 (Court).  The Plaintiffs stated that the parties dispute whether Sharkey was aware of sufficient facts that would have required him to investigate J.P.'s ability to form the requisite criminal intent to commit battery before arresting her.  See Tr. at 13:14-19 (Kennedy). The Plaintiffs argued that Sharkey had such a duty, because: (i) he had a prior interaction with J.H., J.P.'s mother, during which J.H. informed Sharkey that J.P. had a BIP; (ii) he arrested J.P. in a special education class; (iii) he knows that the school has a procedure for managing disabled children that have violent outbreaks; (iv) twenty-five percent of the students in the school were in special education programs; and (vi) Congress expressed its intent in the IDEA that children with disabilities should not be excluded from school even if their disabilities cause them to commit violent actions.  See Tr. at 14:7-15:2 (Kennedy); id. at 16:18-25 (Kennedy).

The Plaintiffs explained that, before arresting J.P., Sharkey did not ask her what had happened, why she hit Gonzales, or whether she intended to do so.  See Tr. at 15:7-11 (Kennedy).  The Plaintiffs argued that Sharkey had a duty to interview J.P. and her teachers to determine what had happened before the incident and whether J.P.'s actions were a manifestation of her disability or a criminal act.  See Tr. at 16:11-17 (Kennedy).  The Court asked whether the Plaintiffs would concede that there is no bright-line rule prohibiting officers from arresting developmentally disabled children.  See Tr. at 17:8-12 (Court).  The Plaintiffs agreed that no such rule exists.  See Tr. at 17:13-14 (Kennedy).  The Court asked the Plaintiffs what the narrowest holding would be under which they could prevail.  See Tr. at 17:14-17 (Court).  The Plaintiffs responded that the Court's holding could turn on a combination of two legal authorities: (i) the IDEA, which recognizes that schools should not punish children when their disabilities cause them to commit violent actions; and (ii) the common-law rebuttable

presumption that children cannot form the requisite intent to commit a crime, which indicates that an officer has a duty to investigate whether intent is established whenever a child in a special education class commits a violent act.  See Tr. at 17:18-18:14 (Kennedy).

The Court asked the Plaintiffs for the strongest cases from the Tenth Circuit that support their position.  See Tr. at 20:8-10 (Court).  The Plaintiffs said that Baptiste v. J.C. Penney Co., 147 F.3d 1252 (10th Cir. 1998), is the strongest case indicating that officers have a duty to investigate and review all available evidence at the scene before making an arrest.  See Tr. at 20:15-18 (Kennedy).  The Plaintiffs stated that, in that case, the Tenth Circuit held that police officers should have viewed a video footage that the store had taken of the shoplifter before arresting her to determine whether they had probable cause to believe she had committed a crime.  See Tr. at 20:21-25 (Kennedy).  The Plaintiffs said that they could not find any cases outside of the Tenth Circuit that support their argument.  See Tr. at 21:5-21 (Kennedy, Court).

Sharkey argued that the Plaintiffs improperly borrow their duty-to-investigate theory from the IDEA.  See Tr. at 22:2-5 (Robles).  Sharkey stated that the IDEA applies only to educational establishments and not to law enforcement officers.  See Tr. at 22:6-8 (Robles). Sharkey explained that the IDEA contains a provision that explicitly allows state and local law enforcement to enforce state and federal law in cases involving children with disabilities.  See Tr. at 22:6-8 (Robles).  Sharkey stated that, accordingly, "to the extent that the IDEA creates some sort of duty to protect . . . children who have these disorders which may make them violent and disruptive from being excluded from school, it does not insulate those children from the criminal consequences of their action[s]."  Tr. at 22:9-13 (Robles).

The Court inquired whether the state -- through police officers, teachers, or principals -- has to treat developmentally disabled children differently from others.  See Tr. at 22:22-23:1

(Court).   Sharkey responded that he "would like to answer [that] question with a deeper review

of the facts."   Tr. at 23:2-3 (Robles).   Sharkey explained that, "on the date this incident

occurred[,] all that [he] knew was that [J.P.] was in special education."   Tr. at 23:3-5 (Robles).

Sharkey pointed out that "it wasn't until six months later that J.P. [w]as actually diagnosed with

having the learning disability ADHD."   Tr. at 23:6-7.   Sharkey argued that, therefore, "this whole

notion that [J.P. is] developmentally disabled and [it] should have been clear to anyone that she

didn't have mens rea simply doesn't have a factual basis."   Tr. at 8-10 (Robles).   Sharkey also

explained that special education programs include both children who "were once called gifted"

and children with developmental disabilities.   Tr. at 23:10-13 (Robles).   In Sharkey's view,

therefore, to say that a child cannot form the requisite intent for a crime because he or she is in a

special education class "is a bridge too far."   Tr. at 23:14-17 (Robles).   Sharkey also argued that

there is no evidence that anyone at the school knew on or before the date of the incident that J.P.

could not form the requisite intent for battery.   See Tr. at 23:17-22 (Robles).   Sharkey contended

that there is, therefore, no indication that any additional investigation would have revealed this

information.   See Tr. at 23:23-25 (Robles).

    Sharkey reiterated the argument from the MSJ No. 1 and from the Reply that an average

police officer who observed J.P.'s actions would have probable cause to believe that she

committed a crime.   See Tr. at 24:8-25 (Robles).   Sharkey asserted that, as a police officer, he

needed to establish only probable cause; he did not have to prove either the mens rea or the actus

reus of the crime beyond a reasonable doubt.   See Tr. at 24:24-25:2 (Robles).   Sharkey

analogized this case to Romero v. Fay, 45 F.3d 1472 (10th Cir. 1995).   See Tr. at 25:12-13

(Robles).   According to Sharkey, in that case,

        an Albuquerque Police Department detective was confronted by a murder suspect
        who kept demanding that he was innocent and he could prove his innocence if he

only talked to certain people.  But yet the other information that was available to
the [detective] certainly supported [a] finding of probable cause.  And despite the
fact that [the suspect] was in fact factually innocent, that wasn't enough to vitiate
probable cause.

Tr. at 25:14-21 (Robles).  Sharkey stated that <u>Romero v. Fay</u> indicates that the duty to investigate

"is not a duty to investigate every possibility, to essentially prove the criminal defense . . .

lawyer's case for him or her.  It's simply to prove probable cause."  Tr. at 25:21-25 (Robles).

Sharkey argued that further investigation into J.P.'s ability to form the requisite intent was

unnecessary, because J.P.'s actions established probable cause.  <u>See</u> Tr. at 26:2-11 (Gobles).

The Court asked the Plaintiffs whether -- without considering Sharkey's duty to

investigate J.P.'s ability to form the requisite intent for battery -- Sharkey had probable cause.

<u>See</u> Tr. at 26:12-15 (Court).  The Plaintiffs responded:

> I agree that there's probable cause to detain and investigate[,] . . . .  As far as the
> factual elements of the crime being fulfilled,  but the criminal act is a general
> intent crime under the state of -- and of course we're examining state of New
> Mexico law as to how it interprets criminal law, so factually, yes, probable cause.
> So [Sharkey] had enough evidence that there was factually probable cause.

Tr. at 26:16-27:1 (Kennedy).  The Plaintiffs explained, however, that, because the government

has to prove general intent at trial, an officer should have to consider whether an individual has

the requisite intent to commit the crime as part of his or her probable cause analysis.  <u>See</u> Tr. at

27:7-14 (Kennedy).  The Court asked whether, "if you have what you're calling factual probable

cause isn't . . . in a simplistic way, without getting the fact that it's children or they're disabled or

anything like that, it becomes a question . . . of [whether the officer] had a duty to investigate

further?"  Tr. at 27:15-21 (Court).  The Plaintiffs responded that Sharkey's knowledge of J.P.'s

disability triggered his duty to further investigate whether J.P. had the requisite intent to commit

battery.  <u>See</u> Tr. at 28:5-13 (Kennedy).

The Court asked Sharkey whether he had any black-letter law indicating that an officer does not owe any special duties to developmentally disabled children when determining probable cause.  See Tr. at 29:9-12 (Court).  Sharkey responded that, under Tenth Circuit law, an officer has a duty to investigate only exculpatory evidence that is readily available.  See Tr. at 29:13-15 (Robles).  Sharkey explained that, unlike in Baptiste v. J.C. Penney Co., where the officers refused to consider a readily accessible surveillance tape that contained exculpatory material, in this case, requiring Sharkey to further investigate J.P.'s ability to form the requisite intent for battery would force him to "delve[] into the protected mental healthcare records of a [child]."  Tr. at 29:18-20 (Robles).  Sharkey contended that FERPA prohibited him from conducting such an investigation.  See Tr. at 29:20-22 (Robles).  Sharkey argued that, moreover, even if he had looked at J.P.'s records, those records would not have indicated that J.P. could not form the requisite intent for battery.  See Tr. at 30:5-10 (Robles).

Sharkey also asserted that, far from being clearly established law, there is not a single case in which a court has required an officer to investigate whether a developmentally disabled individual can form the requisite intent for a particular crime.  See Tr. at 30:25-31:9 (Robles).  Sharkey contended that, accordingly, qualified immunity bars the Plaintiffs' claim.  See Tr. at 31:11-12 (Robles).  The Court asked Sharkey how he would address the Tenth Circuit's holding in Romero v. Fay, which seems to require officers to investigate further even where the elements of a crime are met.  See Tr. at 31:13-16.  Sharkey contended that Romero v. Fay stands for the proposition that "someone may be factual[ly] innocent but that doesn't mean that the officer at the time of the arrest did not have probable cause."  Tr. at 32:15-18 (Robles).  In Sharkey's view, that proposition applies equally here: that J.P. is incompetent to stand trial has no bearing on whether Sharkey had probable cause to arrest her.  See Tr. at 32:18-33:4 (Robles).

The Court said that it was having a difficult time trying to determine when this duty to investigate arises.  See Tr. at 33:5-11 (Court); id. at 33:13-16 (Court).  Sharkey responded that he could not find a case "where there was a duty imposed on an officer . . . to examine the student's special education records to determine from those records[,] interviews of the family, interviews of . . . individuals with knowledge" whether the student had the requisite mens rea to commit a crime.  Tr. at 33:17-24 (Robles).  The Court asked: "[Y]ou think once [officers] come up to the scene, they check off [the elements of the crime], that's it, they don't have to do any investigation, whether it's in this case or any other case?"  Tr. at 33:25-24:3 (Court).  Sharkey responded that he would not extend the rule that far.  See Tr. at 34:4-5 (Robles).  Sharkey argued that he would distinguish this case from the Court's hypothetical scenario, because there is no Supreme Court or Tenth Circuit precedent indicating that an officer cannot find probable cause without evidence of mens rea.  See Tr. at 34:6-9 (Robles).  Sharkey explained that, although prosecutors must prove mens rea during trial, there is no such duty imposed on law enforcement officers in finding probable cause.  See Tr. at 34:10-13 (Robles).

Sharkey also argued that, even if there is such a requirement, J.P.'s actions -- that she stopped kicking Gonzales and retreated to a classroom when Sharkey arrived -- demonstrated her mens rea.  See Tr. at 34:15-21 (Robles).  The Court said that it was reluctant to cabin the issue to what steps an officer must take before arresting a mentally disabled child.  See Tr. at 35:14-18 (Court).  In the Court's view, the better way to frame the issue -- at least for qualified immunity purposes -- is how far officers must go in an investigation when they already have enough evidence to establish probable cause.  See Tr. at 35:19-21 (Court).  The Court questioned whether Romero v. Fay was the best case to answer that question.  See Tr. at 35:21-22 (Court).  The Court stated that it had dealt with this issue recently and thought it had written that the duty arises in

only a narrow set of circumstances.  <u>See</u> Tr. at 35:22-36:2 (Court).  The Court thought that there

were Tenth Circuit cases involving search warrants in which officers had a broader duty to

investigate facts which might undercut the warrant -- like an informant's reliability.  <u>See</u> Tr. at

35:3-8 (Court).  The Court said that it was inclined to think that, by contrast, when officers

respond to the scene of a crime, they have a narrow duty to investigate.  <u>See</u> Tr. at 36:8-10

(Court).  The Court said that it was concerned that the Plaintiffs' rule would require officers to

investigate further in a fast-paced situation involving violent activity before arresting anyone.

<u>See</u> Tr. at 36:13-18 (Court).  The Court concluded that it was more troubled by the Plaintiffs'

approach than Sharkey's and that it was, therefore, leaning towards granting the MSJ No. 1.  <u>See</u>

Tr. at 36:19-20 (Court).

<div align="center"><u>**LAW REGARDING SUMMARY JUDGMENT**</u></div>

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving

party's case.'"  <u>Herrera v. Santa Fe Pub. Sch.</u>, No. CIV 11-0422 JB/KBM, 2013 WL 3462484, at

*23 (D.N.M. June 28, 2013)(Browning, J.)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>,

939 F.2d 887, 891 (10th Cir. 1991)).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "If

the *moving* party will bear the burden of persuasion at trial, that party must support its motion

with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it

to a directed verdict if not controverted at trial."  <u>Celotex Corp v. Catrett</u>, 477 U.S. at 331

<div align="center">- 68 -</div>

(Brennan, J., dissenting)(emphasis in original).[75]   Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.   See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."   Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."   (quotation marks omitted)).   Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."   Fed. R. Civ. P. 56(c)(1).   It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."   Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.   See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported

---

[75]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.   See 10A C. Wright & A. Miller, Federal Practice & Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

summary judgment motion is made, the opposing party may not rest on the allegations contained

in his complaint, but must respond with specific facts showing the existence of a genuine factual

issue to be tried.'"  (citation omitted)).  Nor can a party "avoid summary judgment by repeating

conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l

Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing

Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R.

Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on

ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the

mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL

2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

　　　　To deny a motion for summary judgment, genuine factual issues must exist that "can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either

party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not

avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the factfinder

could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at

251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871));

Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the

evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be

granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational

trier of fact, considering the record as a whole, could not find for the nonmoving party, there is

no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the Court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified-immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at 586-87] (footnote omitted).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .   When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.   Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.   The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

Applying this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), the Tenth Circuit explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]"   York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

584 F.3d at 1312.   "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[76]] explained that the blatant contradictions of the record

---

[76]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").   The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

must be supported by more than other witnesses' testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . .
>
> Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted). See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92). In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court" before inquiring into whether there are genuine issues of material fact for resolution by the jury. 584

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that Rhoads v. Miller, Lobozzo v. Colorado Department of Corrections, 429 F. App'x 707 (10th Cir. 2011), Johnson v. Sedgwick County Sheriff's Dep't, 461 F. App'x 756 (10th Cir. 2012), Grass v. Johnson, 322 F. App'x 586 (10th Cir. 2009), and Silvan West v. Briggs, 309 F. App'x 216 (10th Cir. 2009), have persuasive value with respect to material issues and will assist the Court in its preparation of this Sealed Memorandum Opinion.

F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability. See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)). The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C.

§ 1983.  See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is inapplicable to Bivens[77] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

### 1.   Color of State Law.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."  Jojola v. Chavez, 55 F.3d at

---

[77]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

493.  Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"  Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

**2.      Individual Liability.**

- 76 -

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the

'philosophic' or but-for sense by the illegal entry." <u>Id.</u>  In civil rights cases, a
superseding cause, as we traditionally understand it in tort law, relieves a
defendant of liability.  <u>See, e.g.</u>, <u>Warner v. Orange Cnty. Dep't of Prob.</u>, 115 F.3d
1068, 1071 (2d Cir. 1997); <u>Springer v. Seaman</u>, 821 F.2d 871, 877 (1st Cir. 1987),
<u>abrogated on other grounds by</u> <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701 . . .
(1989).

<u>Trask v. Franco</u>, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment,

the Tenth Circuit has held that government actors "may be held liable if the further unlawful

detention and arrest would not have occurred but for their conduct and if there were no

unforeseeable intervening acts superseding their liability."  <u>Martinez v. Carson</u>, 697 F.3d at 1255.

The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable

Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the

Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest
> warrant and that they improperly enter without knocking and announcing their
> presence.  Once inside, they encounter the suspect, identify themselves, show him
> the warrant, and tell him that they are placing him under arrest. The suspect,
> however, breaks away, shoots and kills two of the officers, and is preparing to
> shoot the third officer when that officer disarms the suspect and in the process
> injures him.  Is the third officer necessarily liable for the harm caused to the
> suspect on the theory that the illegal entry without knocking and announcing
> rendered any subsequent use of force unlawful?  The obvious answer is "no." The
> suspect's conduct would constitute a "superseding" cause, <u>see</u> Restatement
> (Second) of Torts § 442 (1965), that would limit the officer's liability. <u>See</u> <u>id.</u>
> § 440.

<u>Trask v. Franco</u>, 446 F.3d at 1046 (quoting <u>Bodine v. Warwick</u>, 72 F.3d at 400).  Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility."  <u>Trask v. Franco</u>, 446 F.3d at 1047 (quoting William

Lloyd Prosser et al., <u>Prosser and Keeton on Torts</u> § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in
> determining whether the intervening act relieves the actor from liability for his
> antecedent wrongful act, and under the undisputed facts there is room for

reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

**3.   Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'"   Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(internal alterations omitted).   Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."   Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).   Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.   The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.   See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).   The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."   Ashcroft v. Iqbal, 556 U.S. at 676.   The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about <u>Iqbal</u>, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that <u>Ashcroft v. Iqbal</u> "does not purport to overrule existing Supreme Court precedent," but stated that "<u>Iqbal</u> may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  It concluded that <u>Ashcroft v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after <u>Ashcroft v. Iqbal</u>:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

<u>Dodds v. Richardson</u>, 614 F.3d at 1199-1200 (citing <u>Summum v. City of Ogden</u>, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in <u>Board of County Commissioners v. Brown</u>, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.  Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required

> to prove the underlying violation.   Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.   Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).   The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."   Dodds v. Richardson, 614 F.3d at 1200 n.8.   Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"   Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4.   **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.   See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).   Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.   See Graves v. Thomas, 450 F.3d at 1218.   When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.   See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).   A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).   Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  Oliver v. Woods, 209 F.3d at 1186.

### 1.      Investigative Detentions and Reasonable Suspicion.

An encounter that is not consensual may nevertheless be justified as an investigative detention.  An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).   Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  Oliver v. Woods, 209 F.3d at 1186 (quoting

United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001)(en banc), overruled on other grounds as recognized in United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion. United States v. Winder, 557 F.3d at 1134.  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").  A police-citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest which probable cause or consent must support to be valid.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in

- 83 -

danger." Terry v. Ohio, 392 U.S. at 27.  A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."  Terry v. Ohio, 392 U.S. at 29.  In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

The Tenth Circuit has recognized the doctrine in Terry v. Ohio of an investigative detention -- a "stop" -- and of a protective search -- a "frisk."

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1997)(citations omitted)).  The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment.  United States v. King, 990 F.2d at 1557.

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior. See 364 F.3d at 1194.  The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot.  See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").  While many of the factors that the Tenth Circuit considered

would not, without more, have given rise to reasonable suspicion, the combination of circumstances was sufficient.  See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In <u>United States v. Ceballos</u>, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night.  See 355 F. App'x at 227-28.  A truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk.  See 355 F. App'x at 228.  Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk.  See 355 F. App'x at 228.  The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused.  See 355 F. App'x at 228.  Not investigating any particular crime or suspected-crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled up behind the truck.  355 F. App'x at 228, 229.  Upon talking to the truck's driver, Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, he did not have a driver's license, and he had a gun and other items in his vehicle.  See 355 F. App'x at 227-29.  The Tenth Circuit found that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed and that the officer's "subjective characterization of his actions is irrelevant."  355 F. App'x at 229.  The Tenth Circuit, in an opinion written by the Honorable Michael R. Murphy, United States Circuit Judge for the Tenth Circuit, and joined by the Honorable Mary Beck Briscoe, Chief Judge, and Robert H. McWilliams, Jr., Senior Judge, explained:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that

caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night. He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street. Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride. She refused, telling him she lived up the street. Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking. He parked in a dark location and turned off his lights.

. . . .

We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos. Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home. The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229. The Tenth Circuit did not require the officer to identify the particular crime of which the officer had reasonable suspicion or even to acknowledge having reasonable suspicion. The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian." 355 F. App'x at 229. The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur. See 355 F. App'x at 229.

In United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), the Tenth Circuit found reasonable suspicion based upon an officer's knowledge of the defendant's:

(1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner consistent with an attempt to find a route to flee; and, (5) approach to [a private] home's back door without conversing with the residents visible inside.

483 F. App'x at 417. At the district court level, in ruling on the motion to suppress, the Honorable Martha A. Vazquez, United States District Court Judge for the District of New

Mexico, had concluded that, because the defendant's conduct in standing outside a private residence and looking in "was consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance," the officer did not have reasonable suspicion at the time of the stop and should have waited longer to rule out innocent conduct. 483 F. App'x at 418 (quoting District Court Opinion at 19). The Tenth Circuit disagreed, however, stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and often is -- consistent with innocent behavior." 483 F. App'x at 418. The Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily innocent, because an Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling." 483 F. App'x at 417 (quoting Albuquerque Ord. § 12-2-21(B)). The Tenth Circuit, thus, reversed Judge Vazquez' decision, disagreeing with her finding that the officer lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home." 483 F. App'x at 417.

2.    **Arrests**.

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest. An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)). The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest. United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994). See Florida v. Royer, 460 U.S. 491, 499 (1983). The use of handcuffs, however,

does not always elevate a detention into an arrest.  See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not always elevate a detention into an arrest."); Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *44-49 (D.N.M. Apr. 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun).  "Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."  United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).  See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'"  (quoting Oliver v. Woods, 209 F.3d at 1185)), aff'd, 512 F. App'x 841 (10th Cir. 2013).

"Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion."  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can be made:

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer."  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations omitted)(internal quotation marks omitted).

### 3.        When a Detention Becomes an Arrest.

The Tenth Circuit has held that a police-citizen encounter which goes beyond the limits of an investigative stop is an arrest which probable cause or consent must support to be valid. See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances."  United States v. Perdue, 8 F.3d at 1462. "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions

of an investigative seizure.'"   United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest.  In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court had to determine whether the police involved transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car.  See United States v. Perea, 374 F. Supp. 2d at 976.  In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest.  See 374 F. Supp. 2d at 976.  The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at 974.  See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause); United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998)("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'").

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest.  'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'"  United States v. Perea, 374 F. Supp. 2d at 974.  See United States v. Merkley,

988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained

the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill

someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d

1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to

the street" was not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73

(2d Cir. 1990)(holding that the law enforcement officers did not convert the stop into an arrest by

"unholstering their guns and frisking" the defendant when they suspected that the defendant had

"just completed a narcotics purchase," there were a number of "innocent bystanders on the

crowded city street," and stopping a vehicle "is especially hazardous and supports the need for

added safeguards").  Similarly, there are circumstances in which a seizure is not an arrest merely

because the subject of the detention is placed in handcuffs.  See United States v. Merkley, 988

F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have

held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop.");

United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of

Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the

safety of the agents.").  United States v. Perea was one of those unique cases, because the police

had reasonable cause to believe that the person whom they were detaining the suspect whom

they sought to arrest -- a man wanted for murder whom, it was believed, might be armed and

dangerous.  See 374 F. Supp. 2d at 976.  The Tenth Circuit affirmed the Court's determination

that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the
> perceived threat.  The measures taken during a Terry stop must be reasonably
> related in scope to the circumstances which justified the interference in the first
> place and may not go beyond what is necessary for officer safety.  The felony stop
> was justified by suspicion that someone in the Escalade might have a gun, or at
> least was dangerous.  The officers displayed their weapons only as long as

> necessary to ensure that the vehicle and its occupants posed no threat.   The
> officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him
> in the back of a police car, and confirmed that no one else was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730 (citations omitted)(internal quotation

marks omitted).

### 4.   Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily

available at the scene, investigate basic evidence, or otherwise inquire if a crime has been

committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay,

45 F.3d at 1476-77.  Police officers "may not ignore easily accessible evidence and thereby

delegate their duty to investigate [to others]." Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

However, "[o]nce probable cause is established, an officer is not required to continue to

investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas, No. CIV

11-0011 JB/RHS, 2011 WL 7444745, at *49 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Cortez

v. McCauley, 478 F.3d at 1121 n.18).

The Tenth Circuit confronted the issue when an officer must conduct further investigation

before arresting an individual in Romero v. Fay.   In that case, law enforcement officers

interviewed two individuals -- Stella Gutierrez and Manuel Duran -- who implicated the plaintiff

in a murder.  See 45 F.3d at 1474.  Approximately four hours later, without conducting additional

investigation or obtaining a warrant, an officer arrested the plaintiff for murder.  See 45 F.3d at

1474.  After he was taken into custody, the plaintiff told the officer that he was innocent and that

he had an alibi.  See 45 F.3d at 1474.  The plaintiff stated that three individuals would establish

that he was asleep at home when the murder occurred.  See 45 F.3d at 1474.  The officer refused

the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little

- 92 -

significance because they would lie to protect" the plaintiff.  45 F.3d at 1474.  The officer never interviewed the alibi witnesses.  See 45 F.3d at 1474.  The plaintiff was incarcerated for three months before the government dismissed the case and he was released.  See 45 F.3d at 1474.

The plaintiff brought a § 1983 action for, among other things, violations of his Fourth Amendment rights.  See 45 F.3d at 1474.  The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him.  See 45 F.3d at 1476.  The Tenth Circuit, in an opinion that Judge Baldock authored, and Judges Tacha and McKay joined, disagreed.  See 45 F.3d at 1476.  The Tenth Circuit stated that the Fourth Amendment requires officers to only "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention."  45 F.3d at 1476-77.  The Tenth Circuit concluded that,

> [o]nce [the defendant] concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

In Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store surveillance; and (ii) watching a video of the surveillance footage on which the security officers relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen anything.  See 147 F.3d at 1254-55.  The Tenth Circuit, in an opinion that Judge Murphy authored, and Judges Anderson and Logan joined, concluded that qualified immunity did not

apply.  See 147 F.3d at 1257-59.  The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's conduct, "which was memorialized in its entirety on the videotape."  147 F.3d at 1257.  The Tenth Circuit stated that the police officers "viewed the very same conduct on the videotape, which this court has concluded failed to establish probable cause."  147 F.3d at 1257.  The Tenth Circuit held that, consequently, "it was . . . not reasonable for the officers to rely on the security guards' allegations."  147 F.3d at 1257.  The Tenth Circuit added that,

> police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation. . . .  Here, [the defendants] did conduct some investigation by viewing the videotape and questioning [the plaintiff].  They argue, however, that they should be allowed to rely on the statement of the guards for probable cause to arrest.  Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

In Cortez v. McCauley, officers responded to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her.  See 478 F.3d at 1113 (internal quotation marks omitted).  Without (i) interviewing the girl, her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of sexual assault; or (iii) waiting for the results of a medical examination of the child, the officers arrested the boyfriend.  See 478 F.3d at 1113.  The Tenth Circuit, in an en banc opinion that Judge Kelly authored, explained that,

> whether we view it as a need for more pre-arrest investigation because of insufficient information, . . . or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by [the defendant].  See BeVier v. Hucal, 806 F.2d 123, 128

(7th Cir. 1986)("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place."). Based on the facts above, [the defendant] was arrested without probable cause.

478 F.3d at 1116 (footnotes omitted)(citations omitted). The Tenth Circuit further held that

it was established law that "the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero, 45 F.3d at 1476-77 (footnote omitted); see also Baptiste v. J.C. Penney, Co., 147 F.3d . . . 1259 . . . ("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation."). In the present case, witnesses were readily available for interviews, physical evidence was available, and a medical diagnosis was forthcoming. Defendants, however, . . . conducted no investigation. Instead, the Defendants relied on the flimsiest of information conveyed by a telephone call.

Cortez v. McCauley, 478 F.3d at 1117-18 (footnotes omitted)(citations omitted). The Tenth Circuit concluded, therefore, that qualified immunity did not apply. See 478 F.3d at 1118-22.

In Garcia v. Casuas, a detective with the City of Rio Rancho, New Mexico -- Monica Casuas -- arrested the plaintiff, Mitchell Garcia, for sexual penetration of a minor. See 2011 WL 7444745, at *8. The plaintiff was ultimately exonerated, and subsequently filed a § 1983 claim against the arresting officer and the City of Rio Rancho for, among other things, unlawfully arresting him in violation of his Fourth Amendment rights. See 2011 WL 7444745, at *12. The Court found that the officer had probable cause to arrest the plaintiff based on information gleaned from other officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Audrey Odom, and a witness at the scene on the night of the incident -- Jennifer Katz. See 2011 WL 7444745, at *43-46. Garcia argued that, by failing to re-interview Odom and Katz, and instead choosing to rely on the other officers' interviews of them, Casuas "fail[ed] to interview readily accessible witnesses." 2011 WL 7444745, at *15. Garcia contended that, moreover,

Casuas should have known that failing to personally interview him, Odom, Katz, K.J., and Katz'
neighbors before arresting him violated his constitutional rights.  See 2011 WL 7444745, at *15.
Garcia argued that, had Casuas interviewed him before arresting him, she would have discovered
Katz' and Odom's motivations to lie.  See 2011 WL 7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the
plaintiff did not constitute a Fourth Amendment violation, the Court explained:

> Although Garcia cites Romero v. Fay and cases from several other circuits
> for the general proposition that officers must interview witnesses at the scene,
> Garcia points to no case law which would establish that, after the officers at the
> scene have interviewed witnesses, the Constitution requires the investigating
> detective to interview those witnesses again. . . .   Here, the responding police
> officers . . . interviewed every adult alleged to be involved in the incident and
> briefly spoke with K.J. . . .
>
> Garcia also states that, if Casuas had investigated further, she would have
> known that there was no semen on the bedding, and she would have discovered
> Katz' and Odom's motivation if she spoke to him. . . .   The Tenth Circuit's
> discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion
> that Casuas was required to do more after [K.J.'s interview] solidified the
> existence of probable cause.  In Romero v. Fay, the Tenth Circuit held:
>
>> Plaintiff contends that regardless of whether the statements by Duran and
>> Guiterrez supplied probable cause for Defendant Fay to arrest Plaintiff,
>> under clearly established law a reasonable police officer would have
>> investigated his alibi witnesses before arresting him, and the exculpatory
>> information possessed by them would have negated the probable cause to
>> arrest. We disagree.
>
> 45 F.3d at 1466.  In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized
> that "officers are not required to conduct full investigations before making an
> arrest." 147 F.3d at 1257 n. 8.
> . . . .
>
> These cases establish that Casuas was not required to speak to [Katz'
> neighbors], because they did not appear to be material witnesses.  Garcia has
> made no allegations and presented no facts suggesting that the neighbors were
> ever around K.J.  Garcia has also not presented any facts demonstrating that [the
> neighbors] have shed light on the motivations of Katz or Odom.  Garcia only
> speculates that Casuas *might* have found something.  An officer is not required to

exhaust every possible lead to satisfy the Fourth Amendment.  In <u>Romero v. Fay</u>, the Tenth Circuit held:

> Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

. . . .

     Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him.  When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. . . . Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. . . . .  During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives.  The cases that Garcia cites establish only that the police may not ignore available material witnesses.  Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed.  Garcia presents no cases, and the Court could find none, suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses. . . .  Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination, because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it does not have the capabilities to detect the presence of urine in or on a substance . . . .

     Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect.  <u>See Cortez v. McCauley</u>, 478 F.3d at 1121 n.18 (citing <u>Baker v. McCollan</u>, 443 U.S. 137, 145-46 (1979)).  The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview.  Casuas was not required to investigate further after that determination.

2011 WL 7444745, at *47-49.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227

(1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1. Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether

in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional

question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 131 S. Ct. at 2031-32. See Kerns v. Bader, 663 F.3d at 1181.[78] "Courts should think carefully before

---

[78]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the

Provisions of the Fourteenth Amendment." . . .  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)).  See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[79]  The Tenth Circuit will

_____

litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).

[79]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried

- 103 -

assiduously to avoid thinking about or categorizing some cases as "large" and some as "small." It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment. Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job. The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way. Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts. The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice. The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance. Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012). In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation. See 132 S. Ct. at 2092, 2097. In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S. Ct. at 1660, 1668. In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error. See 132 S. Ct. at 1241, 1250. The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant. See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained

remand a case to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

> ### 2.      Clearly Established Rights in the Qualified Immunity Analysis.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."

---

that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm's, 888 F. Supp. 2d at 1222 n.35.

Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in <u>Kerns v. Bader</u> that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction <u>might</u> make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  In <u>Kerns v. Bader</u>, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was <u>beyond debate</u> in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See <u>Casey v. City of Fed. Heights</u>, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  <u>Casey v. City of Fed. Heights</u>, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."  <u>Hope v. Pelzer</u>, 536 U.S. at 741.

## ANALYSIS

Sharkey did not violate J.P.'s Fourth Amendment right to be free from unlawful seizure when he arrested her.  Given J.P.'s recent attack on a student and on a school employee, Sharkey had probable cause to do so.  Sharkey's decision to transport J.P. to the juvenile detention center similarly did not violate any right that the Fourth Amendment secures.  Moreover, even if Sharkey violated J.P.'s Fourth Amendment rights by either arresting her or transporting her to the juvenile detention center, such rights were not clearly established.  Accordingly, Sharkey is

entitled to qualified immunity, and the Court will grant summary judgment as to the Plaintiffs'

Fourth Amendment unlawful seizure claim.

## I.   <u>SHARKEY LAWFULLY ARRESTED J.P.</u>

"Probable cause to arrest exists only when the 'facts and circumstances within the

officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in

themselves to warrant a man of reasonable caution in the belief that an offense has been or is

being committed.'"  <u>United States v. Valenzuela</u>, 365 F.3d at 896-97 (quoting <u>United States v.</u>

<u>Edwards</u>, 242 F.3d at 934)(citing <u>Draper v. United States</u>, 358 U.S. at 313).   Although

"[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more

than mere suspicion."  <u>United States v. Morris</u>, 247 F.3d at 1088 (internal quotation marks

omitted).

The Supreme Court has explained that probable cause is an objective standard.  <u>See</u> <u>Beck</u>

<u>v. Ohio</u>, 379 U.S. at 96.   "The subjective belief of an individual officer as to whether there was

probable cause for making an arrest is not dispositive."  <u>United States v. Valenzuela</u>, 365 F.3d at

896-97 (citing <u>Florida v. Royer</u>, 460 U.S. at 507; <u>United States. v. Treto-Haro</u>, 287 F.3d at 1006).

Thus, the Court must determine "whether a reasonable officer would have believed that probable

cause existed to arrest [J.P.] based on the information possessed by [Sharkey]."  <u>Olsen v. Layton</u>

<u>Hills Mall</u>, 312 F.3d at 1312 (alterations omitted)(internal quotation marks omitted).

The evidence supports Sharkey's determination that he had probable cause to arrest J.P.

for battery of a school employee, in violation of N.M. Stat. Ann. § 30-3-9(E).   Minutes before

Sharkey arrived, J.P. attacked a fellow student and a teacher.   When she saw Sharkey, J.P.

retreated into a classroom, sat on the floor, held her hands together so as to avoid being

handcuffed, and cried for fifteen minutes -- showing both consciousness of guilt and an effort to

avoid her actions' consequences.   In short, Sharkey saw J.P. kick her teacher, heard what happened, and, in light of all the circumstances, concluded that J.P. had probably committed the crime.   Indeed, in light of the undisputed facts before the Court, it seems likely that she committed the crime, and it is difficult to fault Sharkey for concluding likewise.[80]

**A.    SHARKEY DID NOT HAVE A DUTY TO INVESTIGATE WHETHER J.P.'S DEVELOPMENTAL DISABILITY PREVENTED HER FROM FORMING THE REQUISITE INTENT FOR BATTERY ON A SCHOOL EMPLOYEE.**

The Plaintiffs argue that, because Sharkey knew or should have known that J.P. had a developmental disability, he violated the Fourth Amendment by failing to investigate whether J.P.'s disability rendered her incapable of forming the requisite intent for battery of a school employee before arresting her.   This argument lacks a sound basis in law or fact.

First, Sharkey neither knew, nor should have known, that J.P. had a developmental disability.   Because Sharkey knew J.P. was in a special education classroom, because he knew of a prior incident involving J.P. in elementary school where J.H. had spoken about a "plan" -- which, in context, probably was a reference to her BIP or IEP -- and because he generally gets to know his students well, Sharkey at most either knew or should have known that J.P. had some

_____

[80]The Court recognizes that Sharkey has stated that whether a person whom he is investigating has a disability plays no role in his investigation or in his decision to arrest that person.   See Response to MSJ No. 1 ¶ R, at 12 (setting forth a similar fact); Plaintiffs' Sharkey Depo. at 7:5-21.   If one understands Sharkey to believe that whether a person has a disability is irrelevant to the probable-cause determination, he misunderstands the law: in some situations -- like that in Lewis v. Truitt, where the police had good reason to believe the person ignoring their commands was deaf -- whether a person is disabled is relevant to the probable-cause determination.   Nonetheless, Sharkey's statement does not change the Court's conclusion.   First, Sharkey did not know or have reason to know that J.P. was disabled within the ADA's definition -- much less that any disability she had rendered her incapable of forming criminal intent.   Second, Fourth Amendment probable cause inquiry is an objective test that does not depend on Sharkey's subjective thought processes.   See Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *30 (D.N.M. Apr. 30, 2014)(Browning, J.)("Probable cause is measured against an objective standard.").

educational or behavioral limitations.  Nothing that Sharkey knew, however, would have given him knowledge, or reason to know, that J.P. had a disability as the ADA defines that term -- that is, "a physical or mental impairment that substantially limits one or more major life activities of [an] individual."  42 U.S. § 12102.  Perhaps a teacher familiar with J.P.'s classroom performance could speak to whether her impairments "substantially limit" her ability to learn.  An SRO's interactions with a student are, however, more limited: although an SRO would, incidental to his or her day-to-day interactions with a student, be able to infer that a given child has some limitations, he or she would have no reason to determine that condition "substantially limits" an individual student's learning ability.  42 U.S. § 12102.  Consequently, Sharkey neither knew nor should have known that J.P. had a developmental disability.

Second, even if Sharkey knew that J.P. had a developmental disability, that knowledge did not give rise to a duty to investigate whether J.P.'s disability prevented her from forming the requisite intent for battery on a school employee.  The Plaintiffs argue that Sharkey's duty to investigate arose out of four legal authorities: (i) the IDEA; (ii) the common-law rebuttable presumption that children cannot form the requisite intent to commit a crime; (iii) the NMDA; and (iv) Tenth Circuit law.  None of these authorities provide a sound basis for imposing a duty to investigate J.P.'s ability to form mens rea.

The IDEA does not require law enforcement officers to investigate whether disabled students have the capacity to form criminal intent before arresting them.  When Congress enacted the IDEA, it noted that "millions of children with disabilities . . . [are] excluded entirely from the public school system and [do not go through the educational process] with their peers."  20 U.S.C. § 1400(c)(2)(B).  To ameliorate this problem, the IDEA sought to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes

special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living." 20 U.S.C. § 1400(d)(1)(A).  To achieve this goal, "Congress conferred a panoply of rights on children with disabilities and their parents to aid them in their disputes with school systems."  See Dean Hill Rivkin, Decriminalizing Students with Disabilities, 54 N.Y.L. Sch. L. Rev. 909, 912 (2010)(citing 20 U.S.C. § 1400(d)(1)(B)).

For example, the IDEA requires schools to develop comprehensive plans for meeting the special educational needs of individual disabled students -- including IEPs and BIPs.  See 20 U.S.C. § 1414(d)(2)(A).  The IDEA also details how and when schools may remove and/or discipline a child with a disability who violates a code of student conduct.  See 20 U.S.C. §§ 1415(j)-(k).  Before taking any disciplinary action against a child with a disability who violates a code of student conduct, the school must conduct a "manifestation determination review."  20 U.S.C. § 1415(k)(1)(E).  During a manifestation determination review, the student's parents and teachers meet with school administrators to consider the relevant information in the student's file, as well as information that the teachers and parents provide, to determine whether the conduct at issue "was caused by, or had a direct and substantial relationship to, the child's disability," or "was the direct result of the [school's] failure to implement the IEP."  20 U.S.C. § 1415(k)(1)(E).  If the child's behavior is determined to be a manifestation of his or her disability, the child must be restored to his or her education program, without being punished for his or her actions.  See 20 U.S.C. § 1415(k)(1)(F).  If not, the school may discipline the child as it would any other non-disabled student.  See 20 U.S.C. § 1415(k)(5)(D)(i).

The IDEA expressly states, however, that these procedural safeguards do not apply to law enforcement officers investigating a crime committed by a disabled child:

> Nothing in this subchapter shall be construed to prohibit an agency from reporting a crime committed by a child with a disability to appropriate authorities or to prevent State law enforcement and judicial authorities from exercising their responsibilities with regard to the application of Federal and State law to crimes committed by a child with a disability.

20 U.S.C. § 1415(k)(6)(A).  The IDEA's express language, therefore, contradicts the Plaintiffs' contention that the IDEA required Sharkey to investigate whether J.P.'s disability prevented her from forming the requisite intent for battery on a school official.  The Plaintiffs do not cite -- and the Court has been unable to find -- a case in which a court has extended the IDEA's protections to officers investigating crimes committed by students with disabilities.  The Court will not do so here.

Judge Tunheim reached the same conclusion in S.A.S. v. Hibbing Public Schools.  In that case, officers arrested and charged a disabled student on multiple occasions for his conduct at school -- which ranged from disruptive behavior in class to fighting with other students.  See 2005 WL 2230415, at *3.  Analyzing the student's § 1983 claim for unlawful arrest, Judge Tunheim stated:

> S.A.S.'s disability does not exempt him from abiding by the law.  Under the IDEA and his individualized education plan, S.A.S. is entitled to have *school officials* address behavior related to his disability according to his particular behavior intervention plan.  However, both the IDEA and S.A.S.'s behavior intervention plan contemplate the referral of criminal behavior to the police and make no mention of altering the standards by which such behavior is investigated or addressed *by the police.*  See 20 U.S.C. § 2015 (stating that "[n]othing in this subchapter shall be construed to prohibit an agency from reporting a crime committed by a child with disability to the appropriate authorities").  As such, . . . that any of the officers may have known S.A.S. was disabled is not relevant to whether they appropriately determined that probable cause existed to bring criminal charges against S.A.S.  See Whren v. United States, 517 U.S. 806, 813 (1996)("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

2014 WL 2230415, at *3 (emphasis in original).

The common-law infancy defense similarly did not require Sharkey to investigate whether J.P.'s disability prevented her from forming the requisite intent for battery of a school employee.   Under the common law infancy defense, there is a rebuttable presumption that children between seven and fourteen "could not form the necessary criminal intent to commit the crime of which they are accused."   State v. Ruby B., 2010-NMSC-045, ¶¶ 49-50, 243 P.3d 726, 739 (N.M. 2010).   "The infancy defense required the prosecution to prove that when a child subject to the rebuttable presumption committed the alleged offense, the child manifested a consciousness of guilt, and a discretion to discern between good and evil."   State v. Ruby B., 2010-NMSC-045, ¶ 49 (citations omitted)(internal quotation marks omitted).   The common-law infancy defense is, however, a presumption that the government must only rebut at trial.   The Plaintiffs do not cite -- and the Court has been unable to find -- a case in which a court has applied the common-law infancy defense to an officer's probable-cause determination. Moreover, even if this common-law infancy defense applied to Sharkey, J.P. manifested a consciousness of guilt and a discretion to discern between good and evil: when she saw Sharkey, she stopped fighting, retreated from him, hid in a classroom, held her hands to resist handcuffing, and cried.   Her actions upon a law enforcement authority's arrival showed that she felt guilty and that she understood that she had done something wrong.   Thus, even if the infancy defense applied to Sharkey, it did not require him to investigate further whether J.P.'s disability prevented her from forming the requisite intent for battery, because her actions rebutted the presumption.

The NMDA did not require Sharkey to investigate whether J.P.'s disability prevented her from forming the requisite intent for battery of a school employee.   The Plaintiffs cite this statement from the "[p]urpose of act" portion of the NMDA:

The purpose of the Delinquency Act is:

> A. consistent with the protection of the public interest, to remove from children committing delinquent acts the adult consequences of criminal behavior, but to still hold children committing delinquent acts accountable for their actions to the extent of the child's age, education, mental and physical condition, background and all other relevant factors, and to provide a program of supervision, care and rehabilitation, including rehabilitative restitution by the child to the victims of the child's delinquent act to the extent that the child is reasonably able to do so[.]

N.M. Stat. Ann. § 32A-2-2A.  The Plaintiffs ask the Court to conclude that Sharkey violated this statement of purpose, because he did not "take[] into consideration her age, mental and physical condition, background and all other relevant factors" as the statute's "plain language" requires. Response at 23.

The Court disagrees for three reasons.  First, adopting the Plaintiffs' interpretation would lead to absurd results.  See Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982)("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); State v. Gutierrez, 1993-NMCA-058, ¶ 3, 854 P.2d 878, 879 (N.M. Ct. App. 1993)("This Court cannot interpret a statute or other legislative action in a way that will produce an absurd result.").  Under the Plaintiffs' interpretation, an officer who encounters a child attacking someone on the street would first have to determine that child's age, education, mental and physical condition, and "all other relevant factors," before arresting that child.  N.M. Stat. Ann. § 32A-2-2A.  This would effectively paralyze any officer faced with a child committing a crime.  Under the Plaintiffs' interpretation, an officer in such a situation would be inclined to conduct a full social study of the child -- by, for example, interviewing the child, his or her parents, teachers, friends, doctors, etc. -- to ensure that he or she considers all of the factors enumerated in § 32A-2-2A before making the arrest.  Moreover, the Plaintiffs have not explained how an officer would conduct such a

study without first detaining the child -- thus, defeating the purported purpose of such a requirement in the first place.

The Court finds it difficult to conclude that, if the New Mexico Legislature intended to impose such an onerous and unrealistic burden on officers, it would do so ambiguously by providing factors for officers to consider -- without mentioning that officers must consider them -- in the NMDA's "purpose" section and not mentioning them in the sections authorizing officers to arrest children, see N.M. Stat. Ann. § 32A-2-2A, or detain them, see N.M. Stat. Ann. § 32A-2-12.  The Court, instead, concludes that that this legislative throat-clearing, which may be relevant for determining legislative intent, did not create any legal rights and liabilities.  The Plaintiffs have not cited a case in which a court has held otherwise.  Consequently, the NMDA did not impose a duty to investigate whether J.P.'s disability prevented her from forming the requisite intent for battery on a school employee.

Second, even if Sharkey violated the NMDA, there is no indication that such a violation would run afoul of the Fourth Amendment.  It is true, of course, that state law is not wholly irrelevant in all Fourth Amendment cases.  See United States v. Mikulski, 317 F.3d at 1232 ("'[T]he question of compliance with state law may well be relevant in determining whether police conduct was reasonable for Fourth Amendment purposes.'"  (quoting United States v. Baker, 16 F.3d at 856 n.1)).  That said, an "officer['s] violation of state law is not, without more, necessarily a federal constitutional violation."  United States v. Mikulski, 317 F.3d at 1232.  It is simply a non sequitur to, as the Plaintiffs suggest, equate every "clearly established" state law right with a "clearly established" Fourth Amendment right.  United States v. Jones, 701 F.3d at 1309 ("It is well established in this circuit that in federal prosecutions the test of reasonableness in relation to the Fourth Amendment protected rights must be determined by *Federal law* even

though the police actions are those of state police officers.")(emphasis in original)(citations omitted)(internal quotation marks omitted).   In short, the Plaintiffs ask the Court to conclude that: (i) N.M. Stat. Ann. § 32A-2-2A, requires officers to consider these factors in every situation before arresting a child; and (ii) this requirement is a clearly established Fourth Amendment right.  Far from being clearly established, if no court has found that § 32A-2-2A imposes such a requirement on officers making their probable cause determination, the Court finds it difficult to conclude that the requirement is grounded in the Fourth Amendment.   Consequently, the Court concludes that the NMDA did not require Sharkey to investigate whether J.P.'s disability prevented her from forming the requisite intent for battery and, even if it did, Sharkey's failure to do so did not violate the Fourth Amendment.

The Plaintiffs' argument that Tenth Circuit law imposed a duty to investigate whether J.P.'s disability prevented her from forming the requisite intent for battery of a school employee similarly lacks a sound basis in the law.  The Tenth Circuit has held that "the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."  Romero v. Fay, 45 F.3d at 1476-77.  Accordingly, the Tenth Circuit has found arrests unlawful where they are based on unreliable information and the arresting officer neglects to investigate readily available evidence.  In Cortez v. McCauley, for example, officers responded to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her.  See 478 F.3d at 1113 (internal quotation marks omitted).  Without (i) interviewing the alleged victim, her mother, the nurse, or the attending physician; (ii) inspecting the alleged victim's clothing for signs of sexual assault; or (iii) waiting for the

results of a medical examination of the alleged victim, the officers arrested the boyfriend.  See 478 F.3d at 1113.  The Tenth Circuit, in an en banc opinion that Judge Kelly authored, explained that,

> whether we view it as a need for more pre-arrest investigation because of insufficient information, . . . or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by [the defendant].  See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986)("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.  Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place.").  Based on the facts above, [the defendant] was arrested without probable cause.

478 F.3d at 1116 (footnotes omitted)(citations omitted).  The Tenth Circuit stated that "witnesses were readily available for interviews, physical evidence was available, and a medical diagnosis was forthcoming.  Defendants, however, . . . conducted no investigation.  Instead, the[y] relied on the flimsiest of information . . . ."  478 F.3d at 1117-18 (footnotes omitted)(citations omitted)(internal quotation marks omitted).  The Tenth Circuit concluded, therefore, that the arrest was unlawful.  See 478 F.3d at 1118-22.

In Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store surveillance; and (ii) watching a video of the surveillance footage on which the security officers relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen anything.  See 147 F.3d at 1254-55.  The Tenth Circuit, in an opinion that Judge Murphy authored, and Judges Anderson and Logan joined, concluded that qualified immunity did not apply.  See 147 F.3d at 1257-59.  The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's conduct, "which was memorialized in its entirety on the videotape."  147 F.3d at 1257.  The Tenth Circuit stated that the police officers "viewed the very

same conduct on the videotape, which this court has concluded failed to establish probable cause." 147 F.3d at 1257.  The Tenth Circuit held that, consequently, "it was . . . not reasonable for the officers to rely on the security guards' allegations."  147 F.3d at 1257.  The Tenth Circuit added that,

> police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation. . . .  Here, [the defendants] did conduct some investigation by viewing the videotape and questioning [the plaintiff].  They argue, however, that they should be allowed to rely on the statement of the guards for probable cause to arrest.  Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect."  Garcia v. Casuas, 2011 WL 7444745, at *49 (citing Cortez v. McCauley, 478 F.3d at 1121 n.18).  In Romero v. Fay, law enforcement officers interviewed two individuals -- Gutierrez and Duran -- who implicated the plaintiff in a murder.  See 45 F.3d at 1474.  Approximately four hours later, without either conducting additional investigation or obtaining a warrant, an officer arrested the plaintiff for murder.  See 45 F.3d at 1474.  After he was taken into custody, the plaintiff told the officer that he was innocent and that he had an alibi.  See 45 F.3d at 1474.  The plaintiff stated that three individuals would establish that he was asleep at home when the murder occurred.  See 45 F.3d at 1474.  The officer refused the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little significance because they would lie to protect" the plaintiff.  45 F.3d at 1474.  The officer never interviewed the alibi witnesses.  See 45 F.3d at 1474.  The plaintiff was

incarcerated for three months before the government dismissed the case and he was released. See 45 F.3d at 1474.

The plaintiff brought a § 1983 action for, among other things, violations of his Fourth Amendment rights. See 45 F.3d at 1474. The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him. See 45 F.3d at 1476. The Tenth Circuit, in an opinion that Judge Baldock authored, and Judges Tacha and McKay joined, disagreed. See 45 F.3d at 1476. The Tenth Circuit stated that the Fourth Amendment requires officers only to "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention." 45 F.3d at 1476-77. The Tenth Circuit concluded that, once probable cause existed to arrest the plaintiff for murder, "his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation." 45 F.3d at 1478.

The Court reached a similar conclusion in Garcia v. Casuas. In that case, a detective with the City of Rio Rancho -- Casuas, arrested the plaintiff -- Garcia, for sexual penetration of a minor. See 2011 WL 7444745, at *8. The plaintiff was ultimately exonerated, and subsequently filed a § 1983 claim against the arresting officer and the City of Rio Rancho for, among other things, unlawfully arresting him in violation of his Fourth Amendment rights. See 2011 WL 7444745, at *12. The Court found that the officer had probable cause to arrest the plaintiff based on information gleaned from other officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Odom, and a witness at the scene on the night of the incident -- Katz. See

2011 WL 7444745, at *43-46.  Garcia argued that by failing to re-interview Odom and Katz, and

instead choosing to rely on the other officers' interviews of them, Casuas "fail[ed] to interview

readily accessible witnesses."   2011 WL 7444745, at *15.   Garcia contended that, moreover,

Casuas should have known that failing to personally interview him, Odom, Katz, K.J., and Katz'

neighbors before arresting him violated his constitutional rights.  See 2011 WL 7444745, at *15.

Garcia argued that, had Casuas interviewed him before arresting him, she would have discovered

Katz' and Odom's motivations to lie about the incident and his involvement.  See 2011 WL

7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the

plaintiff did not constitute a Fourth Amendment violation, the Court explained:

> Garcia points to no case law which would establish that, after the officers
> at the scene have interviewed witnesses, the Constitution requires the
> investigating detective to interview those witnesses again. . . .   Here, the
> responding police officers . . . interviewed every adult alleged to be involved in
> the incident and briefly spoke with K.J. . . .
>
> Garcia also states that, if Casuas had investigated further, she would have
> known that there was no semen on the bedding, and she would have discovered
> Katz' and Odom's motivation if she spoke to him. . . .   The Tenth Circuit's
> discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion
> that Casuas was required to do more after [K.J.'s interview] solidified the
> existence of probable cause.  In Romero v. Fay, the Tenth Circuit held:
>
> > Plaintiff contends that regardless of whether the statements by Duran and
> > Guiterrez supplied probable cause for Defendant Fay to arrest Plaintiff,
> > under clearly established law a reasonable police officer would have
> > investigated his alibi witnesses before arresting him, and the exculpatory
> > information possessed by them would have negated the probable cause to
> > arrest.  We disagree.
>
> 45 F.3d at 1466.  In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized
> that "officers are not required to conduct full investigations before making an
> arrest."  147 F.3d at 1257 n.8.
>
> . . . .

These cases establish that Casuas was not required to speak to [Katz' neighbors], because they did not appear to be material witnesses. Garcia has made no allegations and presented no facts suggesting that the neighbors were ever around K.J. Garcia has also not presented any facts demonstrating that [the neighbors] have shed light on the motivations of Katz or Odom. Garcia only speculates that Casuas *might* have found something. An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment.

. . . .

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect. See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)). The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview. Casuas was not required to investigate further after that determination.

Garcia v. Casuas, 2011 WL 7444745, at *47-49.

Sharkey's arrest of J.P. was closer to the lawful arrests in Garcia v. Casuas and Romero v. Fay than to the unlawful arrests in Baptiste v. J.C. Penney Co. and Cortez v. McCauley. Unlike in Baptiste v. J.C. Penney Co., where officers relied on the security guards' allegations that video surveillance evidence contradicted, and in Cortez v. McCauley, where the officers relied on unsubstantiated double-hearsay originating from a two-year-old, Sharkey based his probable-cause finding on his own first-hand observations of J.P.'s conduct that were corroborated by his interviews of Gonzales and the student whom J.P. attacked. As in Romero v. Fay and in Garcia v. Casuas, where the officers did not have to conduct further tests or interviews because they already had probable cause, it was unnecessary for Sharkey to conduct further investigation -- by, for example, interviewing J.P. or reviewing her behavioral records -- because he already had probable cause to arrest J.P. Consequently, Sharkey's failure to further investigate J.P.'s ability to form general intent did not make the arrest unlawful.

**B.      EVEN  IF  SHARKEY  INVESTIGATED  FURTHER,  HE  WOULD  NOT HAVE  DISCOVERED  THAT  J.P.'S  DISABILITY  PREVENTED  HER FROM  FORMING  THE  REQUISITE  INTENT  FOR  BATTERY  OF  A SCHOOL EMPLOYEE.**

Even if Sharkey had a duty to investigate further, he would not have discovered any evidence indicating that J.P.'s disability rendered her incapable of forming the requisite intent for battery of a school employee.  New Mexico law defines battery on a school employee as "the unlawful, intentional touching or application of force to the person of a school employee while he is in the lawful discharge of his duties, when done in a rude, insolent or angry manner."  N.M. Stat. Ann. § 30-3-9F.  The Supreme Court of New Mexico has determined that battery is a general intent crime.  See State v. Nozie, 2009–NMSC–018, ¶ 41, 207 P.3d 1119, 1131-32 (N.M. 2009)(citing State v. Duran, 80 N.M. 406, 407, 456 P.2d 880, 881 (Ct. App. 1969))(distinguishing the intent to apply force required to commit battery from the intent to injure required to commit aggravated battery).  The general intent instruction in the New Mexico Uniform Jury Instructions[81] provides:

> In addition to the other elements of _____ (*identify crime or crimes*), the state must prove to your satisfaction beyond a reasonable doubt that the defendant acted intentionally when he committed the crime.  A person acts intentionally when he purposely does an act which the law declares to be a crime [, even though he may not know that his act is unlawful].  Whether the defendant acted intentionally may be inferred from all of the surrounding circumstances, such as the manner in which he acts, the means used, [and] his conduct [and any statements made by him].

---

[81]Although the juvenile justice system differs from the adult justice system, see N.M. Stat. Ann. §§ 32A-2A-1 to -33, the instruction still accurately reflects New Mexico law on criminal intent.

NMRA, Crim. UJI 14-141 (footnotes omitted).[82]  See State v. Gonzales, 2005-NMCA-031, ¶ 23,

107 P.3d 547, 554 (N.M. 2005)("[G]eneral intent is only the intention to make the bodily

movement which constitutes the act which the crime requires." (internal quotation marks

omitted)).  See also United States v. Miera, No. CR 12-3111 JB, 2013 WL 6504297, at *16

(D.N.M. Nov. 22, 2013)(Browning, J.)(discussing New Mexico law on general intent).  In other

words, to prove the requisite intent for battery of a school employee, the government must

establish only that the defendant intentionally touched or applied force to a school employee

while he or she "is in the lawful discharge of his duties, when done in a rude, insolent or angry

manner."  N.M. Stat. Ann. § 30-3-9(F).

Had Sharkey reviewed J.P.'s school records -- including records that federal laws conceal

from him[83] -- those records would not have given him any reason to believe that J.P. could not

---

[82]"The Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law."  Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F. Supp. 2d 1200, 1211 n.2 (D.N.M. 2011)(Browning, J.)(citing State v. Wilson, 1994-NMSC-0009, ¶ 5, 867 P.2d 1175, 1178 (N.M. 1994)).

[83]The Plaintiffs' repeated suggestion that the IDEA requires Sharkey to access these files and transmit them to appropriate authorities rests on a misreading of the IDEA.  The relevant statutory provision provides:

(6)   Referral to and action by law enforcement and judicial authorities

(A)   Rule of construction

Nothing in this subchapter shall be construed to prohibit an agency from reporting a crime committed by a child with a disability to appropriate authorities or to prevent State law enforcement and judicial authorities from exercising their responsibilities with regard to the application of Federal and State law to crimes committed by a child with a disability.

(B)   Transmittal of records

act purposely.  J.P.'s BIP contains the following statement: "[J.P.] will frequently lash out at peers and adults in the classroom.  This behavior manifests as cussing, throwing objects and furniture with the intent to cause harm, as well as physical and verbal aggression to cause harm to peers and/or adults."  BIP at 1 (emphasis added).  That J.P. had the cognitive ability to throw objects, and commit physical and verbal aggression, with the intent to cause harm would have indicated to Sharkey that J.P. could act intentionally.  Moreover, nothing in J.P.'s IEP indicates that her disability prevented her from acting intentionally.  Instead, the IEP states that J.P. was capable of writing paragraphs, and performing addition, subtraction, and multiplication -- tasks that, at least to a layman like Sharkey, would have indicated that J.P. was capable of acting

---

An agency reporting a crime committed by a child with a disability shall ensure that copies of the special education and disciplinary records of the child are transmitted for consideration by the appropriate authorities to whom the agency reports the crime.

20 U.S.C. § 1415(k)(6).  To see the statement in full context is to understand the Plaintiffs' mistake.  "The agency" refers to "[a]ny State educational agency, State agency, or local educational agency that receives assistance under [the relevant provision if IDEA]," which requires those agencies to "establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies."  20 U.S.C. § 1415(a).  Sharkey is not the agency providing education; he is the state law enforcement authority to whom the crime has been reported.  Accordingly, he had no duty to transmit those records.  Nor could he: as Sharkey has stated, with no substantive rebuttal, FERPA bars the school from releasing those records to him.  See 20 U.S.C. § 1232g(b)(1).  Section 1232g(b)(1) states:

No funds shall be made available under any applicable program to any educational agency which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein [with one inapplicable exception]) of students without the written consent of their parents to any individual, agency, or organization, other than [in enumerated, and inapplicable, exceptions].

20 U.S.C. § 1232g(b)(1).  Consequently, the IDEA does not command Sharkey to distribute information that FERPA forbids the school from giving him in the first place.

intentionally.  See IEP at 2.  On its face, therefore, the IEP also would have confirmed that J.P.'s disability did not prevent her from acting intentionally.

Had Sharkey interviewed J.P. before arresting her, the interview would have indicated that J.P. acted intentionally.  Sharkey spoke with J.P. shortly after the incident occurred when he transported her to the juvenile detention center.  Sharkey asked J.P. what would happen if she assaulted another student or teaching staff at Roosevelt Middle School, and J.P. responded that she would be handcuffed and arrested again -- showing that J.P. not only acted intentionally, but also understood that her actions were wrong.  J.P. then volunteered that she would not hit anyone anymore but would use words when she was upset.  Consequently, J.P.'s own words would have demonstrated that she acted intentionally.

That the government dismissed the charges against J.P. because the juvenile court found her incompetent to stand trial does not change the analysis.  The psychologist who conducted the competency evaluation could only provide his provisional impressions of J.P., because J.P. did not cooperate with the evaluation.  See Competency Evaluation at 4.  The psychologist opined the following regarding J.P.'s competency to stand trial:

> It was not possible to evaluate adequately [J.P.'s] comprehension of the instant charges, penalties that may be associated with the charges, or her understanding of the duties and functions of the various offices of the court and the nature of adversarial proceedings.  It was further not possible to assess her understanding of the concepts of evidence and proof of her understanding of the various options that are available to her in her defense (e.g., pleas and plea bargain arrangement).

> It was not possible to engage [J.P.] in competency specific testing that encompassed, in part, her understanding of the court process.  Her mute posture and complete refusal to engage the examiner is suggestive of developmental immaturity combined with underlying mental health issues that cannot be adequately assessed under the current circumstances.
> . . . .

> The results of the current evaluation . . . did not result in sufficient information to render an opinion relative to her understanding of duties and functions of the various officers of the court or her appreciation of the various options that are available to her in her defense.  Her understanding of the nature of the charges pending against her and her appreciation of the range of penalties that could be [i]mposed against her in the event of a guilty finding likewise could not be assessed.  Her instant ability to effectively track courtroom proceedings, to assist counsel in her[] own defense, to effectively challenge witnesses against her, and to testify relevantly are felt to be compromised as of the date of this evaluation.  Accordingly, it is felt that [J.P.] may not have a present sufficient understanding of the nature and significance of the instant proceedings and that she is presently unable to assist her attorney in a factual and rational manner.  It is my opinion that [J.P.] is likely not presently competent to proceed in the matter of the instant charges.  She is further not competent to enter into a plea bargain arrangement with the court.

Competency Evaluation at 4-6.  The psychologist's determination that J.P. was incompetent to stand trial is inapposite for two reasons.  First, although the psychologist determined that J.P. was incompetent to stand trial based on her ability to effectively track courtroom proceedings, assist her attorney, effectively challenge witnesses testifying against her, and to testify, he did not conclude that she could not act intentionally.  Complex cognitive functions like testifying for trial and assisting in developing trial strategies are a far cry from not being able to control one's actions.  Accordingly, even if Sharkey had evaluated this information before arresting J.P., it likely would not have changed his conclusion that J.P. acted intentionally.  Second, the psychologist evaluated J.P. on March 16, 2012 -- almost six months after the incident occurred.  Consequently, this analysis obviously would not have been available to Sharkey had he done additional investigation.  Moreover, any number of intervening factors, including trauma from the arrest itself, could have exacerbated J.P.'s condition in the meantime to the extent that the psychologist's diagnosis would not accurately reflect J.P.'s condition when the incident

occurred.   As a result, even if Sharkey had a duty to investigate whether J.P.'s disability prevented her from forming the requisite intent for battery on a school employee, had Sharkey investigated further, he would not have discovered any evidence to contradict his initial probable cause determination.

The Court does not relish the thought of police officers arresting eleven-year-old children with developmental disabilities.   Involving law enforcement when such children misbehave may undermine the IDEA's purpose of ensuring that children with disabilities receive equal access to public education.   As Professor Katayoon Majd points out, referring children to the criminal justice system "compounds the disadvantages associated with school suspensions and expulsions."  Katayoon Majd, Students of the Mass Incarceration Nation, 54 How. L.J. 343, 378 (2011).  For example, a first-time arrest during high school nearly doubles the odds that a youth will drop out; if the arrest results in a court appearance, it nearly quadruples the odds that the youth will drop out.   See Gary Sweeten, Who Will Graduate?  Disruption of High School Education by Arrest and Court Involvement, 23 Just. Q. 462, 473 (2006).   Furthermore, "a juvenile adjudication brings with it many collateral consequences that can follow youth into adulthood."  Majd, 54 How. L.J. at 378.  For example, Professor Michael Pinard explains:

> [S]ome housing authorities, in addition to conducting background checks for adult applicants, can investigate whether any member of the family unit, including a juvenile member, has been convicted of specific disqualifying offenses.
>
> Juvenile adjudications may also limit future employment opportunities. For example, adjudications could impact an individual's eligibility to serve in the military. . . .   Additionally, adjudications for certain sex offenses may lead to requirements that the juvenile register as a sex offender, and be subject to community notification provisions.
>
> Also, juvenile adjudications may be used to enhance future sentences.  For example, in those states with "three-strike laws", juvenile adjudications can be counted as a strike in certain instances.  Moreover, a past juvenile adjudication

may affect sentencing in a future criminal proceeding by factoring into whether the individual is eligible for classification as a juvenile and reduced sentencing.

Lastly, juveniles can face consequences that are unique to their status as juveniles.  Specifically, juvenile adjudications can impact immediate educational opportunities.  For example, public schools, acting pursuant to zero tolerance policies, often expel students who have been adjudicated in juvenile court.  As a result, juveniles can lose both short and long-term opportunities because of their involvement with the juvenile justice system.

Michael Pinard, The Logistical and Ethical Difficulties of Informing Juveniles About the

Collateral Consequences of Adjudications, 6 Nev. L.J. 1111, 1114-15 (2006)(footnotes omitted).

As can be expected, the impacts of entering the criminal justice system are exacerbated when

youth are incarcerated.  Professor Majd states:

Once they enter the justice system, youth who are incarcerated rather than placed on probation face particularly devastating impacts.  The quality of education that youth receive while incarcerated is typically abysmal, and approximately 66% of youth who leave juvenile justice facilities end up dropping out of school.  However, the harms of incarceration extend well beyond education.  Youth in detention and secure confinement facilities experience high rates of sexual abuse and a suicide rate four times greater than that of the general population.  Once released, youth face discouraging odds.  Compared with other groups of youth, incarcerated youth will achieve less educationally, work less and for lower wages, fail more frequently to form enduring families, experience more chronic health problems (including addiction), and suffer more imprisonment.

Majd, 54 How. L.J. at 379 (footnotes omitted)(internal quotation marks omitted).  These factors

counsel toward involving the justice system only as a last resort when children misbehave at

school.

Consequently, whenever possible, all parties involved -- including the child's parents,

teachers, and service providers -- should try to understand the causes of the child's behavior and

develop creative and comprehensive solutions while keeping the student in the school

environment.  Schools are often better equipped than judges or probation officers to develop

such solutions, both because of their greater involvement in the child's life and the wider variety

of carrots and sticks at their disposal, where the justice system often can typically only vary the amount of punishment that a child receives.

In this case, however, the system worked as it should.  By arresting J.P., Sharkey got the situation under control and prevented any further violence from occurring.  When he took J.P. to the juvenile detention center, CYFD staff correctly determined that it would be inappropriate to house her there.  When J.P. was eventually evaluated by a licensed professional, he determined that she did not have the cognitive capacity to stand trial, and the government, consequently, dismissed its charges against her.  Although it is tragic that such drastic measures were necessary in this situation, the alternative -- allowing J.P. to cause further harm to teachers and fellow students -- would have been worse.  The Court, accordingly, finds that Sharkey lawfully arrested J.P.

### C.   SHARKEY DID NOT VIOLATE THE FOURTH AMENDMENT BY TRANSPORTING J.P. TO THE JUVENILE DETENTION CENTER.

The Plaintiffs also argue that Sharkey violated the Fourth Amendment by transporting J.P. to the juvenile detention center, because she did not meet the detention criteria.  See Response at 23-24.  The Plaintiffs contend that J.P. did not meet the detention criteria, because she sat on the floor crying for fifteen minutes before Sharkey arrested her -- indicating that she posed no danger to herself, her teachers, or other students.  See Response at 24.  The Court disagrees for three reasons.

First, the Plaintiffs fail to consider that J.P. had just hit another student twice in the head and kicked, head butted, and bit her teacher.  These actions meet one of the statutory criteria for detention: "poses substantial risk of harm to others."  N.M. Stat. Ann. § 32A-2-11A(2).  Second, CYFD probation and parole officers, rather than law enforcement officers, determine whether a juvenile should be placed in secure detention.  See N.M.S.A. § 32A-2-5B(3)(explaining that

CYFD has the power to "make predisposition studies and assessments and submit reports and recommendations to the court"). Consequently, the NMDA did not require Sharkey to determine whether she should be placed in secure detention. Third, even if Sharkey violated the NMDA by bringing J.P. to the juvenile detention center, such violation neither negates his probable cause finding nor arises to the level of a Fourth Amendment violation. See United States v. Jones, 701 F.3d at 1309 ("It is well established in this circuit that in federal prosecutions the test of reasonableness in relation to the Fourth Amendment protected rights must be determined by *Federal law* even though the police actions are those of state police officers.")(emphasis in original)(citations omitted)(internal quotation marks omitted). Accordingly, the Court finds that Sharkey did not violate the Fourth Amendment when he transported J.P. to the juvenile detention facility.

## II. EVEN IF SHARKEY UNLAWFULLY ARRESTED J.P., HE DID NOT VIOLATE CLEARLY ESTABLISHED LAW.

Even if Sharkey unlawfully arrested J.P., it was not clearly established that the arrest was unlawful. In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327. "In determining whether the right was 'clearly established,' a court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (citations omitted)(internal quotation marks omitted). The Tenth Circuit reiterated that "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing law," but held that, where distinctions "*might* make a

- 130 -

constitutional difference," the law is not clearly established.  Kerns v. Bader, 663 F.3d at 1187 (emphasis in original).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  In Casey v. City of Federal Heights, the Tenth Circuit re-emphasized its sliding scale approach: "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." 509 F.3d at 1284 (citing Pierce v. Gilchrist, 359 F.3d at 1298).  Thus, "when an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284. Furthermore, "general statements of law are not inherently incapable of giving fair and clear warning."  Hope v. Pelzer, 536 U.S. at 741.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  The Plaintiffs do not cite -- and the Court has been unable to find -- a case in which an officer's failure to investigate whether a child with developmental disabilities can form the requisite intent for a crime before arresting the child causes the arrest to be unlawful.  There are cases, however, where courts have found an officer's failure to investigate readily available evidence a Fourth Amendment violation.

Three cases from the Tenth Circuit concern factual scenarios relevant to the matter before the Court -- Cortez v. McCauley, Baptiste v. J.C. Penney Co., and Romero v. Fay.  In Cortez v. McCauley, the Tenth Circuit concluded:

> [T]he only information which arguably implicated Rick Cortex was a statement
> attributed to a barely-verbal two-year old child that her babysitters' "boyfriend"

had "hurt her pee pee."  The statement was relayed by telephone to the officers, from a nurse, who heard it from the mother who ostensibly heard it from the two-year old.  Rather than waiting to receive the results of the medical examination of the child, interview the child or her mother to better understand the circumstances, or seek to obtain a warrant, the officers responded to the statement with an immediate arrest of the babysitter's husband, Rick Cortez.

478 F.3d at 1117.  The Tenth Circuit also held: "That unsubstantiated double-hearsay originating from a two-year-old, standing alone, does not give rise to probable cause should have been patently obvious to any reasonable law enforcement official."  Cortez v. McCauley, 478 F.3d at 1118.  As the Court has noted, the case before it is substantially different from Cortez v. McCauley.  Rather than being based on "unsubstantiated double-hearsay originating from a two-year-old," 478 F.3d at 1118, Sharkey's probable cause finding was based on his own first-hand observations of J.P.'s conduct that were corroborated by his interviews of Gonzales and the student that J.P. attacked.  Accordingly, unlike in Cortez v. McCauley, Sharkey did not need to conduct additional investigation for his arrest of J.P. to be lawful.

This case is also substantially different from the circumstances in Baptiste v. J.C. Penney Co., where the Tenth Circuit affirmed the denial of qualified immunity for officers who relied solely on the statements of store security guards -- despite having seen a contradictory security videotape capturing the events -- to establish probable cause for arrest.  See 147 F.3d at 1254. The Tenth Circuit noted that, because the officers "had the benefit of observing the very conduct which they knew served as the basis for the guard's allegations," they were not entitled to rely solely on the security guard's allegations.  147 F.3d at 1257.  The Tenth Circuit also held that "police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation." 147 F.3d at 1259.  Here, unlike Baptiste v. J.C. Penney Co., Sharkey observed J.P.'s criminal conduct himself, and corroborated his observations by interviewing the student and teacher that

- 132 -

J.P. attacked.  Accordingly, the record does not establish that Sharkey ignored "easily accessible evidence."  147 F.3d at 1259.  Moreover, at no point did Sharkey delegate his duty to investigate and make an independent probable cause determination based on that investigation.

Although a controlling decision need not declare the "very action in question . . . unlawful," Anderson v. Creighton, 483 U.S. at 640, "the contours of the right [must be] sufficiently clear that a reasonable official would understand that what he is doing violates that right," Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (citations omitted)(internal quotation marks omitted).  The facts of this case are sufficiently distinct from Baptiste v. J.C. Penney Co. and Cortez v. McCauley -- because Sharkey conducted a more thorough investigation than either case and based his probable cause finding on more reliable information -- that a reasonable officer in Sharkey's position would not understand that what he or she was doing violated the Fourth Amendment.

This case more closely resembles Romero v. Fay, where an officer refused to interview the plaintiff's alibi witnesses before arresting him for murder, because he had already developed sufficient probable cause.  See 45 F.3d at 1474.  Finding the officer's actions reasonable, the Tenth Circuit stated that the Fourth Amendment requires officers only to "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention."  45 F.3d at 1476-77.  The Tenth Circuit concluded that, once probable cause existed to arrest the plaintiff for murder, "his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation."  45 F.3d at 1478.  As in Romero v. Fay, Sharkey's failure to investigate J.P.'s school records or conduct additional interviews to

- 133 -

determine whether her disability prevented her from forming the requisite intent for battery did not constitute a constitutional violation, because he already had probable cause to arrest J.P. based on his own observations corroborated by interviews of Gonzales and the student that J.P. attacked.

Because of the similarities between this case and Romero v. Fay, as well as the distinctions between this case and Cortez v. McCauley and Baptiste v. J.C. Penney Co., the Court finds that the law was not clearly established that an officer has a duty to investigate whether a child's disability prevents him or her from forming the requisite intent for the crime he or she is suspected of committing. The similarities between this case and Romero v. Fay are such that the contours of the right, if it was violated, was not sufficiently clear, and "'a reasonable official would [not] understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). Even if Sharkey made a mistake in believing that he had no duty to investigate whether J.P.'s disability prevented her from forming the requisite intent for battery on a school employee, the record before the Court does not establish that Sharkey was "plainly incompetent" or that he "knowingly violate[d] the law," such that he would not be entitled to qualified immunity. Malley v. Briggs, 475 U.S. at 341.

The discussion about New Mexico law is also of no help to the Plaintiffs' cause. First, the Court notes that the Plaintiffs misread qualified immunity law. The Plaintiffs seek recovery for an alleged Fourth Amendment violation; the relevant body of law for determining whether the alleged Fourth Amendment right was clearly established is Fourth Amendment law. The Plaintiffs cannot end-run qualified immunity by locating a state statute, asserting that J.P. had clearly established rights under that statute, asserting that Sharkey violated that right, importing

that right into Fourth Amendment law, and stating that, therefore, Sharkey violated clearly established Fourth Amendment law and is not entitled to qualified immunity.  As the Court has noted, state law is not wholly irrelevant in all Fourth Amendment cases.  See United States v. Mikulski, 317 F.3d at 1232 ("'[T]he question of compliance with state law may well be relevant in determining whether police conduct was reasonable for Fourth Amendment purposes.'" (quoting United States v. Baker, 16 F.3d at 856 n.1)).  That said, an "officer['s] violation of state law is not, without more, necessarily a federal constitutional violation."  United States v. Mikulski, 317 F.3d at 1232.  It is simply a non sequitur to, as the Plaintiffs suggest, equate every "clearly established" statutory right with a "clearly established" Fourth Amendment right.  Moreover, even if the Plaintiffs could generate clearly established Fourth Amendment law by pointing to disparate state statutes that Sharkey might have violated, Sharkey did not violate the statutes on which the Plaintiffs rely.  As the Court has explained, none of the cases or statutes that the Plaintiffs cite are on point; at most, in the aggregate, they stand for the proposition that the state should treat children well.  That obvious point is not enough to make it clearly established that an officer who learns that a child -- even a disabled child -- had recently violently attacked a fellow student and her teacher, must investigate that child's ability to form the requisite intent before arresting him or her.  The Court concludes that, even if Sharkey violated New Mexico law when he arrested J.P. without conducting further investigation into whether her disability prevented her from forming the requisite intent for battery on a school employee, such law did not create a clearly established Fourth Amendment right, and Sharkey is, therefore, protected by qualified immunity.  Accordingly, the Court finds that, because Sharkey had probable cause to arrest J.P., and is entitled to qualified immunity even if he lacked such probable cause, summary judgment in favor of Sharkey on the unlawful arrest claim is proper.

**IT IS ORDERED** that Defendant J.M. Sharkey's Motion for Partial Summary Judgment No. I: Dismissal of Plaintiffs' Fourth Amendment Illegal Seizure Claim (Count I) Based on Qualified Immunity, filed July 30, 2013 (Doc. 92), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph P. Kennedy
Shannon L. Kennedy
Laura Schauer Ives
Kennedy Kennedy & Ives, LLC
Albuquerque, New Mexico

*Attorneys for the Plaintiffs*

Terri S. Beach
Miller Stratvert P.A.
Albuquerque, New Mexico

--and--

Luis E. Robles
Marcus J. Rael, Jr.
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

*Attorneys for Defendants Bernalillo County and J.M. Sharkey*

Jeremy K. Harrison
Megan Muirhead
Modrall Sperling
Albuquerque, New Mexico

*Attorneys for Defendants Cee Kaye Nation and Alison Gonzales*