# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

J. H., on behalf of her minor child, J.P.,

      Plaintiffs,[1]

vs.                                                                  No. CIV 12-0128 JB/WDS

CEE KAYE NATION, Principal;
ALISON GONZALES, Teacher;
J.M. SHARKEY, Bernalillo County Deputy;
and BERNALILLO COUNTY,

      Defendants.

## MEMORANDUM OPINION[2]

**THIS MATTER** comes before the Court on Deputy Sharkey's Motion to Dismiss No. II: Dismissal of Fourteenth Amendment Substantive Due Process Claim, filed January 16, 2013 (Doc. 53)("MTD"). The Court held a hearing on April 25, 2013. The primary issues are: (i) whether Plaintiff J.H., on behalf of her developmentally disabled child, J.P., can simultaneously bring claims under the Fourth and Fourteenth Amendments of the Constitution of the United States for Defendant J.M. Sharkey's alleged unlawful seizure of J.P.; (ii) whether Sharkey violated J.P.'s substantive due-process rights under the Fourteenth Amendment when, immediately after J.P. had

---

[1]There is some inconsistency about the parties' names in the briefing. Sometimes, the parties -- including the Plaintiffs -- refer to J.H., on behalf of her minor child, J.P., as a singular Plaintiff, and sometimes the parties refer to J.H. and J.P. as plural Plaintiffs. Even though the Plaintiffs' briefing does not clearly prefer one name over the other, and even though the caption refers to the Plaintiffs in the plural, the Court will use "J.H.," because J.H. brings this case on behalf of J.P.

[2]On September 12, 2013, the Court entered an Order granting Deputy Sharkey's Motion to Dismiss No. II: Dismissal of Fourteenth Amendment Substantive Due Process Claim, filed January 16, 2013 (Doc. 53). See Order, filed September 12, 2013 (Doc. 128)("Order"). The Court stated that it would "at a later date issue a memorandum opinion more fully detailing its rationale for this decision." Order at 2 n.1. This Memorandum Opinion is the promised opinion.

an altercation with another student at school, he handcuffed J.P. and transported her to the Juvenile

Detention Facility; and (iii) whether J.P.'s substantive due-process rights were clearly established.

First, J.H. cannot simultaneously bring claims under the Fourth and Fourteenth Amendments for

Sharkey's alleged unlawful seizure of J.P.   Second, even if J.H. could bring a separate Fourteenth

Amendment claim, Sharkey did not violate J.P.'s substantive due-process rights.   Third, even if

Sharkey violated J.P.'s substantive due-process rights, those rights were not clearly established,

and Sharkey is entitled to qualified immunity.   Accordingly, the Court will grant the MTD.

## FACTUAL BACKGROUND

Consistent with the Court's duty to take the plaintiff's allegations as true when considering

a motion to dismiss for failure to state a claim under rule 12(b)(6) of the Federal Rules of Civil

Procedure, the Court takes its facts from J.H.'s complaint.   See Plaintiffs' Second Amended

Complaint for Recovery of Damages Due to Deprivation of Civil Rights and Rights Under the

Americans with Disabilities Act, filed June 28, 2013 (Doc. 85)("Complaint").[3]   J.H. and J.P. live

---

[3]When the parties briefed and argued this motion, the operative pleading was Plaintiffs' First Amended Complaint for Recovery of Damages Due to Deprivation of Civil Rights, filed November 14, 2012 (Doc. 42).   J.H. subsequently filed a second complaint.   See Plaintiffs' Second Amended Complaint for Recovery of Damages Due to Deprivation of Civil Rights and Rights Under the Americans With Disabilities Act, filed June 28, 2013 (Doc. 85).   As a general matter, "[o]nce an amended pleading is interposed, the original pleading no longer performs any function in the case and any subsequent motion made by an opposing party should be directed at the amended pleading."   6 C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 1476, at 636-38 (3d ed. 2010)(footnotes omitted).   Professors Charles Alan Wright and Arthur Miller continue, however:

[D]efendants should not be required to file a new motion to dismiss simply because an amended pleading was introduced while their motion was pending.   If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading.   To hold otherwise would be to exalt form over substance.

in Bernalillo County, New Mexico.   See Complaint ¶¶ 1-2, at 1.   Throughout the events that the Complaint alleges, J.P. was an eleven-year-old student at Roosevelt Middle School, in Albuquerque, New Mexico.   See Complaint ¶¶ 2-5, at 1; id. ¶ 25, at 3.

Because J.P. had experienced significant emotional difficulty at school in the past, she was placed on an Individualized Educational Plan ("IEP").   Complaint ¶¶ 14-22, at 2-3.   IEPs are designed to address a developmentally disabled student's behavior if such behavior will interfere with learning.   See Complaint ¶ 21, at 3.   As part of her IEP, J.P.'s IEP team issued a Behavioral Intervention Plan ("BIP") that detailed procedures which school officials had to follow before and during the use of physical restraints on J.P.; the Complaint does not describe the procedures other than by alleging that they "did not include handcuffing as an appropriate intervention." Complaint ¶¶ 20-22, at 3; id. ¶ 29-31, at 4.

In the fall of 2011, J.P. was placed in a special education class that regularly included approximately five developmentally disabled students.   See Complaint ¶¶ 25-26, at 4.   J.H. informed Sharkey -- a Deputy Sherriff of the County of Bernalillo and the school resource officer assigned to Roosevelt Middle School -- that either restraining her daughter in handcuffs or arresting her daughter would violate her daughter's BIP.   See Complaint ¶ 6, at 2; ¶ 38, at 5.   On September 26, 2011, J.P. struck a student in her classroom.   See Complaint ¶¶ 27-28, at 4.   The classroom teacher, Alison Gonzalez contacted Sharkey.   See Complaint ¶¶ 25-28, at 4.   Gonzales tried to restrain J.P by grabbing her around the waist.   See Complaint ¶¶ 30-32, at 4.   Sharkey grabbed J.P. "in violation of the proper method of restraint detailed in [J.P.'s] BIP."

---

C. Wright & A. Miller, supra, at 638.   In this case, the First and Second Amended Complaints are almost identical in their presentations of the relevant facts, and in their statements of the due-process claim.   The Court therefore considers the MTD as addressed to the Second Amended Complaint and cites that document.

Complaint ¶ 33, at 4.   Having "decided to press charges against the child for kicking" her teacher, Sharkey "placed J.P. in handcuffs and walked her out of the classroom," and then "transported the 11 year old disabled child to the Juvenile Detention Center in his patrol unit," where she "was held . . . for several hours."   Complaint ¶¶ 34-37, at 4-5.   "Eventually, J.P.'s handcuffs were removed and she was placed in a small cell with only a floor mat to sit on."   Complaint ¶ 39, at 5. J.H. was informed of these events only after Sharkey placed J.P. in handcuffs and moved her to the Detention Center.   See Complaint ¶ 38, at 4-5.   "Defendant Sharkey never notified J.P.'s mother, J.H., that her daughter had been arrested, charged with battery and taken to the Detention Center in violation of her BIP."   Complaint ¶ 40, at 5.

## PROCEDURAL BACKGROUND

J.H. commenced this lawsuit in New Mexico state court on December 5, 2011; Sharkey's co-Defendants removed the case to federal court on February 9, 2012.   See Notice of Removal (Doc. 1).   On June 28, 2013, J.H. filed the Second Amended Complaint.   See Complaint at 1. The Complaint alleges seven causes of action, only one of which is relevant to this Memorandum Opinion and Order: a claim that the Sharkey violated J.P.'s rights under the Due Process Clause of the Fourteenth Amendment.   See Complaint ¶¶ 60-65, at 7-8.   J.H. asserts that New Mexico statutes regulating the handling of a mentally disabled child create a constitutionally protected liberty interest.   See Complaint at ¶ 63, at 7-8.   J.H. argues that Sharkey violated that interest in two ways: first, by handcuffing J.P., and, second, by transporting her to the Juvenile Detention Center.   See Complaint at ¶¶ 62-65, at 7-8.

### 1.      The MTD.

On January 16, 2013, Sharkey moved the Court to dismiss J.P.'s substantive due-process claim.   See MTD *passim*.   Sharkey asserts the defense of qualified immunity, arguing that the

- 4 -

Complaint does not allege that he violated a clearly established right that the Due Process Clause protects.   See MTD at 7-14.   In his view, only the Fourth Amendment's prohibition on unreasonable searches and seizures protects any rights that he allegedly violated.   See MTD at 7-14.

       2.    **The Response**.

      J.H. responded to the MTD on February 11, 2013.   See Plaintiff's Response to Deputy Sharkey's Motion to Dismiss No. II: Fourteenth Amendment Due Process Claim, filed February 11, 2013 (Doc. 61)("Response").   In J.H.'s view, "the restraint of a mentally ill child for transport to a jail was clearly a violation of the child's right to be free of liberty deprivations through the use of restraints."   Response at 7.   Citing cases involving restraints placed upon those with mental difficulties, J.H. argues that the proper standard for evaluating this claim is whether the state actor properly exercised "professional judgment."   Response at 3-4 (citing Youngberg v. Romeo, 457 U.S. 307, 316 (1982); Santana v. Collazo, 714 F.2d 1172, 1182 (1st Cir. 1983); M.H. v. Bristol Bd. of Educ., 169 F. Supp. 2d 21, 31 (D. Conn. 2001)).   J.H. argue that "[t]he State of New Mexico has created a comprehensive statutory scheme that requires police officers to refrain from restraining mentally ill children and providing them with treatment or evaluation."   Response at 3. For example, J.H. points to various sections of the New Mexico Children's Code that limit the circumstances in which law enforcement can physically restrain or detain a child.   See Response at 4-6 (citing N.M. Stat. Ann. §§ 32A-2-2(A); 32A-2-3(B), (H), (J); 32A-2-10; 32A-6A-3).   J.H. contends that New Mexico statutes restricting the restraint, transport, and confinement of a delinquent child give rise to a liberty interest that the Due Process Clause protects, and that "the restraint and transport of an eleven year old mentally ill child violated her Fourteenth Amendment rights to be free of restraints."   Response at 6.   In sum, J.H. argues that Sharkey violated J.P.'s

rights under both the Fourth Amendment and the Due Process Clause, and, because she "does not have to choose whether she vindicates one right or another, she may vindicate both constitutional rights simultaneously."   Response at 1.

> ### 3. **The Reply**.

Sharkey replied to the Response on February 20, 2013.   See Deputy Sharkey's Reply to Response to Motion to Dismiss No. II: Dismissal of Fourteenth Amendment Substantive Due Process Claim, filed February 20, 2013 (Doc. 64)("Reply").   Sharkey reiterates that "controlling precedent requires analysis of Plaintiff's . . . claims under the objective reasonableness and probable cause standard of the Fourth Amendment and not the substantive due-process clause of the Fourteenth Amendment."   Reply at 3.   Sharkey further emphasizes other cases which hold that a state actor does not forfeit his qualified immunity defense merely because he has violated state statutory law, and that the issue for suits brought under 42 U.S.C. § 1983 is whether the conduct violates the standards of federal law, and not of state law.   See Reply at 5-7.   Sharkey argues that, even if he violated New Mexico law governing the treatment of developmentally disabled children, the state-law violations did not, alone, violate J.P.'s clearly established constitutional rights.   See Reply at 6-11.   Sharkey contends that he is, therefore, entitled to qualified immunity.   See Reply at 6-11.

> ### 4. **The April 25, 2013, Hearing**.

The Court held a hearing on the MTD on April 25, 2013.   See Transcript of Hearing (taken Apr. 25, 2013)(Doc. 105)("Tr.").   Sharkey underscored that he acted as a law enforcement officer when he responded to what he believed to be criminal activity and that, regardless of the presence of a minor who suffers from a behavioral disorder, the Court should evaluate the claim that J.P.'s arrest was unlawful only under the Fourth Amendment rather than under the Fourteenth

Amendment.  See Tr. at 2:24-4:19 (Court, Robles).  The Court asked Sharkey whether he is arguing that the Fourth and Fourteenth Amendment claims are mutually exclusive as a matter of law, or that the facts alleged do not satisfy the shocks-the-conscience standard for liability under the Fourteenth Amendment.  See Tr. at 4:20-25 (Court).  Sharkey indicated that he advances both arguments.  See Tr. at 5:1-18 (Robles).   The Court asked Sharkey to identify the best case indicating the claims are mutually exclusive; Sharkey cited the decision of the Supreme Court of the United States in Graham v. Connor, 490 U.S. 386 (1989), for the proposition that "the more specific amendment should be the one that controls and determines which cause of action should be brought."  Tr. at 5:19-6:13 (Court, Robles).  Sharkey also pointed to the Court's decision in James v. Chavez, 830 F. Supp. 2d 1208 (D.N.M. 2011)(Browning, J.), as evidence that whether the Fourteenth Amendment or the Fourth Amendment applies turns on whether there was a seizure. See Tr. at 6:14-7:15 (Court, Robles).  Sharkey argued that, if there was a seizure, the Fourth Amendment applies; if there was no seizure, the Fourteenth Amendment applies.  See Tr. at 6:14-7:15 (Court, Robles).  Sharkey also pointed to cases cited in the MTD that analyze similar claims under Fourth Amendment law.  See Tr. 7:16-9:9 (Robles).

The Court then asked Sharkey to clarify the "clearly established" prong of the qualified immunity analysis; specifically, the Court asked Sharkey to explain whether the officer must know what the specific cause of action will be or simply that there would be some sort of claim.   See Tr. 9:10-21 (Court).  Sharkey responded by reiterating his argument that "[t]he law is clearly established as to the type of claim that the plaintiff actually has."  Tr. 10:3-4 (Robles).  The Court further asked whether it could dispose of this motion by "simply say[ing] there is no cause of action there under the Fourteenth Amendment . . . [b]ut not getting into the clearly established

prong."   Tr. 10:17-21 (Court); id. at 10:23-24 (Court).   Sharkey responded that the Court could

so limit its decision.   See Tr. at 10:22 (Robles).

Sharkey then turned the Court's attention to cases that J.H. cites that touch on state actors'

treatment of mental health patients.   See Tr. at 10:25-11:22 (Court, Robles).   Sharkey

emphasized that the standard applied under the Fourteenth Amendment in cases involving mental

health patients differs from the reasonableness standard applied under the Fourth Amendment in

cases involving law enforcement officers.   See Tr. at 11:11-22 (Robles).   According to Sharkey,

a legal framework that permits both Fourteenth Amendment and Fourth Amendment claims given

facts like those in this case would be illogical.   See Tr. at 11:11-22 (Robles).   Sharkey concluded

by reiterating his qualified immunity argument.   See Tr. at 12:7-13:3 (Robles).   He emphasized

that, although the relevant Fourth Amendment law is clearly established, the relevant Fourteenth

Amendment law is not.   See Tr. at 12:7-24 (Robles).   He concluded: "The plaintiff will still have

[her] day in court; [she] will just have to try their case under the Fourth Amendment standard."

Tr. at 13:1-3 (Robles).

J.H. first argued that the Fourth Amendment and Fourteenth Amendment rights differ,

because, when an individual is restrained, a "special relationship" is created between the

individual and the state.   Tr. at 13:19–25 (Kennedy).   J.H. reiterated her reliance on cases dealing

with state actors taking care of the developmentally disabled.   See Tr. at 14:1-17 (Court).   The

Court pointed out that none of those cases dealt with law enforcement officers and suggested that a

different framework might apply in those cases.   See Tr. at 14:18-25 (Court).   J.H. disagreed,

arguing that the activity in this case is not a traditional law enforcement activity, but that Sharkey

was instead acting as a "community caretaker[]" with a "duty to recognize medical needs."   Tr. at

15:1-6 (Kennedy).   The Court asked J.H. why it was necessary to impose this new framework

- 8 -

when the Fourth Amendment provides a remedy for anything happening after a lawful arrest.  See Tr. at 15:7-11 (Court).  J.H. responded that the additional remedy was necessary, because probable cause might support the arrest and thus be lawful under the Fourth Amendment, which would leave disabled child J.H. in cases like this one without a remedy for violations of rights arising under the special relationship that New Mexico law arguably creates.  See Tr. at 15:17-16:11 (Court, Kennedy).

The Court asked J.H. to clarify the role of state law in this case.  See Tr. at 16:12-15 (Court).  J.H. argued that the state statutory framework regulating the treatment of children creates a liberty interest that the Due Process Clause protects, and that law enforcement violates that interest when, as here, it arrests an eleven-year-old child and takes her to jail.  See Tr. at 16:16-17:19 (Kennedy).  The Court asked whether the shock-the-conscience standard applies in this case.  See Tr. at 17:20-22 (Court).  J.H. argued that the standard does not apply to special-relationship cases, but the Court recalled case law saying that the shock-the-conscience standard applies to all substantive due-process claims.  See Tr. at 17:20-19:2 (Court, Kennedy). J.H. pointed out that, because Sharkey had not raised that argument in the MTD, they did not address it.  See Tr. at 19:3-22 (Court, Kennedy, Robles).  J.H. then clarified her position by stating that, once Sharkey arrested J.P., it became a special-relationship case, so the shock-the-conscience standard did not apply.  See Tr. at 19:23-20:8 (Court, Kennedy).

The Court then asked J.H. to clarify her views of the issues in the case.  See Tr. at 20:14-17 (Court).  After some argument, the parties seemed to agree that the case implicates two issues: (i) whether J.H. could have both a Fourth Amendment claim and a Fourteenth Amendment claim; and (ii) whether the state statutes governing the treatment of children create a liberty interest that the Due Process Clause protects.  See Tr. at 20:18-23:8 (Court, Kennedy, Robles).  J.H. then

sought to give hypotheticals where both the Fourteenth and the Fourth Amendments would apply. See Tr. at 13:12-20 (Kennedy).   The Court asked J.H. to identify cases stating that "somewhere in this continuum it becomes a Fourteenth Amendment claim rather than a Fourth Amendment Claim"; J.H. was unable to do so.   Tr. at 23:21-24:1 (Court, Kennedy).   J.H. insisted, however, that there are scenarios where the two claims overlap -- for example, where an individual is arrested without probable cause and does not get appropriate medical care.   See Tr. at 23:25-24:8 (Kennedy).   In J.H.'s view, there are no cases directly on point, because such claims typically have proceeded without objection.   See Tr. at 24:9-14 (Kennedy).   J.H. also distinguished cases analyzing similar claims under the Fourth Amendment, arguing that this case is different from the run-of-the-mill adult-arrest case, because it involves the treatment of children with mental health issues.   See Tr. at 24:15-25:2 (Court, Kennedy).

    The Court asked Sharkey about J.H.'s argument that, if the Court dismisses the Fourth Amendment claim because Sharkey made the arrest with probable cause, J.H. would lack a claim for events after the handcuffing.   See Tr. at 15:11-17 (Court).   Sharkey argued that cases both from the Supreme Court of the United States and from the United States Court of Appeals for the Tenth Circuit mandate that outcome.   See Tr. at 25:18-26:1 (Robles).   The Court asked Sharkey when the claim converted from a Fourth Amendment claim to a Fourteenth Amendment claim. See Tr. at 26:2-7 (Court).   Sharkey argued that, once he dropped off J.P. at the Juvenile Detention Center, his duties under the Fourth Amendment ceased, because Sharkey no longer had her in custody.   See Tr. at 28:18-24 (Robles).   At that point, according to Sharkey, employees of the Judicial Detention Center took responsibility for J.P., and they were "required by the Constitution to observe her Fourteenth Amendment rights."   Tr. at 28:24-29:3 (Kennedy).

The Court asked J.H. why it was necessary to have Fourteenth Amendment and Fourth Amendment claims.   See Tr. at 30:22-31:2 (Court).   J.H. suggested that the Fourteenth Amendment claim is necessary, because Sharkey could file a summary judgment motion regarding the Fourth Amendment claim on the basis that probable cause supported the arrest.   See Tr. at 31:3-32:14 (Court, Kennedy).   The Court asked J.H. how old a person must be to be considered a criminal defendant.   See Tr. at 33:2-4 (Court).   J.H. answered that a person must be eighteen years old to be considered a criminal defendant, and also indicated that, because New Mexico law does not permit a Juvenile Detention Center to accept a juvenile who has committed only a misdemeanor, such a person should not be taken to a Juvenile Detention Center.   See Tr. at 33:2-33:16 (Court, Kennedy).

Sharkey reiterated his view that, under controlling precedent, the Fourth Amendment secures rights that "include liberty, property, and privacy interests, a person's sense of security and individual dignity."   Tr. at 33:19-34:5 (Court, Robles).   For this reason, Sharkey argued, the Fourth Amendment provides a sufficient remedy for J.H.   See Tr. at 34:6-34:25 (Court, Robles). In Sharkey's view, "[i]t is the Fourth Amendment that's meant to protect not only [a] wrongfully charged criminal defendant, but also to protect those criminal defendants who have disabilities that are particular to them that make them more vulnerable than other criminal defendants."   See Tr. at 35:7-12 (Robles).

## LAW REGARDING RULE(12)(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those

allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).   The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all of the complaint's well-pleaded factual allegations, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.   "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)("To determine whether a motion to dismiss was properly granted, we apply a plausibility standard to ascertain whether the complaint includes enough facts that, if assumed to be true, state a claim to relief that

- 12 -

is plausible on its face.").   "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).   "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."   Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).

The Tenth Circuit has held that "Iqbal establishes the importance of context to a plausibility determination."   Gee v. Pacheco, 627 F.3d 1178, 1185 (10th Cir. 2010).

> "[P]lausibility" in th[e general pleading] context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."   The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.   For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.   "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."   West v. Atkins, 487 U.S. 42, 48 (1988).   Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.   See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).   The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.   See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens[4] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).   "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."   Garcia v. Casaus, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).   Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.   See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

---

[4]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."   403 U.S. at 389.

1.        <u>**Color of State Law**</u>.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d 1442, 1447 (10th Cir. 1995). The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." <u>Jojola v. Chavez</u>, 55 F.3d 488, 492 (10th Cir. 1995). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" <u>West v. Atkins</u>, 487 U.S. at 49 (quoting <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941)). "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." <u>Jojola v. Chavez</u>, 55 F.3d at 493. Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1447 (quoting <u>Lugar v. Edmonson Oil Co.</u>, 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" <u>Jojola v. Chavez</u>, 55 F.3d at 493 (quoting <u>Lugar v. Edmonson Oil Co.</u>, 457 U.S. at 935-36 n.18; <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1150 (3d Cir. 1995)). Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the

- 15 -

employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."   Jojola v. Chavez, 55 F.3d at 493.   What constitutes the required real nexus, however, is not completely clear.   As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.   Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.   Individual Liability.

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.   Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).   The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"   Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).   "Thus, Defendants are liable for the harm proximately caused by their conduct."   Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d 1046).   As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations.   The

- 16 -

recovery should be guided by common-law tort principles -- including principles of causation . . . ."   Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.   Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."   Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."   Id.   In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.   See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.   Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."   Martinez v. Carson, 697 F.3d at 1255.   The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.   Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest.   The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in

the process injures him.   Is the third officer necessarily liable for the harm
caused to the suspect on the theory that the illegal entry without knocking and
announcing rendered any subsequent use of force unlawful?   The obvious
answer is "no."   The suspect's conduct would constitute a "superseding" cause,
see Restatement (Second) of Torts § 442 (1965), that would limit the officer's
liability.   See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).   Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility."   Trask v. Franco, 446 F.3d at 1047 (quoting William

Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)).   If

the reasonable foreseeability of an intervening act's occurrence is a factor in
determining whether the intervening act relieves the actor from liability for his
antecedent wrongful act, and under the undisputed facts there is room for
reasonable difference of opinion as to whether such act was wrongful or
foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.  **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless

there is "'an affirmative link . . . between the constitutional deprivation and either the

supervisor's personal participation, . . . exercise of control or direction, or . . . failure to

supervise.'"   Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v.

Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(alterations omitted).   Because supervisors can

be held liable only for their own constitutional or illegal policies, and not for the torts that their

employees commit, supervisory liability requires a showing that such policies were a "deliberate

or conscious choice."   Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal

quotation marks omitted).   Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not

enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.

The plaintiff must also demonstrate that, through its <u>deliberate</u> conduct, the municipality was the 'moving force' behind the injury alleged."   (emphasis in original)).

The Tenth Circuit has recognized that <u>Ashcroft v. Iqbal</u> limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.   See <u>Garcia v. Casaus</u>, 2011 WL 7444745, at *25-26 (citing <u>Dodds v. Richardson</u>, 614 F.3d 1185 (10th Cir. 2010)).   The language that may have altered the landscape for supervisory liability in <u>Ashcroft v. Iqbal</u> is as follows: "Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 676.   The Tenth Circuit in <u>Dodds v. Richardson</u> held:

> Whatever else can be said about <u>Iqbal</u>, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.   The Tenth Circuit noted that <u>Ashcroft v. Iqbal</u> "does not purport to overrule existing Supreme Court precedent," but stated that "<u>Iqbal</u> may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."   <u>Dodds v. Richardson</u>, 614 F.3d at 1200.   It concluded that <u>Ashcroft v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."   <u>Dodds v. Richardson</u>, 614 F.3d at 1200.   The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after <u>Ashcroft v. Iqbal</u>:

A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).   The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."   Dodds v. Richardson, 614 F.3d at 1200 n.8.   Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.   Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.   Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.   Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).   The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."   Dodds v. Richardson, 614 F.3d at 1200 n.8.   Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their

- 20 -

subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4.    Municipal Liability.

A municipality will not be held liable under § 1983 solely because its officers inflicted injury. See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006). Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged. See Graves v. Thomas, 450 F.3d at 1218. When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants. See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). "The qualified immunity

analysis is the same whether the claims are brought under <u>Bivens</u> or pursuant to the post-Civil

War Civil Rights Acts." <u>Breidenbach v. Bolish</u>, 126 F.3d 1288, 1291 (10th Cir. 1997),

<u>overruled on other grounds as recognized in</u> <u>Currier v. Doran</u>, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and <u>Bivens v. Six Unknown Fed. Narcotics</u>
> <u>Agents</u>, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from
> government officials who have violated her constitutional or statutory rights.
> But to ensure that fear of liability will not "unduly inhibit officials in the
> discharge of their duties," <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 . . . (1987),
> the officials may claim qualified immunity; so long as they have not violated a
> "clearly established" right, they are shielded from personal liability, <u>Harlow v.</u>
> <u>Fitzgerald</u>, 457 U.S. 800, 818 . . . (1982).   That means a court can often avoid
> ruling on the plaintiff's claim that a particular right exists.   If prior case law has
> not clearly settled the right, and so given officials fair notice of it, the court can
> simply dismiss the claim for money damages.   The court need never decide
> whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has
> merit.

<u>Camreta v. Green</u>, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

<u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009)(quoting <u>Hunter v. Bryant</u>, 502 U.S. 224, 227

(1991)(per curiam)).   "If qualified immunity is to mean anything, it must mean that public

employees who are just doing their jobs are generally immune from suit."   <u>Lewis v. Tripp</u>, 604

F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known."   <u>Pearson v. Callahan</u>, 555 U.S. at 231 (quoting <u>Harlow v. Fitzgerald</u>, 457

U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken

beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.

<u>Saucier v. Katz</u>, 533 U.S. at 205.   When a defendant asserts qualified immunity, the plaintiff

must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory

rights; and (ii) that the right was clearly established at the time of the alleged misconduct.   See

Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1.       **Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a

qualified immunity defense.   In Pearson v. Callahan, the Supreme Court held that lower courts

"should be permitted to exercise their sound discretion in deciding which of the two prongs of

the qualified immunity analysis should be addressed first in light of the circumstances of the

particular case at hand."   555 U.S. at 236.   The Supreme Court also noted that, while no longer

mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the

defendant's actions violated the Constitution, and then the court determines if the right violated

was clearly established -- will often be beneficial.   See Pearson v. Callahan 555 U.S. at 241.

In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases

in which it is plain that a constitutional right is not clearly established but far from obvious

whether in fact there is such a right," and that such an approach burdens district court and courts

of appeals with "what may seem to be an essentially academic exercise."   555 U.S. at 237.

The Supreme Court also recognized that the prior mandatory approach "departs from the general

rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass

on questions of constitutionality unless such adjudication is unavoidable."   555 U.S. at 241

(alterations omitted)(internal quotation marks omitted).   See Reichle v. Howards, 132 S. Ct.

2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified

immunity issues on the basis of a right being not "clearly established" by prior case law

"comports with our usual reluctance to decide constitutional questions unnecessarily").   Once

the plaintiff establishes an inference that the defendant's conduct violated a clearly established

constitutional right, a qualified immunity defense generally fails.   See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."   Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42)(internal quotation marks omitted). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 131 S. Ct. at 2031-32.   See Kerns v. Bader, 663 F.3d at 1181.[5]   "Courts

---

[5]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that, despite both aspects being "in play" before the Court,

"the district court did not analyze the clearly established law element" and that the Court "held only that the defendants had actually violated Mr. Kerns's Fourth Amendment rights."   663 F.3d at 1181 (emphases in original).   In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.   And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.   The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."   663 F.3d at 1187 n.5.   On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.   A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.   See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).   In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . .   The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.   Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or

- 25 -

omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).   The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.   See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).   The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."   Wood v. Strickland, 420 U.S. 308, 322 (1975).   In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test.   See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").   It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.   J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).   Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.   See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .   These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).   In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.   See 547 U.S. at 596-97.   Rather than being a poor or discouraged means of developing

- 26 -

should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[6]   The Tenth

---

constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.   It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.   It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).   See Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations).

[6]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.   131 S. Ct. at 2032.   As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."   It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.   Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.   The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way. Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled

Circuit will remand a case to the district court for further consideration when the district court

has given cursory treatment to the clearly established prong of the qualified immunity analysis.

See Kerns v. Bader, 663 F.3d at 1182.

---

with the arguments, addressed them, and accurately stated the facts. The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice. The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance. Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

    If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012). In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation. See 132 S. Ct. at 2092, 2097. In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S. Ct. at 1660, 1668. In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error. See 132 S. Ct. at 1241, 1250. The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant. See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

    On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention. A trial judge can overwork a "large" case. It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

2.    **Clearly Established Rights in the Qualified Immunity Analysis.**

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.   See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).   "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"   Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)[7](quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."   Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).   On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."   Anderson v. Creighton, 483 U.S. 635, 640 (1987).   "In determining whether the

---

[7]Lobozzo v. Colo. Department of Corrections is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").   The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).   The Court finds that Lobozzo v. Colo. Department of Corrections has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion.

right was 'clearly established,' the court assesses the objective legal reasonableness of the action

at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently

clear that a reasonable official would understand that what he is doing violates that right.'"

Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier

v. Katz, 533 U.S. at 202).   A court should inquire "whether the law put officials on fair notice

that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for

cases with precisely the same facts."   Pierce v. Gilchrist, 359 F.3d at 1298.

The Supreme Court has clarified that the clearly established prong of the qualified

immunity test is a very high burden for the plaintiff: "A Government official's conduct violates

clearly established law when, at the time of the challenged conduct, the contours of a right are

sufficiently clear that every reasonable official would have understood that what he is doing

violates that right."   Ashcroft v. al-Kidd, 131 S. Ct. at 2083.   "In other words, 'existing

precedent must have placed the statutory or constitutional question beyond debate.'"   Reichle v.

Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).   "The operation

of this standard, however, depends substantially upon the level of generality at which the

relevant 'legal rule' is to be identified."   Anderson v. Creighton, 483 U.S. at 639.   "The general

proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment

is of little help in determining whether the violative nature of particular conduct is clearly

established."   Ashcroft v. al-Kidd, 131 S. Ct. at 2084.   The level of generality at which the

legal rule is defined is important, because qualified immunity shields officers who have

"reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect

officers from the sometimes "hazy border[s]" of the law.   Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if

the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction <u>might</u> make a constitutional difference."   663 F.3d at 1188 (emphasis in original).   In <u>Kerns v. Bader</u>, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was <u>beyond debate</u> in 2005 that the officers' entry and search lacked legal justification."   663 F.3d at 1183 (emphasis added).   Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.   <u>See</u> <u>Casey v. City of Fed. Heights</u>, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").   "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."   <u>Casey v. City of Fed. Heights</u>, 509 F.3d at 1284.   Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."   <u>Hope v. Pelzer</u>, 536 U.S. at 741.

In <u>Rivera v. Bates</u>, No. CIV 12-0473 JB/RHS, 2014 WL 3421050 (D.N.M. June 21, 2014)(Browning, J.), the Court used the <u>Kerns v. Bader</u> qualified-immunity framework to determine if it was clearly established that arresting a suspect in his underwear and failing to retrieve his clothing to cover him up while he is transported from his house to a patrol car makes the arrest unreasonable.   <u>See</u> 2014 WL 3421050, at *54.   The Court stated:

> Even if the Court could, on the record before it, conclude, as a matter of law, that the manner in which Hernandez effectuated the arrest was [un]reasonable, the Court finds that the law was not clearly established such that a reasonable officer in Hernandez' position would have recognized that he needed to retrieve clothing for S. Rivera rather than escort him directly to the police vehicle.   As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly

- 31 -

established where "a distinction *might* make a constitutional difference."   Kerns v. Bader, 663 F.3d at 1188 (emphasis in original).   In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was *beyond debate* in 2005 that the officers' entry and search lacked legal justification."   663 F.3d at 1183 (emphasis added).   Here, S. Rivera has relied on Cortez v. McCauley to establish that his clearly established rights were violated, but the Tenth Circuit in that case stated that it had "little difficulty concluding that a small amount of force, like grabbing Rick Cortez and placing him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment."   663 F.3d at 1128.   The Tenth Circuit only made one comment regarding Cortez' clothing during the arrest:

> Although the dignity aspects of this arrest are troubling, specifically hauling Rick Cortez (clad only in his shorts) into the patrol car in the middle of the night without any explanation, the police were investigating a serious felony and claimed a need for quick action to separate the accused from any other children that might be in the home.

478 F.3d at 1128-29.   The Tenth Circuit did not explain what would have to be different about the "dignity aspects" for the arrest to violate the Fourth Amendment.   More importantly, the Court emphasizes that Hernandez did not participate in any of the alleged wrongdoing inside S. Rivera's house, nor did he refuse to allow S. Rivera to get dressed; instead, Hernandez was involved in the arrest only after S. Rivera was outside the house.   S. Rivera has not pointed to, nor has the Court been able to identify, any cases that demand that an officer delay taking the arrestee to a police vehicle so the officer can enter the arrestee's home to search for clothing or otherwise find some covering for an arrestee on the way to the police vehicle.   The Court will thus grant the MSJ on S. Rivera's excessive and unreasonable force claim against Hernandez.

Rivera v. Bates, 2014 WL 3421050, at *54 (emphasis in original).

## LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."   U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due process rights and not for third parties' acts.   See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cnty., 489 U.S. 189, 197 (1987)).   "[N]othing

- 32 -

in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors." DeShaney v. Winnebago Cnty., 489 U.S. at 195. The Due Process Clause is not a guarantee of a minimal level of safety and security. See DeShaney v. Winnebago Cnty., 489 U.S. at 195.

        **1.**    **Exceptions to the General Rule.**

There are, however, two exceptions to this general rule. The first -- the special-relationship exception -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual. See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994). The second -- the danger-creation exception -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'" Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)). "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'" Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006). The Court's decision in Glover v. Gartman was also consistent with a previous Tenth Circuit decision -- Radecki v. Barela, 146 F.3d 1227 (10th Cir. 1998) -- in which the Tenth Circuit stated:

> It is true, of course, that state actors are generally only liable under the Due Process Clause for their own acts and not private violence. There are, however, two exceptions to that rule. First, the state may be subject to constitutional liability if it does not perform a duty to provide protection to an individual with whom the state has a special relationship because it has assumed control over that individual, such as in a prison. Second, the state may be constitutionally liable if it creates a danger that results in harm to an individual, even if that harm is ultimately

- 33 -

inflicted by a private party.   The shocks the conscience standard applies to both types of suits.

Radecki v. Barela, 146 F.3d at 1230 (emphasis added).

### 2.   The Special-Relationship Exception.

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due-process clause is the special-relationship doctrine. A plaintiff must show that they were involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine.   See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996).   "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g., when the individual is a prisoner or involuntarily committed mental patient)."   Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

### 3.   The Danger-Creation Exception.

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct."   Uhlrig v. Harder, 64 F.3d at 573.   The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."   Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).   See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm.").   Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm."   Uhlrig v. Harder, 64 F.3d at 573.   A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'"   Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting

- 34 -

Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)).   To state a prima-facie

case, the plaintiff must show that his or her danger-creation claim for due-process violations meets

a six-part test: (i) the state and individual actors must have created the danger or increased

plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited

and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial

risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) and

the defendant must have acted recklessly in conscious disregard of that risk.   See Pena v. Greffet,

922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat

Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

     In determining whether the danger-creation exception applies, the Tenth Circuit has

focused on the deliberateness of the conduct in relation to the caused harm.   See Christiansen v.

City of Tulsa, 332 F.3d at 1281.   The defendant must recognize the unreasonableness of the risk

of the conduct and act "with an intent to place a person unreasonably at risk." Medina v. City &

Cnty. of Denver, 960 F.2d at 1496.   The intent to place a person unreasonably at risk is present

where the defendant "is aware of a known or obvious risk" creating a high probability that serious

harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable

disregard of the consequences." Medina v. City & Cnty. of Denver, 960 F.2d at 1496.

### 4.   What Shocks the Conscience.

     A government actor's official conduct intended to injure in a way that cannot reasonably be

justified by any government interest most likely shocks the conscience.   See Cnty. of Sacramento

v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way unjustifiable by

any government interest is the sort of official action most likely to rise to the conscience-shocking

level.").   "[A] plaintiff must do more than show that the government actor intentionally or

recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)(internal quotation marks omitted)).   "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995))(internal quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.), aff'd, 511 F. App'x 742 (10th Cir. 2013)(finding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively")).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates.   See 265 F.3d at 1132.   The district court found that the plaintiff failed to state a § 1983

- 36 -

claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience." 265 F.3d at 1134. The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. Apr. 30, 2010)(Browning, J.), the plaintiff alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiff's substantive due-process rights when they did not take sufficient action to prevent a student at the school from "racking"[8] the plaintiff's son. 716 F. Supp. 2d at 1072-73. The Court concluded that the defendants' conduct did not shock the conscience. See 716 F. Supp. 2d at 1074-75. The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [J.H.' son] from falling victim to the same fate. Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.
>
> While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .
>
> Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls

---

[8]The parties in Schaefer v. Las Cruces Public School District defined "racked" as being "kicked and/or punched in the testicles." 716 F. Supp. 2d at 1059 n.2 (citations omitted)(internal quotation marks omitted).

and declined to implement safety measures to minimize that conduct, the Court is
not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## ANALYSIS

The Court will grant the MTD for three reasons.   First, J.H. cannot simultaneously bring
claims under the Fourth and Fourteenth Amendments for Sharkey's alleged unlawful seizure of
J.P.   Second, even if J.H. could bring a separate Fourteenth Amendment claim, Sharkey did not
violate J.P.'s substantive due-process rights.   Third, even if Sharkey violated J.P.'s substantive
due-process rights, those rights were not clearly established and Sharkey is entitled to qualified
immunity.   Accordingly, the Court will grant the MTD.

## I.    J.H. CANNOT SIMULTANEOUSLY BRING CLAIMS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS FOR SHARKEY'S ALLEGED UNLAWFUL SEIZURE OF J.P.

The Court first must address whether J.H. may simultaneously being claims under both the
Fourth and the Fourteenth Amendments.   The Supreme Court has explained that, "where a
particular Amendment provides an explicit textual source of constitutional protection against a
particular sort of government behavior, that Amendment, not the more generalized notion of
substantive due process, must be the guide for analyzing these claims."   Cnty. of Sacramento v.
Lewis, 523 U.S. at 842 (citations omitted)(internal quotation marks omitted).   In J.H.'s view, the
Fourth Amendment protected J.P. only until Sharkey handcuffed her; from that point forward,
only Fourteenth Amendment substantive due-process protections were in place.   See Tr. at
13:9-25 (Court, Kennedy).   J.H.'s argument lacks a sound basis in the law.

While the Supreme Court has not resolved the question whether the Fourth Amendment
protects individuals after formal arrest and before pretrial detention, see Graham v. Connor, 490

U.S. at 395 n.10, the Tenth Circuit has held that the Fourth Amendment applies to an officer's treatment of an arrestee from the formal arrest until the probable-cause hearing, see Austin v. Hamilton, 945 F.2d 1155, 1160 (10th Cir. 1991)("We think the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested . . . is arraigned or formally charged." (citation omitted)(internal quotation marks omitted)).  As the Supreme Court indicated in County of Sacramento v. Lewis, where the Fourth Amendment directly addresses the alleged unconstitutional conduct, a plaintiff cannot also bring a substantive due-process claim for that conduct.  See 523 U.S. at 842.  Because J.H.'s claims focus on Sharkey's treatment of J.P. from her arrest until he transported her to the Juvenile Detention Center, Tenth Circuit precedent indicates the Fourth Amendment directly addresses Sharkey's alleged unconstitutional conduct.  Consequently, J.H. cannot bring a substantive due-process claim for that conduct.

J.H. contends that: (i) the New Mexico statutes governing the treatment of children create a constitutionally protected liberty interest that J.P. can enforce under the Due Process Clause; (ii) Sharkey violated those state statutes; and (iii) he thereby violated J.P.'s due-process rights. This argument misunderstands the nature of the interests that the substantive due-process doctrine protects.  It is true that statutes can create property and liberty interests, but that is a procedural due process concept.  Procedural due process -- which Mathews v. Eldridge, 424 U.S. 319 (1976), and its progeny govern -- mandate the procedures that the government must follow before it deprives an individual of certain liberty or property interests.  See 424 U.S. at 332.  By contrast, substantive due process -- which is the only due process doctrine potentially implicated in this case -- protects an entirely different collection of rights: "fundamental rights and liberties which are 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty'

qualify for such protection." Chavez v. Martinez, 538 U.S. 760, 775 (2003)(quoting Washington v. Glucksberg, 521 U.S. 702, 721 (1997)). As the Tenth Circuit has made clear: "Substantive due process claims are not based on state law but are founded upon deeply rooted notions of fundamental personal interests derived from the Constitution." Graves v. Thomas, 450 F.3d at 1220 (quoting Hennigh v. City of Shawnee, 155 F.3d 1249, 1256 (10th Cir. 1998))). Accordingly, J.H.'s reliance on New Mexico statutory law to establish a violation of substantive due-process is misplaced.

Because New Mexico statutory law is irrelevant, what remains of J.H.'s claim is, substantially, a challenge to the reasonableness of her daughter's arrest. The Fourth Amendment protects this dimension of J.P.'s liberty, and controlling precedent requires her to pursue relief under that doctrine. The Court has already decided that Sharkey did not violate J.P.'s Fourth Amendment rights. See Unsealed Memorandum Opinion at 108-30, filed November 19, 2014 (Doc. 155). J.P. cannot circumvent this barrier by grafting New Mexico statutory law onto the Due Process Clause. The Court, therefore, concludes that J.P. has not stated a claim under the Fourteenth Amendment.

## II. EVEN IF J.H. COULD BRING A SEPARATE FOURTEENTH AMENDMENT CLAIM, SHARKEY DID NOT VIOLATE J.P.'S SUBSTANTIVE DUE-PROCESS RIGHTS.

Even if J.H. could simultaneously bring Fourth and Fourteenth Amendment claims in this case, J.H. has failed to state a substantive due-process claim. Sharkey's conduct neither shocked the Court's conscience nor violated the professional judgment standard. Consequently, he did not violate J.P.'s substantive due-process rights.

The Supreme Court has instructed that courts should use the "shocks-the-conscience" standard to evaluate substantive due-process claims against police officers. Cnty. of Sacramento

v. Lewis, 523 U.S. at 847 (using the shocks-the-conscience standard to determine whether police officers' conduct during a high-speed car chase violated the plaintiff's substantive due-process rights).  Cf. Rochin v. California, 342 U.S. 165, 209 (1952)(finding that officers' actions of breaking into the defendant's home, trying to pull two capsules out of his mouth, forcibly taking him to the hospital, and pumping his stomach, violated the defendant's substantive due-process rights).  To satisfy this demanding standard, Sharkey's conduct "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1223 (10th Cir. 2006)(quoting Uhlrig v. Harder, 64 F.3d at 574).   More specifically, "a § 1983 violation based on substantive due process 'must be predicated on a state action manifesting one of two traditional forms of wrongful intent -- that is, either (1) an intent to harm; or (2) an intent to place a person unreasonably at risk of harm."   Ward v. Anderson, 494 F.3d 929, 938 (10th Cir. 2007)(quoting Uhlrig v. Harder, 64 F.3d at 573). Sharkey's conduct exhibits neither.

The Complaint alleges that, on September 26, 2011, J.P. struck another student in her classroom.  See Complaint ¶¶ 27-28, at 4.  Gonzalez, J.P.'s teacher, then contacted Sharkey. See Complaint ¶ 25-28, at 4.   Gonzales tried to restrain J.P by grabbing her around the waist.   See Complaint ¶¶ 30-32, at 4.  Sharkey grabbed J.P. "in violation of the proper method of restraint detailed in [J.P.'s] BIP."  Complaint ¶ 33, at 4.  Having "decided to press charges against the child for kicking" her teacher, Sharkey "placed J.P. in handcuffs and walked her out of the classroom," and then "transported the 11 year old disabled child to the Juvenile Detention Center in his patrol unit," where she "was held . . . for several hours."  Complaint ¶¶ 34-37, at 4-5. These actions simply do not manifest either an intent to harm J.P. or an intent to place J.P. unreasonably at risk of harm, as Ward v. Anderson, required, 494 F.3d at 929, nor do they

"demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking," Camuglia v. City of Albuquerque, 448 F.3d at 1223, as they must to state a claim that Sharkey violated the Due Process Clause.   J.H. wants the Court to focus on Sharkey's handcuffing a disabled minor and transporting her to the Juvenile Detention Center.   Those events, however, did not happen in a vacuum.   Immediately before Sharkey handcuffed and transported J.P., she had attacked another student.   Whatever one might conclude about the wisdom of Sharkey's actions, they do not shock the Court's conscience.   If one puts aside J.P.'s disability, it was a routine arrest of a juvenile.   The arrest of a disabled student is not enough to shock the Court's conscience.

J.H. has also suggested that, when Sharkey restrained J.P., he created a custodial relationship governed by the "special relationship" exception, and that she has a valid substantive due-process claim under that exception.   Tr. at 13:19-25 (Kennedy).   The Court disagrees for two reasons.   First, the special-relationship exception does not apply.   The special-relationship exception is an exception to the general rule that "a state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."   Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1064 (quoting DeShaney v. Winnebago County of Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)).   The special relationship exception requires state actors to protect individuals in the state's custody -- e.g., foster children, prison inmates, and developmentally disabled individuals who have been involuntarily committed to the state -- from harm at the hands of private individuals.   See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994).   In other words, the special relationship exception does not apply when, as in this case, a state actor harms the plaintiff.   J.H. does not cite -- and the Court has been unable to find -- a case in which a

court has applied the special-relationship exception to a police officer's allegedly unconstitutional conduct.   The cases that J.H. cites deal with circumstances different from those that this case presents.   For example, Youngberg v. Romeo dealt with the duties that state caretakers owe to an individual with mental health problems who had been involuntarily committed to their care in state institutions.   See 457 U.S. at 309-13.   The principal relevant issue in a second case J.H. cites, Santana v. Collazo, 717 F.2d 1172 (1st Cir. 1983), was whether the Mayaguez Industrial School violated the Constitution by placing juveniles in solitary confinement.   See 717 F.2d at 1175-82. In the third case on which J.H. relies, M.H. v. Bristol Bd. of Educ., 169 F. Supp. 2d 21 (D. Conn. 2001), a disabled child's teacher spat in his face and, on a different occasion, tied him to a chair with a belt, among other actions.   See 169 F. Supp. 2d at 24-26.   As these cases demonstrate, Youngberg v. Romeo's professional judgment standard applies in a very different context: reviewing the acts of individuals or institutions specially charged with the care or education of juveniles or those with developmental disabilities.   Consequently, those cases are inapposite.

Second, even if the special-relationship applied, it would not affect the Court's decision. Where the special relationship applies, courts use the professional judgment standard to evaluate the plaintiff's substantive due-process claims.   See, e.g., A.M. ex rel. Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2014 WL 6969684, *47-49 (D.N.M. Dec. 5, 2014)(Browning, J.)(concluding that New Mexico Department of Health officials violated the professional judgment standard by failing to properly supervise and provide treatment to the plaintiff, a developmentally disabled individual committed to state custody).   Under the professional judgment standard, a state official is liable for violating a developmentally disabled individual's substantive due-process rights only if the official "knew of the asserted danger to [the individual] or failed to exercise professional judgment with respect thereto."   Yvonne L. v. N.M. Dep't of Human Servs.,

959 F.2d at 890.   The Court has previously explained that, under the professional judgment standard, "[a] decision made by a professional is presumptively valid, and liability will be imposed only if the decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."   Johnson ex rel. Cano v. Homes, 377 F. Supp. 2d 1039, 1048 (D.N.M. 2004)(Browning, J.), aff'd sub nom. Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133 (10th Cir. 2006)(citing Youngberg v. Romeo, 457 U.S. at 323).   The Court recently held that New Mexico State Department of Health officials violated the professional judgment standard when they abandoned a developmentally disabled woman with a private third party for over thirty years, during which time, the woman did not receive: (i) social services, Medicaid benefits, or social security benefits; (ii) adequate medical, dental and psychological care; (iii) rehabilitative, educational, and vocational services; or (iv) therapy.   See A.M. ex rel. Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2014 WL 6969684, *47-49 (D.N.M. Dec. 5, 2014)(Browning, J.).

Unlike the facts that the plaintiff alleged in A.M. ex rel. Youngers v. New Mexico Department of Health, the facts that the Complaint alleges indicate that Sharkey properly exercised his professional judgment.   When he encountered a child who had attacked another student, he restrained her to prevent further violence from occurring.   Moreover, he did not use any more force than was necessary to restrain her -- he did not throw J.P. to the ground or up against the wall; he did not strike her, injure her, scratch her; he did not pull out any sort of weapon or threaten to use a weapon; he did not even yell at her.   Aside from allowing J.P. to continue attacking the other student, the Court questions what else Sharkey could have done to exercise restraint in this situation.   Perhaps he could have released J.P. from the handcuffs and not taken

her to the Juvenile Detention Center, but even those decisions were reasonable in light of the fact that she had just committed a crime.  Consequently, Sharkey did not violate the professional judgment standard when he arrested J.P. and took her to the Juvenile Detention Center.

That Sharkey allegedly violated J.P.'s BIP and IEP when he arrested her does not dictate a different outcome for three reasons.  First, J.H. has not cited -- and the Court has been unable to find -- a case in which a police officer, teacher, or school official violated an individual's substantive due-process rights by violating his or her IEP or BIP.  To the contrary, the Supreme Court has repeatedly emphasized that substantive due process protects only "fundamental rights and liberties which are 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty' qualify for such protection."  Chavez v. Martinez, 538 U.S. at 775 (quoting Washington v. Glucksberg, 521 U.S. at 721).  The Court finds it difficult to conclude that not arresting a child who has committed a crime -- even if that is what the child's BIP and IEP prescribe -- is a fundamental right that is "deeply rooted in this Nation's history and tradition." Chavez v. Martinez, 538 U.S. at 775 (quoting Washington v. Glucksberg, 521 U.S. at 721). Second, holding that J.P.'s BIP and IEP bound Sharkey would be impractical.  The rule which J.H. proposes would require every police officer in every public school across the country to study the records of every child at the school in which they are stationed -- many of which federal law prohibits schools from giving them[9]-- to determine which punishment is appropriate for which

---

[9]Section 1232g(b)(1) of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-82, states:

> No funds shall be made available under any applicable program to any educational agency which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein [with one inapplicable exception]) of students without the written consent of their parents to any individual, agency, or organization, other than [in enumerated, and

child.  If a school officer encountered a child committing a crime with whom they were not familiar, that officer would have to ask that child for his or her name, go to the school office, review that child's records, come back, and then levy the appropriate punishment.   In a worst-case scenario, an officer faced with a child whose BIP or IEP prevents that child from being arrested would have to stand idly by as a child attacks another student or teacher in the hopes that the child will eventually get him or herself under control.   The Court is unwilling to hold that the Due Process Clause imposes such a dangerous policy.   Third, the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-82, which enacted the requirement that schools must develop IEPs for children with special education needs, expressly provides that the procedural safeguards that it established do not apply to law enforcement officers investigating a crime committed by a disabled child:

> Nothing in this subchapter shall be construed to prohibit an agency from reporting a crime committed by a child with a disability to appropriate authorities or to prevent State law enforcement and judicial authorities from exercising their responsibilities with regard to the application of Federal and State law to crimes committed by a child with a disability.

20 U.S.C. § 1415(k)(6)(A).   For these reasons, the Court concludes that, even if J.P.'s BIP or IEP prohibited Sharkey from arresting her, Sharkey did not violate her substantive due-process rights.

## III.   J.P.'S SUBSTANTIVE DUE-PROCESS RIGHTS WERE NOT CLEARLY ESTABLISHED.

Even if the Complaint plausibly stated a substantive due-process claim, the qualified immunity doctrine would pose a second independent obstacle to J.H.'s claim.   The Complaint must demonstrate not only that the defendant violated a constitutional right, but also that that

---

inapplicable, exceptions].

20 U.S.C. § 1232g(b)(1).   Consequently, even if Sharkey wanted to review J.P.'s BIP and IEP to determine what those plans prescribe and prohibit, federal law prevented him from doing so.

constitutional right is "clearly established" within the meaning of the qualified immunity jurisprudence.   The Complaint does not satisfy that burden.

The clearly established prong of the qualified immunity test places a burden on the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   Ashcroft v. al-Kidd, 131 at 2083.   "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"   Lobozzo v. Colo. Dep't of Corr., 429 F. App'x at 710 (quoting Zweibon v. Mitchell, 720 F.2d at 172-73).   The Tenth Circuit has held that the law is not clearly established where "a distinction might make a constitutional difference."   Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in original).

J.H. has not carried this burden.   To demonstrate that J.P.'s substantive due-process rights were clearly established, J.H. cites Youngberg v. Romeo and Armijo ex rel. Chavez v. Wagon Mound Public Schools, 159 F.3d 1253 (10th Cir. 1998).   Youngberg v. Romeo involved a thirty-three year old developmentally disabled individual -- Nicholas Romeo -- who was involuntarily committed to a state institution.   See 457 U.S. at 309.   While at that institution, Romeo suffered numerous injuries -- some self-inflicted and some that the other residents caused. See 457 U.S. at 310.   After objecting multiple times to the state's failure to care for her son properly, Romeo's mother brought a § 1983 action, alleging, among other things, that state officials had violated her son's substantive due-process rights to reasonable care and safety.   See 457 U.S. at 310.

Before the Supreme Court, the defendants conceded that Romeo had "a right to adequate

- 47 -

food, shelter, clothing, and medical care," but disputed his right to "safety, freedom of movement, and training." 457 U.S. at 314. In an opinion that the Honorable Lewis F. Powell, then-Associate Justice of the Supreme Court, authored, the Supreme Court began its analysis by noting that, "[a]s a general matter, a State is under no constitutional duty to provide substantive services for those within its border." 457 U.S. at 317 (citations omitted). Justice Powell stated, however, that "[w]hen a person is institutionalized -- and wholly dependent on the State -- . . . a duty to provide certain services and care does exist." 457 U.S. at 317. Justice Powell concluded that developmentally disabled individuals involuntarily committed to the state have "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." 457 U.S. at 324.

In Armijo ex rel. Chavez v. Wagon Mound Public Schools, the plaintiff's developmentally disabled son -- Philadelfio Armijo -- committed suicide after he was suspended from school. See 159 F.3d at 1256. Although school policy dictated that Armijo should be placed on in-school suspension because his parents were not home to supervise him, a school official dropped Armijo off at home without informing his parents. See 159 F.3d at 1257. The Tenth Circuit, in an opinion that the Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, authored, and Judges Holloway and Murphy joined, held that the special-relationship exception did not apply, because Armijo ended his life after the school official dropped him off at home. See 159 F.3d at 1260-62.

Neither of these cases clearly establish that a law enforcement officer violates the Due Process Clause when he arrests a developmentally disabled child and transports her to a juvenile detention facility. Unlike the developmentally disabled individuals in Youngberg v. Romeo and

Armijo ex rel. Chavez v. Wagon Mound Public Schools, who committed no crime before state officials allegedly restrained them, J.P. attacked another student before Sharkey arrested her. Unlike the defendants in Youngberg v. Romeo and Armijo ex rel. Chavez v. Wagon Mound Public Schools, whose primary responsibility is to ensure that the developmentally disabled individuals in their care receive the education and therapy that they need, Sharkey's primary responsibility was to keep the teachers and children at his school safe from both internal and external threats.   These distinctions not only "might make a constitutional difference," they do.   Kerns v. Bader, 663 F.3d at 1187. [10]   With only these cases, "every reasonable official" in Sharkey's position would not

_____

[10]On remand in Kerns v. Board of Commissioners, the Court explained the Tenth Circuit's approach to analyzing the clearly established prong of the qualified immunity framework when the Tenth Circuit heard the case on appeal.   See 888 F. Supp. 2d at 1204.   The Court stated:

> [T]he majority analyzed the clearly established prong of the qualified immunity analysis and gave the Court some insight into how the Tenth Circuit applies that test.   The Tenth Circuit recognized that, in Douglas v. Dobbs, 419 F.3d 1097 (10th Cir. 2005), it "accepted that a patient has a privacy interest in medical records held by a third party medical services provider," but pointed out that it had explained that "statutes requiring disclosure of those records to 'law enforcement' may not always violate the Fourth Amendment."   Kerns v. Bader, 663 F.3d at 1184 (majority opinion).   It emphasized that it had noted that the "question whether, in the absence of a statute, 'a warrant is required for [law enforcement] to conduct an investigatory search of [medical] records [held by a third party] . . . is an issue that has not been settled.'"   Kerns v. Bader, 663 F.3d at 1184 (alterations in original). The Tenth Circuit noted J. Kerns' reliance on Ferguson v. City of Charleston, 532 U.S. 67 (2001), but noted that "in that case the Supreme Court expressly declined to answer the question posed in this one."   Kerns v. Bader, 663 F.3d at 1184.   It held that, "[a]ccording to the terms of Ferguson itself, then, it hardly placed the Fourth Amendment question before us beyond debate."   Kerns v. Bader, 663 F.3d at 1185.   Discussing J. Kerns' and the dissent's reliance on Lankford v. City of Hobart, the Tenth Circuit noted that it noted only a "possible" Fourth Amendment violation in "somewhat similar circumstances" and that, "[a]t best, Lankford's equivocation declined to foreclose the possibility of a Fourth Amendment violation."   Kerns v. Bader, 663 F.3d at 1185 n.2 (emphasis in original).   With respect to the Fourteenth Amendment, the Tenth Circuit noted that, "[c]onfirming the lack of a clear answer here, most of the cases Mr. Kerns cites involve state actors who publicly disclosed a citizen's private information, not law enforcement

have understood that arresting J.H. would violate her substantive due-process rights.   Ashcroft v.

al-Kidd, 131 at 2083.   Instead, they would have thought they were doing their job and protecting

the students in their care.   Accordingly, the Court concludes that any due-process rights Sharkey

allegedly violated were not clearly established.   Thus, Sharkey is entitled to qualified immunity

from liability for this claim.

IT IS ORDERED that Deputy Sharkey's Motion to Dismiss No. II:   Dismissal of

Fourteenth Amendment Substantive Due Process Claim, filed January 16, 2013 (Doc. 53), is

granted.

_____
UNITED STATES DISTRICT JUDGE

---

officers who requested the voluntary production of records held by a third party for
use in legitimate law enforcement efforts."   Kerns v. Bader, 663 F.3d at 1186
(emphasis in original).   The Tenth Circuit found that there was a meaningful
difference between those situations.   See Kerns v. Bader, 663 F.3d at 1186.   It
stated: "If we could be sure that the distinction between public disclosure of
government access without a valid purpose, on the one hand, and more limited
government access for otherwise legitimate purposes, on the other, is a trivial one
we would rule in Mr. Kerns' favor."   Kerns v. Bader, 663 F.3d at 1186-87.   It
asserted that the Supreme Court's cases and "the logic of our own cases preclude
such a conclusion and acknowledge instead that such a distinction *might* make a
constitutional difference" such that J. Kerns had "failed to identify clearly
established law rendering beyond debate that the Sheriff's conduct was unlawful as
of 2005."   Kerns v. Bader, 663 F.3d at 1187 (emphasis in original).

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1204-05 (footnotes omitted).   Given that the Tenth
Circuit concluded that the party requesting the records was law enforcement in Kerns v. Bader
might make a constitutional difference, and given how quick the majority in Kerns v. Bader was to
seize on any factual or legal differences in prior cases, the Court is confident that the differences
between the closest cases that J.H. cites "might make a constitutional difference" in the
determination of this case.   Kerns v. Bader, 663 F.3d at 1187

- 50 -

*Counsel:*

Joseph P. Kennedy
Shannon L. Kennedy
Laura Schauer Ives
Kennedy Kennedy & Ives, LLC
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Terri S. Beach
Miller Stratvert P.A.
Albuquerque, New Mexico

--and--

Luis E. Robles
Marcus J. Rael, Jr.
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

       *Attorneys for Defendants Bernalillo County and J.M. Sharkey*

Jeremy K. Harrison
Megan Muirhead
Modrall Sperling
Albuquerque, New Mexico

       *Attorneys for Defendants Cee Kaye Nation and Alison Gonzales*