# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

J.H., on behalf of her minor child, J.P.,

      Plaintiffs,[1]

vs.                                     No. CIV 12-0128 JB/LAM

CEE KAYE NATION, Principal;
ALISON GONZALES, Teacher;
J.M. SHARKEY, Bernalillo County Deputy;
and BERNALILLO COUNTY,

      Defendants.

## MEMORANDUM OPINION[2]

    **THIS MATTER** comes before the Court on the County Defendants' Motion for Partial Summary Judgment No. IV: Dismissal of Plaintiffs' Municipal Liability (Policies, Customs, Patterns, and Practices), Failure to Train, and Supervisory Liability Claims, filed July 30, 2013 (Doc. 95)("MSJ").  The Court held a hearing on September 6, 2013.  The primary issue is whether the Court should grant summary judgment in favor of Defendant Bernalillo County, New Mexico, and J.M. Sharkey, a deputy with the Bernalillo County Sheriff's Office (collectively "the County Defendants"), on the 42 U.S.C. § 1983 claim that Plaintiff J.H., on

---

[1]There is some inconsistency about the parties' names in the briefing.  Sometimes, the parties refer to J.H., on behalf of her minor child, J.P., as a singular Plaintiff, and sometimes the parties refer to J.H. and J.P. as plural Plaintiffs.  Even though the Plaintiffs' briefing does not clearly prefer one name over the other, and even though the caption refers to the Plaintiffs in the plural, the Court will use "J.H.," because J.H. brings this case on behalf of J.P.

[2]On September 27, 2013, the Court entered an Order granting the County Defendants' Motion for Partial Summary Judgment No. IV: Dismissal of Plaintiffs' Municipal Liability (Policies, Customs, Patterns, and Practices), Failure to Train, and Supervisory Liability Claims, filed July 30, 2013 (Doc. 59).  See Order, filed September 27, 2013 (Doc. 132)("Order").  In the Order, the Court stated that it would "at a later date issue a memorandum opinion more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

behalf of her minor child, J.P., brings against Bernalillo County for municipal liability.   The Court concludes that, because J.H. has not offered sufficient evidence to establish any underlying constitutional violations, her municipal liability claim cannot go forward.   Consequently, the Court will grant the MSJ.

## FACTUAL BACKGROUND

This case arises out of Sharkey's alleged unlawful arrest and use of excessive force against J.P., a developmentally disabled eleven-year-old child.   The Court has below included the facts from (i) the MSJ; and (ii) the Plaintiffs' Response to County Defendants' Motion for Partial Summary Judgment No. IV: Dismissal of Plaintiffs' Municipal Liability (Policies, Customs, Patterns, and Practices), Failure to Train, and Supervisory Liability Claims, filed August 16, 2013 (Doc. 101)("Response").[3]

### 1.   Bernalillo County Sheriff's Office Policies and Customs.

During the period before and during the incident which gave rise to this case, the Bernalillo County Sheriff's Office ("BCSO") maintained the following policy regarding BCSO deputies' arrests:

**313 ARRESTS**

The Department shall arrest felony and misdemeanor violators of laws which its Deputies are empowered to enforce and to follow correct legal procedures required in arresting, booking, and filing charges against such violators.

RULES AND PROCEDURES:

---

[3]Because this opinion focuses solely on J.H.'s municipal liability claim -- and the parties have not offered any undisputed facts on either the events leading up to Sharkey's arrest of J.H. or the arrest itself in the MSJ, the Response, and the Reply -- the Court will not include those facts here.   The Court's other opinions on Sharkey's summary judgment motions, however, provide a more detailed factual background on those events.   See Memorandum Opinion at 2-4, filed January 14, 2015 (Doc. 157); Unsealed Memorandum Opinion at 2-51, filed November 19, 2014 (Doc. 155); Unsealed Memorandum Opinion at 2-66, filed July 8, 2014 (Doc. 152).

**313-1 FELONY ARREST AUTHORITY**

      A.      Felony arrests may be made through the authority of a warrant or on probable cause.

      B.      Probable cause felony arrests may be made for all:

            1.      Felony narcotic offenses.

            2.      Felonies in progress (e.g., violent crimes, burglaries, etc.).

            3.      Violent crime offenses (e.g., aggravated battery, aggravated assault, criminal sexual penetrations, etc.).

MSJ at 2-3 (setting forth this fact)(internal quotation marks omitted).  See Bernalillo County Sheriff's Department, Rules and Regulations § 313 at 1 (effective May 22, 2012), filed July 30, 2013 (Doc. 95-1)("BCSO Rules § 313).[4]  "[Beyond these policies and other BCSO policies

---

[4]In addition to these policies, the County Defendants ask the Court to find undisputed that:

      2.      There is no evidence which shows that BCSO deputies had a "custom" of arresting citizens in a manner which was unconstitutional, widespread, permanent, and well settled.

      3.      There is no evidence which shows that the County's arrest policies or customs were deliberately indifferent to Plaintiffs' Fourth Amendment rights against illegal arrests.

MSJ ¶¶ 2-3, at 3.

      J.H. purports to dispute the BCSO policies regarding arrests and the County Defendants proposed facts two and three:

      Plaintiffs do not dispute the language quoted by Defendants or the exhibit they cite.  However, Defendants' citation of a blanket policy related to arrests is insufficient to support their contention that there is no material dispute of fact concerning the existence or absence of a policy which results in the violation of the rights of disabled children.

Response at 2.

regarding interacting with disabled individuals in general, BCSO policies do not instruct School

Resource Officers ("SROs")] whether or how to assess or investigate an alleged crime committed

by a disabled child or whether an arrest of a disabled child for the manifestation of her disability

is appropriate."  Response ¶ A, at 2 (setting forth this fact); id. ¶ K, at 5 (same); id. ¶ AA, at 9

(same).  See Deposition of Jessica Tyler, at 11:23-12:8 (Tyler, Kennedy)(taken June 25, 2013),

filed August 16, 2013 (Doc. 101-1)("Tyler Depo.").[5]  "Whether an [SRO] choses [sic] to arrest,

---

In the Reply, the County Defendants do not respond to J.H.'s purported dispute of the
County Defendants' facts, but instead make a general statement that the facts which J.H. disputes
are immaterial, because the Fourth Amendment does not impose any additional requirements for
arresting developmentally disabled children.  See Reply at 2-6.

Because J.H. does not contest that BCSO has implemented the quoted policies, the Court
deems them undisputed.  The County Defendants' second and third facts -- and J.H.'s responses
to them -- focus on whether BCSO's policies are constitutional, which is a legal conclusion and
not a fact.  Consequently, the Court will not adopt the County Defendants' second and third facts
and will instead resolve the legal dispute between the parties in its analysis.

[5]Although the County Defendants do not specifically controvert the proposed fact, they
argue that it is irrelevant to the Court's analysis, because the Fourth Amendment does not make
any special exceptions for developmentally disabled individuals.  The Court has explained in a
previous Memorandum Opinion that it agrees with this argument.  See Unsealed Memorandum
Opinion passim, filed November 19, 2014 (Doc. 155)("Nov. 19, 2014 MO").  The Court includes
the proposed fact in its findings of fact, however, because it provides useful background
information for this case.

 The Court has also modified the proposed fact, because the testimony reflects that
officers are trained to make arrests based on probable cause and that BCSO had policies which
instructed deputies how to deal with disabled individuals.  See Tyler Depo. at 11:6-10 (Kennedy,
Tyler); id. at 12:2-8 (Kennedy, Tyler).

J.H. has also asked the Court to find undisputed that "Bernalillo County School Resource
Officers are trained to arrest and otherwise interact with a child with disabilities who is accused
of a crime the same as a fully competent adult."  Response ¶ A, at 2; id. ¶ L, at 5; id. ¶ BB, at 9.
Although the County Defendants do not dispute this proposed fact, the record does not support it.
The cited testimony states:

        Q.    So as it relates to a child in a school who commits an act that is a
crime, the child is treated the same as an adult?

        . . . .

transport, or charge a child with a crime is fully within the officer's discretion [once the officer has probable cause to arrest the child]."  Response ¶ C, at 3 (setting forth this fact); id. ¶ M, at 5 (same); id. ¶ CC, at 9.  See Tyler Depo. at 13:7-23 (Kennedy, Tyler).[6]  "There is no limitation of an arresting officer's discretion based on a child's disability."  Response ¶ C, at 3 (setting forth this fact); id. ¶ M, at 5 (same); id. ¶ CC, at 9 (same).  See County Defendants' Reply to Motion for Partial Summary Judgment No. IV: Dismissal of Plaintiffs' Municipal Liability (Policies, Customs, Patterns, and Practices), Failure to Train, and Supervisory Liability Claims at 6, filed September 3, 2013 (Doc. 120)("Reply")(not disputing this fact); Tyler Depo. at 13:7-23 (Kennedy, Tyler).  "Bernalillo County School Resource Officers are not instructed as to whether

_____

> A.     When there is an arrest made in the school, they would be treated based upon . . . the crime that was committed.
>
> Q.     All right.  So a child kicks a teacher, for instance.  That's a crime?
>
> A.     Correct.
>
> Q.     Treated like an adult?
>
> A.     Not treated like an adult, but treated as anybody else that was being arrested.  There is no -- if you're asking if there is a difference between making an arrest on a juvenile and an adult, obviously there are different procedures for where we book them, et cetera, notifications that are made, that type of thing, yes.

Tyler Depo. at 12:9-13:4 (Kennedy, Tyler).  First, the question does not focus on a developmentally disabled child, but generally on "a child in a school."  Tyler Depo. at 12:9 (Kennedy).  Second, Tyler did not testify that SROs are trained to treat a child "the same as a fully competent adult," but instead stated that SROs are trained to treat children and adults differently -- e.g., how they book children, whom notify about the arrest, etc.  Tyler Depo. at 13:1-4 (Tyler).  Consequently, the Court deems this fact unsupported.

[6]Although the County Defendants do not specifically controvert this fact, the Court has modified it, because the testimony reflects that officers do not have unlimited discretion to arrest children, but must instead first determine whether probable cause exists for the arrest.  See Tyler Depo. at 13:8-14 (Kennedy, Tyler).

a child with a disability should be arrested for an act that is a manifestation of their [sic] disability."  Response ¶ D, at 3 (setting forth an unmodified version of this fact); id. ¶ N, at 5 (same); id. ¶ DD, at 9 (same).  See Reply at 2-6 (not disputing this fact); Tyler Depo. at 13:24-14:21 (Kennedy, Tyler).[7]

_____

[7]J.H. also asks the Court to find it undisputed that:

>     Bernalillo County School Resource Officers do not have discretion in whether to arrest a person if they observe the actus reus of an offense.  Mens rea and specific intent are not taken into consideration even where an officer has engaged crisis intervention training and is aware that a person is suffering from some sort of medical episode.  **Exhibit A:** 37:12-39:6.

Response ¶ E, at 3; id. ¶ O, at 6 (same); id. ¶ EE, at 9 (same).

Although the County Defendants do not controvert this proposed fact, the cited testimony contradicts it.  It states:

>     Q.     A person is psychotic, flailing around, trying to get away from people and hits either a family member or an officer or a healthcare worker . . . there is no training that that is a medical issue as opposed to a criminal law issue, is there?

>     A.     No.  Absolutely.  There's training as far as if they're . . . [T]he training is more . . . a legal issue about was there intent to commit a crime.

>     Q.     Right.

>     A.     Was there intent to commit a battery?  Did they intentionally hit somebody, or is somebody having a seizure and hits somebody in the face?  Two different scenarios, yes.

>     Q.     So you understand, then, that battery, for instance, is a specific intent, right?

>     A.     Correct.
>
> . . . .

>     Q.     But is there any training for Bernalillo County officers, and specifically SROs, as it relates to determining, at the point of arrest, whether there is specific intent to commit a battery or any other specific-intent crime?

During the period before and during the incident that gave rise to this case, the BCSO maintained the following policy regarding BCSO deputies' use of force:

**314 USE OF FORCE**

Deputies shall use only that force which is reasonably necessary to protect the sanctity of human life, preserve and protect individual liberties, and to effect lawful objectives. All Deputies will act in good faith in the exercise of force. The

---

A.     Not specific training for SROs, no, but that's something that's generally covered in any type of legal update, crisis intervention training to recognize those things, yes.

Q.     Is there any training that -- a person in a psychosis, for instance, who flails around and hits someone, is there any training that that person should not be arrested and should probably be given medical care?

. . . .

A.     Specifically?  I mean, I guess there is no specific policy to say that this will not occur if this occurs.  Again, it goes back to the officer's discretion and them determining whether there is probable cause and that the elements of a crime have been met. . . .  That's what falls on the officer or the deputy.  So the answer to your question, I guess, it would be, no, there is nothing to my knowledge, of saying, Okay, if a person has -- is in . . . some sort of medical episode, that you won't arrest them.  It's a matter of: Did a crime -- was a crime committed?  Do you have probable cause to believe a crime was committed or not?

Tyler Depo. at 37:6-39:6 (Kennedy, Tyler).
        Tyler never testified that SROs "do not have discretion in whether to arrest a person if they observe the actus reus of an offense."  Response at 3.  In fact, Tyler said the opposite: If an SRO observes a person in a psychosis, it "goes back to the officer's discretion and them determining whether there is probable cause . . ."  Tyler Depo. at 38:20-22.  Moreover, Tyler did not say that "[m]ens rea and specific intent are not taken into consideration even where an officer has engaged crisis intervention training and is aware that a person is suffering from some sort of medical episode."  MSJ ¶ E, at 3.  Although she did not explicitly say that the opposite is true, she implied as much when she testified: "Was there intent to commit a battery?  Did they intentionally hit somebody, or is somebody having a seizure and hits somebody in the face?  Two different scenarios, yes."  Tyler Depo. at 37:19-22 (Tyler).  Tyler also testified that BCSO deputies receive training on how to determine whether an individual had specific intent to commit a crime.  See Tyler Depo. 38:8-11 (Tyler)("[T]hat's something that's generally covered in any type of legal update, crisis intervention training to recognize those things, yes.").  Given that Tyler's testimony contradicts J.H.'s proposed facts, the Court finds them unsupported.

Deputies' options can range from a continuum of verbal persuasion to deadly force.

In vesting Deputy Sheriffs with the lawful authority to use force to protect the public welfare, a careful balancing of all human interests is required.

. . . .

314-1 <u>RULES AND PROCEDURES</u>:

NON DEADLY FORCE/USE

      A.      Where force is warranted, Deputies should assess the incident in order to determine which technique or tool will reasonably de-escalate the incident and bring it under control safely.

      B.      Every Deputy is responsible for weighing all other reasonable means of apprehension or control before resorting to a use of force.

      C.      Deputies shall use only that force which is reasonable and necessary to overcome resistance, to protect oneself or another, and to effect lawful objectives.

      D.      When a confrontation escalates suddenly, Deputies may use any means or device at hand for self-defense provided that the use of force is reasonable, given the existing circumstances.

      E.      Deputies are permitted to use those defensive tactics and non deadly tools with which they are trained, qualified, and certified with [sic], as determined by training procedures, for the resolution of incidents when force becomes necessary.

      F.      Every Deputy is expected to consider the use of Department approved options, ranging from verbal techniques, hand control procedures, and non-lethal equipment.  The following non deadly force tools are authorized to be issued:

            1.      Expandable Baton

            2.      Chemical Agents

3.        Handcuffs

4.        Less than lethal munitions

5.        Pepper-ball System

6.        Electronic Restraint Device

7.        Bean Bag Rounds

MSJ ¶ 7, at 4-5 (setting forth this fact)(alteration in MSJ but not in source)(internal quotation marks omitted).  See Bernalillo County Sheriff's Department, Rules and Regulations § 314 at 1-2 (effective May 22, 2012), filed July 30, 2013 (Doc. 95-2)("BCSO Rules § 314").[8]  BCSO policy "requires officers to handcuff all persons [that are being transported] and makes no exception for children with emotional or behavioral disabilities.   The only discretion an officer has in

---

[8]In addition to these policies regarding BCSO deputies' use of force, the County Defendants ask the Court to find the following facts undisputed:

     5.     There is no evidence which shows that BCSO deputies had a "custom" of using force in a manner which was unconstitutional, widespread, permanent, and well settled.

     6.     There is no evidence which shows that the County's use of force policies or customs were deliberately indifferent to Plaintiffs' Fourth Amendment rights against the use of excessive force.

MSJ ¶¶ 5-6, at 5.  J.H. disputes these facts:

     Defendants' facts 4-6 are disputed.  Plaintiffs do not dispute the language quoted by Defendants or the exhibit they cite.  However, Defendants' citation of a blanket policy related to the use of force is insufficient to support their contention that there is no material dispute of fact concerning the existence or absence of a policy which results in the violation of the rights of disabled children.

Response at 3.  Because J.H. did not specifically controvert proposed fact four -- i.e., BCSO's policies regarding deputies' use of force -- the Court deems it undisputed.  The County Defendants' fifth and sixth facts -- and J.H.'s responses to them -- focus on whether BCSO's policies are constitutional, which are legal conclusions and not facts.  Consequently, the Court will not adopt the County Defendants' fifth and sixth facts, and will instead resolve the relevant legal issues in its analysis.

transporting a subject is if the suspect is suffering from a disability or is overly large."  Response ¶ F, at 3 (setting forth this fact); id. ¶ P, at 6 (same); id. ¶ FF, at 10 (same).  See Reply at 2-6 (not disputing this fact); Tyler Depo. at 34:2-35:10 (Kennedy, Tyler).[9]

"During the period of time prior to and during the incident which gave rise to this lawsuit, BCSO maintained a policy regarding the manner in which it investigated and reviewed a deputy's alleged misconduct."  MSJ ¶ 8, at 7 (setting forth this fact).  See Response ¶ 8, at 4 (not disputing this fact); Bernalillo County Sheriff's Department, Rules and Regulations § 226 at 1-9 (effective May 22, 2012), filed July 30, 2013 (Doc. 95-4).  "During the period of time prior to and during the incident which gave rise to this lawsuit, BCSO maintained a series of policies imposing duties on BCSO commanders and supervisors to actively supervise the deputies in their chain of command."  MSJ ¶ 9, at 7-8 (setting forth this fact).  See Response ¶ 9, at 4 (not disputing this fact); Bernalillo County Sheriff's Department, Rules and Regulations § 103 at 1-3 (effective May 22, 2012), filed July 30, 2013 (Doc. 95-5); Bernalillo County Sheriff's Department, Rules and Regulations § 104 at 1-2 (effective May 22, 2012), filed July 30, 2013 (Doc. 95-6); Bernalillo County Sheriff's Department, Rules and Regulations § 105 at 1 (effective May 22, 2012), filed July 30, 2013 (Doc. 95-7).  "During the period of time prior to and during the incident which gave rise to this lawsuit, BCSO maintained a policy which required deputies to follow the law and the department rules and procedures."  MSJ ¶ 10, at 8 (setting forth this fact).  See Response ¶ 10, at 4 (not disputing this fact); Bernalillo County Sheriff's Department, Rules and Regulations § 106 at 1-3 (effective May 22, 2012), filed July 30, 2013 (Doc. 95-8).[10]

---

[9]Although the County Defendants do not contest this fact, the Court has modified it, because the testimony reflects that officers are required to handcuff all individuals who are being transported.  See Tyler Depo. at 33:25-34:3 (Kennedy, Tyler).

[10]The County Defendants ask the Court to find the following facts undisputed:

During the period before and during the incident which gave rise to this case, the BCSO

maintained the following policy regarding BCSO deputies who work as SROs:

**353 SCHOOL RESOURCE OFFICER (SRO) UNIT**

The School Resource Officer is a uniformed officer assigned to an APS middle school or high school in the unincorporated areas of Bernalillo County on a full-time basis.  The SRO will work in a problem-solving partnership with school officials, students, parents, and the community.  The SRO will provide a law enforcement resource aimed at reducing crimes and addressing issues that affect the safety and welfare of students, faculty, and staff personnel, on and around school campuses.  Some activities will extend to feeder (elementary) schools based on circumstances and practical needs.

---

11.    There is no evidence which shows that BCSO has a "custom" of failing to adequately supervise and investigate a BCSO deputy's alleged illegal seizure and use of excessive force which was unconstitutional, widespread, permanent, and well-settled.

12.    There is no evidence which shows that BCSO's policies or customs were deliberately indifferent to Plaintiffs' Fourth Amendment rights against illegal seizure and the use of excessive force.

13.    There is no evidence which shows that BCSO's supervision of Deputy Sharkey was unconstitutional or otherwise fails to identify this deputy's misconduct and impose corrective action when appropriate.

14.    There is also no evidence which shows that BCSO had actual knowledge of prior civil rights violations by BCSO, including Deputy Sharkey, and failed to take corrective action.

. . . .

16.    There is no evidence which shows that BCSO's supervision of its deputies was deliberately indifferent to Plaintiffs' Fourth Amendment rights.

17.    There is no evidence which shows that BCSO's supervision of Deputy Sharkey was deliberately indifferent to Plaintiffs' Fourth Amendment rights.

MSJ ¶¶ 11-14, 16-17, at 8-9.  J.H. responds that these are not facts, but are instead legal issues which are "to be resolved by this litigation."  Response ¶ 13, at 6.  See Response. ¶¶ 11-14, 16-17, at 4-10.  The Court agrees with J.H.  Accordingly, the Court will not adopt these facts.

. . . .

**353-2 DUTIES AND RESPONSIBILITIES**

A.    The School Resource Officer will be a visible, active law enforcement figure on campus dealing with any law enforcement related issues.

B.    Will be a classroom resource for instruction in the following areas: Gang and Drug Resistance, safety programs, crime prevention, law enforcement-related education and other areas.

C.    Work closely with school principal(s), meeting at least on a weekly basis.

D.    Act as a communication liaison with law enforcement agencies; provide basic information concerning students on campus served by the officer.

E.    Gather information regarding potential problems such as criminal activity, gang activity, student unrest, and identify particular individuals who may be a disruptive influence to the school and/or students.  This information is then passed on to the appropriate school official or retained by the SRO for continued investigation.

F.    Take steps appropriate and consistent with a law enforcement officer's duty when a crime occurs.

G.    Refer students and their families to the appropriate agencies for assistance when a need is determined.

H.    Refrain from functioning as a school disciplinarian.

I.    Attend meetings of parent groups and faculty-wide in-service sessions.

J.    Be available for conferences with students, parents and faculty members to assist with problems related to law enforcement and crime prevention.

K.    Confer with the school administration to develop strategies to prevent or minimize dangerous situations on or near the campus.

L.      Promote citizen awareness of law enforcement efforts on campus to ensure the peaceful operation of school related programs and build support with students.

M.      Whenever possible, attend school functions or extracurricular school events.

N.      File police reports as required by local agency.

O.      Abide by school board policies, consult with and coordinate activities through the school principal.

P.      Remain fully responsive to the chain of command of the law enforcement agency in all matters related to employment.

Q.      SRO's are not to be assigned duties regularly assigned to school personnel such as lunchroom or hall duty.  Nothing should preclude an SRO from being available in areas where interaction with students is expected.

R.      When conducting formal police interviews on a school campus with a student, police personnel shall abide by department and school board policy concerning such interviews.

MSJ ¶ 7, at 5-7 (alterations in MSJ)(setting forth this fact).  See Bernalillo County Sheriff's Department, Rules and Regulations § 353 at 1-2 (effective May 22, 2012), filed July 30, 2013 (Doc. 95-3).[11]

_____

    [11]J.H. purports to dispute this fact:

        Defendants' fact 7 is disputed.  Plaintiffs do not dispute the language quoted by defendants or the exhibit they cite.  However, Defendants' citation of a blanket policy related to the School Resource Officers is insufficient to support their contention that there is no material dispute of fact concerning the existence or absence of a policy which results in the violation of the rights of disabled children.

Response ¶ 7, at 3-4.  J.H. does not controvert the proposed fact, but instead disputes an assertion that the County Defendants did not make in the proposed fact -- i.e., that "there is no material dispute of fact concerning the existence or absence of a policy which results in the violation of

"Bernalillo County Sheriff's Deputies who are placed in a school are not required to go through school resource officer training."  Response ¶ G, at 4 (setting forth this fact).  See Reply at 6-7 (not disputing this fact); Tyler Depo. at 7:20-8:1 (Kennedy, Tyler).  "[SROs] are not required to be trained in the Americans with Disabilities Act."  Response ¶ H, at 4 (setting forth this fact).  See Reply at 6-7 (not disputing this fact); Tyler Depo. at 10:16-20 (Kennedy, Tyler).  "[SROs] are not given any instruction on how to deal with children with disabilities in the education setting beyond the standard departmental training."  Response ¶ J, at 4 (setting forth this fact).  See Reply at 6-7 (not disputing this fact); Tyler Depo. at 11:16-12:1 (Kennedy, Tyler).

> [A]ccording to Children, Youth and Families Department (CYFD) Juvenile Probation Officer Martha Todd, law enforcement officers (including Bernalillo County Sheriff's Deputies) are constantly making decisions to arrest, handcuff and transport children to the detention center unnecessarily and often for the purpose of punishing or intimidating them even after being informed many times by Ms. Todd that such actions serve no legitimate governmental purpose.

Response ¶ 11, at 4-5 (setting forth this fact)(internal quotation marks omitted).  See Deposition of Martha Todd at 23:12-25:16(Kennedy, Todd)(taken June 10, 2013), filed August 16, 2013

---

the rights of disabled children."  Response ¶ 7, at 3-4.  Because J.H. did not specifically controvert the proposed fact, the Court deems it undisputed.

    J.H. asks the Court to find undisputed:

> The deposition of testimony of Captain Tyler, Juvenile Probation Officer Todd, and Jeannie Masterson, the Head of the Juvenile Probation Department in Albuquerque, demonstrate that Bernalillo County brass had actual knowledge of alleged constitutional and statutory violations associated with the arrests and transportation of children for minor offenses as the result of unbridled officer discretion and that the county has done nothing to correct its Deputies' behaviors.  **Exhibit A:** 29:8-21; **Exhibit B:** 66:12-67:14; **Exhibit E:** Deposition of Jennie Masterson, Head of the Juvenile Probation Department at 13:8-22; 67:7-69:11.

Response ¶ 14, at 8.  The Court will not adopt the proposed fact, because J.H. asks the Court to draw a legal conclusion from the cited testimony -- i.e., that Bernalillo County "brass" had actual knowledge of alleged constitutional and statutory violations regarding the arrest and transportation of children for minor offenses.

- 14 -

(Doc. 101-2)("Todd Depo."); id. at 66:12-67:14 (Kennedy, Todd).[12]   "[T]he School Resource

Officer Sergeant is responsible for signing off on police reports involving the work of school

---

[12]The County Defendants also ask the Court to find undisputed that, "[p]rior to the incident involving Plaintiffs, neither the BCSO Internal Affairs Unit nor any BCSO supervisors had found that Deputy Sharkey's arrest or use of force violated the U.S. Constitution, BCSO's policies or procedures, including BCSO's arrest and use of force policy."   MSJ ¶ 15, at 9.   J.H. disputes this proposed fact, stating:

> Plaintiffs are without sufficient information to respond to Defendants' fact 15 and therefore dispute it.   Defendants control Defendant Sharkey's personnel files and have violated summary judgment procedure by failing to support their asserted fact.   Fed. R. Civ. P. 56(C)(1)("A party asserting that a fact cannot be or is genuinely disputed must support the assertion"); D.N.M.LR-Civ. 56.1(b)("The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies.").

Response ¶ 15, at 8-9.   The County Defendants respond:

> Plaintiffs argue that County Defendants violated summary judgment procedure by failing to support their asserted facts with supporting evidence, citing Fed. R. Civ. P. 56(C)(1).   Plaintiffs failed to read the . . . rest of section C of Rule 56.   In pertinent part, Rule 56(C)(1)(A)(2) states that the moving party may assert a fact by stating that "an adverse party cannot produce admissible evidence to support the fact."   Fed. R. Civ. P. 56(C)(1)(A)(2).   This is exactly how Undisputed Material Facts No.s 15, 18, 23, 24, and 25 are phrased.

> Next, Plaintiffs argue that County Defendants'[] failure to disclose certain documents (Defendant Sharkey's personnel, internal affairs, and training files) violates Rule 56.   However, a review of the discovery in this case reveals that Defendant Officers long ago offered to produce the material which Plaintiffs claim that only Defendants control.   On September 6, 2012, Defendant Officers served Plaintiffs' counsel with Defendant Officers' Rule 26 Initial Disclosures.   In that pleading, Defendant Officers disclosed the following:   "Defendant Sharkey will produce Defendant Sharkey's training records as they are kept in the normal course of business and at a time and on a date which is mutually convenient for both parties."   Defendant Sharkey also stated the terms by which he would produce his personnel and Internal Affairs file.   Discovery in this case closed on June 6, 2013.   During the twelve (12) months that discovery was open, Plaintiffs never asked County Defendants to review Defendant Sharkey's personnel, internal affairs, and training files.

> According to Rule 34, "[a] party [in this case Defendant Officers] who produces documents for inspection shall produce them as they are kept in the

---

- 15 -

usual course of business . . . ." Fed. R. Civ. P. 34(b). As set forth above, County Defendant made Defendant Sharkey's training files available for inspection "as they are kept in the usual course of business." For reasons unknown, Plaintiffs never reviewed the training records identified in Defendant Sharkey's initial disclosures.

Reply at 8-9 (citations omitted).

The Court agrees with J.H. that the County Defendants did not comply with rule 56 by failing to support their asserted fact. Rule 56(c)(1) states:

> **(1)** **Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, <u>or that an adverse party cannot produce admissible evidence to support the fact</u>.

Fed. R. Civ. P. 56(c)(1). Contrary to the County Defendants' contentions, rule 56(c)(1) does not permit them to assert that a fact is undisputed because J.H. cannot offer evidence to contradict it. A plain-language reading of the rule makes the County Defendants' mistake clear. The clause that the County Defendants cite refers only to what a party may do to show that a fact is genuinely disputed. The pertinent sections of the rule, when taken together, read: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . showing that . . . an adverse party cannot produce evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Under the County Defendants' interpretation, the pertinent sections of the rule, when taken together, read: "A party asserting that a fact cannot be . . . genuinely disputed must support the assertion by . . . showing that . . . an adverse party cannot produce evidence to support the fact." Fed. R. Civ. P. 56(c)(1). If the rulemakers wanted to allow parties to assert that a fact is undisputed by showing that the adverse party cannot produce admissible evidence to contradict it, they would have used a word meaning the exact opposite of "support" -- <u>e.g.</u>, contradict, controvert, attack, challenge, etc. Because they did not use such a word, the only interpretation of the final clause of the rule that makes sense is that only a party arguing that a proposed fact is disputed because the adverse party cannot offer evidence to support the fact. <u>See</u> 9 C. Wright & A. Miller, <u>Summary Judgment: Fed. Law & Prac.</u> § 8.2 (2014)("Rule 56(a) provides that the motion's disposition depends upon whether there exists any "genuine dispute as to any material fact," and Rule 56(c)(1)(A) specifies that the determination of that question rests on the "materials in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.").

The Local Rules for the United States District Court for the District of New Mexico, use this interpretation, too.  The local rules explain that a Statement of Material Facts in a motion for summary judgment must "set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists.  The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies."  D.N.M.LR-CIV 56.1(b).

In any event, this discussion is largely academic in this case, because J.H. has not offered any evidence that BCSO ever concluded that Sharkey violated the United States' Constitution or BCSO regulations.  The Court has previously explained that, "[t]he party opposing a motion for summary judgment must 'set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'"  J.H. ex rel. J.P. v. Bernalillo Cnty., No. CIV 12-0128 JB/LAM, 2014 WL 6612060, at *27 (D.N.M. Nov. 19, 2014)(Browning, J.)(quoting Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990))(internal quotation marks omitted).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (quotation marks omitted)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).  Because J.H. bears the burden at trial of establishing that the Bernalillo County is liable under § 1983 -- which J.H. may satisfy by demonstrating that the County had a policy of perpetuating or being deliberately indifferent to deputies' constitutional violations -- she must offer evidence indicating that deputies engaged in unconstitutional conduct.  She has failed to do so.  Consequently, although the Court will not accept the County Defendants' proposed fact as undisputed, because they have not offered any evidence to support it, the Court ultimately reaches the same conclusion in its analysis.

The Court disagrees with J.H.'s argument that the County Defendants have failed to disclose Sharkey's personnel files.  The County Defendants correctly assert that Sharkey served J.H. with their Rule 26 Initial Disclosures on September 6, 2012.  See Certificate of Service, filed September 6, 2012 (Doc. 26)("Certificate").  Sharkey also disclosed that: "Defendant Sharkey will produce Defendant Sharkey's training records as they are kept in the normal course of business and at a time and on a date which is mutually convenient for both parties."  Defendant Sharkey Rule 26(a)(1) Initial Disclosures ¶ 2 , at 6, filed September 3, 2013 (Doc. 120-1)("Initial Disclosures").  In that disclosure, Sharkey also stated that, before producing his internal affairs and personnel files, he required reasonable assurances from J.H. that the information contained in them would remain confidential.  See Initial Disclosures ¶ 3, at 6-7.  It appears, however, that J.H. never asked for those records and never filed a motion to compel the production of those records.  See Reply at 9.  There is no evidence of such a request in the record, and it is telling that, although J.H. states in the Response that the County Defendants "control Defendant Sharkey's personnel files," she never says that she requested that

resource officers."  Response ¶ 11, at 4 (setting forth this fact).  See Reply at 1-12 (not disputing this fact); Tyler Depo. at 29:13-23 (Kennedy, Tyler).

### 2.      BCSO Reception and Assessment Center.

"Bernalillo County has in place a facility entitled the Reception and Assessment Center where sworn personnel may transport at-risk youth, including subjects pending charges or in custody in lieu of transporting them to the Juvenile Detention Center."  Response ¶¶ SS, at 15 (setting forth this fact).  See Bernalillo County Sheriff's Department, Rules and Regulations § 349 at 1 (effective May 22, 2012), filed August 16, 2013 (Doc. 101-7)("BCSO Rules § 349").[13] The Reception and Assessment Center "will provide intake services, a risk assessment, crisis

---

information.  Response ¶ 15, at 8.  Accordingly, the County Defendants did not violate any discovery rules or court orders by failing to produce Sharkey's personnel files.

   [13]Sharkey responds:

   Deputy Sharkey objects to Plaintiffs' additional facts lettered SS-YY.  Plaintiffs
   assert that an officer who arrests a juvenile is required to contact juvenile
   probation prior to transporting the child to the detention center.  In support of this
   assertion Plaintiffs cite to a BCSO SOP that become effective almost one year
   after the incident at issue.  This cannot serve to create a genuine dispute because
   this SOP was in effect after the date of J.P.'s arrest.  Moreover, even if Deputy
   Sharkey violated this SOP, the violation would not violate a clearly established
   right.

Reply at 11.  In short, Sharkey does not controvert the proposed facts themselves, but instead argues that they are irrelevant.
   Regarding Sharkey's effective-date argument, all of the BCSO policies in the record -- including those that the County Defendants have presented -- state an effective date of May 22, 2012.  It is unclear whether this date means that all of the policies were implemented on May 22, 2012, or if that was the last time that they were updated.  In any event, because the Court has allowed the County Defendants to introduce and rely on policies with an effective date of May 22, 2012, the Court sees no reason why it should prevent J.H. from doing the same.  Although the Court agrees with Sharkey that a violation of this BCSO SOP would not violate a clearly established constitutional right, it finds that these policies provide relevant background information.  Because Sharkey does not specifically controvert the proposed fact, the Court finds it undisputed.

intervention, and referral services for youth arrested or cited by law enforcement personnel for low-level criminal offenses." Response ¶¶ SS, at 15 (setting forth this fact). See BCSO Rules § 349 at 1.[14] The Reception and Assessment Center "will be utilized as an alternative to transporting eligible youth to the Juvenile Detention Center." Response ¶¶ TT, at 15 (setting forth this fact). See BCSO Rules § 349 at 2.[15] The facility "is staffed and open 24 hours a day, 7 days a week." Response ¶¶ UU, at 15 (setting forth this fact). See BCSO Rules § 349 at 2.[16] "The Reception and Assessment Center is in place because there is a high probability that juveniles arrested for minor offenses will not be housed in the Juvenile Detention Center and is meant to minimize the time that a Deputy is absent from his assigned patrol area (or in this case, school." Response ¶¶ VV, at 16 (setting forth this fact). See BCSO Rules § 349 at 2.[17]

"As applied to sworn deputies, use of the Reception and Assessment Center is discretionary and youth are not to be transported there who are uncooperative and behaving in an aggressive or threatening manner." Response ¶¶ WW, at 16 (setting forth this fact). See BCSO Rules § 349 at 2.[18] "Prior to transporting a youth to the facility, [BCSD] personnel WILL contact the Juvenile Detention Center/Booking at 342-3720 or 342-3721. Once contact is established with JDC, [the deputy] will determine the youth's eligibility status for the reception center." Response ¶¶ XX, at 16 (alterations in Response but not in BCSO Rules). See BCSO Rules § 349

---

[14]The Court addressed Sharkey's disputes with this fact in note 12, supra.

[15]The Court addressed Sharkey's sole dispute with this fact in note 12, supra.

[16]The Court addressed Sharkey's sole dispute with this fact in note 12, supra.

[17]The Court addressed Sharkey's sole dispute with this fact in note 12, supra.

[18]The Court addressed Sharkey's sole dispute with this fact in note 12, supra.

at 2.[19]  "As with any other arrest of a minor, all arrest reports will still be faxed to the appropriate location as outlined in departmental policies and procedures."  Response ¶¶ YY, at 16 (setting forth this fact).  See BCSO Rules § 349 at 2.[20]

### 3.    Department of Justice Training Materials on Juveniles.

"The United States Department of Justice, Office of Community Oriented Policing Services has stated that School Resource Officers need to be trained to apply juvenile statutes and case law prior to being placed in schools."  Response (setting forth this fact).  See Community Oriented Policing Services, United States Department of Justice, A Guide to Developing, Maintaining, and Succeeding With Your School Resource Officer Program at 9 (no date provided), filed August 16, 2014 (Doc. 101-8)("DOJ Guide").[21]  The DOJ Guide also says that, "[i]n addition, [agencies should] consider training new SROs in child development and psychology; handling especially difficult students; the policies, procedures, and culture of the

---

[19]The Court addressed Sharkey's sole dispute with this fact in note 12, supra.

[20]The Court addressed Sharkey's sole dispute with this fact in note 12, supra.  In her factual section, J.H. also quotes several sections of New Mexico law -- specifically, the Children's Code and Delinquency Act, N.M. Stat. Ann. §§ 32A-1-1 to 32A-2-33.  See Response ¶¶ OO-RR, at 14-15.  As Sharkey correctly objects, see Reply at 10-11, this tactic is not appropriate, as it does not lay out facts in the relevant sense of the term.  See Fed. R. Civ. P. 56(c)(1); Davis v. United Student Air Funds, Inc., 45 F. Supp. 2d 1104, 1106 (D. Kan. 1998)(concluding that statements of law contained in a motion's statement of facts are more appropriately considered in the movant's argument).

[21]Sharkey responds: "Deputy Sharkey objects to Plaintiffs' additional facts lettered ZZ-BBB.  Nothing in this document suggests that it is a comment on the policies, customs, or training of the Bernalillo County Sheriff's Department."  Reply at 11 (citation omitted).  Sharkey does not specifically controvert the proposed fact, but instead argues that it is irrelevant.  The Court disagrees.  While the Court has concluded that the Fourth Amendment does not impose a different standard on officers who arrest or use force against developmentally disabled children, if the Court is incorrect, these policies would be relevant for J.H.'s municipal liability claim to establish the training and policies that Bernalillo County would need to have in place to teach officers how to avoid such constitutional violations.  Consequently, the Court finds these facts undisputed and relevant to this case.

schools to which they will be assigned; and the preparation of safe school plans."  Response ¶ AAA, at 16 (setting forth this fact)(quoting DOJ Guide at 10)(modification in Response but not in DOJ Guide)(internal quotation marks omitted).  See DOJ Guide at 10. [22]

The DOJ Guide also states that "[s]chool Resource Officers need to be trained to deal with complex issues associated with enforcing the law in a school setting related to the search and seizure of minors, the interrogation of minors, child development and psychology and specifics involved in working with kids in schools."  Response ¶ BBB, at 17 (setting forth this fact).  See DOJ Guide at 122. [23]   Finally the DOJ Guide explains that

> [t]raining can help SROs to unlearn some of the techniques they became accustomed to using on patrol duty that are not appropriate in dealing with students -- for example, resorting too quickly to using handcuffs or treating misconduct as part of a person's criminal make-up when in a student the behavior may be an example of youthful ebullience, indiscretion, immaturity, or risk taking.

Response ¶ BBB, at 16 (setting forth this fact)(quoting DOJ Guide at 122)(emphasis in Response but not in DOJ Guide)(internal quotation marks omitted).  See DOJ Guide at 122. [24]

### 4.    Sharkey's Training.

"Prior to the incident which gave rise to this lawsuit, BCSO provided Deputy Sharkey with such training on how to serve as a [SRO]."  MSJ ¶ 19, at 9 (setting forth this fact).  See NASRO School Resource Officer National basic SRO Course Certificate, filed July 30, 2014

---

[22]The Court disposed of the County Defendants' sole dispute with this fact in note 21, supra.

[23]The Court disposed of the County Defendants' sole dispute with this fact in note 21, supra.

[24]The Court disposed of the County Defendants' sole dispute with this fact in note 21, supra.

(Doc. 95-9).[25]   During the National Basic SRO Course, Sharkey received training on the following topics:

Foundations of School Based Law Enforcement
- Early Years
- Successful SRO Programs
- Schools Today
- National Recognition of SRO programs
- National Association of School Resource Officers
- NASRO Recognized Model Programs
- What is a School Resource Officer

The TRIAD Components
- Role: Teacher/Guest Speaker
- The Learning Process
- Effective Presentations
- Law Related Education

Role: Informal Counselor
- Effective Communication in Schools
- Adolescent Emotional Issues
- Drugs, Alcohol, and Addictive Behavior
- Dysfunctional Families
- Special education and Student Rights

Role: Law Enforcement
- School Law
- School Safety
- Crime Prevention
- Critical Incident, Management

MSJ ¶ 20, at 9-10 (setting forth this fact).  See Basic School Resource Officer Course Manual at

3 (dated March 2007), filed July 30, 2007 (Doc. 95-10)("SRO Course Manual").[26]  "During the

---

[25]J.H. responds that the "Plaintiffs do not dispute Defendant's fact 19 insofar as it alleges that Defendant Sharkey was provided with a certificate stating that he completed School Resource Officer training."  Response ¶ 19, at 11.  Because J.H. does not specifically controvert the proposed fact, the Court finds it undisputed.

[26]J.H. responds: "Plaintiffs do not dispute Defendant's fact 20 insofar as it alleges that Defendant Sharkey was to be trained in accordance with the National Basic SRO training course

National Basic SRO Course, Deputy Sharkey learned about Special Education and a student's rights under Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g."  MSJ ¶ 21, at 10 (setting forth this fact).  See SRO Course Manual at 90-91.[27]  "[W]hile [Sharkey] may have been aware of the special education and certain statutory provisions, he was not trained or told to modify his behavior as a School Resource Officer when confronted with a child who was subject to their provisions."  Response ¶ 21, at 11 (setting forth unmodified version of this fact).  See Reply at 1-9 (not disputing this fact); Deposition of John Matthew Sharkey at 8:7-10:19 (Kennedy, Sharkey)(taken July 30, 2013), filed August 16, 2013 (Doc. 101-3)("Sharkey Depo.").[28]

> Defendant Sharkey and other Bernalillo County School Resource Officers have no knowledge of whether a child they arrest will be housed at the Juvenile Detention Center and is not fully aware of the booking process for juveniles or how a risk assessment is employed to determine whether a child is subject to custody pursuant to the Delinquency Act, NMSA 1978, Sections 32A-2-1 through 32-A-33.

Response  ¶ Q, at 6 (setting forth this fact).  See Reply at 6-7 (not disputing this fact); Sharkey Depo. at 42:24-44:1 (Kennedy, Sharkey); Video Deposition of Raymond Casalduc at 139:19-

---

in order to receive his SRO certificate."  Response ¶ 20, at 11.  Because J.H. does not specifically controvert this proposed fact, the Court finds it undisputed.

[27]J.H. purports to disputes this fact by stating:

> Defendants' fact 21 is disputed.  Defendant Sharkey's own testimony indicates that, while he may have been made aware of the special education and certain statutory provisions, he was not trained or told to modify his behavior as a School Resource Officer when confronted with a child who was subject to their provisions.

Response ¶ 21, at 11.  Because J.H. does not specifically controvert this proposed fact, but instead offers an additional one, the Court finds the fact undisputed.

[28]The Court has modified this fact to replace "he" with "Sharkey" to make the quotation clearer.

140:25 (Kennedy, Casalduc); id. at 141:17-142:19 (Kennedy, Casalduc); id. at 146:15-147:10 (Kennedy, Casalduc), (taken July 29, 2013), filed August 16, 2013 (Doc. 101-5)("Casalduc Depo."). "Sharkey is aware of the Bernalillo County Reception and Assessment Center, where children may be transferred in lieu of transportation to the Juvenile Detention Center," but he has never used it. Response ¶¶ S-T, at 7 (setting forth these facts). See Reply at 7-8 (not disputing this fact); Sharkey Depo. at 45:23-47:1 (Kennedy, Sharkey). Sharkey agreed that "direct release to a child's parents may be an option in lieu of transportation to the Detention Center." Response ¶ U, at 7 (setting forth this fact). See Reply at 7-8 (not disputing this fact); Sharkey Depo. at 49:11-25 (Kennedy, Sharkey).[29]

---

[29]J.H. asks the Court to find undisputed that "[i]n his deposition Defendant Sharkey agreed that the Juvenile Detention Center's release of J.P. to J.H. had the same effect as if he had released J.P. to J.H." Response ¶ U, at 7. Although Sharkey did not dispute this fact, the testimony that J.H. cites does not support it. The testimony states:

> Q.    Well, she was released immediately essentially, and the time that she was in the detention facility was the time it took her mom to get down there to pick her up. So, I mean, I guess to the extent that your goal was to stop the law breaking behavior by putting her in a correctional facility wasn't accomplished I guess, I mean, because she's released right away to her mom?
>
> A.    To her mom, but she wasn't at Roosevelt Middle School any more. So I didn't have any concern of her attacking another teacher or another student. So it was stopped.
>
> Q.    Okay. Well, how about the option of releasing her to her mom from the school directly rather than taking her to the detention facility?
>
> A.    I -- that may be an option --

Sharkey Depo. at 49:11-25 (Kennedy, Sharkey).
Sharkey did not say that the Juvenile Detention Center's release of J.P. to J.H. had the same effect as if he had released J.P. to J.H. directly from the school; to say that something is "an option" is not to say that all options have the same effect. Accordingly, the Court will not find this fact undisputed.

> Defendant Sharkey did not know nor claims to have had any reason to ascertain whether J.P. had a disability prior to arresting her as whether a person he is investigating has a disability has no role in how he investigates or makes decisions to arrest, even though he claims to have been trained in the American Disabilities Act when he was being trained to become a School Resource Officer in 2010, and knows that there are certain accommodations that are made for students that have a disability.

Response ¶ II, at 10-11 (setting forth this fact)(citations omitted)(internal quotation marks omitted).   See Reply at 7-8 (not disputing this fact); Sharkey Depo. at 7:5-8:6 (Kennedy, Sharkey); id. at 8:10-13 (Kennedy, Sharkey).   "Defendant Sharkey has never been trained in de-escalation techniques relating to children with mental health issues or special needs."   Response ¶ GG, at 10 (setting forth this fact).   See Reply at 7-8 (not disputing this fact); Sharkey Depo. at 10:20-11:22 (Kennedy, Sharkey).

"Defendant Sharkey agreed that there's always a question of whether a child has the ability to form criminal intent, but, nonetheless, unilaterally determined that J.P., an emotionally disturbed 11-year-old, had the requisite criminal intent to commit the crime of Battery."   Response ¶ NN, at 13 (setting forth this fact).   See Reply at 7-8 (not disputing this fact); Sharkey Depo. at 56:2-57:20 (Kennedy, Sharkey); id. at 59:11-23 (Kennedy, Sharkey).

> Defendant Sharkey and other Bernalillo County School Resource Officers have no knowledge of whether a child they arrest will be housed at the Juvenile Detention Center and is not fully aware of the booking process for juveniles or how a risk assessment is employed to determine whether a child is subject to custody . . . .   Defendant Sharkey believes that taking a child to the detention center, even if they will not be housed there, is appropriate because it accomplishes the purpose of stopping law breaking behavior.   According to Defendant Sharkey, if a child is "at the detention center, then they're -- it's controlled."

Response ¶¶ Q-R, at 6-7 (setting forth this fact); Response ¶ KK, at 12 (same).   See Reply at 7-8 (not disputing this fact); Sharkey Depo. at 42:24-44:10 (Kennedy, Sharkey); Casalduc Depo. at

139:19-140:25 (Casalduc, Kennedy); id. at 141:17-142:19 (Casalduc, Kennedy); id. at 146:15-147:10 (Casalduc, Kennedy).

"Defendant Sharkey did not know wh[ether] . . . J.P. would be [considered a delinquent offender or a youthful offender] for the offense of battery under New Mexico law []or whether J.P. would be subject to detention if adjudged to have committed that offense."  Response ¶ V, at 7 (setting forth unmodified version of this fact).  See Reply at 7-8 (not disputing this fact); Sharkey Depo. at 69:21-25 (Kennedy, Sharkey).[30]  "Defendant Sharkey has never been trained as to whether a custodial arrest is proper in New Mexico for crimes that do not merit jail-time punishment (a non-jailable offense)."  Response ¶ W, at 7 (setting forth this fact).  See Reply at 7-8 (not disputing this fact); Sharkey Depo. at 71:5-23 (Kennedy, Sharkey).  "Defendant Sharkey has never been trained that if a child who is subject to the Individuals with Disabilities Education Act (IDEA) is to be prosecuted then their disciplinary records shall be transferred to the prosecuting agency pursuant to 20 U.S.C.A. Section 1415(K)(6)(B) . . . ."  Response ¶ X, at 7 (setting forth unmodified version of this fact).  See Reply at 7-8 (not disputing this fact); Sharkey Depo. at 77:1-16 (Kennedy, Sharkey).[31]  "Defendant Sharkey does not know, nor claims to ever have been trained, that the Juvenile Detention Center completes a risk assessment of a minor alleged to have committed a crime and, based on that score, that they are either released or housed in the facility."  Response ¶ Y, at 8 (setting forth this fact).  See Reply at 7-8 (not disputing this fact); Sharkey Depo. at 79:19-24 (Kennedy, Sharkey).  "Defendant Sharkey does not know, nor claims to ever have been trained, that he can place a call to the Juvenile Probation

---

[30]Although Sharkey does not dispute this fact, the Court has modified it to more accurately reflect the quoted testimony.  See Sharkey Depo. at 69:21-25 (Kennedy, Sharkey).

[31]Although Sharkey does not dispute this fact, the Court has modified it to remove J.H.'s quotation of 10 U.S.C. § 1415(K)(6)(B), because that is a legal authority and not a fact.

Office to attain a child's risk assessment score and thereby determine whether a child will be accepted for housing in a juvenile detention facility."  Response ¶ Z, at 8 (setting forth this fact).  See Reply at 7-8 (not disputing this fact); Sharkey Depo. at 79:6-13 (Kennedy, Sharkey) id. at 79:25-80:3 (Kennedy, Sharkey).[32]

## PROCEDURAL BACKGROUND

J.H., acting on J.P.'s behalf, commenced this lawsuit in New Mexico state court on December 5, 2011; Sharkey's co-Defendants removed the case to federal court on February 9, 2012.  See Notice of Removal (Doc. 1).  On June 28, 2013, J.H. filed the Plaintiffs' Second Amended Complaint for Recovery of Damages due to Deprivation of Civil Rights and Rights Under the Americans with Disabilities Act ¶ 48, at 6, filed June 28, 2013

---

[32]The County Defendants ask the Court to find the following facts undisputed:

22.     There is no evidence which shows that BCSO failed to train its deputies, including Deputy Sharkey, regarding the Fourth Amendment standards by which a deputy may arrest a citizen.

23.     There is no evidence which shows that BCSO failed to train its deputies, including Deputy Sharkey, regarding the Fourth Amendment standards by which a deputy may use force against a citizen.

24.     There is no evidence which shows that the training which BCSO provided its deputies was conducted in a manner which is unconstitutional or otherwise fails to instruct the deputies regarding the standards set by the Fourth Amendment regarding the law of arrest and the use of force.

25.     There is no evidence which shows that BCSO's training of its deputies, including Deputy Sharkey, was deliberately indifferent to Plaintiffs' Fourth Amendment rights against illegal seizure and the use of excessive force.

MSJ ¶¶ 22-25, at 10-11.  As the Court explained in note 12, supra, rule 56 prohibits the County Defendants from asserting that a proposed fact is undisputed simply because the adverse party has not offered any evidence to contradict it.  Instead, rule 56 requires that a party offering an undisputed fact to point to evidence in the record supporting that fact.  See Fed. R. Civ. P. 56(c)(1).  Accordingly, the Court finds these facts unsupported.

(Doc. 85)("Complaint").    The Second Amended Complaint alleges, among other things, municipal liability claims against Bernalillo County for violating J.P.'s Fourth and Fourteenth Amendment rights.  See Complaint ¶¶ 66-69, at 11.  Specifically, the Complaint asserts that Bernalillo County established a policy and procedure of treating children like adults in arresting them at school and transporting them to jail.  See Complaint ¶ 67, at 11.  The Complaint contends that this policy is unreasonable and deliberately indifferent to the rights of children to be free of unreasonable seizures, and of unwarranted liberty deprivations, and to the right to a free and public education.  See Complaint ¶ 68, at 11.  The Complaint also argues that Bernalillo County had a policy of failing to train its officers in identification and treatment of mental health issues for children, and that this policy was the moving force behind Sharkey's failure to obtain medical treatment for J.P.  See Complaint ¶ 68, at 11.

### 1.    The MSJ.

The County Defendants filed the MSJ on July 30, 2013.  See MSJ at 1.  In the MSJ, the County Defendants ask the Court to grant summary judgment on J.H.'s municipal liability claim for three reasons.  See MSJ *passim*.  First, the County Defendants contend that there is no evidence that Bernalillo County established an official policy or an unofficial custom that caused Sharkey to allegedly unlawfully seize J.H. or use excessive force against her.  See MSJ 11-19.  The County Defendants assert that BCSO's official policy on arrests follows the Fourth Amendment, because it requires that officers have probable cause before they make an arrest. See MSJ at 14 (citing Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975)("[A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of a crime, and for a brief period of detention to take the administrative steps incident to arrest."); BCSO Regulations § 313 at 1.  The County Defendants argue that the BCSO's use-of-

force policy is also consistent with the Fourth Amendment, because it uses the excessive-force standard that the Supreme Court of the United States set forth in Graham v. Connor, 490 U.S. 385 (1989) -- i.e., whether the officer's actions were objectively reasonable in light of the surrounding facts and circumstances.  See MSJ at 15-17 (citing Graham v. Connor, 490 U.S. at 397).

The County Defendants contend that J.H. has not offered any evidence that Bernalillo County has a custom or practice of unlawfully arresting citizens or of using excessive force.  The County Defendants explain that, to establish an unconstitutional custom or practice, J.H. must show that BCSO deputies have unlawfully arrested individuals or used excessive force in a manner that is "widespread, permanent, and well-settled."  MSJ at 17 (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988))(internal quotation marks omitted).  The County Defendants assert that J.H. must show a history of widespread prior abuse that put Bernalillo County on notice that it must take corrective action to prevent similar misconduct in the future. See MSJ at 17 (citing Seamons v. Snow, 206 F.3d 1021, 1029 (10th Cir. 2009)(holding that, to impose liability for a § 1983 policy or custom claim, a policymaking official must have prior knowledge of a subordinate's misconduct); Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998)(concluding that, without evidence of prior misconduct, the county was not on notice that its training program was deficient)).  The County Defendants argue that, standing alone, Sharkey's alleged unlawful seizure and use of excessive force against J.P. is an insufficient basis for a § 1983 municipal liability claim.  See MSJ at 18.  Moreover, the County Defendants add, there is no evidence that BCSO had a custom of illegal arrests or using excessive force in a manner that was "widespread, permanent, and well-settled."  MSJ at 18.

Second, the County Defendants argue that J.H. has not presented any evidence to support her failure-to-train claim.  See MSJ at 20.  The County Defendants explain that, to hold a municipality liable under § 1983 for inadequate training, a plaintiff must show:

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city towards persons with whom the police officers come into contact; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

MSJ at 20 (quoting Allen v. Muskogee, 119 F.3d 837, 841-42 (10th Cir. 1997))(internal quotation marks omitted).  The County Defendants say that J.H. has not offered any evidence that Sharkey's training indicates that Bernalillo County was deliberately indifferent to people with whom its deputies come into contact.  See MSJ at 21.  The County Defendants point out that, to the contrary, BCSO trained Sharkey on a variety of topics, including the proper use of force and search and seizure law.  See MSJ at 21.  The County Defendants argue that J.H. has not shown that Sharkey's allegedly inadequate training caused him to violate J.P.'s Fourth Amendment rights.  See MSJ at 21.  According to the County Defendants, Sharkey's training was calculated to ensure that he followed the Fourth Amendment.  See MSJ at 21.

Third, the County Defendants assert that J.H. has not presented any evidence to support her failure-to-supervise claim.  See MSJ at 22-24.  The County Defendants say that, to hold a municipality liable under § 1983 for failure to supervise, a plaintiff must show that a supervisor directed or had actual knowledge and acquiesced to subordinates' constitutional violations.  See MSJ at 22 (citing Woodward v. City of Worland, 977 F.2d 1392, 1400 (10th Cir. 1992)).  The County Defendants contend that J.H. has not offered any evidence which suggests that Sharkey's supervisors were involved in his alleged unlawful seizure and excessive force against J.P. until after it had occurred.  See MSJ at 23.  The County Defendants assert that there is no evidence

- 30 -

which shows that Bernalillo County officials had actual knowledge of BCSO deputies' previous constitutional violations and failed to take corrective action.   See MSJ at 23.   The County Defendants point out:

> Prior to the incident involving Plaintiffs, neither the BCSO Internal Affairs Unit nor BCSO supervisors have found that Deputy Sharkey's arrests nor his use of force was excessive or violated the BCSO's policies or procedures.  No court, either federal or state, has found that any [of] Deputy Sharkey's arrests nor his use of force constituted excessive force, battery, or any other violation of federal or state law.  Moreover, no citizen or law enforcement officer has filed or otherwise presented a complaint to the BCSO's Internal Affairs Unit or to his supervisors regarding Deputy Sharkey's unconstitutional actions.

MSJ at 23-24.

### 2.     The Response.

J.H. responded to the MSJ on August 16, 2013.  See Response at 1.  In the Response, J.H. clarifies that "[i]t is not the presence of an unconstitutional policy or practice that caused Defendant Sharkey to offend J.P.'s constitutional sensibilities, but an utter lack thereof." Response at 1.  J.H. addresses six issues relating to her municipal liability claim.  See Response at 19-20.   First, she asserts that Sharkey and other BCSO SROs are not trained to deal with developmentally disabled children differently from fully competent adults.  See Reply.   Second, she argues that, although BCSO officials were consistently reminded that arresting and detaining children accused of delinquent acts serves no government purpose, they took no measures to correct such behavior or train against it.  See Response at 19.  Third, she points out that SROs are not required to be specially trained before placement in a school which serves developmentally disabled students.   See Response at 22.   Fourth, she contends that SROs have "unbridled discretion" to arrest developmentally disabled children and to transport them to the Juvenile Detention Center for manifestations of their disabilities.  See Response at 22.  J.H. points out that, given this discretion, SROs do not have to consider: (i) whether the children can form the

requisite intent for the crime of which they are accused; or (ii) the proper application of force against those children under the Fourth Amendment.  <u>See</u> Response at 22-23.  Fifth, J.H. asserts that Bernalillo County officials were aware of and acquiesced to BCSO SROs' failure to understand that developmentally disabled children have special Fourth Amendment rights because of the Children's Code and the ADA.  <u>See</u> Response at 22-23.  Sixth, J.H. argues that BCSO's training deficiencies and acquiescence to BCSO SROs' violation of developmentally disabled children's rights caused Sharkey to violate J.P.'s rights when he arrested her and transported her to the Juvenile Detention Center.  <u>See</u> Response at 22-23.

**3.  <u>The Reply.</u>**

The County Defendants replied to the Response on September 3, 2013.  <u>See</u> Reply at 1. In the Reply, the County Defendants advance four arguments.  <u>See</u> Reply *passim*.  First, the County Defendants argue that J.H. misconstrues Fourth Amendment law on arrests.  <u>See</u> Reply at 3.  The County Defendants contend that, under the Fourth Amendment, "the standard for assessing the legality of <u>all</u> arrests of <u>all</u> citizens is probable cause."  <u>See</u> Reply at 3 (emphases in original).  The County Defendants point out that there is no case which: (i) imposes a standard other than probable cause on officers who arrest developmentally disabled children; or (ii) requires officers to investigate developmentally disabled children's crimes differently than other individuals' crimes.  <u>See</u> Reply at 4.

Second, the County Defendants contend that J.H. misconstrues Fourth Amendment law on officers' use of force.  <u>See</u> Reply at 4.  In the County Defendants' view, under the Fourth Amendment, "the standard for assessing all use of force claims against all citizens is objective reasonableness."  Reply at 4 (quoting <u>Graham v. Connor</u>, 490 U.S. at 394)(internal quotation marks omitted).   The County Defendants assert that there is no case in which a court has: (i)

imposed a standard other than "objective reasonableness" on officers who use force against developmentally disabled children; (ii) required officers to try harder to resolve a situation with a developmentally disabled child than they would with other individuals; (iii) required officers to use less force against developmentally disabled children than they would with other individuals; or (iv) required officers to forgo the use of handcuffs with developmentally disabled children altogether.  Reply at 5 (citation omitted)(internal quotation marks omitted).

Third, the County Defendants argue that it is irrelevant whether BCSO trained Sharkey on how to properly handle J.P. and her specific disability.  See Reply at 6-7.  The County Defendants point out that Sharkey could not have known that J.P. suffered from Attention Deficit Hyperactivity Disorder ("ADHD") at the time of the incident, because Dr. King did not make her ADHD diagnosis until six months after the incident occurred.  See Reply at 6 (citation omitted). The County Defendants conclude: "Thus the existence of adequate policies or training to handle juvenile[s] with disabilities is not relevant here because Deputy Sharkey did not know of the existence of J.P.'s disabilities."  Reply at 7.

Fourth, the County Defendants argue that it is irrelevant whether their policies and customs followed the statutory provisions of the New Mexico law -- which provided that children who commit crimes are not to have adult consequences and are not to be subject to restraint and seclusion unless it is an emergency intervention.  See Reply at 7 (citing N.M. Stat. Ann. §§ 32A-2-2(A), 32A-6A-1, 32A-6A-4, 32A-6A-9).  The County Defendants explain that the Supreme Court has recognized that state law does not affect officers' liability under the Fourth Amendment.  See Reply at 8 (citing Virginia v. Moore, 553 U.S. 164, 176 (2008)("[W]arrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, . . . while States are free to regulate such arrests however they

desire, state restrictions do not alter the Fourth Amendment's [standards].")).   The County Defendants also point out that no court has held that the Fourth Amendment requires officers to comply with state law when arresting or using force against developmentally disabled children. See Reply at 7

### 4.      **The September 6, 2013, Hearing.**

The Court held a hearing on September 6, 2013.   See Transcript of Hearing (taken September 6, 2013)("Tr.").[33]  Although the hearing as a whole was lengthy -- because the parties addressed four summary judgment motions -- the parties only briefly discussed their arguments on the MSJ.  See Tr. at 75:1-81:20 (Court, Robles, Kennedy).  The County Defendants reiterated that the Fourth Amendment does not impose any special requirements for officers arresting or using force against children with developmental disabilities.  See Tr. at 75:19-77:8 (Robles).  The County Defendants argued that, moreover, J.H. cannot graft the New Mexico Children's Code and the Delinquency Act onto the Fourth Amendment to create such special requirements.  See Tr. at 78:1-79:4 (Robles).

In response, J.H. clarified that her municipal liability claim focuses on the absence of a policy rather than on the promulgation of an unconstitutional policy.  See Tr. at 79:5-13 (Court, Kennedy).  J.H. argued that Bernalillo County is placing police officers from the street in schools and telling the officers that they can do what they do on the street.  See Tr. at 78:14-17 (Kennedy).  In J.H.'s view, Bernalillo County's failure to train officers properly for the school setting -- including the IDEA, the New Mexico Children's Code, and the Delinquency Act -- is unconstitutional and leads to the deprivation of developmentally disabled children's rights.  See

---

[33]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

Tr. at 79:17-80:2 (Kennedy).   J.H. pointed out that Bernalillo County allows SROs to arrest children for anything they see on a school campus -- even "horseplay" like one child slapping another child in the back of the head.   Tr. at 80:2-6 (Kennedy).   J.H. contended that this unbridled discretion is "clearly not the intent of the constitution or the intent of state statute."  Tr. at 80:7-10 (Kennedy).   J.H. asserted that Bernalillo County is engaging in "a wholesale imposition of the adult criminal justice system into a juvenile population which is infused with people with disabilities."  Tr. at 80:19-22 (Kennedy).   J.H. argued that there is no government purpose in taking children to jail or putting them in handcuffs.   See Tr. at 80:23-25 (Kennedy). J.H. concluded her argument by noting that, although her municipal liability claim would go forward if the Court finds that her other constitutional claims are precluded by qualified immunity and does not reach the underlying constitutional violations, the claim would not go forward if the Court finds that there were no underlying constitutional violations.   See Tr. at 80:4-10 (Kennedy).   At the end of the hearing, the Court stated that the outcome of J.H.'s municipal liability claim would turn on the Court's decisions on the other claims.   See Tr. at 81:23-82:1 (Court).   The Court said that it was not inclined to write an opinion that focused solely on the clearly established prong, but instead wanted to address the underlying constitutional violations.   See Tr. at 82:1-9 (Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., No. CIV 11-0422 JB/KBM, 2013 WL 3462484, at

- 35 -

*23 (D.N.M. June 28, 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc.,
939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If
the moving party will bear the burden of persuasion at trial, that party must support its motion
with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it
to a directed verdict if not controverted at trial."  Celotex Corp v. Catrett, 477 U.S. at 331
(Brennan, J., dissenting)(emphasis in original).[34]  Once the movant meets this burden, rule 56
requires the nonmoving party to designate specific facts showing that there is a genuine issue for
trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts
showing that there is a genuine issue for trial as to those dispositive matters for which it carries
the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238,
1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir.
1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific
facts showing that there is a genuine issue for trial as to those dispositive matters for which it
carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A
party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to
particular parts of materials in the record, including depositions, documents, electronically stored
information, affidavits or declarations, stipulations (including those made for purposes of the

---

[34]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme
Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely
understood to be an accurate statement of the law.  See 10A C. Wright & A. Miller, Federal
Practice & Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four
decision, the majority and dissent both agreed as to how the summary-judgment burden of proof
operates; they disagreed as to how the standard was applied to the facts of the case.").

motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the Court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified-immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81.  The Supreme Court explained:

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at 586-87] (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

Applying this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), the Tenth Circuit explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

584 F.3d at 1312. "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[35]] explained that the blatant contradictions of the record

---

[35]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

must be supported by more than other witnesses' testimony[.]"  Lymon v. Aramark Corp., 728 F.

Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.  And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . .

> Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation.  If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

---

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, Lobozzo v. Colorado Department of Corrections, 429 F. App'x 707 (10th Cir. 2011), Johnson v. Sedgwick County Sheriff's Dep't, 461 F. App'x 756 (10th Cir. 2012), Grass v. Johnson, 322 F. App'x 586 (10th Cir. 2009), and Silvan West v. Briggs, 309 F. App'x 216 (10th Cir. 2009), have persuasive value with respect to material issues and will assist the Court in its preparation of this Memorandum Opinion.

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

that will serve as the foundation for answering the legal question before the court" before

inquiring into whether there are genuine issues of material fact for resolution by the jury.  584

F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir.

1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are

irrelevant to the qualified immunity analysis because that analysis assumes the validity of the

plaintiffs' facts").

### LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."  West v. Atkins, 487

U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or

reasonably should have known that their conduct would lead to the deprivation of a plaintiff's

constitutional rights by others, and an unforeseeable intervening act has not terminated their

liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal

connection is satisfied if [the defendants] set in motion a series of events that [the defendants]

knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).   The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.   See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is inapplicable to Bivens[36] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).   "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.   See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

### 1.     Color of State Law.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).   The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."   Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).   "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only

---

[36]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."   403 U.S. at 389.

because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." Jojola v. Chavez, 55 F.3d at 493. Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)). Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55 F.3d at 493. What constitutes the required real nexus, however, is not completely clear. As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

2.      __Individual Liability.__

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the
> officers only "would be liable for the harm 'proximately' or 'legally' caused by

their tortious conduct."   Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995).
"They would not, however, necessarily be liable for all of the harm caused in the
'philosophic' or but-for sense by the illegal entry."   Id.   In civil rights cases, a
superseding cause, as we traditionally understand it in tort law, relieves a
defendant of liability.   See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d
1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987),
abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . .
(1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment,

the Tenth Circuit has held that government actors "may be held liable if the further unlawful

detention and arrest would not have occurred but for their conduct and if there were no

unforeseeable intervening acts superseding their liability."   Martinez v. Carson, 697 F.3d at 1255.

The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable

Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the

Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest
> warrant and that they improperly enter without knocking and announcing their
> presence.  Once inside, they encounter the suspect, identify themselves, show him
> the warrant, and tell him that they are placing him under arrest. The suspect,
> however, breaks away, shoots and kills two of the officers, and is preparing to
> shoot the third officer when that officer disarms the suspect and in the process
> injures him.  Is the third officer necessarily liable for the harm caused to the
> suspect on the theory that the illegal entry without knocking and announcing
> rendered any subsequent use of force unlawful?  The obvious answer is "no." The
> suspect's conduct would constitute a "superseding" cause, see Restatement
> (Second) of Torts § 442 (1965), that would limit the officer's liability.  See id.
> § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility."   Trask v. Franco, 446 F.3d at 1047 (quoting William

Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in
> determining whether the intervening act relieves the actor from liability for his

antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

3.    **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'"  Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(internal alterations omitted).   Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."  Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.   The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution." <u>Ashcroft</u>

<u>v. Iqbal</u>, 556 U.S. at 676.  The Tenth Circuit in <u>Dodds v. Richardson</u> held:

> Whatever else can be said about <u>Iqbal</u>, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that <u>Ashcroft v. Iqbal</u> "does not purport to overrule

existing Supreme Court precedent," but stated that "<u>Iqbal</u> may very well have abrogated § 1983

supervisory liability as we previously understood it in this circuit in ways we do not need to

address to resolve this case." <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  It concluded that <u>Ashcroft</u>

<u>v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and personal

involvement analysis." <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  The Tenth Circuit, based on this

conclusion, set forth a test for supervisory liability under § 1983 after <u>Ashcroft v. Iqbal</u>:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

<u>Dodds v. Richardson</u>, 614 F.3d at 1199-1200 (citing <u>Summum v. City of Ogden</u>, 297 F.3d 995,

1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these

are distinct analytical prongs, never to be intertwined." <u>Dodds v. Richardson</u>, 614 F.3d at 1200

n.8.  Relying on the Supreme Court's opinion in <u>Board of County Commissioners v. Brown</u>, the

Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the

third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.   Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.   Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.   Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).   The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."   Dodds v. Richardson, 614 F.3d at 1200 n.8.   Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"   Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

## 4.   **Municipal Liability**.

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.   See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).   Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.   See Graves v. Thomas, 450 F.3d at 1218.   When a claim is brought against a municipality for failing to train its

officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).  Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  Oliver v. Woods, 209 F.3d at 1186.

### 1.      Investigative Detentions and Reasonable Suspicion.

An encounter that is not consensual may nevertheless be justified as an investigative detention.  An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).  Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth

Amendment.  First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."   Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001)(en banc), overruled on other grounds as recognized in United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion.   United States v. Winder, 557 F.3d at 1134.  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").  A police-citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest which probable cause or consent must support to be valid.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.  "The officer need not be

absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.  A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."   Terry v. Ohio, 392 U.S. at 29.   In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

The Tenth Circuit has recognized the doctrine in Terry v. Ohio of an investigative detention -- a "stop" -- and of a protective search -- a "frisk."

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1997)(citations omitted)).   The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment.   United States v. King, 990 F.2d at 1557.

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior. See 364 F.3d at 1194.  The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot.  See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect],

and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").  While many of the factors that the Tenth Circuit considered would not, without more, have given rise to reasonable suspicion, the combination of circumstances was sufficient.  See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night.  See 355 F. App'x at 227-28.  A truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk.  See 355 F. App'x at 228.  Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk.  See 355 F. App'x at 228.  The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused.  See 355 F. App'x at 228.  Not investigating any particular crime or suspected-crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled up behind the truck.  355 F. App'x at 228, 229.  Upon talking to the truck's driver, Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, he did not have a driver's license, and he had a gun and other items in his vehicle.  See 355 F. App'x at 227-29.  The Tenth Circuit found that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed and that the officer's "subjective characterization of his actions is irrelevant."  355 F. App'x at 229.  The Tenth Circuit, in an opinion written by the Honorable Michael R. Murphy, United States Circuit Judge for the Tenth Circuit, and joined by the

Honorable Mary Beck Briscoe, Chief Judge, and Robert H. McWilliams, Jr., Senior Judge, explained:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night. He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street. Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride. She refused, telling him she lived up the street. Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking. He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos. Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home. The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229. The Tenth Circuit did not require the officer to identify the particular crime of which the officer had reasonable suspicion or even to acknowledge having reasonable suspicion. The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian." 355 F. App'x at 229. The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur. See 355 F. App'x at 229.

In United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), the Tenth Circuit found reasonable suspicion based upon an officer's knowledge of the defendant's:

> (1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner

consistent with an attempt to find a route to flee; and, (5) approach to [a private] home's back door without conversing with the residents visible inside.

483 F. App'x at 417.  At the district court level, in ruling on the motion to suppress, the Honorable Martha A. Vazquez, United States District Court Judge for the District of New Mexico, had concluded that, because the defendant's conduct in standing outside a private residence and looking in "was consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance," the officer did not have reasonable suspicion at the time of the stop and should have waited longer to rule out innocent conduct.  483 F. App'x at 418 (quoting District Court Opinion at 19).  The Tenth Circuit disagreed, however, stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and often is -- consistent with innocent behavior."  483 F. App'x at 418.  The Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily innocent, because an Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling."  483 F. App'x at 417 (quoting Albuquerque Ord. § 12-2-21(B)).  The Tenth Circuit, thus, reversed Judge Vazquez' decision, disagreeing with her conclusion that the officer lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home." 483 F. App'x at 417.

    2.    **Arrests.**

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest.  An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  The general rule is that "the use of

- 54 -

firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person

has been placed under arrest.  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th

Cir. 1994).  See Florida v. Royer, 460 U.S. 491, 499 (1983).  The use of handcuffs, however,

does not always elevate a detention into an arrest.  See United States v. Albert, 579 F.3d 1188,

1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop.");

United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The

use of handcuffs . . . does not always elevate a detention into an arrest."); Pierre-Louis v. Schake,

No.  CIV  12-0527  JB/RHS,  2014  WL  1954783,  at  *44-49  (D.N.M.  Apr.  30,

2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing

the plaintiff, whom he suspected had recently assaulted a person on the side of the road by

threatening him with a gun).  "Inasmuch as an arrest exceeds an investigative stop's limited

scope or duration, it must be supported by probable cause."  United States v. Rodriguez, 836 F.

Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).  See Wilson v. Jara, 866 F. Supp. 2d 1270,

1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by

highly intrusive or lengthy search or detention.'"  (quoting Oliver v. Woods, 209 F.3d at 1185)),

aff'd, 512 F. App'x 841 (10th Cir. 2013).

    "Probable cause to arrest exists only when the 'facts and circumstances within the

officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in

themselves to warrant a man of reasonable caution in the belief that an offense has been or is

being committed.'"  United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting

United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358

U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding

of guilt . . . , it does require more than mere suspicion."  United States v. Morris, 247 F.3d 1080,

1088 (10th Cir. 2001)(internal quotation marks omitted).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer."  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations omitted)(internal quotation marks omitted).

### 3.    When a Detention Becomes an Arrest.

The Tenth Circuit has held that a police-citizen encounter which goes beyond the limits of an investigative stop is an arrest which probable cause or consent must support to be valid. See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances."  United States v. Perdue, 8 F.3d at 1462.

"The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"  United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest.  In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court had to determine whether the police involved transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car.  See United States v. Perea, 374 F. Supp. 2d at 976.  In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest.  See 374 F. Supp. 2d at 976.  The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at 974.  See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause); United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998)("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'").

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest.  'The use of guns in connection

with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" United States v. Perea, 374 F. Supp. 2d at 974.  See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers did not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when they suspected that the defendant had "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards").  Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs.  See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents.").  United States v. Perea was one of those unique cases, because the police had reasonable cause to believe that the person whom they were detaining was the suspect whom they sought to arrest -- a man wanted for murder whom, it was believed, might be armed and dangerous.  See 374 F. Supp. 2d at 976.  The Tenth Circuit affirmed the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat.  The measures taken during a Terry stop must be reasonably

related in scope to the circumstances which justified the interference in the first place and may not go beyond what is necessary for officer safety. The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous. The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat. The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730 (citations omitted)(internal quotation marks omitted).

### 4.   Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay, 45 F.3d at 1476-77. Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]." Baptiste v. J.C. Penney Co., 147 F.3d at 1259. However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *49 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Cortez v. McCauley, 478 F.3d at 1121 n.18).

The Tenth Circuit confronted the issue when an officer must conduct further investigation before arresting an individual in Romero v. Fay. In that case, law enforcement officers interviewed two individuals -- Stella Gutierrez and Manuel Duran -- who implicated the plaintiff in a murder. See 45 F.3d at 1474. Approximately four hours later, without conducting additional investigation or obtaining a warrant, an officer arrested the plaintiff for murder. See 45 F.3d at 1474. After he was taken into custody, the plaintiff told the officer that he was innocent and that he had an alibi. See 45 F.3d at 1474. The plaintiff stated that three individuals would establish

that he was asleep at home when the murder occurred.  See 45 F.3d at 1474.  The officer refused the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little significance because they would lie to protect" the plaintiff.  45 F.3d at 1474.  The officer never interviewed the alibi witnesses.  See 45 F.3d at 1474.  The plaintiff was incarcerated for three months before the government dismissed the case and he was released.  See 45 F.3d at 1474.

The plaintiff brought a § 1983 action for, among other things, violations of his Fourth Amendment rights.  See 45 F.3d at 1474.  The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him.  See 45 F.3d at 1476.  The Tenth Circuit, in an opinion that Judge Baldock authored, and Judges Tacha and McKay joined, disagreed.  See 45 F.3d at 1476.  The Tenth Circuit stated that the Fourth Amendment requires officers to only "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention."  45 F.3d at 1476-77.  The Tenth Circuit determined that,

> [o]nce [the defendant] concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

In Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store surveillance; and (ii) watching a video of the surveillance footage on which the security officers relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen

anything.  See 147 F.3d at 1254-55.  The Tenth Circuit, in an opinion that Judge Murphy authored, and Judges Anderson and Logan joined, concluded that qualified immunity did not apply.  See 147 F.3d at 1257-59.  The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's conduct, "which was memorialized in its entirety on the videotape."  147 F.3d at 1257.  The Tenth Circuit stated that the police officers "viewed the very same conduct on the videotape, which this court has concluded failed to establish probable cause."  147 F.3d at 1257.  The Tenth Circuit held that, consequently, "it was . . . not reasonable for the officers to rely on the security guards' allegations."  147 F.3d at 1257.  The Tenth Circuit added that

> police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation. . . .  Here, [the defendants] did conduct some investigation by viewing the videotape and questioning [the plaintiff].  They argue, however, that they should be allowed to rely on the statement of the guards for probable cause to arrest.  Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

     In Cortez v. McCauley, officers responded to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her.  See 478 F.3d at 1113 (internal quotation marks omitted).  Without (i) interviewing the girl, her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of sexual assault; or (iii) waiting for the results of the child's medical examination, the officers arrested the boyfriend.  See 478 F.3d at 1113.  The Tenth Circuit, in an en banc opinion that Judge Kelly authored, explained that,

whether we view it as a need for more pre-arrest investigation because of insufficient information, . . . or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by [the defendant].   See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986)("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.  Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place.").  Based on the facts above, [the defendant] was arrested without probable cause.

478 F.3d at 1116 (footnotes omitted)(citations omitted).  The Tenth Circuit further held that

it was established law that "the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."  Romero, 45 F.3d at 1476-77 (footnote omitted); see also Baptiste v. J.C. Penney, Co., 147 F.3d . . . 1259 . . . ("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation.").  In the present case, witnesses were readily available for interviews, physical evidence was available, and a medical diagnosis was forthcoming.  Defendants, however, . . . conducted no investigation.  Instead, the Defendants relied on the flimsiest of information conveyed by a telephone call.

Cortez v. McCauley, 478 F.3d at 1117-18 (footnotes omitted)(citations omitted).  The Tenth Circuit concluded, therefore, that qualified immunity did not apply.  See 478 F.3d at 1118-22.

In Garcia v. Casuas, a detective with the City of Rio Rancho, New Mexico -- Monica Casuas -- arrested the plaintiff, Mitchell Garcia, for sexual penetration of a minor.  See 2011 WL 7444745, at *8.  The plaintiff was ultimately exonerated, and subsequently filed a § 1983 claim against the arresting officer and the City of Rio Rancho for, among other things, unlawfully arresting him in violation of his Fourth Amendment rights.  See 2011 WL 7444745, at *12.  The Court found that the officer had probable cause to arrest the plaintiff based on information gleaned from other officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Audrey Odom, and a witness at the scene on the night of the incident -- Jennifer Katz.  See 2011 WL 7444745, at *43-46.  Garcia argued that, by failing to re-interview Odom and Katz, and

instead choosing to rely on the other officers' interviews of them, Casuas "fail[ed] to interview
readily accessible witnesses."   2011 WL 7444745, at *15.   Garcia contended that, moreover,
Casuas should have known that failing to personally interview him, Odom, Katz, K.J., and Katz'
neighbors before arresting him violated his constitutional rights.  See 2011 WL 7444745, at *15.
Garcia argued that, had Casuas interviewed him before arresting him, she would have discovered
Katz' and Odom's motivations to lie.  See 2011 WL 7444745, at *15.

 Finding that the defendant's failure to conduct further investigation before arresting the
plaintiff did not constitute a Fourth Amendment violation, the Court explained:

>  Although Garcia cites Romero v. Fay and cases from several other circuits
> for the general proposition that officers must interview witnesses at the scene,
> Garcia points to no case law which would establish that, after the officers at the
> scene have interviewed witnesses, the Constitution requires the investigating
> detective to interview those witnesses again. . . .   Here, the responding police
> officers . . . interviewed every adult alleged to be involved in the incident and
> briefly spoke with K.J. . . .
>
>  Garcia also states that, if Casuas had investigated further, she would have
> known that there was no semen on the bedding, and she would have discovered
> Katz' and Odom's motivation if she spoke to him. . . .   The Tenth Circuit's
> discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion
> that Casuas was required to do more after [K.J.'s interview] solidified the
> existence of probable cause.  In Romero v. Fay, the Tenth Circuit held:
>
>> Plaintiff contends that regardless of whether the statements by Duran and
>> Guiterrez supplied probable cause for Defendant Fay to arrest Plaintiff,
>> under clearly established law a reasonable police officer would have
>> investigated his alibi witnesses before arresting him, and the exculpatory
>> information possessed by them would have negated the probable cause to
>> arrest. We disagree.
>
> 45 F.3d at 1466.  In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized
> that "officers are not required to conduct full investigations before making an
> arrest." 147 F.3d at 1257 n. 8.
> . . . .
>
>  These cases establish that Casuas was not required to speak to [Katz'
> neighbors], because they did not appear to be material witnesses.  Garcia has
> made no allegations and presented no facts suggesting that the neighbors were

ever around K.J.  Garcia has also not presented any facts demonstrating that [the neighbors] have shed light on the motivations of Katz or Odom.  Garcia only speculates that Casuas *might* have found something.  An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment.  In Romero v. Fay, the Tenth Circuit held:

> Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

. . . .

Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him.  When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. . . .  Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. . . . .  During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives.  The cases that Garcia cites establish only that the police may not ignore available material witnesses.  Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed.  Garcia presents no cases, and the Court could find none, suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses. . . .  Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination, because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it does not have the capabilities to detect the presence of urine in or on a substance . . . .

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect.  See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)).  The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview.  Casuas was not required to investigate further after that determination.

2011 WL 7444745, at *47-49.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227

(1991)(per curiam)).   "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1.  Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether

in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted)(internal quotation marks omitted). See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily"). Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails. See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional

question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 131 S. Ct. at 2031-32. See Kerns v. Bader, 663 F.3d at 1181.[37] "Courts should think carefully before

---

[37] In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:

>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the

Provisions of the Fourteenth Amendment." . . .   The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[38]   The Tenth Circuit will

---

litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level.");  Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.   Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).   See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[38]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in <u>Camreta v. Greene</u> about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff.  The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) <u>Reichle v. Howards</u>, 132 S. Ct. 2088 (2012); (ii) <u>Filarksy v. Delia</u>, 132 S. Ct. 1657 (2012); and (iii) <u>Messerschmidt v. Millender</u>, 132 S. Ct. 1235 (2012).  In <u>Reichle v. Howards</u>, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  <u>See</u> 132 S. Ct. at 2092, 2097.  In <u>Filarsky v. Delia</u>, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations.  <u>See</u> 132 S. Ct. at 1660, 1668.  In <u>Messerschmidt v. Millender</u>, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  <u>See</u> 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in <u>Groh v. Ramirez</u>, 540 U.S. 551 (2004), where it held that an officer unreasonably relied

remand a case to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

2.        **Clearly Established Rights in the Qualified Immunity Analysis.**

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905,

---

on a deficient warrant.  See 540 U.S. at 565.  The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken

- 73 -

beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."  Hope v. Pelzer, 536 U.S. at 741.

## ANALYSIS

The Court will grant the MSJ.  Because J.H. has not shown an underlying constitutional violation, her municipal liability claim cannot survive summary judgment.  To establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom and the injury alleged.  See Graves v.

Thomas, 450 F.3d at 121.  The Court has held, as a matter of law, that Sharkey did not violate

J.H.'s Fourth or Fourteenth Amendment rights when he arrested her and transported her to the

Juvenile Detention Center.  See Order at 1, filed March 31, 2014 (Doc. 139)(granting summary

judgment in favor of Sharkey on J.H.'s Fourth Amendment excessive-force claim); Unsealed

Memorandum Opinion at 168-183, filed July 8, 2014 (Doc. 152)(explaining the Court's rationale

for granting summary judgment in favor of Sharkey on J.H.'s Fourth Amendment excessive-

force claim); Order at 1, filed September 25, 2013 (Doc. 130)(granting summary judgment in

favor of Sharkey on J.H.'s Fourth Amendment unlawful seizure claim); Nov. 19, 2014, MOO at

107-136 (explaining the Court's rationale for granting summary judgment in favor of Sharkey on

J.H.'s Fourth Amendment unlawful seizure claim); Order at 1, filed September 12, 2013 (Doc.

128)(dismissing J.H.'s Fourteenth Amendment substantive due-process claim against Sharkey);

Memorandum Opinion, filed January 14, 2015 (Doc. 157)(explaining the Court's rationale for

dismissing J.H.'s Fourteenth Amendment substantive due-process claim against Sharkey).

Consequently, J.H. has not demonstrated the first element of a municipal liability claim -- that a

Bernalillo County employee committed an underlying constitutional violation.[39]   Without a

---

[39]The Court would not reach the same conclusion if it had decided J.H.'s Fourth and
Fourteenth Amendment claims based solely the clearly established prong of qualified immunity.
See Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993)("[A] finding of qualified
immunity does not shelter a municipality from liability.").  On remand in Kerns v. Board of
Commissioners, the Court explained that the Tenth Circuit's conclusion that the clearly
established prong of qualified immunity precluded the plaintiffs' claim against one of the
defendants in the case did not "impact the Court's decision that the Kerns were entitled to
summary judgment on the municipal liability claim against the Board of Commissioners of
Bernalillo County."  888 F. Supp. 2d at 1240.  The Court stated:

     In Cordova v. Aragon, 569 F.3d 1183 (10th Cir. 2009), the Tenth Circuit
     dealt with a similar situation.  The Tenth Circuit found that the officer was entitled
     to qualified immunity, because the law was not clearly established.  See Cordova
     v. Aragon, 569 F.3d at 1193.  It recognized, however, that "the same qualified
     immunity analysis does not apply to municipalities" and that, because it had

constitutional violation, the municipal liability claim fails.  See Jiron v. City of Lakewood, 392

F.3d 410, 419 n.8 (10th Cir. 2004)("[W]hen a finding of qualified immunity is based on a

conclusion that the officer has committed no constitutional violation -- i.e., the first step of the

qualified immunity analysis -- a finding of qualified immunity does preclude the imposition of

municipal liability.")(emphasis in original); Sanchez v. City of Albuquerque, No. CIV 12-1161

JB/KBM, 2014 WL 1953499, at *17 (D.N.M. Apr. 30, 2014)(Browning, J.)("Because Sanchez

has failed to establish that a municipal employee, specifically an Albuquerque police officer,

---

found "a genuine issue of material fact as to whether a constitutional violation occurred," it had to remand the case "unless we find that the Cordovas have failed to create a genuine issue of material fact as to whether a municipal policy or custom was the moving force behind the constitutional deprivation."  Cordova v. Aragon, 569 F.3d at 1193.  Thus, a court's finding that an officer is entitled to qualified immunity based on the clearly established prong, does not bar a finding of municipal liability.  The United States Court of Appeals for the Eleventh Circuit has similarly held that a finding of qualified immunity does not preclude municipal liability based on the alleged constitutional violation.  See Cooper v. Dillon, 403 F.3d 1208, 1223 (11th Cir. 2005).  There the Eleventh Circuit held:

> Because the statute's unconstitutionality was not clearly established prior to its enforcement, Dillon is entitled to qualified immunity . . . .  However, as a municipal officer with firm policymaking authority as to law enforcement matters, Dillon did expose the City of Key West to § 1983 liability by choosing to enforce the statute against Cooper.

Cooper v. Dillon, 403 F.3d at 1223.

> Accordingly, the Tenth Circuit's determination that White is entitled to qualified immunity does not affect the Court's determination that the Board of Commissioners for Bernalillo County were subject to municipal liability and its entry of summary judgment on Count VI in favor of the Kerns.  Count VI thus remains pending before the Court and awaits a trial on damages.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1240.  As the Court did not rely solely on the clearly established prong of the qualified immunity analysis in its resolution of J.H.'s constitutional claims against Sharkey, but instead addressed those claims' merits and determined that Sharkey did not violate J.H.'s constitutional rights, the Court's holding in Kerns v. Board of Commissioners would not preclude summary judgment in favor of the County Defendants on J.H.'s municipal liability claim.

violated his constitutional rights, his municipal liability claim must fail."); <u>Chavez v. Cnty. of Bernalillo</u>, No. CIV 13-0309 JB/LFG, 3 F. Supp. 3d 936, 948 (D.N.M. 2014)(Browning, J.)("Without a constitutional violation, the Court concludes that Chavez cannot maintain a municipal liability claim."); <u>Garcia v. Casuas</u>, No. CIV 11-0011 JB/RHS, 2011 WL 7444745 (D.N.M. Dec. 8, 2011)(Browning, J.)("[B]ecause Garcia failed to prove an underlying constitutional violation by Casaus, the City of Rio Rancho is entitled to summary judgment on Garcia's municipal liability."); <u>Lovelace v. Cnty. of Lincoln</u>, No. CIV 10-0763 JB/WPL, 2011 WL 2731179, at *14 n.6 (D.N.M. June 30, 2011)(Browning, J.)("Without an underlying constitutional violation, no municipal liability exists."). Consequently, summary judgment in favor of the County Defendants on J.H.'s municipal liability claim is appropriate.[40]

---

[40]The Court's resolution of the MSJ rests on its previous holding in this case that the Fourth Amendment does not impose a higher standard on officers arresting or using force against children with developmental disabilities. See Nov. 19, 2014, MOO at 109-21. If that conclusion is correct, BCSO's policies, customs, or practices -- which permit officers to treat developmentally disabled children the same as adults -- do not give rise to a municipal liability claim. If the Court's prior decision is incorrect, however, and the Fourth Amendment imposes a different standard on officers arresting and using force against children with developmental disabilities, J.H. likely has offered sufficient evidence for a reasonable jury to find in her favor on the municipal liability claim for three reasons. First, a reasonable jury could conclude that Sharkey did not treat J.P. any differently because of her developmental disability. See Nov. 19, 2014, MOO at 107-08 (explaining that Sharkey arrested J.H. because he believed he had probable cause that she had committed a crime). Second, a reasonable jury could conclude that Bernalillo County official policies on arrest and use of force do not instruct officers to treat children with developmental disabilities different than adults and the BCSO. See, e.g., BCSO Rules § 313 at 1 ("The Department shall arrest felony and misdemeanor violators of laws which its Deputies are empowered to enforce and to follow correct legal procedures required in arresting, booking, and filing charges against such violators."); BCSO Rules § 314 at 1 ("Deputies shall use only that force which is reasonably necessary to protect the sanctity of human life, preserve and protect individual liberties, and to effect lawful objectives."). Moreover, a reasonable jury could conclude that the BCSO did not train their deputies to modify their behavior when they are confronted with a developmentally disabled child. See, e.g., Sharkey Depo. at 11:18-22 (Sharkey)("I don't recall ever receiving any type of specific -- if there was an incident with a special needs child or a mental health issue with a student, specific, this is the steps you need to take to deescalate the situation."); DOJ Guide at 10 ("[Agencies should] consider training new SROs in child development and psychology; handling especially difficult

**IT IS ORDERED** that the County Defendants' Motion for Partial Summary Judgment No. IV: Dismissal of Plaintiffs' Municipal Liability (Policies, Customs, Patterns, and Practices), Failure to Train, and Supervisory Liability Claims, filed July 30, 2013 (Doc. 59), is granted.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph P. Kennedy
Shannon L. Kennedy
Laura Schauer Ives
Kennedy Kennedy & Ives, LLC
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Terri S. Beach
Miller Stratvert, P.A.
Albuquerque, New Mexico

--and--

Luis E. Robles
Marcus J. Rael, Jr.
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendants Bernalillo County and J.M. Sharkey*

---

students; the policies, procedures, and culture of the schools to which they will be assigned; and the preparation of safe school plans.").  Third, a reasonable jury could conclude that BCSO's policies and inadequate training -- which failed to instruct Sharkey that he must treat developmentally disabled children differently from other individuals when he arrests or uses forces against them -- caused Sharkey to violate J.P.'s constitutional rights.  Consequently, if the Court incorrectly decided that the Fourth Amendment does not impose a higher standard on officers arresting or using force against children with developmental disabilities, the County Defendants would not be entitled to summary judgment on J.H.'s municipal liability claim.

Jeremy K. Harrison
Megan Muirhead
Modrall Sperling Law Firm
Albuquerque, New Mexico

*Attorneys for Defendants Cee Kaye Nation and Alison Gonzales*